DAVID L. NEALE (SBN 141225)
TODD M. ARNOLD (SBN 221868)
ROBERT M. CARRASCO (SBN 334642)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: DLN@LNBYG.COM; TMA@LNBYG.COM; RMC@LNBYG.COM

Proposed Attorneys for Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>☐ ITTELLA INTERNATIONAL LLC,<br>a California limited liability company<br>☐ ITTELLA'S CHEF, LLC,<br>a California limited liability company<br>☐ TATTOOED CHEF, INC.,<br>a Delaware corporation<br>☐ MYJOJO, INC.,<br>a Delaware corporation<br>☐ NEW MEXICO FOOD DISTRIBUTORS, INC.,<br>a New Mexico corporation<br>☐ KARSTEN TORTILLA FACTORY, LLC,<br>a New Mexico limited liability company<br>☐ BCI ACQUISITION, INC.,<br>a Delaware corporation<br>☐ TTCF-NM HOLDINGS INC.,<br>a New Mexico corporation<br>☒ All Debtors<br><br>    Debtors and Debtors-in-Possession. | Lead Case No.: 2:23-bk-14154-SK<br><br>Jointly Administered with Case Nos.:<br>2:23-bk-14159-SK; 2:23-bk-14161-SK;<br>2:23-bk-14157-SK; 2:23-bk-14158-SK;<br>2:23-bk-14155-SK; 2:23-bk-14156-SK; and<br>2:23-bk-14160-SK<br><br>Chapter 11 Cases<br><br>**DEBTORS' NOTICE OF MOTION AND MOTION TO: (1) APPROVE AUCTION(S) AND BID PROCEDURES FOR THE SALE OF EQUITY AND/OR ASSETS AND (2) SET SCHEDULING FOR A MOTION TO APPROVE THE SALE OF EQUITY AND/OR ASSETS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF**<br><br>Hearing<br>  Date:       August 16, 2023<br>  Time:       9:00 a.m.<br>  Location:  Courtroom 1575<br>              255 East Temple Street<br>              Los Angeles, California 90012 |

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 22

I. STATEMENT OF FACTS ............................................................................... 22

    A.    BACKGROUND. ............................................................................. 22

    B.    THE DEBTORS' PRIMARY ASSETS. ............................................. 26

    C.    THE DEBTORS' PRIMARY SECURED CREDITOR AND THE NEED
        FOR A SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
        ASSETS. .......................................................................................... 26

    D.    THE DEBTOR'S PURSUIT OF A SALE OF SUBSTANTIALLY ALL
        OF ITS ASSETS AND THE PROPOSED AUCTION(S) AND BID
        PROCEDURES. ............................................................................... 27

II. DISCUSSION ............................................................................................... 29

    A.    THE BID PROCEDURES SHOULD BE APPROVED. ..................... 29

    B.    THE BREAK-UP FEE AND EXPENSE REIMBURSEMENTS
        SHOULD BE APPROVED. .............................................................. 32

    C.    THE SALE MOTION SCHEDULING SHOULD BE APPROVED. ... 34

CONCLUSION .................................................................................................. 35

DECLARATION OF EDWARD BIDANSET ...................................................... 36

DECLARATION OF MATT LOCASCIO .......................................................... 47

# **TABLE OF AUTHORITIES**

**FEDERAL CASES**

*In re 995 Fifth Ave. Assoc., L.P.,*
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) .......................................................... 33

*In re Atlanta Packaging Products, Inc.,*
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ........................................................ 31

*In re Chi-Chi's Inc.,*
    Case No. 03-13063 (Bankr. D. Del. November 4, 2003) ........................ 33

*Cottle v. Storer Communication* Inc.,
    849 F.2d 570 (11th Cir. 1988*)* ..................................................... 32, 33

*CRTF Corp. v. Federated Dept. Stores,*
    683 F. Supp. 422 (S.D.N.Y. 1988) .......................................................... 33

*In re Freedom Communications, Inc.,*
    Case No. 15-15311 (Bankr. C.D. Cal, Feb. 5, 2016 [Docket No. 371]) ................ 33

*In re Great Northern Paper, Inc.,*
    Case No. 03-10048 (Bankr. D. Me, February 18, 2003) ........................ 33

*In re Integrated Resources, Inc.,*
    147 B.R. 650 (S.D.N.Y. 1992) .................................................................. 33

*In re S.N.A. Nut Co.,*
    186 B.R. 98 (Bankr. N.D.Ill. 1995) ......................................................... 32

**FEDERAL STATUTES**

11 U.S.C.
    §§ 101 – 1532 .......................................................................................... 3
    § 327(A) ................................................................................................. 27
    § 363(b)(1) ............................................................................................. 29
    § 105(a) .................................................................................................. 29

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 6004(f) .................................................................................. 29

Local Bankruptcy Rule 6004-1 ......................................................................... 29

**PLEASE TAKE NOTICE** that the above-captioned bankruptcy court (the "<u>Court</u>") will conduct a hearing at the above-referenced date and time, via ZoomGov to consider this motion (the "<u>Bid Procedures Motion</u>")[1] by Ittella International LLC ("<u>Ittella</u>"), Ittella's Chef, LLC ("<u>ICLLC</u>"), Tattooed Chef, Inc. ("<u>TCI</u>"), Myjojo, Inc. ("<u>Myjojo</u>"), New Mexico Food Distributors, Inc. ("<u>NMFD</u>"), Karsten Tortilla Factory, LLC ("<u>Karsten</u>"), BCI Acquisition, Inc. ("<u>BCI</u>"), and TTCF-NM Holdings Inc. ("<u>TTCF</u>, and, together with Ittella, ICLLC, TCI, Myjojo, NMFD, Karsten, and BCI, the "<u>Debtors</u>"), the Chapter 11 debtors and debtors in possession in the above-captioned, jointly administered, Chapter 11 bankruptcy cases, pursuant to Federal Rule of Bankruptcy Procedure ("<u>FRBP</u>") 2002 and 6004 and Local Bankruptcy Rule ("<u>LBR</u>") 6004-1(b) and 9014-1, for the entry of an order:

(1)    approving the bid procedures (the "<u>Bid Procedures</u>") in substantially the form attached hereto as **Exhibit "1"** regarding the auction ("<u>Auction</u>") and sale of substantially all of the Debtors' assets (the "<u>Assets</u>")[2] listed in **Exhibit "A"** to the Bid Procedures, including, but not limited to, (a) TCI's equity interests (the "<u>U.S. Equity Interests</u>") in any of its direct subsidiaries (Myjojo, NMFD, Karsten, BCI and TTCF) and/or indirect subsidiaries (Ittella and ICLLC), (b) ICLLC's equity interests (the "<u>Italian Equity Interests</u>" and, with the U.S. Equity Interests, the "<u>Equity Interests</u>") in Ittella Italy SRL ("<u>Ittella Italy</u>"),[3] (c) goods, (d) equipment, (e) accounts

---

[1] *Pursuant to this Bid Procedures Motion, the Debtors are not seeking to sell any assets or to reject or assume and assign any executory contracts or unexpired leases.  At this juncture, the Debtors are only seeking approval of bid procedures regarding the auction of substantially all of their assets.  As discussed below, the Debtors will file a separate motion to approve the sale of any assets and to reject or assume and assign any executory contracts or unexpired leases.  Creditors and other parties in interest will have an opportunity to object to such separately filed sale motion.*

[2]  This Bid Procedures Motion is made without prejudice to the Debtors' ability to sell certain Assets outside of the Auction process, including, but not limited to, in the ordinary course of the Debtors' business. The "Approved Budget" as defined in the *Interim Order Granting Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cas Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Dkt. 77] (and together with any applicable final order, collectively, the "<u>DIP Order</u>") was premised on the sale of various assets outside the ordinary course of business as early as September 8, 2023. If necessary to avoid defaulting under the DIP Order, the Debtors, to the extent necessary, may seek emergency relief to approve sales of certain Assets outside of the Auction process.

[3] Ittella Italy is not a debtor in any bankruptcy proceeding in the United States.  However, Ittella Italy has commenced a proceeding in Italy to address outstanding creditor claims, which proceeding is governed by Italian law.  Pursuant to the Bid Procedures Motion and the Sale Motion (as defined below) that is to follow, the Debtors

receivable, (f) intellectual property, (g) goodwill, (h) customer lists, (i) any executory contracts ("Contracts") and/or unexpired leases ("Leases") designated by any winning bidder (each a "Winning Bidder") and/or any back-up winning bidder (each a "Winning Back-Up Bidder") for assumption and assignment (with any Contracts and/or Leases designated for assumption and assignment collectively referred to as "Designated Agreements"), and (j) any related assets included in any Qualified Bid (as defined below) but which Assets shall *not* include the Debtors' cash and any avoidance actions arising under 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"),[4] which Bid Procedures are summarized as follows:[5]

(a)    **Key Dates:**

| August 25, 2023, at 2:00 p.m. (prevailing Pacific time) | **Stalking Horse Bid Deadline** – Deadline for the submission of stalking horse bids (each a "Stalking Horse Bid") from Qualified Bidders (as defined below).<br><br>In order to have a Stalking Horse Bid considered, a prospective bidder must be a Qualified Bidder and do all of the following on or before the foregoing deadline:[6]<br><br>1.    Submit to (a) the Debtors' investment banker, SC&H Group, Inc. ("SCH"), Attn: Matt LoCascio (mlocascio@schgroup.com) and Ken Mann (kmann@schgroup.com), (b) the Debtors' proposed bankruptcy counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("LNBYG"), Attn: David L. Neale (dln@lnbyg.com), Todd M. Arnold (tma@lnbyg.com), and Robert M. Carrasco (rmc@lnbyg.com), (c) counsel to the Debtors' primary, senior secured creditor, UMB Bank, N.A. ("UMB"), Sheppard, Mullin, Richter & Hampton |

---

[4] are not seeking to sell any assets owned by Ittella Italy, only ICLLC's Italian Equity Interests in Ittella Italy. Due to exigencies arising due to Ittella Italy's pending Italian proceeding, there may be a separate, expedited sale of ICLLC's Italian Equity Interests in Ittella Italy.

[4] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

[5] This is a summary only. The Debtor is seeking approval of all of the Bid Procedures set forth in Exhibit "1" and, if approved by the Court, all of the Bid Procedures set forth in Exhibit "1" shall apply to the proposed Auction and sale of the Assets. To the extent there is any discrepancy between this summary and the actual terms of the Bid Procedures set forth in Exhibit "1," the actual terms of the Bid Procedures set forth in Exhibit "1" shall govern in all respects.

[6] The Debtors reserve the right to name and identify a Stalking Horse Bid earlier and to request modifications to bids to be accepted as Stalking Horse Bid(s).

LLP ("SMRH"), Attn: Kyle Mathews (KMathews@sheppardmullin.com), and (d) the members of any committee formed under Section 1102(a) or, when retained, counsel to any such committee ("Committee Counsel" and, with UMB, SMRH, and Committee Counsel, the "Consultation Parties") a signed asset purchase agreement (the "APA") in substantially the form attached hereto as **Exhibit "2,"**[7] with the only permissible revisions being the identity of the Qualified Bidder making the Stalking Horse Bid, the list of Assets to be purchased, the list of Designated Agreements to be assumed and assigned, and the bid price, which shall be separated into the amount to be paid for the Assets, *plus* the cure costs related to any Designated Agreements, which shall be paid by any Winning Bidder or Winning Back-Up Bidder in connection with the assumption and assignment of any Designated Agreements;

2.      Submit to the Debtors, SCH, LNBYG, SMRH and Committee Counsel all proof reasonably requested to determine whether the proposed bidder is financially qualified to timely close its Stalking Horse Bid under its APA, including the ability to, if required, (a) pay all cure amounts owed under any Designated Agreement and (b) provide adequate assurance of future performance as required by Section 365(b)(1) and (f)(2)(B); and

3.      Submit a deposit (each a "Deposit") via wire instructions to be provided on written request to SCH equal to 10% of the Stalking Horse Bid amount, with a minimum of $300,000[8] and a maximum of $1 million (the "Initial Deposit Requirement"), provided that (a) any Qualified Bidder making a further Stalking Horse Bid or Initial Bid (as defined below) before the Auction(s) shall increase its Deposit to meet the Initial Deposit Requirement, (b) any Winning Bidder must increase its Deposit to 10% of its final bid within 24 hours of the conclusion of the applicable Auction, and (c) Deposits shall be deemed non-refundable if (i) a bidder is deemed to be the Winning Bidder or a Winning Back-Up Bidder at the applicable Auction, (ii) the Debtors' proposed free

---

[7] The form APA will be filed with the Court and served on parties in interest served with the Bid Procedures Motion no later than seven (7) days prior to the hearing on the Bid Procedures Motion.

[8] SCH, in consultation with the Consultation Parties, may reduce the minimum deposit in the case of an auction of less than all of the Assets.

| | |
|---|---|
| | and clear sale of Assets to the Winning Bidder or a Winning Back-Up Bidder is approved by the Court, and (iii) the Winning Bidder or a Winning Back-Up Bidder fails to close as required by their APA and the order of the Court approving the proposed free and clear sale of Assets to the Winning Bidder or a Winning Back-Up Bidder. |
| | A Stalking Horse Bid received after the Stalking Horse Bid Deadline shall not be considered unless the Debtors and SCH, for good cause, consent, after consulting with the Consultation Parties[9]. |
| August 30, 2023, at 2:00 p.m. (prevailing Pacific time) | **Stalking Horse Bid Identification Deadline** – Deadline for (1) SCH, in consultation with the Consultation Parties, to identify accepted Stalking Horse Bids, including the Qualified Bidders that made such bids and the Assets subject to each Stalking Horse Bid, and (2) the Debtors to file notice of the foregoing with the Court. |
| | Only a Qualified Bidder whose Stalking Horse Bid has been accepted in writing will be entitled to receive a Break-Up Fee and Expense Reimbursement (both as defined below) and only provided that all requirements for the payment thereof have been satisfied. |
| September 5, 2023 | **Sale Motion Deadline** – Deadline for the Debtors to file a motion (the "Sale Motion") to approve (1) the sale of Assets free and clear of all liens, claims, and interests, (2) the assumption and assignment of Designated Agreements, which shall include a list of all Contracts and Leases that may be assumed and assigned and related cure amounts, and (3) related relief. |
| September 12, 2023 | **Sale Motion Objection Deadline** – Deadline for objections to the Sale Motion, other than in regard to (1) a sale of the Assets free and clear of all liens, claims, and |

---

[9]   Notwithstanding the foregoing, the Debtors will not consult with or provide copies of any bids or other confidential information with respect to particular Assets to any Consultation Party if such party is an active bidder for such Assets at the applicable time. For the avoidance of doubt, if UMB submits a bid for any Assets and thereby ceases to be a Consultation Party with respect to such Assets (for the avoidance of doubt, UMB and SMRH shall be Consultation Parties unless and until UMB submits a bid for any Assets and shall be Consultation Parties for any Assets that UMB is not actively bidding on), upon written notice by UMB or SMRH to the Debtors, or express confirmation on the record during the Auction, of UMB's withdrawal as a bidder for such Assets, UMB's and SMRH's rights as a Consultation Party shall be restored with respect to such Assets.

| | interests if the proposed sale price is less than all secured debt, and secured creditors have not consented to the proposed sale of Assets pursuant to the Sale Motion, (b) the assumption and assignment of Designated Agreements as to adequate assurance of future performance, but not as to cure amounts, for which this will be the deadline to object, and (c) a good faith finding with respect to the Winning Bidders ("Initial Sale Motion Objections"). |
|---|---|
| September 15, 2023 | **Deadline to Overbid Stalking Horse Bids** – Deadline for Qualified Bidders to submit to SCH Initial Bids (as defined below) overbidding the current Stalking Horse Bid(s). Promptly following SCH's receipt of each Initial Bid, SCH will share each such Initial Bid with the Consultation Parties.<br><br>An overbid to a Stalking Horse Bid received after the Deadline to overbid Stalking Horse Bids shall not be considered unless the Debtors and SCH, after consulting with the Consultation Parties, for good cause, consent.<br><br>**Deadline to Become a Qualified Bidder** – Deadline for any Potential Bidder to become a Qualified Bidder other than a Qualified Credit Bid (as defined below). |
| September 18, 2023, at 2:00 p.m. (prevailing Pacific time) | **Deadline for Notice of Qualified Bids**: Deadline for SCH, in consultation with the Consultation Parties, to identify to all Qualified Bidders: (a) each and every Initial Bid that SCH considers to be a Qualified Bid (as defined below) and (b) if more than one Qualified Bid has been timely received, the Qualified Bid(s) that will constitute the Opening Bid(s) (as defined below) at the applicable Auction, the Assets to which each Opening Bid applies, and the bidding order in which such Auction will be conducted. |
| September 19, 2023 | **Sale Motion Reply Deadline** – Deadline for the Debtors and any other parties in interest to reply to any Initial Sale Motion Objections. |
| September 19, 2023, at 10:00 a.m. (prevailing Pacific time) | **Auction(s)** – Auction(s) of the Assets to be held at the offices of LNBYG, which are located at 2818 La Cienega Avenue, Los Angeles, California 90034, with access available via Zoom with all Qualified Bidders to be provided with particulars in advance of the Auction(s), |

| | which shall be documented by a court reporter. |
|---|---|
| September 20, 2023 | **Sale Motion Supplement Deadline** – Deadline for (1) the Debtors to file supplement to Sale Motion describing the Auction(s), bids before and during the Auction(s), the Winning Bidder(s) and Winning Back-Up Bidder(s), any bases for a good faith finding under Section 363(m), Contracts and Leases to be assumed and assigned and/or rejected, and adequate assurance information regarding Designated Agreements that will be assumed and assigned (the "<u>Sale Motion Supplement</u>"), and (2) Winning Bidder(s) to file with the Court any documents or information required for a good faith finding under Section 363(m) and adequate assurance of future performance as required by Sections 365(b)(1) and (f)(2)(B). |
| September 22, 2023 | **Sale Motion Supplement Objection Deadline** – Deadline for objections to the Sale Motion and Sale Motion Supplement, only in regard to (1) a sale of the Assets free and clear of all liens, claims, and interests if the sale price is less than all secured debt, and secured creditors have not consented to the proposed sale of Assets pursuant to the Sale Motion, (b) the assumption and assignment of Designated Agreements solely as to evidence of adequate assurance of future performance, but not as to cure amounts, and (c) a good faith finding with respect to the Winning Bidder(s) ("<u>Supplemental Sale Motion Objections</u>"). |
| September 25, 2023, at 12:00 p.m. (prevailing Pacific time) | **Sale Motion Supplement Reply Deadline** – Deadline for the Debtors and any other parties in interest to reply to any Supplemental Sale Motion Objections. |
| September 27, 2023, at 9:00 a.m. (or such time thereafter as available to the court) (prevailing Pacific time) | **Sale Motion Hearing** – Hearing on the Sale Motion (the "<u>Sale Hearing</u>"). |
| Fifteen (15) days after the entry of an order of the Court granting the Sale Motion and approving the sale | **Closing Deadline** – Deadline for any Winning Bidder(s) to close the sale of Assets and the assumption and assignment of Designated Agreements and any related |

| | |
|---|---|
| of Assets and the assumption and assignment of Designated Agreements and any related transactions contemplated by the Sale Motion, provided that such order is final. | transactions contemplated by the Sale Motion. |

(b)    **Stalking Horse Bidder:** None as of the date hereof.    However, as discussed above in paragraph 1(a), the Debtors and SCH are seeking Stalking Horse Bids, there is a deadline for making Stalking Horse Bids, and the Debtors will provide notice of any accepted Stalking Horse Bids. Before selecting any Stalking Horse Bids, the Debtors will consult with the Consultation Parties.

(c)    **Minimum Price:** None as of the date hereof, but may be set by any Stalking Horse Bids as to some or all Assets.

(d)    **Due Diligence Access / Auction Participation Requirements:** Other than a Qualified Credit Bid, in order to make a Stalking Horse Bid or to otherwise participate in the Auction process as a bidder, a person or entity interested in purchasing some or all of the Assets (a "Potential Bidder") must deliver or have previously delivered to SCH all of the following documents (the "Participation Requirements"): (1) an executed non-disclosure agreement in the form provided by SCH; (2) a statement demonstrating a *bona fide* interest in purchasing some or all of the Assets; and (3) one of the following: (i) written evidence of readily available funds equal to the Potential Bidder's Stalking Horse Bid, any other Initial Bid (as defined below), and any increase the Potential Bidder desires to have authority to bid to, with SCH to keep all such information completely confidential, (ii) a firm, non-contingent commitment for financing sufficient for the Potential Bidder to timely consummate its purchase of such Assets and the assumption and assignment of any Designated Agreements, including the payment of required cure amounts if the Potential Bidder were to be designated as the Winning Bidder, or (iii) other sufficient information, which may include current audited financial statements and the latest unaudited financial

statements of the Potential Bidder and/or its equity holders, or such other form of financial disclosure and credit-quality support or enhancement that will allow SCH, in consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to timely consummate their purchase of such Assets and the assumption and assignment of any Designated Agreements, including the payment of required cure amounts.  Any Potential Bidder who has satisfied the foregoing Participation Requirements will be afforded, subject to the other provisions of the Bid Procedures, due diligence access and additional information through access to an online data room, as well as, upon reasonable advance notice, on-site visits and direct communication with management as the Potential Bidder desires and SCH determines to be appropriate under the circumstances and subject to the availability of such management.

(e)    **Bid Deadlines:** *See* paragraph 1(a) above regarding deadlines for Stalking Horse Bids, other Initial Bids, overbidding Stalking Horse Bids before the Auction(s), and the Auction(s).

(f)    **Bid Requirements:** Other than a Qualified Credit Bid (defined below), to be eligible to make a Stalking Horse Bid or overbid and prior to the Auction(s) (each an "Initial Bid"), each Initial Bid and each Potential Bidder submitting an Initial Bid (each, a "Bidder") must be determined by the Debtors and SCH, in consultation with the Consultation Parties, to have satisfied all of the conditions listed below (collectively, the "Bid Requirements"), most of which have been or will be incorporated into the APA to be used by Bidders making Initial Bids:[10]

1.    Signature.  The APA pursuant to which the Initial Bid is made, shall be signed by an authorized representative of the Bidder.

2.    Terms.  An Initial Bid shall identify which of the Assets the Bidder is making an Initial Bid upon, including any Designated Agreements to be assumed and

---

[10] This is only a summary of terms to be included in the APA.  To the extent there is any disagreement between this summary and the actual terms of the APA, the terms of the APA shall govern in all respects.

assigned to the Bidder.

3.      No Contingencies.    An Initial Bid shall include a provision providing that there are no conditions precedent to the Bidder's authority to consummate its purchase of the Assets bid upon, including any related assumption and assignment of Designated Agreements, other than entry by the Court of a final order approving the sale of Assets to the Bidder (the "Sale Order").

4.      Bid Requirements.    An Initial Bid shall set forth a cash purchase price for the Assets, which shall be separated into the amount to be paid for the Assets, *plus* the cure costs related to any Designated Agreements, which shall be paid by any Winning Bidder or Winning Back-Up Bidder in connection with the assumption and assignment of any Designated Agreements.    Without limiting the generality of the foregoing, an Initial Bid (a) may not be conditioned upon obtaining financing, any internal, regulatory, or other third party approvals, or on the outcome or review of due diligence, and (b) may not provide for a closing date (the "Sale Closing") that will be later than fifteen (15) days after the entry of an order of the Court granting the Sale Motion and approving the sale of Assets and the assumption and assignment of Designated Agreements and any related transactions contemplated by the Sale Motion, provided that such order is final.

5.      Irrevocable.    An Initial Bid shall include a provision providing that the offer made by the Bidder in its Initial Bid is binding and irrevocable until the conclusion of the Sale Hearing and such Initial Bid must continue to remain binding and irrevocable through the Sale Closing if the Initial Bid or any higher bid submitted by the Bidder at the applicable Auction is accepted by the Debtors at such Auction as the Winning Bid (as defined below) or the Winning Back-Up Bid (as defined below) and approved by the Court at the Sale Hearing.

6.      Identity of Bidder.    An Initial Bid shall fully disclose the identity of each entity or person that will be bidding for or purchasing the Assets, including all material equity holders (*i.e.*, parties that own at least 10% of the equity of the Bidder) in

the case of a Bidder that is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Initial Bid, and the complete terms of any such participation, including any agreements, arrangements or understanding concerning collaborative or joint bid or any other combination concerning the proposed Initial Bid.  An Initial Bid must also fully disclose any connection with or participation by any "insider" (as defined by Section 101(31)) of the Debtors or any relative or any affiliate of any "insider" of the Debtor.  An Initial Bid shall also fully disclose any connection with or participation by any current creditor or equity holder of the Debtors.

7.    Contact Information.  An Initial Bid shall include the names and contact information (including phone numbers and email addresses) of all authorized representatives of the Bidder who will be available to answer questions regarding the Initial Bid, including advisors and related parties.

8.    Deposit.  An Initial Bid shall include a provisions providing for a Deposit to be made concurrently with receipt of the Bidders Initial Bid via wire instructions to be provided on written request to SCH equal to 10% of the Stalking Horse Bid or other Initial Bid amount, with a minimum of $300,000[11] and a maximum of $1 million (i.e., Initial Deposit Requirement), provided that (a) any Qualified Bidder making a further Initial Bid before the Auction(s) shall increase its Deposit to meet the Initial Deposit Requirement, (b) any Winning Bidder must increase its Deposit to 10% of its final bid within 24 hours of the conclusion of the applicable Auction, and (c) Deposits shall be deemed non-refundable if (i) a Bidder is deemed to be the Winning Bidder or a Winning Back-Up Bidder at the applicable Auction, (ii) the Debtors' proposed free and clear sale of Assets to the Winning Bidder and/or a Winning Back-Up Bidder, as applicable, is approved by the Court, and (iii) the Winning Bidder and/or a Winning Back-Up Bidder, as applicable, fails to close as required by their APA and the

---

[11] SCH, in consultation with the Consultation Parties, may reduce the minimum deposit in the case of an auction of less than all of the Assets.

order of the Court approving the proposed free and clear sale of Assets to the Winning Bidder or a Winning Back-Up Bidder.

If a bid submitted at an Auction ("Bid"), including any Initial Bid, is determined to be the Winning Bid at such Auction and the Bidder who submitted such Winning Bid fails to timely close the sale for any reason other than the Court not entering a final Sale Order approving the Winning Bid, the Deposit shall become non-refundable and be forfeited to the Debtors.  The same shall apply to any Winning Back-Up Bid.  In the event the Winning Bidder fails to timely close the sale, the Winning Back-Up Bidder shall be notified in writing that it is now the Winning Bidder, and, if the Winning Back-Up Bidder fails to close its purchase within ten (10) days of having been notified that it was the Winning Bidder, unless the Winning Bidder and the Debtors (in consultation with the Consultation Parties) jointly agree to extend the sale closing date, the Winning Back-Up Bidder's Deposit shall become non-refundable and be forfeited to the Debtors.  All Deposits shall be held in a segregated account maintained by SCH and shall be returned (other than with respect to the Winning Bidder and the Winning Back-Up Bidder) promptly after the conclusion of the applicable Auction.

9.    Financing Sources.  An Initial Bid shall include written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed sale with appropriate contact information for such financing sources, with SCH, in consultation with the Consultation Parties, to determine whether such evidence of financing satisfies the bidding requirements and enables the Bidder to participate in the Auction(s), with such determination to be in SCH's sole and absolute discretion after consulting with the Consultation Parties.

10.    Break-Up Fees and Expense Reimbursements, and Termination Fees.  Any Qualified Bidder that makes a timely Stalking Horse Bid that has been accepted in writing by the Debtors (directly or through SCH) after consulting with the Consultation Parties shall be entitled to receive (a) a fee in an amount up to 2% of the amount bid for Assets subject to the Stalking Horse Bid (the "Break-Up Fee"), which

Break-Up Fee shall be calculated based only on the cash price bid for such Assets and *not* any cure amounts required by be paid by the Qualified Bidder in connection with the assumption and assignment of any Designated Agreements, and (b) up to $100,000[12] of actual, out-of-pocket professional fees and expenses incurred by the Qualified Bidder (the "Expense Reimbursement"), provided that any Break-Up Fee and/or Expense Reimbursement shall only be payable if the Qualified Bidder's timely Stalking Horse Bid accepted in writing by the Debtors (directly or through SCH) is overbid by a higher Winning Bid or Winning Back-Up Bid (both as defined below) that is accepted by the Debtors, approved by the Court pursuant to a final Sale Order, and closes.

Other than the foregoing, no other Bidders, including any Qualified Bidder that submits an Initial Bid that is not a Stalking Horse Bid, shall be entitled to receive any Break-Up Fee or Expense Reimbursement, and any Initial Bid, other than a Stalking Horse Bid timely submitted on or before the Stalking Horse Bid Deadline, must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and by submitting an Initial Bid, the Bidder waives the right to pursue a substantial contribution claim under Section 503 related in any way to the submission of its Initial Bid or its participation in the Auction(s).

(g) **Qualified Bidders and Qualified Bids:** Potential Bidders who have satisfied the Participation Requirements and Bid Requirements will be deemed "Qualified Bidders," and Initial Bids that meet all of the Bid Requirements described above will be deemed "Qualified Bids," in each case, only if the Debtors and SCH, in consultation with the Consultation Parties, conclude in the exercise of their business judgment, that such Initial Bid would be consummated if selected as the Winning Bid; provided, however, that, for avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors or SCH to their satisfaction, the Debtors and SCH, in consultation with the Consultation Parties, shall

---

[12] SCH, in consultation with the Consultation Parties, may reduce the Expense Reimbursement in the case of an auction of less than all of the Assets.

have right, in their sole and absolute discretion, to disqualify any Qualified Bidder and Qualified Bid, and such Bidder shall not be entitled to attend or otherwise participate in the Auction(s).

(h)    **Auction(s):** If no Qualified Bids are received then the Auction(s) will be deemed automatically cancelled unless the Debtors and SCH determine otherwise, in their sole and absolute discretion.  If only one Qualified Bid is received, there will be no Auction(s) and the Qualified Bidder will be deemed the Winning Bidder.  If more than one Qualified Bid is received, the Auction(s) will proceed as scheduled. The Debtors will have the right to conduct any number of Auctions on such date to accommodate Qualified Bids for certain, but less than all, of the Assets, in consultation with the Consultation Parties, that such process would be in the best interest of the Debtors' estates.

(i)    **Opening Bid at the Auction(s):** The Qualified Bid(s) determined by SCH and the Debtors, in consultation with the Consultation Parties, to constitute the highest and best Initial Bid(s) will serve as the opening bid(s) (the "Opening Bid(s)") at the Auction(s).  SCH will notify all Qualified Bidders in advance of the Auction(s) which Initial Bid(s) have been accepted as the Opening Bid(s) at the Auction(s) and the order in which the bidding at the Auction(s) will proceed.

(j)    **Conducting the Auction(s); Initial Overbid Amount, and Subsequent Overbid Amounts:** SCH and LNBYG, in consultation with the Consultation Parties, will direct and preside over the Auction(s).  At the start of each Auction, and after each Qualified Bidder acknowledges on the record that it has not engaged in any collusion with respect to the bidding, that its Initial Bid is a good faith *bona fide* offer, and that it intends to consummate the proposed transaction if selected as the Winning Bidder or the Winning Back-Up Bidder, SCH and LNBYG will identify, confirm and describe the Opening Bid(s).  The bidding will then ensue in the bidding order provided by SCH to all Qualified Bidders in advance of such Auction.  All Bids will be made and received in one room (or otherwise in the presence via Zoom, Webex or similar virtual means of all parties), on an open basis, and all Qualified Bidders and Consultation Parties will be entitled to be

present for all bidding with the understanding that the identity of each Qualified Bidder will be fully disclosed to all Qualified Bidders and Consultation Parties before such Auction and the material terms of each Qualified Bid submitted prior to such Auction, and all successive bids made at such Auction, will be fully disclosed to all Qualified Bidders and Consultation Parties.  All Qualified Bidders will be permitted to bid at such Auction based on what SCH and LNBYG determine to be an appropriate amount of time to respond to each prior submitted Bid.

Prior to each Auction, SCH will randomly assign to each Qualified Bidder a bidder number, except that the Qualified Bidder whose Initial Bid was accepted as the Opening Bid for a particular subset of Assets will be assigned bidder number 1.  Once the Opening Bid has been described by SCH and LNBYG, the bidding for the subject subset of Assets will then pass to Bidder number 2.  Bidder number 2 will have the option of submitting an overbid to the Opening Bid, passing, or dropping out of such Auction.  Once a Bidder drops out of such Auction, the Bidder will no longer be permitted to participate in the applicable Auction regarding the subject subset of Assets.  After Bidder number 2 either submits a qualifying overbid, passes, or drops out of such Auction, the bidding will then pass to Bidder number 3.  A Bidder may not pass on making a qualifying overbid more than twice during such Auction.  This process will apply to each subset of Assets and continue until only two Qualified Bidders are left for all or each subset of the Assets, in which case the Qualified Bidder who submits the highest Qualified Bid will be deemed the Winning Bidder at such Auction, and the Qualified Bidder who submits the second highest Qualified Bid (excluding any Qualified Credit Bid) will be deemed the Winning Back-Up Bidder at such Auction.

Except as expressly provided in the order approving the Bid Procedures or the provisions of the Bid Procedures, the Debtors and SCH, in consultation with the Consultation Parties, shall have the right to conduct the Auction(s) in the manner they reasonably determine, in the exercise of their business judgment, to be in the best interests of the Debtors' bankruptcy estates.  The Debtors and SCH, in consultation with the

Consultation Parties, shall also have the right to deviate from the Bid Procedures without the need for any further order of the Court if they reasonably determine, in the exercise of their business judgment, that doing so would be in the best interests of the Debtors' bankruptcy estates and is not inconsistent with any of the provisions of the Bankruptcy Code or any previously entered order of the Court including the order approving the Bid Procedures.

SCH and LNBYG, in consultation with the Debtors and the Consultation Parties, may (1) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer and (2) reject at any time any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtors or their bankruptcy estates; provided that, the highest, best, and otherwise financially superior offer shall be the Qualified Bid at the applicable Auction reasonably expected to result in the highest amount of money being paid to the Debtors for their purchase of the Assets.

(k)    **Initial Overbid Amount and Subsequent Overbid Amounts:** The initial overbid amount (each an "Initial Overbid Amount") after the accepted Stalking Horse Bid for each subset of Assets shall be higher than the accepted Stalking Horse Bid by (1) 3% of the cash price bid for such Assets (not including any cure amounts required by be paid under the Stalking Horse Bid in connection with the assumption and assignment of any Designated Agreements), plus (2) $100,000.

Each Bid after the initial overbid for each subset of Assets, shall exceed the prior overbid by $100,000[13] (each a "Subsequent Overbid Amount"), provided that the Debtors and SCH, in consultation with the Consulting Parties, shall have the right to adjust the Subsequent Overbid Amount in the manner they reasonably determine, in the exercise of their business judgment, to be in the best interests of the Debtors' bankruptcy estates.

---

[13] SCH, in consultation with the Consultation Parties, may reduce the bid increment in the case of an auction of less than all of the Assets.

(l)      **Special Rules Applicable to UMB Bank, N.A.:** As set forth in the DIP Order, unless a Challenge (as defined in the DIP Order) is timely and properly raised in accordance with the terms of the DIP Order, UMB has a valid, binding, perfected and enforceable first priority security interest in substantially all of the Debtors' Assets to secure the Lender Allowed Claim (as defined in the DIP Order) and the DIP Obligations (as defined in the DIP Order), subject to the subject only to (x) Excluded Assets (as defined in the DIP Order), (y) the Permitted Prior Liens (as defined in the DIP Order) and (z) the Carve-Out (as defined in the DIP Order).  Pursuant to Section 363(k) and the DIP Order, UMB shall have the right to credit bid all or any portion of the Lender Allowed Claim (as defined in the DIP Order) and the DIP Obligations (as defined in the DIP Order).  Notwithstanding anything to the contrary herein, UMB shall be deemed to be a Qualified Bidder and, subject to Section 363(k) and to UMB's compliance with the Bidding Procedures. UMB shall be deemed a Qualified Bidder, and any Bid submitted by UMB shall be deemed a Qualified Bid (a "Qualified Credit Bid").  UMB shall not be entitled to any Break-Up Fee, Expense Reimbursement, and/or any substantial contribution claim under Section 503 related in any way to the submission of a Stalking Horse Bid or any other Initial Bid, or its participation in the Auction(s).  UMB shall not be obligated to submit a Deposit with its Bid.  UMB shall have the right to credit bid even if it does not submit an Initial Bid or bid in earlier rounds.  The Qualified Credit Bid will not serve as a Backup Bid without the written consent of UMB. For the avoidance of doubt, any of the prepetition or post-petition obligations that are credit bid as part of a Qualified Credit Bid will be treated as cash consideration at the face amount of such obligations for the purposes of calculating whether such Qualified Credit Bid is the highest and best Bid. Except as otherwise provided herein, UMB shall be bound by all other terms of the Bid Procedures.

(m)      **Selection of Winning Bid and Winning Back-Up Bid:** The Auction(s) shall continue until there is one Qualified Bid for all of the Assets or for any subset of the Assets that the Debtors, SCH, and LNBYG in consultation with the Consulting Parties,

determine, subject to Court approval at the Sale Hearing, to be the highest and best bid (each a "Winning Bid") for all of the Assets or for any subset of the Assets, and another Qualified Bid to be the second highest and best bid (each a "Winning Back-Up Bid") for all of the Assets or for any subset of the Assets, at which point the applicable Auction will be deemed concluded.   The Debtors will not consider any Bids submitted after the conclusion of the applicable Auction.

Unless the Debtors, UMB and the applicable Winning Bidder jointly agree to an extension of the outside sale closing date, which will be in their sole and absolute discretion, the Winning Bidder(s) shall be required to close their purchase(s) of the Assets no later than fifteen (15) days after the entry of a final Sale Order granting the Sale Motion and approving the free and clear sale(s) of Assets and the assumption and assignment of Designated Agreements and any related transactions contemplated by the Sale Motion, provided that such order is final (the "Closing Date").   Any Winning Bidder that does not close the purchase it its Assets by the Closing Date will be deemed to have forfeited its Deposit to the Debtors.   Promptly following the closing of the sale(s) to the Winning Bidder(s), SCH shall return the Deposit of the relative Winning Back-Up Bidder(s) to the relevant Winning Back-Up Bidder(s).

If the Winning Bidder(s) fail to close their purchase by the Closing Date, unless the Debtors, UMB and the applicable Winning Bidder jointly agree to an extension of the outside Closing Date, which will be in their sole and absolute discretion, SCH shall so notify the relevant Winning Back-Up Bidder(s).   The relevant Winning Back-Up Bidder(s) will then have ten (10) days following the date of having been notified by SCH to close their purchase(s) of Assets.   If a Winning Back-Up Bidder fails to close its purchase of Assets within this time period, unless the Debtors (after consulting with the Consultation Parties) and the relevant Winning Back-Up Bidder mutually agree, in their sole and absolute discretion, to extend the Closing Date, the relevant Winning Back-Up Bidder will be deemed to have forfeited its Deposit to the Debtors.

(2)    setting the following scheduling for the Sale Motion to approve the sale of the Assets (the "Sale Motion Scheduling"):

| September 5, 2023 | **Sale Motion Deadline** – Deadline for the Debtors to file their Sale Motion to approve (1) the sale of Assets free and clear of all liens, claims, and interests, (2) the assumption and assignment of Designated Agreements, which shall include a list of all Contracts and Leases that may be assumed and assigned and related cure amounts, and (3) related relief. |
|---|---|
| September 12, 2023 | **Sale Motion Objection Deadline** – Deadline for Initial Sale Motion Objections to the Sale Motion, other than in regard to (1) a sale of the Assets free and clear of all liens, claims, and interests if the sale price less than secured debt and secured creditors have not consented to the proposed sale of Assets pursuant to the Sale Motion, (b) the assumption and assignment of Designated Agreements as to adequate assurance of future performance, but not as to cure amounts, for which this will be the deadline to object, and (c) a good faith finding with respect to the Winning Bidders. |
| September 19, 2023 | **Sale Motion Reply Deadline** – Deadline for the Debtors and any other parties in interest to reply to any Initial Sale Motion Objections. |
| September 20, 2023 | **Sale Motion Supplement Deadline** – Deadline for (1) the Debtors to file the Sale Motion Supplement to Sale Motion describing the Auction(s), bids before and during the Auction(s), the Winning Bidder(s) and Winning Back-Up Bidder(s), any bases for a good faith finding under Section 363(m), Contracts and Leases to be assumed and assigned and/or rejected, and adequate assurance information regarding Designated Agreements that will be assumed and assigned, and (2) Winning Bidders to file with the Court any documents or information required for a good faith finding under Section 363(m) and adequate assurance of future performance as required by Sections 365(b)(1) and (f)(2)(B). |

| September 22, 2023 | **Sale Motion Supplement Objection Deadline** – Deadline for Supplemental Sale Motion Objections to the Sale Motion and Sale Motion Supplement, only in regard to (1) a sale of the Assets free and clear of all liens, claims, and interests if the sale price less than secured debt and secured creditors have not consented to the proposed sale of Assets pursuant to the Sale Motion, (b) the assumption and assignment of Designated Agreements as to adequate assurance of future performance, but not as to cure amounts, and (c) a good faith finding with respect to the Winning Bidders. |
|---|---|
| September 25, 2023, at 12:00 p.m. (prevailing Pacific time) | **Sale Motion Supplement Reply Deadline** – Deadline for the Debtors and any other parties in interest to reply to any Supplemental Sale Motion Objections. |
| September 27, 2023, at 9:00 a.m. (or such time thereafter as available to the court) (prevailing Pacific time) | **Sale Motion Hearing** – Sale Hearing on the Sale Motion. |

   **PLEASE FURTHER TAKE NOTICE** that as required by LBR 6004-1(b)(2), the Debtor provides the following information regarding the marketing efforts undertaken and the anticipated additional marketing efforts to be undertaken regarding the Auction(s) of the Assets.  SCH, whose marketing efforts have already resulted in the identification of 72 Potential Bidders, which have signed non-disclosure agreements, has/intends to do the following to market the Assets:

   1.    preparing an executive summary and other materials to be used in SCH's marketing efforts;

   2.    developing a target list of Potential Bidders from SCH's database, research, and discussions with management;

   3.    leading the outreach process to Potential Bidders and sending the executive summary and other marketing materials to such Potential Bidders, which Potential Bidders pool is expected to exceed 1,600 people/entities;

   4.    managing the due diligence process conducted by Potential Bidders;

5.      facilitating and conducting on-site visits with Potential Bidders, two of which have already been conducted, with another four scheduled

6.      qualifying Bidders in advance of the deadline for Initial Bids and the Auction(s); and

7.      conducting the Auction(s) in accordance with the Bid Procedures.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 6004-1(b)(2), any opposition to the Bid Procedures Motion must (1) be in writing and include all reasons and evidence in support of the opposition, (2) be filed at least one (1) day prior to the hearing on the Bid Procedures Motion, and (3) be served on the United States Trustee and counsel for the Debtors, whose contact information is on the first page of this notice.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the Court may deem the failure of any party to file a timely opposition to the Bid Procedures Motion to constitute consent to the granting of the Bid Procedures Motion and the relief requested herein.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order:

(1)     granting the Bid Procedures Motion;

(2)     approving the Bid Procedures;

(3)     approving the Sale Motion Scheduling; and

(4)     granting such further relief as the Court deems just and proper.

Dated: August 1, 2023

LEVENE, NEALE, BENDER YOO
& GOLUBCHIK L.L.P.

By:    _/s/ David L. Neale_____
DAVID L. NEALE
TODD A. ARNOLD
JOHN-PATRICK M. FRITZ
ROBERT M. CARRASCO
Proposed Counsel for Chapter 11
Debtors and Debtors in Possession

### MEMORANDUM OF POINTS AND AUTHORITIES[14]

### I.

### STATEMENT OF FACTS

**A.      BACKGROUND.**

1.      On July 2, 2023 (the "Petition Date"), the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtors bankruptcy cases are being jointly administered under the lead case In re Ittella International, LLC (Case No. 2:23-bk-14154-SK). The Debtors continue to operate their businesses, manage their financial affairs, and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108.  On July 25, 2023, the United States Trustee (the "UST") appointed official committees of unsecured creditors (each a "Committee" and, collectively, the "Committees") in Ittella's and NMFD's bankruptcy cases

2.      TCI is a publicly held company (NASDAQ: TTCF) offering a broad portfolio of innovative plant-based frozen foods through the other Debtors, all of which are direct or indirect subsidiaries of TCI. Beginning in 2017, the Debtors have supplied plant-based products to leading retailers in the United States, with signature products such as ready-to-cook bowls, zucchini spirals, riced cauliflower, acai and smoothie bowls, cauliflower crust pizza, wood fire crusted pizza, handheld burritos, bars and quesadillas.  The Debtors' products are available in all 50 states both in private label and through their "Tattooed Chef™" brand mainly in the frozen food section of retail food stores.

3.      The Debtors believe their innovative food offerings converge with consumer trends and demands for great-tasting, wholesome, plant-based foods made from sustainably sourced ingredients, including preferences for flexitarian, vegetarian, vegan, organic, and gluten-free lifestyles.  As of December 31, 2022, the Debtors' products were sold in approximately 21,000 retail outlets in the United States. The Debtors' brand strategy has been to introduce the attributes of a plant-based lifestyle to build a connection with a broad array of consumers that are

---

[14] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the preceding Notice of Motion and Motion.

seeking delicious, sustainably sourced, plant-based foods. The diverse offering of plant-based meals produced by the Debtors includes certified organic, non-GMO, certified Kosher, gluten-free, as well as plant protein elements that the Debtors believe provide health-conscious consumers an affordable, great tasting, clean label food option.  As of December 31, 2022, the Debtors had 132 SKUs and over 175 plant-based food concepts and recipes under development and testing.

4.    The Debtors are led by their President and CEO, Salvatore "Sam" Galletti, who has over 35 years of experience in the food industry as both a manager and an investor, and Sarah Galletti, the Chief Creative Officer and the creator of the Tattooed Chef brand.  The brand's tagline, "Serving Plant-Based Foods to People Who Give a Crop," aims to convey the brand's mission to deliver plant-based foods to consumers who care about sustainable and ethically sourced foods.

5.    The Debtors, through their affiliate Ittella Italy SRL ("Ittella Italy"),[15] operate a 100,000 square foot processing facility in Prossedi, Italy located in close proximity to many of the growers that are the Debtors' primary suppliers of produce. This facility opened in 2017 and manufactures various products, including riced cauliflower (plain and value-added), diced squash/zucchini, and vegetable spirals. Due to the location of the facility, the Debtors are able to transport raw materials to the facility, process them, and manufacture products within a relatively short time. Prior to each growing season, the Debtors obtain written commitments as to quantity and price from various growers, who commit to supply the projected needs, which commitments are then followed by written purchase orders closer to the start of the harvest season. When necessary (whether as a result of greater than anticipated demand from customers, or poor crop yields due to inclement weather, infestation and the like), the Debtors have been able to obtain alternative raw material supply from other sources or on the spot market on satisfactory terms. The Prossedi plant was originally leased from a third party. In April 2021, the Debtors spent approximately $4.9 million to acquire this facility and its machinery to secure and upgrade the

---

[15] Concurrently with the commencement of these bankruptcy cases, the Debtors' Italian affiliate commenced an insolvency proceeding under Italian law.

frozen food manufacture capabilities. During the past two years, the Debtors improved their internal cold storage capabilities to better manage inventory and to capitalize on seasonal purchases of raw materials during peak harvest season.

6.      In May 2021, TCI acquired NMFD and Karsten for a total purchase price of approximately $34.1 million, and, on December 21, 2021, through BCI, acquired substantially all of the assets and assumed certain liabilities from Belmont Confections, Inc. (located in Ohio) for a total purchase price of $16.7 million. In August 2022, TCI, through TTCF, entered into an equipment purchase agreement with Desert Premium Group, LLC pursuant to which the Debtors acquired certain manufacturing, production, and storage assets, organized workforce, as well as assumed a lease for an 80,000 square foot manufacturing facility located in Albuquerque, New Mexico, for a purchase price of approximately $10.4 million.[16]

7.      The Debtors currently lease processing facilities in Paramount, California, Albuquerque, New Mexico, and Youngstown, Ohio, a storage facility in Vernon, California, approximately 270,000 square feet of cold storage facility in Ceccano, Italy and have a small office suite lease in San Pedro, California. The Paramount facility also serves as the Debtors' headquarters.

8.      As of December 31, 2022, the Debtors had approximately 800 full-time employees in the United States and 140 full-time employees in Italy. None of the Debtors' employees are represented by a labor union; they are either employed directly through the Debtors or through a staffing agency.

9.      When the Debtors went public in 2020, the brand had household awareness of under 6%, were available in only 4 major retailers nationwide, and were in less than 4,000 stores. Since then, brand awareness has grown to over 26% of households, and the Debtors' products are carried by over 40 retailers in over 23,000 retail stores.  The Debtors invested over $100

---

[16] TCI acquired all of the equity of Myjojo pursuant to an Agreement and Plan of Merger, dated June 11, 2020, as amended on August 10, 2020.  Myjojo has no operations, and its only asset is the membership interest in Ittella.  In turn, Ittella owns the membership interest in ITLLC, a California limited liability company, which owns equity interests in Ittella Italy.

million on marketing and in-store promotions to achieve this growth within such a short time period.

10.    After the corporate acquisitions described above and the substantial outlay of funds to develop the market for the Debtors' products, the Debtors found themselves short on cash.  In August 2022, the Debtors engaged a financial advisor to pursue new financing through a "PIPE"[17] transaction whereby an institutional or accredited investor would acquire shares in TCI at a below market price, or through other financing methods that might be available to the Debtors.  In October, the Debtors' auditors advised the Debtors that certain adjustments and restatements to their financial statements were required, which affected the Debtors' financial statements for the preceding six financial quarters.

11.    Over the next 8 months, the Debtors diligently explored alternative financing and funding solutions.  However, due to the Debtors' restated financial statements, changes in the capital markets, and the general economic conditions affecting the Debtors' market segment, the Debtors were unable to obtain any new financing.  Although the Debtors experienced revenue growth from $147 million in 2020 to $230 million in 2022, TCI's share price declined dramatically, particularly over the first quarter of 2023.  During this time period, the Debtors' liquidity became constrained and the Debtors fell behind on payments to suppliers and other parties necessary to the continued operation and profitability of their business.

12.    Although the Debtors have done everything possible to reduce operating expenses over the 9 months prior to the Petition Date, such reduction in expenses did not result in sufficient savings to preserve the Debtors' ability to timely pay their obligations and satisfy customer demand.  In addition, the costs of compliance with public company reporting and other requirements were substantial.  As a result of the Debtors' inability to obtain new financing and materially reduce operating and other expenses, the Debtors ultimately decided to commence these bankruptcy cases in order to expeditiously pursue a sale of substantially all of their Assets.

---

[17] Private investment in public equity.

**B.      THE DEBTORS' PRIMARY ASSETS.**

13.      The Assets the Debtors are seeking to sell at the Auction(s) for which the Debtors are seeking approval of Bid Procedures herein, include, but are not limited to, (a) TCI's U.S. Equity Interests in its direct subsidiaries (Myjojo, NMFD, Karsten, BCI and TTCF) and indirect subsidiaries (Ittella and ICLLC), (b) ICLLC's Italian Equity Interests in Ittella Italy,[18] (c) goods, (d) equipment, (e) accounts receivable, (f) intellectual property,[19] (g) goodwill, (h) customer lists, (i) any Contracts and/or Leases designated by any Winning Bidder and/or any Winning Back-Up Bidder for assumption and assignment, and (j) any related assets included in any Qualified Bid but which Assets shall ***not*** include the Debtors' cash and any avoidance actions arising under the Bankruptcy Code.

**C.      THE DEBTORS' PRIMARY SECURED CREDITOR AND THE NEED FOR A SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS.**

14.      As will be further discussed in the Sale Motion, based on pre-Petition Date loan and related agreements between the Debtors and UMB (the "Prepetition Credit Agreements") and post-Petition Date loan and related agreements between the Debtors and UMB (the "DIP Documents") pursuant to which UMB provided the Debtors with debtor in possession financing (the "DIP Facility"),[20] UMB has a lien on substantially all of the Debtors assets securing a claim in the current approximate amount of $20 million (the "UMB Claim").[21]

---

[18] Ittella Italy is not a debtor in any bankruptcy proceeding in the United States.  However, as noted, Ittella Italy is in a proceeding in Italy governed by Italian law.  Pursuant to the Bid Procedures Motion and the Sale Motion that is to follow, the Debtors are not seeking to sell any assets owned by Ittella Italy, only ICLLC's Italian Equity Interests in Ittella Italy.  Due to exigencies arising due to Ittella Italy's pending Italian proceeding, efforts are underway to have a separate, expedited sale of ICLLC's Italian Equity Interests in Ittella Italy.

[19] The Debtors own domestic copyrights and domestic and foreign trademarks, trademark applications, registrations, and other proprietary rights that are important to their business.  The Debtors' primary trademarks include the Tattooed Chef® and People Who Give a Crop™.  The Debtors own the domain names: www.ittellafoods.com and www.tattooedchef.com.

[20] On July 7, 2023, the Court entered an interim order [Dkt. 77] approving the DIP Documents and DIP Facility.

[21] *See Omnibus   Declaration   Of Edward Bidanset In Support Of Emergency First Day Motions* [Dkt. 15], at ¶¶ 20-37 for additional information regarding the Prepetition Credit Agreements, the DIP Documents, and UMB's liens on substantially all of the Debtors' Assets.

15.    Prior to the Petition Date, the Debtors were in default under the Prepetition Credit Agreements.

16.    The Debtors obtained the DIP Facility to, among other things, permit the orderly sale of their businesses and/or assets, as the Debtors, in consultation with their processionals, including SCH, determined, in an exercise of their business judgment, that (a) the Debtors are unable to continue business operations in the long-term and accomplish a reorganization around continued operations and, therefore, (b) an orderly liquidation of substantially all of the Debtors' Assets, which is expected to net sufficient funds to pay allowed secured, administrative and priority unsecured claims in full and to make a distribution on allowed general unsecured claims will serve the best interests of the Debtors' bankruptcy estates and the creditors thereof. Accordingly, pursuant to the DIP Document, the Debtors agreed that they will be in default if, among other things, (a) the Debtors failed to file this Bid Procedures Motion within thirty (30) days of the Petition Date (*i.e.*, by August 1, 2023) and (b) the Debtors fail to repay the UMB Claim by September 30, 2023 (subject to extension by agreement between the Debtors and UMB).[22]

**D.**    **THE DEBTOR'S PURSUIT OF A SALE OF SUBSTANTIALLY ALL OF ITS ASSETS AND THE PROPOSED AUCTION(S) AND BID PROCEDURES.**

17.    In furtherance of an orderly sale of substantially all of the Debtors' Assets, on July 11, 2023, the Debtors filed their *Application Of Chapter 11 Debtors And Debtors In Possession To Employ SC&H Group, Inc. As Investment Banker Pursuant To 11 U.S.C. § 327(A)* (the "SCH Employment Application") [Dkt. 110]. On August 1, 2023, the Court entered its order [Dkt. 171] approving the SCH Employment Application.

18.    Both prior to and after the Court's approval of the SCH Employment Application, SCH has engaged in substantial efforts to market the Assets for sale and obtain the highest and

---

[22] The Debtors have discussed the timetable proposed for the sale process with UMB, and believe that UMB is likely to consent to extend this deadline through the anticipated closing date of a sale, subject to reaching agreement on compliance with the Approved Budget and Milestones (as defined in the DIP Order) through the sale date. As noted above, if necessary to avoid defaulting under the DIP Order, the Debtors, to the extent necessary, may seek emergency relief to approve sales of certain Assets on a shorter timeline.

best price for such Assets.  SCH's marketing efforts have already resulted in the identification of 72 Potential Bidders, which have signed non-disclosure agreements.    In addition, SCH has/intends to do the following to market the Assets:

       a.     preparing an executive summary and other materials to be used in SCH's marketing efforts;

       b.     developing a target list of Potential Bidders from SCH's database, research, and discussions with management;

       c.     leading the outreach process to Potential Bidders and sending the executive summary and other marketing materials to such Potential Bidders, which Potential Bidders pool is expected to exceed 1,600 people/entities;

       d.     managing the due diligence process conducted by Potential Bidders;

       e.     facilitating and conducting on-site visits with Potential Bidders, two of which have already been conducted, with another four scheduled

       f.     qualifying Bidders in advance of the deadline for Initial Bids and the Auction(s); and

       g.     conducting the Auction(s) in accordance with the Bid Procedures.

19.    As discussed herein, the Debtors are seeking (a) to hold the Auction(s) for the Assets on September 19, 2023, (2) to have the Sale Hearing on the Sale Motion to approve the sale of the Assets on September 27, 2023, and (3) to close the sale of the Assets on or about October 12, 2023, which the Debtors understand is an agreeable timeline for UMB provided the Debtors are able to comply with the Approved Budget (as defined in the DIP Order).

20.    Given the foregoing proposed timeline for the Auction(s) and the approval of the sale of the Assets, it is important that the Debtors obtain approval of the Bid Procedures as soon as possible so that they can be provided to Potential Bidders.  For the same reasons, it is important to set the Sale Motion Scheduling so that the Debtors can attempt to close a sale of the Assets on or about October 12, 2023.

21.    In consideration of all of the foregoing and SCH's experience as an investment

banker in sales of assets in bankruptcy cases, the Debtors and SCH, as the Debtors investment banker, believe that the proposed timing regarding the Bid Procedures and the Sale Motion Scheduling will allow the Debtors to maximize the value of the Assets while (a) avoiding the possibility of unexcused breaches of the Prepetition Credit Agreements and/or the DIP Documents, which would be catastrophic to the Debtors bankruptcy estates and the creditors thereof, (b) limiting the incurrence of additional operating losses and administrative expenses and (c) providing ample notice and opportunity for parties in interest to be heard.

22.    In consideration of the foregoing, the Debtors, in an exercise of their business judgment, believe that (a) the Bid Procedures summarized in the foregoing Notice and attached hereto as **Exhibit "1"** and (2) the Sale Motion Scheduling should be approved.

## II.

## DISCUSSION

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

## A.    THE BID PROCEDURES SHOULD BE APPROVED.

FRBP 2002 and 6004 govern the scope of the notice to be provided in the event a debtor in possession elects to sell property of the estate under Section 363. However, with respect to the procedures to be adopted in conducting a sale outside the ordinary course, FRBP 6004 provides only that such sale may be by private sale or public auction, and requires only that the trustee provide an itemized list of the property sold together with the prices received upon consummation of the sale. Fed. R. Bankr. P. 6004(f). With that said, Local Bankruptcy Rule 6004-1 provides, in pertinent part, as follows:

> **(b) Motion for Order Establishing Procedures for the Sale of Estate Property.**
> . . .

(2) <u>Contents of Notice [of a Sale Procedure Motion]</u>. The notice must describe the proposed bidding procedures and include a copy of the proposed purchase agreement. If the purchase agreement is not available, the moving party must describe the terms of the sale proposed, when a copy of the actual agreement will be filed with the court, and from whom it may be obtained. The notice must describe the marketing efforts undertaken and the anticipated marketing plan, or explain why no marketing is required. …

(3) <u>Service of the Notice and Motion.</u> The moving party must serve the motion and notice of the motion and hearing by personal delivery, messenger, telephone, fax, or email to the parties to whom notice of the motion is required to be given by the FRBP or by these rules, any other party that is likely to be adversely affected by the granting of the motion, and the United States trustee.…

LBR 6004-1(b).[23]

The Debtors respectfully submit that the foregoing Notice of the Bid Procedures Motion meets all of the requirements for the approval of the Bid Procedures pursuant to LBR 6004-1(b). That is, the Notice of the Bid Procedures Motion (1) describes the Bid Procedures, a copy of which is attached hereto as **Exhibit "1,"** (2) describes the marketing efforts undertaken and the anticipated additional marketing efforts to be undertaken regarding the Auction(s) of the Assets, which will be further detailed in the Sale Motion, (3) was served via ECF on the UST, UMB and via ECF or U.S. Mail, as applicable, on any other known secured creditors, all Committee members and their counsel (if any), and parties requesting notice, and (4) advised parties of the deadline to oppose the Bid Procedures Motion.  In regard to the form of the APA, as noticed in the preceding Notice of the Bid Procedures Motion, the form APA will be filed with the Court and served on parties in interest no later than seven (7) days prior to the hearing on the Bid Procedures Motion.

---

[23] Despite that LBR 6004-1(b) allows the Debtors to file the instant Bid Procedures Motion on only 7-days' notice, the Debtors filed this Bid Procedures Motion on regular 15-days' notice to afford ample opportunity for parties in interest to consider the Bid Procedures Motion, for such parties in interest and the Debtors to attempt to resolve any issues regarding the Bid Procedures Motion, and for parties in interest to respond to the Bid Procedures Motion if any issues cannot be resolved.

Neither the Bankruptcy Code nor the FRBP contain specific provisions with respect to the procedures to be employed by a trustee in conducting a public or private sale. Nonetheless, as one Court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Additionally, courts have long recognized the need for competitive bidding at hearings on private sales; "[c]competitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*

Here, for the reasons discussed above, based on their long history in their business and consultation with SCH, the Debtors, in an exercise of their business judgment, believe that the proposed Bid Procedures detailed in the preceding Notice of the Bid Procedures Motion will maximize the price ultimately obtained for the Assets while still protecting the estates from parties who may wish to bid on the Assets but who are ultimately unable to consummate a purchase of the Assets. The Bid Procedures serve numerous legitimate purposes. Among other things, the Bid Procedures will (1) foster competitive bidding among any serious potential purchasers, (2) provide sufficient time to market the Assets, (3) eliminate from consideration purchasers who would waste the estates' time because they would not have the financial ability to consummate a purchase of the Assets, and (4) ensure that the highest possible price is obtained for the Assets.

Based on the foregoing, the Debtors submit that the proposed Bid Procedures are reasonable and in the best interests of the estate and, therefore, should be approved. Importantly, the Debtors are *not* seeking at this time to have the Court approve the actual sale of the Assets. That request will be set forth in a separate Sale Motion to be filed by the Debtors and considered by the Court at the Sale Hearing. The Debtors at this time are only seeking Court approval of the Bid Procedures and related matters so that the entire market place can be advised as soon as possible exactly what they need to do in order to participate in this asset sale process.

**B.**  **THE BREAK-UP FEE AND EXPENSE REIMBURSEMENTS SHOULD BE APPROVED.**

Pursuant to the Bid Procedures Motion, the Debtors are seeking approval of (1) a Break-Up Fee in an amount up to 2% of the amount bid for Assets subject to a Stalking Horse Bid, which 2% Break-Up Fee shall be calculated based only on the cash price bid for such Assets and *not* any cure amounts required by be paid by the Qualified Bidder in connection with the assumption and assignment of any Designated Agreements and (2) up to $100,000 for an Expense Reimbursement for reasonable actual, out-of-pocket professional fees and expenses incurred by a Qualified Bidder, provided that any Break-Up Fee and/or Expense Reimbursement shall only be payable if the Qualified Bidder's timely Stalking Horse Bid accepted in writing by the Debtors (directly or through SCH) is overbid by a higher Winning Bid or Winning Back-Up Bid that is accepted by the Debtors, approved by the Court pursuant to a final Sale Order, and closes.

Other than the foregoing, no other Bidders, including any Qualified Bidder that submits an Initial Bid that is not a Stalking Horse Bid, shall be entitled to receive any Break-Up Fee or Expense Reimbursement, and any Initial Bid, other than a Stalking Horse Bid timely submitted on or before the Stalking Horse Bid Deadline, must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and by submitting an Initial Bid, the Bidder waives the right to pursue a substantial contribution claim under Section 503 related in any way to the submission of its Initial Bid or its participation in the Auction(s).

In general, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode ... to attract other bidders to the auction." Agreements to provide breakup fees and/or expense reimbursements are designed to compensate the potential acquirer who serves as a catalyst or "stalking horse' which attracts more favorable offers. *In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D.Ill. 1995); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

In the bankruptcy context, a break-up fee or expense reimbursement is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude." *Cottle*

*v. Storer Communication* Inc., 849 F.2d 570, 578 (11th Cir. 1988*); In re 995 Fifth Ave.*, 96 B.R. at 28. In evaluating the appropriateness of a breakup fee, the appropriate question for the court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated Resources, Inc.*, 147 B.R. 650, 662 (S.D.N.Y. 1992).  Additionally, so long as a break-up fee or overbid increment is not (1) the product of self-dealing by the debtor or the trustee, (2) likely to hamper or chill, rather than encourage, bidding on the assets to be sold, or (3) unreasonably large in relation to the proposed purchase price, courts have approved the proposed procedures. *See, e.g., id.*, at 657 (a break-up fee is permissible if reasonably related to the bidder's efforts and the transaction's magnitude); *see also Cottle v. Storer Communication*, 849 F.2d at 578; *CRTF Corp. v. Federated Dept. Stores*, 683 F. Supp. 422, 440 (S.D.N.Y. 1988).

After considering the reasonableness of bidding incentives, Bankruptcy Courts, including the Bankruptcy Court for the Central District of California, have approved a range of break-up fees and expense reimbursements as appropriate depending on the facts and circumstances of the case.  *See, e.g., In re Freedom Communications, Inc.*, Case No. 15-15311 (Bankr. C.D. Cal, Feb. 5, 2016 [Docket No. 371]) (approving a break-up fee of 2.5% and an expense reimbursement of $200,000); *In re Chi-Chi's Inc.*, Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); *In re Great Northern Paper, Inc.*, Case No. 03-10048 (Bankr. D. Me, February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld).

In this case, proposed Break-Up Fee is only up to 2% (plus an additional $100,000 for an Expense Reimbursement, which would still make the overall incentive for any Stalking Horse bidder only slightly above 2%).  The Debtors' payment of the Break-Up Fee and Expense Reimbursement under the circumstances described herein would be (1) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of Section 503(b), (2) of substantial benefit to the Debtors' estates, and (3) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by any Stalking Horse Bidder.

The Break-Up Fee and Expense Reimbursement should be approved because they are necessary to obtain the maximum return for the benefit of the Debtors' estates and the creditors thereof. Since the Break-Up Fee and Expense Reimbursement will incentivize Potential Bidders to make binding Stalking Horse bids for the Assets, which will (1) help to ensure the consummation of a sale or sales of the Assets, (2) form the basis upon which other Bids will be submitted and evaluated, and (3) permit the Debtors to insist that competing bids for the Assets be higher or otherwise better than the purchase price under any Stalking Horse Bid, which is a benefit to the Debtors' estates.

In addition, the Bid Procedures require that each an Initial Overbid Amount after the accepted Stalking Horse Bid for each subset of Assets shall be higher than the accepted Stalking Horse Bid by (1) 3% of the cash the cash price bid for such Assets (not including the any cure amounts required by be paid under the Stalking Horse Bid in connection with the assumption and assignment of any Designated Agreements), plus (2) $100,000. Thus, even if a Stalking Horse Bidder is provided with the Break-Up Fee and Expense Reimbursement and is ultimately not the Winning Bidder, the Debtors will still have benefited from the higher floor established by any Stalking Horse Bids and thereby increase the likelihood that the price and terms at which the Assets will be sold will reflect the best offer(s) available.

## C.    THE SALE MOTION SCHEDULING SHOULD BE APPROVED.

As noted above, given that the Debtor is seeking (1) to hold the Auction(s) for the Assets on October 6, 2022, (2) to have the Sale Hearing on the Sale Motion to approve the sale of the Assets on October 13, 2022, and (3) to close the sale of the Assets on or before October 17, 2022, it is important that the Debtor obtain approval of the Bid Procedures as soon as possible so that they can be provided to potential buyers. For the same reasons, it is important to set the Sale Motion Scheduling so that the Debtor can attempt to close a sale of the Assets on or before October 13, 2022, which will, *inter alia*, allow the Debtor to minimize the incurrence of mounting operating losses and unpaid administrative expenses.

## III.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtors respectfully request that the Court enter an order:

(1)    granting the Bid Procedures Motion;

(2)    approving the Bid Procedures;

(3)    approving the Sale Motion Scheduling; and

(4)    granting such further relief as the Court deems just and proper.

Dated: August 1, 2023

LEVENE, NEALE, BENDER YOO
& GOLUBCHIK L.L.P.

By:    _/s/ David L. Neale_
        DAVID L. NEALE
        TODD A. ARNOLD
        JOHN-PATRICK M. FRITZ
        ROBERT M. CARRASCO
Proposed Counsel for Chapter 11
Debtors and Debtors in Possession

## DECLARATION OF EDWARD BIDANSET

I, Edward Bidanset, hereby declare as follows:

1.      Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I make this declaration in support of the Bid Procedures Motion to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the Bid Procedures Motion.

3.      I serve as the Chief Restructuring Officer of the Debtors in the above-captioned, jointly administered, Chapter 11 bankruptcy cases pursuant to the Court's order [Dkt. 121] granting the Debtors' *Emergency Motion For Entry Of An Order (1) Authorizing The Retention Of Cutsheet Express, LLC ["CE"]; (2) Authorizing The Designation Of Edward Bidanset As Chief Restructuring Officer Effective As Of The Petition Date; And (3) Granting Related Relief* [Dkt. 11].

4.      I am the sole member, manager, and employee of CE, which is an internationally recognized restructuring and turnaround firm with substantial experience in providing interim management and financial advisory services and has an excellent reputation for its work in complex situations including in Chapter 11 cases on behalf of debtors and creditors throughout the United States.

5.      I am a turnaround executive with more than 35 years of financial consulting and management experience.  My professional résumé is attached hereto as **Exhibit "3"** and is incorporated herein by reference. I have an extensive background in turnarounds, crisis management, investment banking, and sales of assets in and out of bankruptcy cases.  I have worked with both Fortune 500 firms and privately held companies, acting as an advisory consultant or taking on the role of CRO, CFO or COO.  I have particular expertise working with companies in the consumer products, food processing, retail, printing, plastics and metals industries.

6.      I have been a member of the Turnaround Management Association (TMA) and the Financial Executives Institute.  I hold a Bachelor's degree in Economics from the State University

of New York (SUNY) at Cortland and an MBA from Duke University's Fuqua School of Business.

7.      I have reviewed and am familiar with and am knowledgeable about the books and records of the Debtors, which books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded.

8.      I have reviewed and familiar with the Bid Procedures attached hereto as **Exhibit "1,"** which are the result of discussions with other members of the Debtors' management, SCH, and UMB's counsel, all in an effort by me and the Debtors to determine how to maximize the value of the Debtors' assets for the benefit of creditors.

9.      On July 2, 2023 (the "Petition Date"), the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code.   The Debtors bankruptcy cases are being jointly administered under the lead case In re Ittella International, LLC (Case No. 2:23-bk-14154-SK). The Debtors continue to operate their businesses, manage their financial affairs, and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108.   On July 25, 2023, the United States Trustee (the "UST") appointed official committees of unsecured creditors (each a "Committee" and, collectively, the "Committees") in Ittella's and NMFD's bankruptcy cases

10.      TCI is a publicly held company (NASDAQ: TTCF) offering a broad portfolio of innovative plant-based frozen foods through the other Debtors, all of which are direct or indirect subsidiaries of TCI. Beginning in 2017, the Debtors have supplied plant-based products to leading retailers in the United States, with signature products such as ready-to-cook bowls, zucchini spirals, riced cauliflower, acai and smoothie bowls, cauliflower crust pizza, wood fire crusted pizza, handheld burritos, bars and quesadillas.   The Debtors' products are available in all 50 states both in private label and through their "Tattooed Chef™" brand mainly in the frozen food section of retail food stores.

11.      The Debtors believe their innovative food offerings converge with consumer trends and demands for great-tasting, wholesome, plant-based foods made from sustainably

sourced ingredients, including preferences for flexitarian, vegetarian, vegan, organic, and gluten-free lifestyles.  As of December 31, 2022, the Debtors' products were sold in approximately 21,000 retail outlets in the United States. The Debtors' brand strategy has been to introduce the attributes of a plant-based lifestyle to build a connection with a broad array of consumers that are seeking delicious, sustainably sourced, plant-based foods. The diverse offering of plant-based meals produced by the Debtors includes certified organic, non-GMO, certified Kosher, gluten-free, as well as plant protein elements that the Debtors believe provide health-conscious consumers an affordable, great tasting, clean label food option.  As of December 31, 2022, the Debtors had 132 SKUs and over 175 plant-based food concepts and recipes under development and testing.

12.     The Debtors are led by their President and CEO, Salvatore "Sam" Galletti, who has over 35 years of experience in the food industry as both a manager and an investor, and Sarah Galletti, the Chief Creative Officer and the creator of the Tattooed Chef brand.  The brand's tagline, "Serving Plant-Based Foods to People Who Give a Crop," aims to convey the brand's mission to deliver plant-based foods to consumers who care about sustainable and ethically sourced foods.

13.     The Debtors, through their affiliate Ittella Italy SRL ("Ittella Italy"),[24] operate a 100,000 square foot processing facility in Prossedi, Italy located in close proximity to many of the growers that are the Debtors' primary suppliers of produce. This facility opened in 2017 and manufactures various products, including riced cauliflower (plain and value-added), diced squash/zucchini, and vegetable spirals. Due to the location of the facility, the Debtors are able to transport raw materials to the facility, process them, and manufacture products within a relatively short time. Prior to each growing season, the Debtors obtain written commitments as to quantity and price from various growers, who commit to supply the projected needs, which commitments are then followed by written purchase orders closer to the start of the harvest season. When necessary (whether as a result of greater than anticipated demand from customers, or poor crop

---

[24] Concurrently with the commencement of these bankruptcy cases, the Debtors' Italian affiliate commenced an insolvency proceeding under Italian law.

yields due to inclement weather, infestation and the like), the Debtors have been able to obtain alternative raw material supply from other sources or on the spot market on satisfactory terms. The Prossedi plant was originally leased from a third party. In April 2021, the Debtors spent approximately $4.9 million to acquire this facility and its machinery to secure and upgrade the frozen food manufacture capabilities. During the past two years, the Debtors improved their internal cold storage capabilities to better manage inventory and to capitalize on seasonal purchases of raw materials during peak harvest season.

14.    In May 2021, TCI acquired NMFD and Karsten for a total purchase price of approximately $34.1 million, and, on December 21, 2021, through BCI, acquired substantially all of the assets and assumed certain liabilities from Belmont Confections, Inc. (located in Ohio) for a total purchase price of $16.7 million. In August 2022, TCI, through TTCF, entered into an equipment purchase agreement with Desert Premium Group, LLC pursuant to which the Debtors acquired certain manufacturing, production, and storage assets, organized workforce, as well as assumed a lease for an 80,000 square foot manufacturing facility located in Albuquerque, New Mexico, for a purchase price of approximately $10.4 million.  TCI acquired all of the equity of Myjojo pursuant to an Agreement and Plan of Merger, dated June 11, 2020, as amended on August 10, 2020.  Myjojo has no operations, and its only asset is the membership interest in Ittella.  In turn, Ittella owns the membership interest in ITLLC, a California limited liability company, which owns equity interests in Ittella Italy.

15.    The Debtors currently lease processing facilities in Paramount, California, Albuquerque, New Mexico, and Youngstown, Ohio, a storage facility in Vernon, California, approximately 270,000 square feet of cold storage facility in Ceccano, Italy and have a small office suite lease in San Pedro, California. The Paramount facility also serves as the Debtors' headquarters.

16.    As of December 31, 2022, the Debtors had approximately 800 full-time employees in the United States and 140 full-time employees in Italy. None of the Debtors' employees are represented by a labor union; they are either employed directly through the Debtors or through a staffing agency.

17.    When the Debtors went public in 2020, the brand had household awareness of under 6%, were available in only 4 major retailers nationwide, and were in less than 4,000 stores. Since then, brand awareness has grown to over 26% of households, and the Debtors' products are carried by over 40 retailers in over 23,000 retail stores. The Debtors invested over $100 million on marketing and in-store promotions to achieve this growth within such a short time period.

18.    After the corporate acquisitions described above and the substantial outlay of funds to develop the market for the Debtors' products, the Debtors found themselves short on cash. In August 2022, the Debtors engaged a financial advisor to pursue new financing through a "PIPE"[25] transaction whereby an institutional or accredited investor would acquire shares in TCI at a below market price, or through other financing methods that might be available to the Debtors. In October, the Debtors' auditors advised the Debtors that certain adjustments and restatements to their financial statements were required, which affected the Debtors' financial statements for the preceding six financial quarters.

19.    Over the next 8 months, the Debtors diligently explored alternative financing and funding solutions. However, due to the Debtors' restated financial statements, changes in the capital markets, and the general economic conditions affecting the Debtors' market segment, the Debtors were unable to obtain any new financing. Although the Debtors experienced revenue growth from $147 million in 2020 to $230 million in 2022, TCI's share price declined dramatically, particularly over the first quarter of 2023. During this time period, the Debtors' liquidity became constrained and the Debtors fell behind on payments to suppliers and other parties necessary to the continued operation and profitability of their business.

20.    Although the Debtors have done everything possible to reduce operating expenses over the 9 months prior to the Petition Date, such reduction in expenses did not result in sufficient savings to preserve the Debtors' ability to timely pay their obligations and satisfy customer demand. In addition, the costs of compliance with public company reporting and other requirements were substantial. As a result of the Debtors' inability to obtain new financing and

---

[25] Private investment in public equity.

materially reduce operating and other expenses, the Debtors ultimately decided to commence these bankruptcy cases in order to expeditiously pursue a sale of substantially all of their Assets.

21.    The Assets the Debtors are seeking to sell at the Auction(s) for which the Debtors are seeking approval of Bid Procedures herein, include, but are not limited to, (a) TCI's U.S. Equity Interests in its direct subsidiaries (Myjojo, NMFD, Karsten, BCI and TTCF) and indirect subsidiaries (Ittella and ICLLC), (b) ICLLC's Italian Equity Interests in Ittella Italy,[26] (c) goods, (d) equipment, (e) accounts receivable, (f) intellectual property,[27] (g) goodwill, (h) customer lists, (i) any Contracts and/or Leases designated by any Winning Bidder and/or any Winning Back-Up Bidder for assumption and assignment, and (j) any related assets included in any Qualified Bid but which Assets shall ***not*** include the Debtors' cash and any avoidance actions arising under the Bankruptcy Code.

22.    As will be further discussed in the Sale Motion, based on pre-Petition Date loan and related agreements between the Debtors and UMB (the "Prepetition Credit Agreements") and post-Petition Date loan and related agreements between the Debtors and UMB (the "DIP Documents") pursuant to which UMB provided the Debtors with debtor in possession financing (the "DIP Facility"),[28] UMB has a lien on substantially all of the Debtors assets securing a claim in the current approximate amount of $20 million (the "UMB Claim").[29]

23.    Prior to the Petition Date, the Debtors were in default under the Prepetition Credit Agreements.

---

[26] Ittella Italy is not a debtor in any bankruptcy proceeding in the United States.  However, as noted, Ittella Italy is in a proceeding in Italy governed by Italian law.  Pursuant to the Bid Procedures Motion and the Sale Motion that is to follow, the Debtors are not seeking to sell any assets owned by Ittella Italy, only ICLLC's Italian Equity Interests in Ittella Italy.  Due to exigencies arising due to Ittella Italy's pending Italian proceeding, efforts are underway to have a separate, expedited sale of ICLLC's Italian Equity Interests in Ittella Italy.

[27] The Debtors own domestic copyrights and domestic and foreign trademarks, trademark applications, registrations, and other proprietary rights that are important to their business.  The Debtors' primary trademarks include the Tattooed Chef® and People Who Give a Crop™.  The Debtors own the domain names: www.ittellafoods.com and www.tattooedchef.com.

[28] On July 7, 2023, the Court entered an interim order [Dkt. 77] approving the DIP Documents and DIP Facility.

[29] *See Omnibus   Declaration   Of Edward Bidanset In Support Of Emergency First Day Motions* [Dkt. 15], at ¶¶ 20-37 for additional information regarding the Prepetition Credit Agreements, the DIP Documents, and UMB's liens on substantially all of the Debtors' Assets.

24.     The Debtors obtained the DIP Facility to, among other things, permit the orderly sale of their businesses and/or assets, as the Debtors, in consultation with their processionals, including SCH, determined, in an exercise of their business judgment, that (a) the Debtors are unable to continue business operations in the long-term and accomplish a reorganization around continued operations and, therefore, (b) an orderly liquidation of substantially all of the Debtors' Assets, which is expected to net sufficient funds to pay allowed secured, administrative and priority unsecured claims in full and to make a distribution on allowed general unsecured claims will serve the best interests of the Debtors' bankruptcy estates and the creditors thereof. Accordingly, pursuant to the DIP Document, the Debtors agreed that they will be in default if, among other things, (a) the Debtors failed to file this Bid Procedures Motion within thirty (30) days of the Petition Date (*i.e.*, by August 1, 2023) and (b) the Debtors fail to repay the UMB Claim by September 30, 2023 (subject to extension by agreement between the Debtors and UMB).[30]

25.     In furtherance of an orderly sale of substantially all of the Debtors' Assets, on July 11, 2023, the Debtors filed their *Application Of Chapter 11 Debtors And Debtors In Possession To Employ SC&H Group, Inc. As Investment Banker Pursuant To 11 U.S.C. § 327(A)* (the "SCH Employment Application") [Dkt. 110].  On August 1, 2023, the Court entered its order [Dkt. 171] approving the SCH Employment Application.

26.     I am informed by SCH and believe that, both prior to and after the Court's approval of the SCH Employment Application, SCH has engaged in substantial efforts to market the Assets for sale and obtain the highest and best price for such Assets.  SCH's marketing efforts have already resulted in the identification of 72 Potential Bidders, which have signed non-disclosure agreements.  In addition, I am informed by SCH and believe that SCH has/intends to do the following to market the Assets:

---

[30] The Debtors have discussed the timetable proposed for the sale process with UMB, and believe that UMB is likely to consent to extend this deadline through the anticipated closing date of a sale, subject to reaching agreement on compliance with the Approved Budget and Milestones (as defined in the DIP Order) through the sale date.  As noted above, if necessary to avoid defaulting under the DIP Order, the Debtors, to the extent necessary, may seek emergency relief to approve sales of certain Assets on a shorter timeline.

a.      preparing an executive summary and other materials to be used in SCH's marketing efforts;

b.      developing a target list of Potential Bidders from SCH's database, research, and discussions with management;

c.      leading the outreach process to Potential Bidders and sending the executive summary and other marketing materials to such Potential Bidders, which Potential Bidders pool is expected to exceed 1,600 people/entities;

d.      managing the due diligence process conducted by Potential Bidders;

e.      facilitating and conducting on-site visits with Potential Bidders, two of which have already been conducted, with another four scheduled

f.      qualifying Bidders in advance of the deadline for Initial Bids and the Auction(s); and

g.      conducting the Auction(s) in accordance with the Bid Procedures.

27.     As discussed herein, the Debtors are seeking (a) to hold the Auction(s) for the Assets on September 19, 2023, (2) to have the Sale Hearing on the Sale Motion to approve the sale of the Assets on September 27, 2023, and (3) to close the sale of the Assets on or about October 12, 2023, which I understand is an agreeable timeline for UMB provided the Debtors are able to comply with the Approved Budget (as defined in the DIP Order).

28.     Given the foregoing proposed timeline for the Auction(s) and the approval of the sale of the Assets, it is important that the Debtors obtain approval of the Bid Procedures as soon as possible so that they can be provided to Potential Bidders.  For the same reasons, it is important to set the Sale Motion Scheduling so that the Debtors can attempt to close a sale of the Assets on or about October 12, 2023.

29.     In consideration of all of the foregoing, SCH's experience as an investment banker in sales of assets in bankruptcy cases, and my experience as set forth above, SCH in its capacity as investment banker to the Debtors, and I, in my capacity as CRO, believe that the proposed timing regarding the Bid Procedures and the Sale Motion Scheduling will allow the Debtors to maximize the value of the Assets while (a) avoiding the possibility of unexcused

breaches of the Prepetition Credit Agreements and/or the DIP Documents, which would be catastrophic to the Debtors bankruptcy estates and the creditors thereof, (b) limiting the incurrence of additional operating losses and administrative expenses and (c) providing ample notice and opportunity for parties in interest to be heard.

30.    In consideration of the foregoing, I, in an exercise of my business judgment, believe that (a) the Bid Procedures summarized in the foregoing Notice and attached hereto as **Exhibit "1"** and (2) the Sale Motion Scheduling should be approved.

31.    Further, for the reasons discussed above, based the long history of the Debtors in their business and my experience discussed above, I, in my capacity as CRO, and after consultation with SCH, in an exercise of my business judgment, believe that the proposed Bid Procedures detailed in the preceding Notice of the Bid Procedures Motion will maximize the price ultimately obtained for the Debtors' Assets while still protecting the estates from parties who may wish to bid on the Assets but who are ultimately unable to consummate a purchase of the Assets.  The Bid Procedures serve numerous legitimate purposes.  Among other things, the Bid Procedures will (a) foster competitive bidding among any serious potential purchasers, (b) provide sufficient time to market the Assets, (c) eliminate from consideration purchasers who would waste the estates' time because they would not have the financial ability to consummate a purchase of the Assets, and (d) ensure that the highest possible price is obtained for the Assets.

32.    Pursuant to the Bid Procedures Motion, the Debtors are seeking approval of (a) a Break-Up Fee in an amount up to 2% of the amount bid for Assets subject to a Stalking Horse Bid, which 2% Break-Up Fee shall be calculated based only on the cash price bid for such Assets and *not* any cure amounts required by be paid by the Qualified Bidder in connection with the assumption and assignment of any Designated Agreements and (b) up to $100,000 for an Expense Reimbursement for reasonable actual, out-of-pocket professional fees and expenses incurred by a Qualified Bidder, provided that any Break-Up Fee and/or Expense Reimbursement shall only be payable if the Qualified Bidder's timely Stalking Horse Bid accepted in writing by the Debtors (directly or through SCH) is overbid by a higher Winning Bid or Winning Back-Up Bid that is accepted by the Debtors, approved by the Court pursuant to a final Sale Order, and

closes.

33.     Other than the foregoing, no other Bidders, including any Qualified Bidder that submits an Initial Bid that is not a Stalking Horse Bid, shall be entitled to receive any Break-Up Fee or Expense Reimbursement, and any Initial Bid, other than a Stalking Horse Bid timely submitted on or before the Stalking Horse Bid Deadline, must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and by submitting an Initial Bid, the Bidder waives the right to pursue a substantial contribution claim under Section 503 related in any way to the submission of its Initial Bid or its participation in the Auction(s).

34.     Based on my business judgment after considering the foregoing, I believe that the Break-Up Fee and Expense Reimbursement should be approved because they are necessary to obtain the maximum return for the benefit of the Debtors' estates and the creditors thereof.  Since the Break-Up Fee and Expense Reimbursement will incentivize Potential Bidders to make binding Stalking Horse bids for the Assets, which will (a) help to ensure the consummation of a sale or sales of the Assets, (b) form the basis upon which other Bids will be submitted and evaluated, and (c) permit the Debtors to insist that competing bids for the Assets be higher or otherwise better than the purchase price under any Stalking Horse Bid, which is a benefit to the Debtors' estates.

35.     In addition, the Bid Procedures require that each an Initial Overbid Amount after the accepted Stalking Horse Bid for each subset of Assets shall be higher than the accepted Stalking Horse Bid by (a) 3% of the cash the cash price bid for such Assets (not including the any cure amounts required by be paid under the Stalking Horse Bid in connection with the assumption and assignment of any Designated Agreements), plus (b) $100,000.  Thus, even if a Stalking Horse Bidder is provided with the Break-Up Fee and Expense Reimbursement and is ultimately not the Winning Bidder, the Debtors will still have benefited from the higher floor established by any Stalking Horse Bids and thereby increase the likelihood that the price and terms at which the Assets will be sold will reflect the best offer(s) available.

36.     As noted above, given that the Debtor is seeking (1) to hold the Auction(s) for the

1    Assets on October 6, 2022, (2) to have the Sale Hearing on the Sale Motion to approve the sale

2    of the Assets on October 13, 2022, and (3) to close the sale of the Assets on or before October

3    17, 2022, it is important that the Debtor obtain approval of the Bid Procedures as soon as

4    possible so that they can be provided to potential buyers.  For the same reasons, it is important to

5    set the Sale Motion Scheduling so that the Debtor can attempt to close a sale of the Assets on or

6    before October 13, 2022, which will, *inter alia*, allow the Debtor to minimize the incurrence of

7    mounting operating losses and unpaid administrative expenses.

8         I declare under penalty of perjury under the laws of the United States that the foregoing is

9    true and correct.

10        Executed on this 1st day of August 2023, at Los Angeles, California.

EDWARD BIDANSET

-46-

## DECLARATION OF MATT LOCASCIO

I, Matt LoCascio, hereby declare as follows:

1.      Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I make this declaration in support of the Bid Procedures Motion to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the Bid Procedures Motion.

3.      I am a principal of SC&H Group, Inc ("SCH"), which serves as the he Debtors' investment banker in the above-captioned, jointly administered, Chapter 11 bankruptcy cases pursuant to the Court's order [Dkt. 171] granting the *Application Of Chapter 11 Debtors And Debtors In Possession To Employ SC&H Group, Inc. As Investment Banker Pursuant To 11 U.S.C. § 327(A)* [Dkt. 110].

4.      I maintain an office at 6011 University Blvd., Suite 490, Ellicott City, Maryland 21043.  I am a FINRA Registered Investment Banking Representative (Series 79).

5.      SCH has extensive experience in providing investment banking services to public and private companies for a broad range of transactions including advice on mergers and acquisitions and guidance on strategic decisions, including in connection with sales of assets in and out of bankruptcy cases.  My professional résumé is attached hereto as **Exhibit "4"** and is incorporated herein by reference. I am the professional at SCH primarily responsible for working on the Debtors' cases.  Additional information regarding SCH and its professionals is available at: https://www.schgroup.com/.

6.      I have reviewed and am familiar with and am knowledgeable about the books and records the Debtors provided to me relating to the Assets to be sold.

7.      In furtherance of an orderly sale of substantially all of the Debtors' Assets, subject to Court approval, the Debtors retained SCH as their investment banker in connection with marketing and sale of the Assets discussed in the bid Procedures Motion.

8.      Both prior to and after the Court's approval of the SCH Employment Application, SCH has engaged in substantial efforts to market the Assets for sale and obtain the highest and

best price for such Assets.  SCH's marketing efforts have already resulted in the identification of 72 Potential Bidders, which have signed non-disclosure agreements.  In addition, I am informed by SCH and believe that SCH has/intends to do the following to market the Assets:

       a.     preparing an executive summary and other materials to be used in SCH's marketing efforts;

       b.     developing a target list of Potential Bidders from SCH's database, research, and discussions with management;

       c.     leading the outreach process to Potential Bidders and sending the executive summary and other marketing materials to such Potential Bidders, which Potential Bidders pool is expected to exceed 1,600 people/entities;

       d.     managing the due diligence process conducted by Potential Bidders;

       e.     facilitating and conducting on-site visits with Potential Bidders, two of which have already been conducted, with another four scheduled

       f.     qualifying Bidders in advance of the deadline for Initial Bids and the Auction(s); and

       g.     conducting the Auction(s) in accordance with the Bid Procedures.

9. As discussed herein, the Debtors are seeking (a) to hold the Auction(s) for the Assets on September 19, 2023, (2) to have the Sale Hearing on the Sale Motion to approve the sale of the Assets on September 27, 2023, and (3) to close the sale of the Assets on or about October 12, 2023, which I understand from the Debtors is an agreeable timeline for UMB provided the Debtors are able to comply with the Approved Budget (as defined in the DIP Order).

10. Given the foregoing proposed timeline for the Auction(s) and the approval of the sale of the Assets, it is important that the Debtors obtain approval of the Bid Procedures as soon as possible so that they can be provided to Potential Bidders.  For the same reasons, it is important to set the Sale Motion Scheduling so that the Debtors can attempt to close a sale of the Assets on or about October 12, 2023.

11.     In consideration of all of the foregoing and my experience as set forth above, I, in my capacity as a principal of SCH, the Debtors' investment banker, believe that the proposed timing regarding the Bid Procedures and the Sale Motion Scheduling will allow the Debtors to maximize the value of the Assets while (a) avoiding the possibility of unexcused breaches of the Prepetition Credit Agreements and/or the DIP Documents, which would be catastrophic to the Debtors bankruptcy estates and the creditors thereof, (b) limiting the incurrence of additional operating losses and administrative expenses and (c) providing ample notice and opportunity for parties in interest to be heard.

12.     In consideration of the foregoing, I, in an exercise of my business judgment, believe that (a) the Bid Procedures summarized in the foregoing Notice and attached hereto as **Exhibit "1"** and (2) the Sale Motion Scheduling should be approved.

13.     Further, for the reasons discussed above, based the long history of the Debtors in their business and my experience discussed above, I, in my capacity as a principal of SCH, the Debtors' investment banker, believe that the proposed Bid Procedures detailed in the preceding Notice of the Bid Procedures Motion will maximize the price ultimately obtained for the Debtors' Assets while still protecting the estates from parties who may wish to bid on the Assets but who are ultimately unable to consummate a purchase of the Assets.  The Bid Procedures serve numerous legitimate purposes.  Among other things, the Bid Procedures will (a) foster competitive bidding among any serious potential purchasers, (b) provide sufficient time to market the Assets, (c) eliminate from consideration purchasers who would waste the estates' time because they would not have the financial ability to consummate a purchase of the Assets, and (d) ensure that the highest possible price is obtained for the Assets.

14.     Pursuant to the Bid Procedures Motion, the Debtors are seeking approval of (a) a Break-Up Fee in an amount up to 2% of the amount bid for Assets subject to a Stalking Horse Bid, which 2% Break-Up Fee shall be calculated based only on the cash price bid for such Assets and *not* any cure amounts required by be paid by the Qualified Bidder in connection with the assumption and assignment of any Designated Agreements and (b) up to $100,000 for an Expense Reimbursement for reasonable actual, out-of-pocket professional fees and expenses

incurred by a Qualified Bidder, provided that any Break-Up Fee and/or Expense Reimbursement shall only be payable if the Qualified Bidder's timely Stalking Horse Bid accepted in writing by the Debtors (directly or through SCH) is overbid by a higher Winning Bid or Winning Back-Up Bid that is accepted by the Debtors, approved by the Court pursuant to a final Sale Order, and closes.

15.    Other than the foregoing, no other Bidders, including any Qualified Bidder that submits an Initial Bid that is not a Stalking Horse Bid, shall be entitled to receive any Break-Up Fee or Expense Reimbursement, and any Initial Bid, other than a Stalking Horse Bid timely submitted on or before the Stalking Horse Bid Deadline, must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and by submitting an Initial Bid, the Bidder waives the right to pursue a substantial contribution claim under Section 503 related in any way to the submission of its Initial Bid or its participation in the Auction(s).

16.    Based on my experience and after considering the foregoing, I, as a principal of SCH, the Debtors' investment banker, believe that the Break-Up Fee and Expense Reimbursement should be approved because they are necessary to obtain the maximum return for the benefit of the Debtors' estates and the creditors thereof.    Since the Break-Up Fee and Expense Reimbursement will incentivize Potential Bidders to make binding Stalking Horse bids for the Assets, which will (a) help to ensure the consummation of a sale or sales of the Assets, (b) form the basis upon which other Bids will be submitted and evaluated, and (c) permit the Debtors to insist that competing bids for the Assets be higher or otherwise better than the purchase price under any Stalking Horse Bid, which is a benefit to the Debtors' estates.

17.    In addition, the Bid Procedures require that each an Initial Overbid Amount after the accepted Stalking Horse Bid for each subset of Assets shall be higher than the accepted Stalking Horse Bid by (a) 3% of the cash the cash price bid for such Assets (not including the any cure amounts required by be paid under the Stalking Horse Bid in connection with the assumption and assignment of any Designated Agreements), plus (b) $100,000.  Thus, even if a Stalking Horse Bidder is provided with the Break-Up Fee and Expense Reimbursement and is

ultimately not the Winning Bidder, the Debtors will still have benefited from the higher floor established by any Stalking Horse Bids and thereby increase the likelihood that the price and terms at which the Assets will be sold will reflect the best offer(s) available.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 1st day of August 2023, at Annapolis, Maryland.

MATT LoCASCIO

# EXHIBIT "1"

1   DAVID L. NEALE (SBN 141225)
2   TODD M. ARNOLD (SBN 221868)
    ROBERT M. CARRASCO (SBN 334642)
3   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
    2818 La Cienega Avenue
4   Los Angeles, California 90034
    Telephone: (310) 229-1234
5   Facsimile: (310) 229-1244
    Email: DLN@LNBYG.COM; TMA@LNBYG.COM; RMC@LNBYG.COM
6
7   <mark>Proposed</mark> Attorneys for Debtors and Debtors in Possession

8                       UNITED STATES BANKRUPTCY COURT

9            CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

10

11

| | |
|---|---|
| In re: | Lead Case No.: 2:23-bk-14154-SK |
| ☐ ITTELLA INTERNATIONAL LLC, a California limited liability company | Jointly Administered with Case Nos.: 2:23-bk-14159-SK; 2:23-bk-14161-SK; 2:23-bk-14157-SK; 2:23-bk-14158-SK; 2:23-bk-14155-SK; 2:23-bk-14156-SK; and 2:23-bk-14160-SK |
| ☐ ITTELLA'S CHEF, LLC, a California limited liability company | |
| ☐ TATTOOED CHEF, INC., a Delaware corporation | Chapter 11 Cases |
| ☐ MYJOJO, INC., a Delaware corporation | |
| ☐ NEW MEXICO FOOD DISTRIBUTORS, INC., a New Mexico corporation | **BIDDING PROCEDURES** |
| ☐ KARSTEN TORTILLA FACTORY, LLC, a New Mexico limited liability company | |
| ☐ BCI ACQUISITION, INC., a Delaware corporation | |
| ☐ TTCF-NM HOLDINGS INC., a New Mexico corporation | |
| ☒ All Debtors | |
| Debtors and Debtors-in-Possession. | |

-1-

These bidding procedures (the "Bidding Procedures")[1] relate to the proposed free and clear sale by Ittella International LLC ("Ittella"), Ittella's Chef, LLC ("ICLLC"), Tattooed Chef, Inc. ("TCI"), Myjojo, Inc. ("Myjojo"), New Mexico Food Distributors, Inc. ("NMFD"), Karsten Tortilla Factory, LLC ("Karsten"), BCI Acquisition, Inc. ("BCI"), and TTCF-NM Holdings Inc. ("TTCF, and, together with Ittella, ICLLC, TCI, Myjojo, NMFD, Karsten, and BCI, the "Debtors"), the Chapter 11 debtors and debtors in possession in the above-captioned, jointly administered, Chapter 11 bankruptcy cases, of substantially all of the Debtors' assets (the "Assets") listed in **Exhibit "A"** hereto, which include, but are not limited to, (a) TCI's equity interests (the "U.S. Equity Interests") in any of its direct subsidiaries (Myjojo, NMFD, Karsten, BCI and TTCF) and/or indirect subsidiaries (Ittella and ICLLC), (b) ICLLC's equity interests (the "Italian Equity Interests") in Ittella Italy SRL ("Ittella Italy"),[2] (c) goods, (d) equipment, (e) accounts receivable, (f) intellectual property, (g) goodwill, (h) customer lists, (i) any executory contracts ("Contracts") and/or unexpired leases ("Leases") designated by any winning bidder (each a "Winning Bidder") and/or any back-up winning bidder (each a "Winning Back-Up Bidder") for assumption and assignment (with any Contracts and/or Leases designated for assumption and assignment collectively referred to as "Designated Agreements"), and (j) any related assets included in any Qualified Bid (as defined below) but which Assets shall **not** include the Debtors' cash and any avoidance actions arising under 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code").[3]

---

[1] These Bidding Procedures were approved by an order of the Court (the "Bid Procedures Order") [Dkt. ▮] entered on ▮, 2023 granting the Debtors' *Motion And Motion To: (1) Approve Auction(S) And Bid Procedures For The Sale Of Equity And/Or Assets And (2) Set Scheduling For A Motion To Approve The Sale Of Equity And/Or Assets* (the "Bid Procedures Motion") [Dkt. ▮].  The Bid Procedures Motion and Bid Procedures Order, like all pleadings in the above-captioned bankruptcy cases, are available at https://cases.stretto.com/Ittella.

[2] Ittella Italy is not a debtor in any bankruptcy proceeding in the United States.  However, Ittella Italy has commenced a proceeding in Italy to address outstanding creditor claims, which proceeding is governed by Italian law.  Pursuant to the Bid Procedures Motion and the Sale Motion (as defined below) that is to follow, the Debtors are not seeking to sell any assets owned by Ittella Italy, only ICLLC's Italian Equity Interests in Ittella Italy.  Due to exigencies arising due to Ittella Italy's pending Italian proceeding, there may be a separate, expedited sale of ICLLC's Italian Equity Interests in Ittella Italy.

[3] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

The sale of the Assets is subject to Court approval following an auction (the "<u>Auction</u>") of the Assets, all pursuant to the following Bidding Procedures.

**<u>KEY DATES</u>**

| August 25, 2023, at 2:00 p.m. (prevailing Pacific time) | **Stalking Horse Bid Deadline** – Deadline for the submission of stalking horse bids (each a "<u>Stalking Horse Bid</u>") from Qualified Bidders (as defined below).<br><br>In order to have a Stalking Horse Bid considered, a prospective bidder must be a Qualified Bidder and do all of the following on or before the foregoing deadline:[4]<br><br>1.    Submit to (a) the Debtors' ==proposed== investment banker, SC&H Group, Inc. ("<u>SCH</u>"), Attn: Matt LoCascio (<u>mlocascio@schgroup.com</u>) and Ken Mann (<u>kmann@schgroup.com</u>), (b) the Debtors' proposed bankruptcy counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("<u>LNBYG</u>"), Attn: David L. Neale (<u>dln@lnbyg.com</u>), Todd M. Arnold (<u>tma@lnbyg.com</u>), and Robert M. Carrasco (<u>rmc@lnbyg.com</u>), (c) counsel to the Debtors' primary, senior secured creditor, UMB Bank, N.A. ("<u>UMB</u>"), Sheppard, Mullin, Richter & Hampton LLP ("<u>SMRH</u>"), Attn: Kyle Mathews (<u>KMathews@sheppardmullin.com</u>), and (d) the members of any committee formed under Section 1102(a) or, when retained, counsel to any such committee ("<u>Committee Counsel</u>" and, with UMB, SMRH, and Committee Counsel, the "<u>Consultation Parties</u>") a signed asset purchase agreement (the "<u>APA</u>") in substantially the form attached hereto as **Exhibit "B,"** with the only permissible revisions being the identity of the Qualified Bidder making the Stalking Horse Bid, the list of Assets to be purchased, the list of Designated Agreements to be assumed and assigned, and the bid price, which shall be separated into the amount to be paid for the Assets, *plus* the cure costs related to any Designated Agreements, which shall be paid by any Winning Bidder or Winning Back-Up Bidder in connection with the assumption and assignment of any Designated Agreements;<br><br>2.    Submit to the Debtors, SCH, LNBYG, SMRH and Committee Counsel all proof reasonably requested to |

---

[4] The Debtors reserve the right to name and identify a Stalking Horse Bid earlier and to request modifications to bids to be accepted as Stalking Horse Bid(s).

determine whether the proposed bidder is financially qualified to timely close its Stalking Horse Bid under its APA, including the ability to, if required, (a) pay all cure amounts owed under any Designated Agreement and (b) provide adequate assurance of future performance as required by Section 365(b)(1) and (f)(2)(B); and

3.      Submit a deposit (each a "Deposit") via wire instructions to be provided on written request to SCH equal to 10% of the Stalking Horse Bid amount, with a minimum of $300,000[5] and a maximum of $1 million (the "Initial Deposit Requirement"), provided that (a) any Qualified Bidder making a further Stalking Horse Bid or Initial Bid (as defined below) before the Auction(s) shall increase its Deposit to meet the Initial Deposit Requirement, (b) any Winning Bidder must increase its Deposit to 10% of its final bid within 24 hours of the conclusion of the applicable Auction, and (c) Deposits shall be deemed non-refundable if (i) a bidder is deemed to be the Winning Bidder or a Winning Back-Up Bidder at the applicable Auction, (ii) the Debtors' proposed free and clear sale of Assets to the Winning Bidder or a Winning Back-Up Bidder is approved by the Court, and (iii) the Winning Bidder or a Winning Back-Up Bidder fails to close as required by their APA and the order of the Court approving the proposed free and clear sale of Assets to the Winning Bidder or a Winning Back-Up Bidder.

A Stalking Horse Bid received after the Stalking Horse Bid Deadline shall not be considered unless the Debtors and SCH, for good cause, consent, after consulting with the Consultation Parties[6].

| | |
|---|---|
| **August 30, 2023, at 2:00 p.m. (prevailing Pacific time)** | **Stalking Horse Bid Identification Deadline** – Deadline for (1) SCH, in consultation with the Consultation Parties, |

---

[5]  SCH, in consultation with the Consultation Parties, may reduce the minimum deposit in the case of an auction of less than all of the Assets.

[6]  Notwithstanding the foregoing, the Debtors will not consult with or provide copies of any bids or other confidential information with respect to particular Assets to any Consultation Party if such party is an active bidder for such Assets at the applicable time. For the avoidance of doubt, if UMB submits a bid for any Assets and thereby ceases to be a Consultation Party with respect to such Assets (for the avoidance of doubt, UMB and SMRH shall be Consultation Parties unless and until UMB submits a bid for any Assets and shall be Consultation Parties for any Assets that UMB is not actively bidding on), upon written notice by UMB or SMRH to the Debtors, or express confirmation on the record during the Auction, of UMB's withdrawal as a bidder for such Assets, UMB's and SMRH's rights as a Consultation Party shall be restored with respect to such Assets.

| | to identify accepted Stalking Horse Bids, including the Qualified Bidders that made such bids and the Assets subject to each Stalking Horse Bid, and (2) the Debtors to file notice of the foregoing with the Court.<br><br>Only a Qualified Bidder whose Stalking Horse Bid has been accepted in writing will be entitled to receive a Break-Up Fee and Expense Reimbursement (both as defined below) and only provided that all requirements for the payment thereof have been satisfied. |
|---|---|
| **September 5, 2023** | **Sale Motion Deadline** – Deadline for the Debtors to file a motion (the "<u>Sale Motion</u>") to approve (1) the sale of Assets free and clear of all liens, claims, and interests, (2) the assumption and assignment of Designated Agreements, which shall include a list of all Contracts and Leases that may be assumed and assigned and related cure amounts, and (3) related relief. |
| **September 12, 2023** | **Sale Motion Objection Deadline** – Deadline for objections to the Sale Motion, other than in regard to (1) a sale of the Assets free and clear of all liens, claims, and interests if the proposed sale price is less than all secured debt, and secured creditors have not consented to the proposed sale of Assets pursuant to the Sale Motion, (b) the assumption and assignment of Designated Agreements as to adequate assurance of future performance, but not as to cure amounts, for which this will be the deadline to object, and (c) a good faith finding with respect to the Winning Bidders ("<u>Initial Sale Motion Objections</u>"). |
| **September 15, 2023** | **Deadline to Overbid Stalking Horse Bids** – Deadline for Qualified Bidders to submit to SCH Initial Bids (as defined below) overbidding the current Stalking Horse Bid(s). Promptly following SCH's receipt of each Initial Bid, SCH will share each such Initial Bid with the Consultation Parties.<br><br>An overbid to a Stalking Horse Bid received after the Deadline to overbid Stalking Horse Bids shall not be considered unless the Debtors and SCH, after consulting with the Consultation Parties, for good cause, consent.<br><br>**Deadline to Become a Qualified Bidder** – Deadline for any Potential Bidder to become a Qualified Bidder other |

| | |
|---|---|
| | than a Qualified Credit Bid (as defined below). |
| **September 18, 2023, at 2:00 p.m. (prevailing Pacific time)** | **Deadline for Notice of Qualified Bids**: Deadline for SCH, in consultation with the Consultation Parties, to identify to all Qualified Bidders: (a) each and every Initial Bid that SCH considers to be a Qualified Bid (as defined below) and (b) if more than one Qualified Bid has been timely received, the Qualified Bid(s) that will constitute the Opening Bid(s) (as defined below) at the applicable Auction, the Assets to which each Opening Bid applies, and the bidding order in which such Auction will be conducted. |
| **September 19, 2023** | **Sale Motion Reply Deadline** – Deadline for the Debtors and any other parties in interest to reply to any Initial Sale Motion Objections. |
| **September 19, 2023, at 10:00 a.m. (prevailing Pacific time)** | **Auction(s)** – Auction(s) of the Assets to be held at the offices of LNBYG, which are located at 2818 La Cienega Avenue, Los Angeles, California 90034, with access available via Zoom with all Qualified Bidders to be provided with particulars in advance of the Auction(s), which shall be documented by a court reporter. |
| **September 20, 2023** | **Sale Motion Supplement Deadline** – Deadline for (1) the Debtors to file supplement to Sale Motion describing the Auction(s), bids before and during the Auction(s), the Winning Bidder(s) and Winning Back-Up Bidder(s), any bases for a good faith finding under Section 363(m), Contracts and Leases to be assumed and assigned and/or rejected, and adequate assurance information regarding Designated Agreements that will be assumed and assigned (the "Sale Motion Supplement"), and (2) Winning Bidder(s) to file with the Court any documents or information required for a good faith finding under Section 363(m) and adequate assurance of future performance as required by Sections 365(b)(1) and (f)(2)(B). |
| **September 22, 2023** | **Sale Motion Supplement Objection Deadline** – Deadline for objections to the Sale Motion and Sale Motion Supplement, only in regard to (1) a sale of the Assets free and clear of all liens, claims, and interests if the sale price is less than all secured debt, and secured |

| | creditors have not consented to the proposed sale of Assets pursuant to the Sale Motion, (b) the assumption and assignment of Designated Agreements solely as to evidence of adequate assurance of future performance, but not as to cure amounts, and (c) a good faith finding with respect to the Winning Bidder(s) ("Supplemental Sale Motion Objections"). |
|---|---|
| **September 25, 2023, at 12:00 p.m. (prevailing Pacific time)** | **Sale Motion Supplement Reply Deadline** – Deadline for the Debtors and any other parties in interest to reply to any Supplemental Sale Motion Objections. |
| **September 27, 2023, at 9:00 a.m. (or such time thereafter as available to the court) (prevailing Pacific time)** | **Sale Motion Hearing** – Hearing on the Sale Motion (the "Sale Hearing"). |
| **Fifteen (15) days after the entry of an order of the Court granting the Sale Motion and approving the sale of Assets and the assumption and assignment of Designated Agreements and any related transactions contemplated by the Sale Motion, provided that such order is final.** | **Closing Deadline** – Deadline for any Winning Bidder(s) to close the sale of Assets and the assumption and assignment of Designated Agreements and any related transactions contemplated by the Sale Motion. |

## **STALKING HORSE BIDDER**

As of the date hereof, there are no Stalking Horse Bidders.  However, as discussed above, the Debtors and SCH are seeking Stalking Horse Bids, there is a deadline for making Stalking Horse Bids, and the Debtors will provide notice of any accepted Stalking Horse Bids. Before selecting any Stalking Horse Bids, the Debtors will consult with the Consultation Parties.

## **MINIMUM PRICE**

None as of the date hereof, but may be set by any Stalking Horse Bids as to some or all Assets.

## **DUE DILIGENCE ACCESS / AUCTION PARTICIPATION REQUIREMENTS**

Other than a Qualified Credit Bid, in order to make a Stalking Horse Bid or to otherwise participate in the Auction process as a bidder, a person or entity interested in purchasing some or all of the Assets (a "Potential Bidder") must deliver or have previously delivered to SCH all of the following documents (the "Participation Requirements"): (1) an executed non-disclosure agreement in the form provided by SCH; (2) a statement demonstrating a *bona fide* interest in purchasing some or all of the Assets; and (3) one of the following: (i) written evidence of readily available funds equal to the Potential Bidder's Stalking Horse Bid, any other Initial Bid (as defined below), and any increase the Potential Bidder desires to have authority to bid to, with SCH to keep all such information completely confidential, (ii) a firm, non-contingent commitment for financing sufficient for the Potential Bidder to timely consummate its purchase of such Assets and the assumption and assignment of any Designated Agreements, including the payment of required cure amounts if the Potential Bidder were to be designated as the Winning Bidder, or (iii) other sufficient information, which may include current audited financial statements and the latest unaudited financial statements of the Potential Bidder and/or its equity holders, or such other form of financial disclosure and credit-quality support or enhancement that will allow SCH, in consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to timely consummate their purchase of such Assets and the assumption and assignment of any Designated Agreements, including the payment of required cure amounts.  Any Potential Bidder who has satisfied the foregoing Participation Requirements will be afforded, subject to the other provisions of the Bid Procedures, due diligence access and additional information through access to an online data room, as well as, upon reasonable advance notice, on-site visits and direct communication with management as the Potential Bidder desires and SCH determines to be appropriate under the circumstances and subject to the availability of such management.

## BID DEADLINES

*See* Key Dates paragraph above regarding deadlines for Stalking Horse Bids, other Initial Bids, overbidding Stalking Horse Bids before the Auction(s), and the Auction(s).

## BID REQUIREMENTS

Other than a Qualified Credit Bid (defined below), to be eligible to make a Stalking Horse Bid or overbid and prior to the Auction(s) (each an "Initial Bid"), each Initial Bid and each Potential Bidder submitting an Initial Bid (each, a "Bidder") must be determined by the Debtors and SCH, in consultation with the Consultation Parties, to have satisfied all of the conditions listed below (collectively, the "Bid Requirements"), most of which have been or will be incorporated into the APA to be used by Bidders making Initial Bids:[7]

    1.   Signature. The APA pursuant to which the Initial Bid is made shall be signed by an authorized representative of the Bidder.

    2.   Terms. An Initial Bid shall identify which of the Assets the Bidder is making an Initial Bid upon, including any Designated Agreements to be assumed and assigned to the Bidder.

    3.   No Contingencies. An Initial Bid shall include a provision providing that there are no conditions precedent to the Bidder's authority to consummate its purchase of the Assets bid upon, including any related assumption and assignment of Designated Agreements, other than entry by the Court of a final order approving the sale of Assets to the Bidder (the "Sale Order").

    4.   Bid Requirements. An Initial Bid shall set forth a cash purchase price for the Assets, which shall be separated into the amount to be paid for the Assets, *plus* the cure costs related to any Designated Agreements, which shall be paid by any Winning Bidder or Winning Back-Up Bidder in connection with the assumption and assignment of any Designated Agreements. Without limiting the generality of the foregoing, an Initial Bid (a) may not be conditioned upon obtaining financing, any internal, regulatory, or other

---

[7] This is only a summary of terms to be included in the APA. To the extent there is any disagreement between this summary and the actual terms of the APA, the terms of the APA shall govern in all respects.

third party approvals, or on the outcome or review of due diligence, and (b) may not provide for a closing date (the "<u>Sale Closing</u>") that will be later than fifteen (15) days after the entry of an order of the Court granting the Sale Motion and approving the sale of Assets and the assumption and assignment of Designated Agreements and any related transactions contemplated by the Sale Motion, provided that such order is final.

5.      <u>Irrevocable.</u>  An Initial Bid shall include a provision providing that the offer made by the Bidder in its Initial Bid is binding and irrevocable until the conclusion of the Sale Hearing and such Initial Bid must continue to remain binding and irrevocable through the Sale Closing if the Initial Bid or any higher bid submitted by the Bidder at the applicable Auction is accepted by the Debtors at such Auction as the Winning Bid (as defined below) or the Winning Back-Up Bid (as defined below) and approved by the Court at the Sale Hearing.

6.      <u>Identity of Bidder.</u>  An Initial Bid shall fully disclose the identity of each entity or person that will be bidding for or purchasing the Assets, including all material equity holders (*i.e.*, parties that own at least 10% of the equity of the Bidder) in the case of a Bidder that is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Initial Bid, and the complete terms of any such participation, including any agreements, arrangements or understanding concerning collaborative or joint bid or any other combination concerning the proposed Initial Bid.  An Initial Bid must also fully disclose any connection with or participation by any "insider" (as defined by Section 101(31)) of the Debtors or any relative or any affiliate of any "insider" of the Debtor.  An Initial Bid shall also fully disclose any connection with or participation by any current creditor or equity holder of the Debtors.

7.      <u>Contact Information.</u>  An Initial Bid shall include the names and contact information (including phone numbers and email addresses) of all authorized representatives of the Bidder who will be available to answer questions regarding the Initial Bid, including advisors and related parties.

8.  <u>Deposit.</u>  An Initial Bid shall include a provisions providing for a Deposit to be made concurrently with receipt of the Bidders Initial Bid via wire instructions to be provided on written request to SCH equal to 10% of the Stalking Horse Bid or other Initial Bid amount, with a minimum of $300,000[8] and a maximum of $1 million (*i.e.*, Initial Deposit Requirement), provided that (a) any Qualified Bidder making a further Initial Bid before the Auction(s) shall increase its Deposit to meet the Initial Deposit Requirement, (b) any Winning Bidder must increase its Deposit to 10% of its final bid within 24 hours of the conclusion of the applicable Auction, and (c) Deposits shall be deemed non-refundable if (i) a Bidder is deemed to be the Winning Bidder or a Winning Back-Up Bidder at the applicable Auction, (ii) the Debtors' proposed free and clear sale of Assets to the Winning Bidder and/or a Winning Back-Up Bidder, as applicable, is approved by the Court, and (iii) the Winning Bidder and/or a Winning Back-Up Bidder, as applicable, fails to close as required by their APA and the order of the Court approving the proposed free and clear sale of Assets to the Winning Bidder or a Winning Back-Up Bidder.

If a bid submitted at an Auction ("<u>Bid</u>"), including any Initial Bid, is determined to be the Winning Bid at such Auction and the Bidder who submitted such Winning Bid fails to timely close the sale for any reason other than the Court not entering a final Sale Order approving the Winning Bid, the Deposit shall become non-refundable and be forfeited to the Debtors.  The same shall apply to any Winning Back-Up Bid.  In the event the Winning Bidder fails to timely close the sale, the Winning Back-Up Bidder shall be notified in writing that it is now the Winning Bidder, and, if the Winning Back-Up Bidder fails to close its purchase within ten (10) days of having been notified that it was the Winning Bidder, unless the Winning Bidder and the Debtors (in consultation with the Consultation Parties) jointly agree to extend the sale closing date, the Winning Back-Up Bidder's Deposit shall become non-refundable and be forfeited to the Debtors.  All Deposits shall be held in a segregated account maintained by SCH and shall be returned

---

[8] SCH, in consultation with the Consultation Parties, may reduce the minimum deposit in the case of an auction of less than all of the Assets.

(other than with respect to the Winning Bidder and the Winning Back-Up Bidder) promptly after the conclusion of the applicable Auction.

9.    <u>Financing Sources.</u>    An Initial Bid shall include written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed sale with appropriate contact information for such financing sources, with SCH, in consultation with the Consultation Parties, to determine whether such evidence of financing satisfies the bidding requirements and enables the Bidder to participate in the Auction(s), with such determination to be in SCH's sole and absolute discretion after consulting with the Consultation Parties.

10.    <u>Break-Up Fees and Expense Reimbursements, and Termination Fees.</u>    Any Qualified Bidder that makes a timely Stalking Horse Bid that has been accepted in writing by the Debtors (directly or through SCH) after consulting with the Consultation Parties shall be entitled to receive (a) a fee in an amount up to 2% of the amount bid for Assets subject to the Stalking Horse Bid (the "<u>Break-Up Fee</u>"), which Break-Up Fee shall be calculated based only on the cash price bid for such Assets and *not* any cure amounts required by be paid by the Qualified Bidder in connection with the assumption and assignment of any Designated Agreements, and (b) up to $100,000[9] of actual, out-of-pocket professional fees and expenses incurred by the Qualified Bidder (the "<u>Expense Reimbursement</u>"), provided that any Break-Up Fee and/or Expense Reimbursement shall only be payable if the Qualified Bidder's timely Stalking Horse Bid accepted in writing by the Debtors (directly or through SCH) is overbid by a higher Winning Bid or Winning Back-Up Bid (both as defined below) that is accepted by the Debtors, approved by the Court pursuant to a final Sale Order, and closes.

Other than the foregoing, no other Bidders, including any Qualified Bidder that submits an Initial Bid that is not a Stalking Horse Bid, shall be entitled to receive any Break-Up Fee or Expense Reimbursement, and any Initial Bid, other than a Stalking Horse

---

[9] SCH, in consultation with the Consultation Parties, may reduce the Expense Reimbursement in the case of an auction of less than all of the Assets.

Bid timely submitted on or before the Stalking Horse Bid Deadline, must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and by submitting an Initial Bid, the Bidder waives the right to pursue a substantial contribution claim under Section 503 related in any way to the submission of its Initial Bid or its participation in the Auction(s).

### QUALIFIED BIDDERS AND QUALIFIED BIDS

Potential Bidders who have satisfied the Participation Requirements and Bid Requirements will be deemed "Qualified Bidders," and Initial Bids that meet all of the Bid Requirements described above will be deemed "Qualified Bids," in each case, only if the Debtors and SCH, in consultation with the Consultation Parties, conclude in the exercise of their business judgment, that such Initial Bid would be consummated if selected as the Winning Bid; provided, however, that, for avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors or SCH to their satisfaction, the Debtors and SCH, in consultation with the Consultation Parties, shall have right, in their sole and absolute discretion, to disqualify any Qualified Bidder and Qualified Bid, and such Bidder shall not be entitled to attend or otherwise participate in the Auction(s).

### AUCTION(S)

If no Qualified Bids are received then the Auction(s) will be deemed automatically cancelled unless the Debtors and SCH determine otherwise, in their sole and absolute discretion. If only one Qualified Bid is received, there will be no Auction(s) and the Qualified Bidder will be deemed the Winning Bidder.  If more than one Qualified Bid is received, the Auction(s) will proceed as scheduled. The Debtors will have the right to conduct any number of Auctions on such date to accommodate Qualified Bids for certain, but less than all, of the Assets, in consultation with the Consultation Parties, that such process would be in the best interest of the Debtors' estates.

## **OPENING BID AT THE AUCTION(S)**

The Qualified Bid(s) determined by SCH and the Debtors, in consultation with the Consultation Parties, to constitute the highest and best Initial Bid(s) will serve as the opening bid(s) (the "Opening Bid(s)") at the Auction(s). SCH will notify all Qualified Bidders in advance of the Auction(s) which Initial Bid(s) have been accepted as the Opening Bid(s) at the Auction(s) and the order in which the bidding at the Auction(s) will proceed.

## **CONDUCTING THE AUCTION(S); INITIAL OVERBID AMOUNT, AND SUBSEQUENT OVERBID AMOUNTS**

SCH and LNBYG, in consultation with the Consultation Parties, will direct and preside over the Auction(s). At the start of each Auction, and after each Qualified Bidder acknowledges on the record that it has not engaged in any collusion with respect to the bidding, that its Initial Bid is a good faith *bona fide* offer, and that it intends to consummate the proposed transaction if selected as the Winning Bidder or the Winning Back-Up Bidder, SCH and LNBYG will identify, confirm and describe the Opening Bid(s). The bidding will then ensue in the bidding order provided by SCH to all Qualified Bidders in advance of such Auction. All Bids will be made and received in one room (or otherwise in the presence via Zoom, Webex or similar virtual means of all parties), on an open basis, and all Qualified Bidders and Consultation Parties will be entitled to be present for all bidding with the understanding that the identity of each Qualified Bidder will be fully disclosed to all Qualified Bidders and Consultation Parties before such Auction and the material terms of each Qualified Bid submitted prior to such Auction, and all successive bids made at such Auction, will be fully disclosed to all Qualified Bidders and Consultation Parties. All Qualified Bidders will be permitted to bid at such Auction based on what SCH and LNBYG determine to be an appropriate amount of time to respond to each prior submitted Bid.

Prior to each Auction, SCH will randomly assign to each Qualified Bidder a bidder number, except that the Qualified Bidder whose Initial Bid was accepted as the Opening Bid for a particular subset of Assets will be assigned bidder number 1. Once the Opening Bid has been described by SCH and LNBYG, the bidding for the subject subset of Assets will then pass to Bidder number 2. Bidder number 2 will have the option of submitting an overbid to the Opening

Bid, passing, or dropping out of such Auction.  Once a Bidder drops out of such Auction, the Bidder will no longer be permitted to participate in the applicable Auction regarding the subject subset of Assets.  After Bidder number 2 either submits a qualifying overbid, passes, or drops out of such Auction, the bidding will then pass to Bidder number 3.  A Bidder may not pass on making a qualifying overbid more than twice during such Auction.  This process will apply to each subset of Assets and continue until only two Qualified Bidders are left for all or each subset of the Assets, in which case the Qualified Bidder who submits the highest Qualified Bid will be deemed the Winning Bidder at such Auction, and the Qualified Bidder who submits the second highest Qualified Bid (excluding any Qualified Credit Bid) will be deemed the Winning Back-Up Bidder at such Auction.

Except as expressly provided in the order approving the Bid Procedures or the provisions of the Bid Procedures, the Debtors and SCH, in consultation with the Consultation Parties, shall have the right to conduct the Auction(s) in the manner they reasonably determine, in the exercise of their business judgment, to be in the best interests of the Debtors' bankruptcy estates.  The Debtors and SCH, in consultation with the Consultation Parties,  shall also have the right to deviate from the Bid Procedures without the need for any further order of the Court if they reasonably determine, in the exercise of their business judgment, that doing so would be in the best interests of the Debtors' bankruptcy estates and is not inconsistent with any of the provisions of the Bankruptcy Code or any previously entered order of the Court including the order approving the Bid Procedures.

SCH and LNBYG, in consultation with the Debtors and the Consultation Parties, may (1) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer and (2) reject at any time any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtors or their bankruptcy estates; provided that, the highest, best, and otherwise financially superior offer shall be the Qualified Bid at the applicable Auction reasonably expected to result in the highest amount of money being paid to the Debtors for their purchase of the Assets.

### INITIAL OVERBID AMOUNT AND SUBSEQUENT OVERBID AMOUNTS

The initial overbid amount (each an "Initial Overbid Amount") after the accepted Stalking Horse Bid for each subset of Assets shall be higher than the accepted Stalking Horse Bid by (1) 3% of the cash price bid for such Assets (not including any cure amounts required by be paid under the Stalking Horse Bid in connection with the assumption and assignment of any Designated Agreements), plus (2) $100,000.

Each Bid after the initial overbid for each subset of Assets, shall exceed the prior overbid by $100,000[10] (each a "Subsequent Overbid Amount"), provided that the Debtors and SCH, in consultation with the Consulting Parties, shall have the right to adjust the Subsequent Overbid Amount in the manner they reasonably determine, in the exercise of their business judgment, to be in the best interests of the Debtors' bankruptcy estates.

### SPECIAL RULES APPLICABLE TO UMB BANK, N.A.

As set forth in the DIP Order, unless a Challenge (as defined in the DIP Order) is timely and properly raised in accordance with the terms of the DIP Order, UMB has a valid, binding, perfected and enforceable first priority security interest in substantially all of the Debtors' Assets to secure the Lender Allowed Claim (as defined in the DIP Order) and the DIP Obligations (as defined in the DIP Order), subject to the subject only to (x) Excluded Assets (as defined in the DIP Order), (y) the Permitted Prior Liens (as defined in the DIP Order) and (z) the Carve-Out (as defined in the DIP Order).  Pursuant to Section 363(k) and the DIP Order, UMB shall have the right to credit bid all or any portion of the Lender Allowed Claim (as defined in the DIP Order) and the DIP Obligations (as defined in the DIP Order).  Notwithstanding anything to the contrary herein, UMB shall be deemed to be a Qualified Bidder and, subject to Section 363(k) and to UMB's compliance with the Bidding Procedures. UMB shall be deemed a Qualified Bidder, and any Bid submitted by UMB shall deemed a Qualified Bid (a "Qualified Credit Bid").  UMB shall not be entitled to any Break-Up Fee, Expense Reimbursement, and/or any substantial

---

[10] SCH, in consultation with the Consultation Parties, may reduce the bid increment in the case of an auction of less than all of the Assets.

contribution claim under Section 503 related in any way to the submission of a Stalking Horse Bid or any other Initial Bid, or its participation in the Auction(s).  UMB shall not be obligated to submit a Deposit with its Bid.  UMB shall have the right to credit bid even if it does not submit an Initial Bid or bid in earlier rounds.  The Qualified Credit Bid will not serve as a Backup Bid without the written consent of UMB. For the avoidance of doubt, any of the prepetition or post-petition obligations that are credit bid as part of a Qualified Credit Bid will be treated as cash consideration at the face amount of such obligations for the purposes of calculating whether such Qualified Credit Bid is the highest and best Bid.  Except as otherwise provided herein, UMB shall be bound by all other terms of the Bid Procedures.

## SELECTION OF WINNING BID AND WINNING BACK-UP BID

The Auction(s) shall continue until there is one Qualified Bid for all of the Assets or for any subset of the Assets that the Debtors, SCH, and LNBYG in consultation with the Consulting Parties, determine, subject to Court approval at the Sale Hearing, to be the highest and best bid (each a "Winning Bid") for all of the Assets or for any subset of the Assets, and another Qualified Bid to be the second highest and best bid (each a "Winning Back-Up Bid") for all of the Assets or for any subset of the Assets, at which point the applicable Auction will be deemed concluded. The Debtors will not consider any Bids submitted after the conclusion of the applicable Auction.

Unless the Debtors, UMB and the applicable Winning Bidder jointly agree to an extension of the outside sale closing date, which will be in their sole and absolute discretion, the Winning Bidder(s) shall be required to close their purchase(s) of the Assets no later than fifteen (15) days after the entry of a final Sale Order granting the Sale Motion and approving the free and clear sale(s) of Assets and the assumption and assignment of Designated Agreements and any related transactions contemplated by the Sale Motion, provided that such order is final (the "Closing Date").  Any Winning Bidder that does not close the purchase it its Assets by the Closing Date will be deemed to have forfeited its Deposit to the Debtors.  Promptly following the closing of the sale(s) to the Winning Bidder(s), SCH shall return the Deposit of the relative Winning Back-Up Bidder(s) to the relevant Winning Back-Up Bidder(s).

If the Winning Bidder(s) fail to close their purchase by the Closing Date, unless the Debtors, UMB and the applicable Winning Bidder jointly agree to an extension of the outside Closing Date, which will be in their sole and absolute discretion, SCH shall so notify the relevant Winning Back-Up Bidder(s).  The relevant Winning Back-Up Bidder(s) will then have ten (10) days following the date of having been notified by SCH to close their purchase(s) of Assets.  If a Winning Back-Up Bidder fails to close its purchase of Assets within this time period, unless the Debtors (after consulting with the Consultation Parties) and the relevant Winning Back-Up Bidder mutually agree, in their sole and absolute discretion, to extend the Closing Date, the relevant Winning Back-Up Bidder will be deemed to have forfeited its Deposit to the Debtors.

Dated: August __, 2023

LEVENE, NEALE, BENDER YOO
& GOLUBCHIK L.L.P.

By:    /s/ David L. Neale
       DAVID L. NEALE
       TODD A. ARNOLD
       JOHN-PATRICK M. FRITZ
       ROBERT M. CARRASCO
Proposed Counsel for Chapter 11
Debtors and Debtors in Possession

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

**<u>EXHIBIT "A"</u>**

21

**[LIST OF ASSETS FOR SALE]**

22
23
24
25
26
27
28

# EXHIBIT "A"[1]

## EQUITY INTERESTS

### U.S. EQUITY INTERESTS

1.    TCI's 100% equity interests in its direct subsidiaries: Myjojo, NMFD, Karsten, BCI and TTCF.

2.    Myjojo's 100% equity interest in its direct subsidiary: Ittella.

3.    Ittella's 100% equity interest in its direct subsidiary: ICLLC.

4.    ICLLC's100% equity interest in its direct subsidiary: Ittella Italy

## ACCOUNTS RECEIVABLE[2]

[TO FOLLOW]

## RAW MATERIALS[3]

[TO FOLLOW]

## WORK IN PROGRESS[2]

[TO FOLLOW]

## INVENTORY[2]

[TO FOLLOW]

---#

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Bidding Procedures.

[2] The Debtors' accounts receivable have some turnover as accounts receivable are collected and new accounts receivable are created when inventory is sold.  Therefore, as the accounts receivable list is updated, the most current version of such list will be made available to prospective Bidders via the data room for the Auction.

[3] The Debtors' raw materials, work in progress, and inventory all have some turnover as raw materials are purchased and processed into inventory, and inventory and sold in the ordinary course of the Debtors' business. Therefore, as the raw materials, work in progress, and inventory lists are updated, the most current version of such lists will be made available to prospective Bidders via the data room for the Auction.

## INTELLECTUAL PROPERTY

### TRADEMARKS[4]

| | Jurisdiction | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead | Class(es) |
|---|---|---|---|---|---|---|---|
| 1. | U.S. | 97878832 | | GROWING + MAKING PLANT BASED FOODS FOR PEOPLE WHO GIVE A CROP | TSDR | LIVE | |
| 2. | U.S. | 97878828 | | GROWING + MAKING PLANT BASED FOODS FOR PEOPLE WHO GIVE A CROP | TSDR | LIVE | |
| 3. | U.S. | 97689034 | | PEOPLE WHO GIVE A CROP | TSDR | LIVE | |
| 4. | U.S. | 90833757 | | TATTOOED CHEF | TSDR | LIVE | |
| 5. | U.S. | 88459153 | | PEOPLE WHO GIVE A CROP | TSDR | DEAD | |
| 6. | U.S. | 88459166 | | CULINARIAN LIBRARIAN | TSDR | LIVE | |
| 7. | U.S. | 87979888 | 5705366 | TATTOOED CHEF | TSDR | LIVE | |
| 8. | U.S. | 87517021 | 6283412 | TATTOOED CHEF | TSDR | LIVE | |
| 9. | U.S. | 87092039 | 5908459 | TATTOOED CHEF | TSDR | LIVE | |
| 10. | U.S. | 87517032 | | ITTELLA | TSDR | DEAD | 029; 030 |
| 11. | U.S. | 76412046 | | DE LA CASA | TSDR | DEAD | 029; 030 |
| 12. | U.S. | 76410113 | | SAN FRANCISCO FOODS CO. | TSDR | DEAD | 029; 030 |
| 13. | U.S. | 74381274 | 1858733 | FOODS OF NEW MEXICO | TSDR | DEAD | 029 |
| 14. | U.S. | 86661692 | 4922123 | FOODS OF NEW MEXICO | TSDR | LIVE | |
| 15. | U.S. | 85859211 | | RIO GRANDE TORTILLA FACTORY | TSDR | DEAD | 030 |
| 16. | U.S. | 85850565 | | TERRITORIAL TORTILLA FACTORY | TSDR | DEAD | 030 |
| 17. | U.S. | 85842698 | | ROSIE'S TORTILLAS | TSDR | DEAD | 030 |
| 18. | U.S. | 85829348 | | WOW! "FEEL, SMELL, AND TASTE THE DIFFERENCE!" | TSDR | DEAD | 030 |
| 19. | U.S. | 85826057 | | EL GORDO | TSDR | DEAD | 030 |
| 20. | U.S. | 85107867 | | FOODS OF NEW MEXICO | TSDR | DEAD | 029 |
| 21. | U.S. | 77935332 | | HATCH CHILE BROKERAGE COMPANY | TSDR | DEAD | 030 |
| 22. | U.S. | 75558761 | 2246869 | HATCH CHILE BROKERAGE COMPANY | TSDR | DEAD | 030 |
| 23. | U.S. | 74381274 | 1858733 | FOODS OF NEW MEXICO | TSDR | DEAD | 029 |
| 24. | U.S. | 73794465 | 1561675 | FOODS OF NEW MEXICO | TSDR | DEAD | 029 |
| 25. | U.S. | 73722269 | | FOODS OF NEW MEXICO | TSDR | DEAD | 029 |
| 26. | U.K. | UK00801502134 | UK00801502134 | PEOPLE WHO GIVE A CROP | | | 25, 29, 30 |
| 27. | International Registration designating the European Union and United Kingdom | W01502134 | W01502134 | PEOPLE WHO GIVE A CROP | | | 25, 29, 30 |

--------------------------#

[4] Relevant USPTO and other hyperlinks are active where available.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### LEASES

| Tab Reference | Contract ID | Lease Category | Contract Title | Lessor | Lessee | Description | Asset Leased |
|---|---|---|---|---|---|---|---|
| 1.1a | 6305 - Alondra Paramount | | | Ittella Properties LLC | Tattooed Chef, Inc. | Lease of real property including improvements - 6305 Alondra Blv., Paramount CA (approx. 16,608 sq. ft. cold storage building) | |
| 1.1a3 | 6307 Alondra | Real Estate | | Scorpio Line LLC | Ittella International, Inc. | Lease of real property including improvements - 6307 Alondra Blv., Paramount CA (approx. 3,150 sq. ft) | Warehouse Space |
| 1.1b | 6325 Alondra | Real Estate | Standard Industrial/ Commercial Single-Tenant Lease-Gross | JEP Mason Enterprise LLC | Ittella International, Inc. | Lease of real property including improvements - 6325 Alondra Blv., Paramount CA (approx. 16,608 sq. ft. cold storage building) | Cold storage building |
| 1.1c | 6403 Alondra | Real Estate | Standard Industrial/ Commercial Single-Tenant Lease-Gross | Robert A. D'Souza and Effie M. D'Souza Revocable Living Trust | Ittella International, LLC | General office and warehouse use, including dry storage (approximately 9,304 rentable square feet) | Office/ warehouse |
| 1.1d | 6409 Alondra | Real Estate | Standard Industrial/ Commercial Single-Tenant Lease-Gross | RIF V – Paramount Business Center | Ittella International, Inc. | Packaging, warehousing and distribution of food items (approximately 3,594 rentable square feet) | Office space & dry storage |

| 1.1d2 | 6411 Alondra | Real Estate | RIF V – Paramount Business Center | RIF V – Paramount Business Center | Ittella International, Inc. | | Office space |
| 1.1d3 | 6309 Alondra | Real Estate | Commercial lease agreement | Jian Liu, individual | Ittella International, Inc. | Part of warehouse and office , (approximately 2700 rentable square feet) | Office/ warehouse |
| 1.2.4 | 1622 South Gaffey Street, 201,204,207-209 & additional Suites 202 and 205, San Pedro, CA 90731 | Real Estate | Standard Industrial/ Commercial Single-Tenant Lease-Gross | Deluna Investment, Inc. | Ittella International, Inc. | Offices & Storage of Office Records, comprising approximately 1,919 rentable square feet. | Offices & Storage of Office Records |
| 1.2.6 | 2021 52nd Street, Vernon, CA 90058 | Real Estate | Standard Industrial/ Commercial Single-Tenant Lease-Net | Grateful Egg, LLC | Ittella International, Inc. | approximate 46,510 SF freestanding industrial building situated on 76,230 SF of land | Distribution, warehouse and fulfillment of food products, office use, and any other uses permitted by current zoning; |
| 1.2.7 | Cloud@Work | Equipment | | Cloud@Work | Ittella International, Inc. | Cloud hosting agreement for SageX, as these equipements are idenfied assets and exclusively used for TTCF and TTCF gains almost all of the economic benefits for these equipments, therefore, treated as embedded lease. | VCPU cores, RAM, Production storage, etc. |
| 1.3.1 | 3041 University Blvd. SE, Albuquerque, NM, 87106 | Real Estate | | Larry Gutierrez | NMFD | Lease of real property including improvements - 3041 University Bld | Manufacturing Facility |
| 1.3.2 | 2601 Baylor Dr SE, Albuquerque, NM, 87106 | Real Estate | | Greg Pluemer | NMFD | Lease of real property including improvements - 2601 Baylor Dr (approx 30,000 sq ft) | Warehouse Space |

| 1.3.3 | 1700 Desert Surf Circle., NE Albuquerque, New Mexico 87107 | Real Estate | AQB lease | The Tortilla Building, LLC | TTCF-NM Holdings, Inc | Lease of real property- 1700 Desert Surf Circle., NE Albuquerque, New Mexico 87107 | Manufacturing Facility |
|---|---|---|---|---|---|---|---|
| FL 3.1 | Addendum to business loan agreement | Real Estate | Commercial Security Agreement | Nusenda Federal Credit Union | Karsten Tortilla Factory LLC | IRB lease | |
| 1.4 | 4718 Belmont Avenue, Youngstown, Ohio 44505 & 1598 Motor Inn Drive, Girard, OH 44420 | Real Estate | | PENHURST REALTY, LLC | BELMONT ACQUISITION, INC. | Lease of real property including improvements - 4718 Belmont Avenue, | Manufacturing Facility |
| 1.4.2.b | 6105 W. Liberty St, Hubbard, Ohio 44425 | Real Estate | | PNM Development Group LLC | BELMONT ACQUISITION, INC. | 22000 Square feet for warehouse purposes | Warehouse Space |
| 2.8 | Tennant floor scrubber | Equipment | Flex clean rental agreement | Wells Fargo | BELMONT Confections, Inc. | Tennant Model T500e Scrubber | |
| 3.6 | IDEALLEASE CERNI | Vehicle | IDEALLEASE CERNI | CERNI LEASING LLC | BELMONT ACQUISITION, INC. | MODEL: MV SBA22.5 Vehicle#:10353 | Vehicle |

| 3.7 | Penske | Vehicle | Penske Truck Lease Agreement | Penske Truck Leasing Co, L.P. | BELMONT ACQUISITION, INC. | 2019 freightliner M2 106 sadc Multivans | Vehicle |
|---|---|---|---|---|---|---|---|
| 3.8.1 | Penske | Vehicle | Penske Truck Lease Agreement | Penske Truck Leasing Co, L.P. | NMFD | 2020 International MV4*2 Truck | Vehicle |
| 3.8.2 | Penske | Vehicle | Penske Truck Lease Agreement | Penske Truck Leasing Co, L.P. | NMFD | 2019 International MV4*2 Truck Morgan 25*103*102 | Vehicle |
| 3.8.3 | Penske | Vehicle | Penske Truck Lease Agreement | Penske Truck Leasing Co, L.P. | NMFD | 2018 Freightliner M2 106 4*2 Truck | Vehicle |
| 3.8.4 | Penske | Vehicle | Penske Truck Lease Agreement | Penske Truck Leasing Co, L.P. | NMFD | 2023 Morgan Aluminum &2024 Hino L6 | Vehicle |
| 2.1.3.2a | Linde Agreement | Equipment | The Linde Group | The Linde Group | Ittella International, Inc. | Addition of application equipment to Agreements in place. Linde Spiral Freezer | Addition of application equipment to Agreements in place. Linde Spiral Freezer |

| 2.9 | Sonsray rental and leasing, inc. | Trailers | Sonsray rental and leasing, inc. | Sonsray rental and leasing, inc. | Ittella International, Inc. | Equipment Lease Agreement | Reefer R-8000B |
| 3.5_2019_3.1 | Penske Truck Lease Agreement | Vehicle | Vehicle Lease Service Agreement | Penske Truck Leasing Co, L.P. | Ittella International, Inc. | Penske Truck Lease Agreement | Penske Truck |

## CONTRACTS

[TO FOLLOW]

## GOODWILL

The goodwill associated with each or any Debtor as included with any Bid.

## CUSTOMER LISTS

The customer lists owned by each or any Debtor as included with any Bid.

## FF&E

[SEE BELOW]

**Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA**

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **BUILDING 5 (6411 ALONDRA)** | |
| Lot- | Racking Throughout Building 5, Consisting of: (20) Sections of 4' x 4' x 1' Light Duty Adjustable Racking, (2) Sections of 6' x 6' x 2' Heavy Duty Adjustable Steel Pallet Racking | 1,000 |
| 1- | Manufacturer Unknown 15' x 40' Heavy Duty Mezzanine, with Stairway, Etc. | 25,000 |
| 1- | **#EQ0000545** Kaeser Model ASD-40, 40-HP Rotary Screw Air Compressor, S/N T1372 (New 2022 Est.), with Vertical Air Receiver | 25,000 |
| | **(Please Note:** Not Yet Installed at Time of Inspection) | |
| Lot- | Miscellaneous Equipment Throughout Building, Consisting of: Electric Pallet Jacks, Heavy Duty Adjustable Steel Pallet Racking, Portable Scaffolding, Drill Presses, Double End Grinders, Vices, Hand and Power Tools, Presses, Vacuums, Etc. | 6,500 |
| | **BUILDING 3 (6409 ALONDRA)** | |
| Lot- | (5) Sections of 16' x 8' x 4' Heavy Duty Adjustable Steel Pallet Racking | 425 |

| | Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value |
|---|---|---|
| | | $ |
| Lot- | Miscellaneous Equipment Not Yet Installed at Time of Inspection, Consisting of:<br>• Rytec 10'W Roll-Up Fast Door, New in Box. Not Yet Installed<br>• (3) Mini Refrigerators<br>• Messer Model N194JTHPCW, Stationary Central Fan, S/N 133990<br>• Messer Model N174HTHCW, Stationary Central Fan, S/N 1339090<br>• Messer Stationary Central Fan | 12,500 |

**BUILDING 7 (6309  ALONDRA)**

| | | |
|---|---|---|
| 1- | Index Variable Speed Vertical Milling Machine, S/N B8350XH-73-1790A-6 | 2,000 |
| 1- | Microcut 12" x 3' Geared Head Engine Lathe, S/N 1320-372167 | 1,750 |
| Lot- | Miscellaneous Equipment Stored in Not in Use, Consisting of:<br>• (4) Smipack Model T452, Heat Shrink Tunnels, S/N 70866, 70872, 70872, 53236, N/A<br>• MBPS Industries Model MD612, 6" x 12" Metal Detector, S/N 14061602<br>• Speedaire Model 3JR80LL, Tank Mounted Air Compressor, S/N 200-00026 | 550,000 |

*Continued...*

| | Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Tennant Model T500, Walk-Behind Floor Scrubber | |
| | • Pro Seal Model GT1, Horizontal Flow Wrapper, S/N SN-M-05874 (New 2020) | |
| | • 120-Gal. Liquefier, Stainless Steel, with Hopper Feed | |
| | • Passport Model Q5650, Bowl Chopper, S/N T00005 | |
| | • Scott Turbon Pedestal Type Mixer, S/N PHRSLR-10-16338 | |
| | • Amco Model BM-150, 150-Gal. Batter Mixer, S/N P0201602908-2 | |
| | • American Process Systems Model DRB-24, Horizontal Ribbon Blender, S/N 3853 (New 1993) | |
| | • Texwrap Model STE2011SSCRR, Horizontal Flow Wrapper, S/N NTX52546-5 | |
| | • (2) Smipack Model FP500, Hi-Speed Horizontal Wrappers, S/N AL19A5274, N/A | |
| | • (2) Manufacturer Unknown 12' Vertical Bowl Elevators | |
| | • (2) Smipack Model FP6000, Horizontal Flow Wrappers, S/N N/A | |
| | • YWD Model 901S, Carton Erector, S/N 40-1161-40 | |
| | • Langen Model Mpac B1-M, Manual Load Continuous Cartoner, S/N MN102604 (New 2021) | |
| | *Continued...* | |

| | | |
|---|---|---|
| **Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA** | | |

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Texwrap Model 20HSSCRR-MTX5266 Speed Side Seal Wrapper, S/N S-NTX | |
| | • Ishida Model CCW-N2-216W-2M, 16-Head Vertical Weigh Scale, S/N 30-PB-198-1760, with Acceleron Vertical Pouch Filler | |
| | • Interlocking Belt Conveyor, Hand and Power Tools, Welders, Plasma Torches, Pallet Jacks, Racking, Parts Washers, Sauce Applicators, Scales, Pressure Washers, Weigh Scale Heads, Hoist, Top and Bottom Case Tapers, Etc. | |
| | **BUILDING 2 (6325 ALONDRA)** | |
| Lot- | Line No. 4, Consisting of: | 350,000 |
| | • Breddo Model LDT-200, 200-Gal. Likwifier, S/N D597101-4-20163 (New 2016 Est.) | |
| | • (2) Unifiller Horizontal Piston Fillers, with Hopper. Bladder Pump | |
| | • Pro Seal Model GT1E, Automatic High-Speed In-Line Tray Sealer, S/N SN-M-06581 (New 2021), with 18" x 10' Interlocking Belt Conveyor | |
| | *Continued...* | |

**Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|---------|
| | *Continued...* | |
| | • Pro Seal Model GT1E, Automatic High-Speed In-Line Tray Sealer, S/N SN-M-06690 (New 2021), with 18" x 1 Interlocking Belt Conveyor | |
| | • Martin Barron Model MB11-36-0500-16, 36"W Stand Alone Nitrogen Spiral Freezer, S/N J060ADZ, 20' x 20' Foot Print, 242-Parts Per/Min., 24"W Incline Exit Conveyor, 12'L Loadout Conveyor | |
| | • YWD Model 9015-60, Carton Erector, S/N 1263, 60-Parts Per/Min., with Nordson Pro Blue Hot Melt Gluer, Keyence Model MKG1000 Inkjet Coder S/N 129G100916971ADO | |
| | • Fortress Model CVF-5795, 12" x 16" Pass Through Metal Detector, S/N CV60X414BSA-T26447 | |
| | • Interpack Top and Bottom Case Taper | |
| Lot- | Miscellaneous Equipment Throughout Break Room, Consisting of: Microwaves, Benches, Chairs, Coffee Makers, Fridges, Water Machines, Etc. | 1,000 |

**Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|------------------------------|
| | **BUILDING 1 (6305 ALONDRA)** | |
| Lot- | Miscellaneous Throughout Lunch Room, Consisting of: Microwaves, Refrigerators, Racks, Benches, Tables, Water Machines, Etc. | 2,000 |
| | **LAB** | |
| Lot- | Equipment Throughout Building 1 Lab, Consisting of: | 50,000 |

- (2) Thermo Scientific Model TSX-5-15, High Performance Refrigerators
- (2) Thermo Scientific Model Heratherm, Benchtop Incubators
- (2) Thermo Scientific Model Heratherm, Incubators
- Thermo Scientific Single Door Incubator
- Thermo Fisher Scientific Model Quant Studio, PCR Machine
- Labconco 8'W Bio Safety Cabinet, S/N 220226104B (New 2022)
- Tuttnauer Benchtop Autoclave, S/N 21010147
- Thermo Scientific Model Pacific II, Water Purifying System, S/N 4132133001820 (New 2021)

*Continued...*

| | Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA | |

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|-----------------------------|
| | *Continued...* | |
| | • Thermo Scientific Benchtop Incubator | |
| | • Thermo Scientific Model Diluflex Pro, Lab Balance | |
| | • Miscellaneous Equipment Throughout Lab, Consisting of: Whirlpool Refrigerator Freezers, Conduction Ovens, Microwaves, Scales, Blenders, Thermal Cyclers, Hand Tools, Work Stations, Etc. | |

**GRANOLA ROOM**

| Qty. | Description | Orderly Liquidation Value |
|------|-------------|---------------------------|
| 1- | **#EQ0000177** Action Pac Model Multi-109VFS, Vertical Form Fill and Seal Machine, S/N 10-3386, with Manufacturer Unknown Weigh Scale Head, Manufacturer Unknown Incline Conveyor Feed, Etc. | 60,000 |
| 1- | **#EQ0000399** Action Pac Model Multi-109VFS, Vertical Form Fill and Seal Machine, S/N 1.6-11190115, with Manufacturer Unknown Weigh Scale Head, Manufacturer Unknown Incline Conveyor Feed, Etc. | 60,000 |
| 1- | **#EQ0000399** Action Pac Model Multi-109VFS, Vertical Form Fill and Seal Machine, with Manufacturer Unknown Weigh Scale Head, Manufacturer Unknown Incline Conveyor Feed, Etc. | 60,000 |

**Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|------------------------------|
| | **BUILDING 1 (6305 ALONDRA) PREP AREA** | |
| 1- | Manufacturer Unknown Horizontal Piston Depositor | 10,000 |
| 1- | Armada Model 810 6" x 12" Metal Detector, S/N 15071118 | 10,000 |
| 1- | Manufacturer Unknown 200-Gal. Stainless Steel Horizontal Ribbon Blender, with Controls | 15,000 |
| 1- | Manufacturer Unknown Horizontal Pepperoni Slicer, S/N TP2200010 (New 2022 Est.), Vertical Magazine Type Feed, Conveyor Exit, Push Button PLC Control | 30,000 |
| Lot- | Equipment Throughout Prep Area, Consisting of: Can Openers, Belt Conveyors, Inkjet Coders, Top and Bottom Case Tapers, Depositors, Scales, Blenders, Etc. | 10,000 |
| Lot- | Miscellaneous Equipment Throughout CIP Room, Consisting of: Portable CIP Foamers, Stainless Steel Sinks, Racks, Etc. | 3,500 |

| | Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **BUILDING 1 (6305 ALONDRA) PRODUCTI** | |
| Lot- | Line No. 1, Consisting of:<br>• Manufacturer Unknown Weigh Scale Conveyor, S/N N/A, Approx. 24"W In Feed Conveyor, Controls, Etc.<br>• Pro Seal Model GT1, Automatic High-Speed In-Line Tray Sealer, S/N SN-M-07076 (New 2022)<br>• Equip Model 03KF28, 28" Stand Alone Nitrogen Spiral Freezer, S/N CB2705, Approx. 15' x 15' Foot-Print, with Incline Conveyor Exit<br>• (2) Keyence Model MKG1000, Inkjet Coders<br>• Fortress Model CVF5796, 6" x 12" Pass Through Metal Detector, S/N CV60X14BSA-T26446<br>• Interpack Top and Bottom Case Taper | 100,000 |
| Lot- | Line No. 3, Consisting of:<br>• Manufacturer Unknown Model QTML5, Piston Depositor, S/N QTMCS190016-12-LAM, with PLC Control | 150,000 |
| | *Continued...* | |

| Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA |
|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | Continued... | |
| | • Quantum Technical Services Model TC3, Delumper and Waterfall Applicator, S/N TC315008, with All Associated Exit Conveyor | |
| | • Texwrap Model 2011SSCRR, Continuous Motion Side Seal Wrapper, S/N MTX52705-5, with Infeed and Exit Conveyor, Controls | |
| | • Manufacturer Unknown 4'L Heat Shrink Tunnel, 24"W x 24"W Opening | |
| | • #EQ0000167 Noren Model KF28, 28" Stand Alone Nitrogen Spiral Freezer, S/N CB2705-30-093-17 (New 2017), with Incline Exit Conveyor | |
| | **(Please Note:** Leased) | |
| | • Langen Model Mpac B1-M, Manual Load Continuous Cartoner, S/N MN1026/3, with Keyence Inkjet Coder, Nordson Hot Melt Gluer, Exit Conveyor | |
| | • Fortress 12" x 6" Metal Detector, S/N 22745 | |
| | • Interpack Top and Bottom Case Taper | |
| 1- | **#448** Manufacturer Unknown 400-Gal. Horizontal Stainless Steel Jacketed Ribbon Blender, S/N 5512 | 20,000 |

| | | Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA | | |

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|-----------------------------|
| Lot- | Line No. 2, Consisting of:<br>• Manufacturer Unknown 200-Gal. Stain Steel Liquifier, S/N N/A, Manual Feed, Pump Exit<br>• Manufacturer Unknown 24"W x 12'L Manual Packing Belt Conveyor<br>• Manufacturer Unknown Manual Control Piston Depositor, with Pump, Layout Table<br>• Pro Seal Model GT1S, Automatic High-Speed In-Line Tray Sealer, S/N SN-M-06136<br>• Equip Model 213, 28" Stand Alone Nitrogen Spiral Freezer, S/N 10201 (New 2003), with Exit Conveyor<br>• YWD Model 901S, Carton Erector, S/N 1256, with Hot Melt Gluer<br>• Interpack Top and Bottom Case Taper | 150,000 |
| 1- | Kaeser Model AS-25, 25-HP Rotary Screw Air Compressor, S/N 1341, with Refrigerated Air Dryer and Tank<br><br>(**Please Note:**  Located Outside) | 4,500 |

| Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA |
|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **BUILDING 6 (6307 ALONDRA)** | |
| Lot- | Miscellaneous Equipment Throughout Building 6, Consisting of: Beverage Air Chiller, Samsung Refrigerator, Imperial Range, Assorted Chest Freezers, Roll-Up Doors, Horizontal Tank Mounted Air Compressors, Assorted Hand and Power Tools, Etc. | 10,000 |
| | **BUILDING 4 (6403 ALONDRA)** | |
| Lot- | Miscellaneous Equipment Throughout Building 6, Consisting of: Vortex Refrigerator, Chest Freezers, Heavy Duty Adjustable Pallet Racking, Electric Pallet Jacks, Etc. | 7,500 |
| | **THROUGHOUT FACILITIES** | |
| Lot- | Miscellaneous Equipment Throughout Facilities, Consisting of: Stainless Steel Sinks, Stainless Steel Workstations, Shovels, Brooms, Trash Cans, CIP Foamers, Portable Racks, Proofing Racks, Stainless Steel Tubs, Metro Racks, Ladders, Mezzanines, Pumps, Pipings, Tanks, Pans, Conveyor, Floor Jacks, Battery Chargers, Etc. | 25,000 |

| Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA | | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| Lot- | Office Furniture and Fixtures Throughout Facility, Consisting of: Laminate Desks, Chairs, Conference Room and Related Equipment, File Cabinets, PC's & Monitors, Laptops, Computers, Printers, Fax Machines, Copiers, Server Room and Related Equipment, Telephones, Security Equipment, Break Room Equipment, Etc. | 10,000 |

**MOBILE EQUIPMENT. NOT INSPECTED B APPRAISER. INFORMATION PROVIDED B COMPANY**

| | | |
|---|---|---|
| 1- | **#1/107** Toyota Model 8FGCU25, 5,000-Lb. LPG Forklift Truck, S/N 35666 | 3,000 |
| 1- | **#2/519** Toyota Model 7FBEU20, 4,000-Lb. Electric Forklift Truck, S/N 18211 | 2,500 |
| 1- | **#3/520** Toyota Model 7FBEU20, 4,000-Lb. Electric Forklift Truck, S/N 22001 (New 2013) | 2,500 |
| 1- | **#4/521** Caterpillar Model 2ETC3000, 3,000-Lb. Electric 3-Wheel Forklift Truck, S/N N/A | 1,500 |
| 1- | **#5/522** Toyota Model 8FBE15U, 3,000-Lb. Electric Forklift Truck, S/N 11111 (New 2017) | 3,500 |
| 1- | **#6/523** Crown Model RR5220-35, 3,500-Lb. Electric Stand Up Narrow Aisle Forklift Truck, S/N N/A (New 2008) | 2,000 |

## Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA

| Qty. | Description | Orderly Liquidation Value |
|------|-------------|---------------------------|
| | | $ |
| 1- | **#7/524** Komatsu Model FG55T-16, 5,500-Lb. LPG Forklift Truck, S/N 203475 | 4,000 |
| 1- | **#8/525** Raymond Model R35-335TT, 3,500-Lb. Electric Stand Up Forklift Truck, S/N R35-04-06139 | 2,000 |
| 1- | **#9/535** Toyota Model 8FGCU25, 5,000-Lb. LPG Forklift Truck, S/N 43007 | 3,000 |
| 1- | **#10/536** Raymond Model R40-C40TT, 4,000-Lb. Electric Stand Up Reach Type Forklift Truck, S/N R40-05-08139 | 2,000 |
| 1- | GMC Model Sierra 3500, Stakebed Truck, VIN N/A | 1,500 |

**TOTAL ORDERLY LIQUIDATION VALUE** $1,790,175

**Tattooed Chef, Inc., 2021 52nd Street, Vernon, CA**

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **FREEZER AREAS** | |
| Lot- | Miscellaneous Equipment Throughout Cold Storage and Receiving, Consisting of: (16) Sections of 20' x 8' x 4' Heavy Duty Adjustable Steel Pallet Racking, (15) Sections of 3-Deep Pallet Flow Racking, (3) Pallet Positions High | 6,100 |
| Lot- | Cooler 2 Lot, Consisting of: (75) Sections of 20'H x 8'W x 4'D Heavy Duty Adjustable Steel Pallet Racking | 7,500 |
| Lot- | Cooler 1 Lot, Consisting of: (26) Sections of 2 & 3 Position Push Back Racking, (3) Positions High | 7,800 |
| Lot- | Freezer 3 Racking, Consisting of: (65) Sections of 20'H x 8'W x 4'D Heavy Duty Adjustable Steel Pallet Racking | 6,500 |
| Lot- | Cooler 4 Racking, Consisting of: (120) Sections of 20'H x 8'W x 4'D Heavy Duty Adjustable Steel Pallet Racking | 12,000 |
| Lot- | Freezer 5 Racking, Consisting of: (46) Sections of 3-Position Push Back Racking, (3) Positions High, (80) Sections of 20' x 8' x 4' Heavy Duty Adjustable Steel Pallet Racking | 22,800 |
| Lot- | Room 7 Racking, Consisting of: (10) Sections of 3-Deep & (4) Sections of 4-Deep, Push Back Pallet Racking, (3) Positions High | 6,500 |

**Tattooed Chef, Inc., 2021 52nd Street, Vernon, CA**

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| Lot- | Room 8 Racking, Consisting of: (4) Sections of 4-Position Push Back Rack, (3) Positions High | 1,200 |
| | **THROUGHOUT FACILITY** | |
| Lot- | Miscellaneous Equipment Throughout Facility, Consisting of: Laminate Desks, Chairs, Conference Room and Related Equipment, File Cabinets, PC's & Monitors, Laptops, Computers, Printers, Fax Machines, Copiers, Server Room and Related Equipment, Telephones, Security Equipment, Break Room Equipment, Battery Chargers, Miscellaneous Hand & Power Tools, Etc. | 10,000 |
| 1- | Skyjack Model SJIII 4626, Electric Scissor Lift, S/N N/A (New 2003) | 7,000 |
| | **MOBILE EQUIPMENT, NOT INSPECTED B APPRAISER, INFORMATION PROVIDED B COMPANY** | |
| 1- | **#18** Yale Model MPE060LVGN24T2748, Rider Ty Electric Pallet Jack, S/N N/A (New 2011) | 1,000 |
| 2- | **#20 & 21** Raymond Model 8410-FRE60L, Rider Type Electric Pallet Jacks, S/N N/A (New 2013) | 2,000 |

**Tattooed Chef, Inc., 2021 52nd Street, Vernon, CA**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|-----------------------------|
| 1- | **#21**<br>Raymond Model 4250C40TT, Stand Up Reac Type Forklift Truck, S/N N/A (New 2014), Truck #26 (Raymond 4250C40TT  2014) | 3,500 |
| 1- | **#22**<br>Raymond Model 750DR32TT, Stand Up Rea Type Forklift Truck, S/N N/A (New 2014) | 3,500 |
| 1- | **#23**<br>Raymond Model 750DR32TT, Stand Up Rea Type Forklift Truck, S/N N/A (New 2014) | 3,500 |
| 1- | **#27**<br>Raymond Model 750DR32TT, Stand Up Rea Type Forklift Truck, S/N N/A (New 2014) | 3,500 |
| 1- | **#28**<br>Raymond Model 750DR32TT, Stand Up Rea Type Forklift Truck, S/N N/A (New 2014) | 3,500 |

| TOTAL ORDERLY LIQUIDATION VALUE | $107,900 |
|---|---|

| | New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **RTE PRODUCTION** | |
| 1- | Blentech 1,500-Lb. Co2 Injected Mixer, S/N N/A, (Rebuilt 2021), with Syspal Model SCE-CR-01 770-Lb. Bowl Elevator, S/N 33632-4 (New 2021) | 30,000 |
| 1- | Blentech 1,500-Lb. Co2 Injected Mixer, S/N N/A, (Rebuilt 2021), with AFECO Model 23K500 Bowl Elevator, S/N 990230 | 30,000 |
| 1- | Amfec Model 510, 500-Lb. Co2 Injected Mixer, S/N 090905, with Reiser Model VB Bowl Elevator, S/N 780 (New 2005) | 20,000 |
| Lot- | Line No. 1, Consisting of:<br>• Reiser Model Vemag DP3, Vacuum Stuffer, S/N 138-2030<br>• Reiser Model Vemag DP3, Vacuum Stuffer, S/N N/A<br>• Reiser Model Vemag DP3, Vacuum Stuffer, S/N 1380269<br>• Manufacturer Unknown 12'L x 4'W 4-Lane Manual Folding Conveyor, S/N N/A<br>• Manufacturer Unknown 40"W x 20'L CO2 Blast Freezer, S/N N/A, with Exit Conveyors<br>• (2) Manufacturer Unknown Horizontal Flow Wrappers, S/N N/A, each with Manual Unwind, Rotary Seal, Etc. | 350,000 |
| | *Continued...* | |

| New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM | | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | Continued... | |
| | • Ceia Model THS21, 12" x 6" Metal Detector, S/N 33002230030 | |
| | • Langen Model Mpac B1-M, Manual Load Continuous Cartoner, S/N MN102614 (New 2022), with Magazine Style Box Feed, Hot Melt Gluer, Exit Conveyor | |
| | • Interpack Model USA2024-SB, Top and Bottom Case Taper, S/N TM09421M028 | |
| Lot- | Line No. 2, Consisting of: • Reiser Model Vemag, Vacuum Stuffer, S/N 128 890 • Manufacturer Unknown 4'W x 12'L Layout Table, S/N N/A • Manufacturer Unknown 36"W x 15'L Co2 Blast Freezer, S/N N/A, with Entry & Exit Conveyor • Ceia Model THS/MS21, 6" x 12" Pass Through Metal Detector, S/N 320002490022 (New 2022) • Ceia Model THS21, 6" x 12" Pass Through Metal Detector, S/N N/A • Reiser Model Repack RE25, Horizontal Form Fill and Seal Machine, S/N 2500617 (New 2022), with Koolant Cooler, Chiller, PLC Control, (2) Ultrasource Matrix Labelers | 350,000 |

| New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM | | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value |
|---|---|---|
| | | $ |
| Lot- | Line No. 3, Consisting of:<br>• Reiser Model Vemag, Vacuum Stuffer, 138-0456 (New 2017)<br>• Reiser Model Vemag DP3, Vacuum Stuffer, S/N 138-0360 (New 2016)<br>• Manufacturer Unknown 24"W x 36'L Manual Folding Conveyor, S/N N/A, with Return Conveyor, (8) Wrapping Stations, Etc.<br>• Ceia Model THS, 12" x 6" Metal Detector, S/N 731002110038 (New 2019)<br>• Domino Model A100, Inkjet Coder, S/N N/A<br>• Interpack Model USA2024-SB, Top and Bottom Case Taper, S/N TM-094-21M-037 | 60,000 |
| Lot- | Line No. 4, Consisting of:<br>• (2) Reiser Model V-B, Vertical Bowl Elevators, S/N 785, N/A (New 2005 Est.)<br>• Reiser Model Vemag R500, Vacuum Stuffer, S/N 123-3571<br>• Reiser Model Vemag R500, Vacuum Stuffer, S/N N/A<br>• Manufacturer Unknown 12"W x 20'L Motorized Belt Conveyor<br>• (2) Custom Designed & Manufactured Steam Boxes, (1) with 3-Sections, (1) with 1-Section | 90,000 |

| | New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **KITCHEN** | |
| 1- | Blentech Model TP28106, 3,000-Lb. Horizontal Steam Kettle, S/N 93122 (New 1993), with Syspal 350-Lb. Bowl Elevator S/N 33936-1 (New 2021) | 50,000 |
| 1- | Stephan Model Microcut MCH-D50, Emulsifier, S/N 727-012-01 (New 2006) | 15,000 |
| 1- | Admix Model Rotosolve 80RS60SS, Portable Bowl Mixer, S/N 3167 (New 2021) | 15,000 |
| Lot- | Chilled Water System, Consisting of: Mezzanine Mounted Freon Pumping and Metering Equipment, Manufacturer Unknown Heat Exchanger, (2) 1,000-Gal. Tanks, Etc. | 10,000 |
| 1- | Cleveland 60-Gal. Steam Kettle, S/N N/A | 10,000 |
| 1- | Manufacturer Unknown 8'W x 4'D Steam Cabinet | 2,000 |
| 1- | Amfec Model 510, 500-Lb. Jacketed Mixer, S/N 158323 | 15,000 |
| 2- | Custom Designed & Manufactured 150-Gal. Tumble Type Chillers, S/N N/A, Front Load | 60,000 |
| 1- | Sealed Air Model 2070C, Co2 Freezer, S/N 0159, with Custom Designed and Manufactured Bucket Elevator, SPX Pump | 40,000 |

**New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value |
|------|-------------|---------------------------|
| | | $ |
| 1- | Sealed Air Model 2070C, Co2 Freezer, S/N 0255, with SPX Pump | 35,000 |
| 1- | Manufacturer Unknown 3,000-Lb. Stainless Steel Horizontal Steam Kettle (New 1989) | 30,000 |
| 2- | Manufacturer Unknown 300-Lb. Steam Kettles | 10,000 |

### KITCHEN PACKAGING

| Lot- | Miscellaneous Equipment Throughout Kitchen Packaging, Consisting of: | 80,000 |
|------|---------------------------------------------------------------------|--------|

- Ceia Model THS/MS21, 12" x 6" Metal Detector, S/N 31002110039
- Interpack Model RSA-2024-SB, Top and Bottom Case Taper, S/N TM122-16B-005
- Manufacturer Unknown Horizontal Potato Peeler, with Manufacturer Unknown Potato Slicer
- Hobart 40-Lb. Meat Slicer
- Stephan Model C15, Emulsifier, S/N 3472584
- Miscellaneous Equipment Throughout Kitchen Packaging, Consisting of: Benchtop Slicers, Scales, Foamers, Hand and Power Tools, Stainless Steel Sinks, Etc.

**New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|------------------------------|

**BAKERY**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|------------------------------|
| Lot- | Equipment Located in Mixing Room, Consisting of:<br>• Koenig Model DW240-S, Stainless Ste Mixer, S/N 50.4.0196 (New 2012)<br>• Koenig Model DW240-H2, Stainless Steel Mixer, S/N 50.4.0025 (New 2012)<br>• Koenig Model DW240-N, Stainless Steel Mixer, S/N 50.4.0259 (New 2015) | 50,000 |
| Lot- | Bakery Line No.1, Consisting of:<br>• Lawrence Model OCL7002-07, Bowl Lift, S/N CL199 (New 2013), with Scraper<br>• Lawrence Model ODR009-02, Divider, S/N DR521 (New 2013), with Lawrence Model DDF3001-15 600-Lb. Hopper Feeds S/N DF460 (New 2013)<br>• Lawrence Model OAL0504-25, Proofer, S/N AL541 (New 2013)<br>• Lawrence Model OFP4242-27, Legend Tortilla Press, S/N FP605 (New 2013)<br>• JC Ford Model TE-1445, 15'L Natural Gas Fired Oven, S/N TE091009, with Exit Conveyor, Vertical Incline Conveyor<br>• JC Ford 13-Tier Forced Air Spiral Cooling Conveyor | 210,000 |

*Continued...*

**New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Lawrence Model OPS1654-18, Counte Stacker, S/N P5491 (New 2018) | |
| | • Manual Pneumatic Tortilla Packaging Machine | |
| | • Domino Model A100, Inkjet Coder, with Belt Conveyor, Clip Dispenser | |
| | • Ceia Model THS/MS21, 12" x 6" Metal Detector, S/N 21800204115 | |
| Lot- | Bakery Line No.2, Consisting of: | 450,000 |
| | • Lawrence Model OCL7002-007, Bowl Lift, S/N CL222 (New 2015), with Scraper | |
| | • Lawrence Model ODR0109-03, Divider, S/N DR530 (New 2015) | |
| | • Lawrence Model ODF3001-21, 600-Lb. Dough Feeder, S/N DF471 | |
| | • Lawrence Model OSC3001-40, Proofer, S/N SC450 (New 2015) | |
| | • Lawrence Model OMP5252-31, Tortilla Press, S/N MP574 (New 2015) | |
| | • Lawrence Model OF05216-53, 30'L Natural Gas Fired Oven, S/N 50634 (New 2015), 1,000,000-Btu | |
| | • Lawrence Model OCC5420-29, 13-Tier Cooling Conveyor, S/N CC862 (New 2015) | |
| | *Continued...* | |

| New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM |
|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Lawrence Model OIR3454-02, Laser Inspection Station, S/N IR298 (New 2015) | |
| | • Lawrence Model OPS1654-18, 6-Row Counter Stacker, S/N P5407 (New 2015) | |
| | • Manual Stuffer | |
| | • Domino Model A100, Inkjet Coder | |
| | • Kwik Lock Dispenser | |
| | • Ceia Model THS/MS21, 12" x 6" Metal Detector, S/N 21800204114 | |
| | • Reiser Model Vemag HP10E, Vacuum Stuffer, S/N 1612220 (New 2022), with Conveyor | |
| | • Reepack Model Reeflow 50, Horizontal Floor Wrapper, S/N W122001 | |

### TEST LAB

| Lot- | Miscellaneous Equipment Throughout Lab, Consisting of: Market Forge Sterilmatic Benchtop Sterilizer, (3) Incubators, Digital Heat Blocks, Pipettor, Balances, PH Meters, Randel 2-Door Stainless Steel Refrigerator, Gallon Camp Benchtop Incubator, Etc. | 15,000 |
|---|---|---|

**New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|----------------------------|
| | **TEST KITCHEN** | |
| Lot- | Miscellaneous Equipment Throughout Test Kitchen, Consisting of: Hoshizaki Ice Machine, True 2-Door Refrigerator, Motak 4-Door Refrigerator, Benchtop Bowl Mixer, Microwaves, Coffee Makers, Monitors, Mixers, Air Fryers, Proofing Ovens, Range, Deep Fryers, Etc. | 10,000 |
| | **BOILER ROOM** | |
| 1- | Hurst 3,450-Steam Lb. Per Hr. Natural Gas Fired Boiler, S/N 5500-150-21M (New 2003), with Parker Boiler Stand Alone Natural Gas Boiler, All Associated Equipment, Etc. | 17,500 |
| | **AIR COMPRESSOR AREA** | |
| 1- | Sullair Model VCC-200, 100-HP Rotary Screw Air Compressor, S/N 20770430000035 | 10,000 |
| 1- | Sullair Model LS20-100L, 100-HP Rotary Screw Air Compressor, S/N 003-113860 | 8,000 |
| 1- | Sullair Model VCC-200-100HA, 100-HP Rotary Screw Air Compressor, S/N 200801240055 | 10,000 |

| | New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM | |
| --- | --- | --- |

| Qty. | Description | Orderly Liquidation Value |
| --- | --- | --- |
| | | $ |
| Lot- | Lot of Assorted Equipment Throughout Air Compressor Area, Consisting of: Oil and Water Separators, Dryers, Vertical Air Tanks, Etc. | 3,500 |
| | **ENGINE ROOM 1** | |
| 1- | Hussmann Model S06RM-XKYWY2SCRSS, Refrigeration Compressor, S/N 7488-0038, with (6) Rotary Screw Compressors, PLC Control | 6,500 |
| 1- | Hussmann Model S03RM-FJRIGL, Refrigeration Compressor, S/N 7188-00230, with (3) Rotary Screw Compressors | 3,500 |
| 2- | Hussmann Model Hirpo0304RLMU, Refrigeration Compressors | 3,000 |
| | **SHIPPING AND RECEIVING** | |
| 1- | Manufacturer Unknown Vertical Cardboard Baler | 2,500 |
| | **THROUGHOUT FACILITY** | |
| Lot- | Finished Goods Freezer, Consisting of: (35) Sections of 20'H x 8'W x 4'D Heavy Duty Adjustable Steel Pallet Racking | 3,500 |

**New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value |
|------|-------------|---------------------------|
| | | $ |
| Lot- | Miscellaneous Racking Throughout RTE Kitchen and Raw Cooler, Consisting of: (20) Sections of 16'H x 8'W x 4'D Heavy Duty Adjustable Steel Pallet Racking | 1,700 |
| Lot- | Dry Kitchen Cold Storage, Consisting of: (20) Sections of 16'H x 8'W x 4'D Heavy Duty Adjustable Steel Pallet Racking | 1,700 |
| Lot- | Miscellaneous Equipment Throughout Maintenance Shop, Consisting of: Welders, Plasma Torches, Drill Presses, Double End Grinders, Saws, Hand and Power Tools, Work Stations, Etc. | 7,500 |
| Lot- | Miscellaneous Racking Throughout South Dock Freezer, Consisting of: (12) Sections of 16' x 8' x 4' Heavy Duty Adjustable Steel Pallet Racking, (14) Sections of 28'H 3'D Push Back Racking S/N N/A | 5,920 |
| 1- | Lantech Series G, Pallet Stretch Wrapper, S/N G00006276 | 2,000 |

(**Please Note:** Located in South Dock)

**New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value |
|------|-------------|---------------------------|
| | | $ |
| Lot- | Miscellaneous Equipment Throughout Facility, Consisting of: Stainless Steel Sinks, Stainless Steel Workstations, Shovels, Brooms, Trash Cans, CIP Foamers, Portable Racks, Proofing Racks, Stainless Steel Tubs, Metro Racks, Ladders, Mezzanines, Pumps, Pipings, Tanks, Pans, Conveyor, Floor Jacks, Battery Chargers, Etc. | 20,000 |
| Lot- | Office Furniture and Fixtures Throughout Facility, Consisting of: Laminate Desks, Chairs, Conference Room and Related Equipment, File Cabinets, PC's & Monitors, Laptops, Computers, Printers, Fax Machines, Copiers, Server Room and Related Equipment, Telephones, Security Equipment, Break Room Equipment, Etc. | 10,000 |

**EQUIPMENT STORED OUTSIDE**

| Qty. | Description | Value |
|------|-------------|-------|
| Lot- | Miscellaneous Equipment Stored Outside, Consisting of: <br>• Superior Model HX353, 2,415-Lb. Steam Boiler, S/N 14478 (New 2000) <br>• Handtmann Model VF50, Vacuum Stuffer, S/N 3219 <br>• Handtmann Model VF50, Vacuum Stuffer, S/N 17056 (New 2003) <br>• Handtmann Model VF50, Vacuum Stuffer, S/N N/A (New 2003) <br>• 12'L x 10'W Stainless Steel Spiral Freezer | 150,000 |

*Continued...*

**New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Triomat Model 660, Vacuum Sealer, S/664/0200 | |
| | • Spiral Freezer, with Guntner Heat Exchanger | |
| | • 400-Qt. Stainless Steel Bowl Chopper | |
| | • Diaphragm Pumps, Stainless Steel Spin Dryers, Oil Filters, Busch Vacuum Pumps, Vacuum Packagers, Horizontal Flow Wrappers, Band Sealers, Case Tapers, Pumps, Conveyors, Column Dumpers, Etc. | |
| | **MOBILE EQUIPMENT. NOT INSPECTED BY APPRAISER. INFORMATION PROVIDED BY COMPANY** | |
| 1- | Noblelift Model FE4P50N, 5,000-Lb. LPG Forklift Truck, S/N 22113188 | 4,000 |
| 1- | Noblelift Model FE4P50N, 5,000-Lb. LPG Forklift Truck, S/N 22113 | 4,000 |
| 1- | Toyota Model 7FBCU25, 5,000-Lb. LPG Forklift Truck, S/N 66031 | 4,000 |
| 1- | Toyota Model 8FBCU15, 3,000-Lb. LPG Forklift Truck, S/N 19575 | 1,500 |
| 1- | Toyota Model 7FBEU18, 3,600-Lb. Electric Forklift Truck, S/N 28314 | 1,750 |

## New Mexico Food Distributors, 3041 University Blvd. SE, Albuquerque, NM

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|----------------------------:|
| 1- | Raymond Model 415-C35TT, Electric Stand Up Reach Type Forklift Truck, S/N 415-14-40513 (New 2014) | 3,500 |
| 1- | Raymond Model 415-C35TT, Electric Stand Up Reach Type Forklift Truck, S/N 415-14-40530 (New 2014) | 3,500 |
| 1- | Raymond Model 415-C3OTT, Electric Stand Up Reach Type Forklift Truck, S/N 415-17-54920 (New 2017) | 4,000 |
| 5- | Crown Model WP3035-45, Electric Pallet Jacks, Serial Numbers: 7A269948, 7A269929, 7A307678, 5A388025, 7A276964 | 2,500 |
| 2- | Toyota Model 7HBW23, Electric Pallet Jacks, S/N 53406 & 53407 | 1,000 |

| TOTAL ORDERLY LIQUIDATION VALUE | $2,333,570 |
|---|---|

| Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM | | |
| --- | --- | --- |

| Qty. | Description | Orderly Liquidation Value $ |
| --- | --- | --- |
| | **OUTSIDE** | |
| 1- | Sullair Model 7509PS/A, Rotary Screw Air Compressor, S/N 200808120128, with (2) Vertical Air Receivers, Manufacturer Unknown Refrigerated Air Dryer | 12,500 |
| | **PRODUCTION** | |
| 1- | Hartmann Model Automat VS-320, Horizontal Flow Wrapper, S/N 626.VS (New 2015) | 40,000 |
| 1- | Lawrence Model OPA5410-04, Accumulation Conveyor, S/N PA136 (New 2015), Approx. 4'W x 25'L | 15,000 |
| 1- | Lawrence Model OST1054-18, 6-Row Tortilla Stacker, S/N SI-241 (New 2015) | 30,000 |
| Lot- | Small Chip Line, Consisting of:<br>• Rigos Model 15/1151/ACTCH, Tortilla Chip Cutter, S/N 997011916, with Exit Conveyor<br>• Rigos 24" Dia. x 4'L Rotary Seasoner Cutter, S/N N/A, with Rigos Exit Conveyor<br>• Interpack Model USA2324-BB, Top and Bottom Case Taper, S/N TM-430-22F-037<br>• Ceia Model THS/MS21, 12" x 12" Pass Through Metal Detector, S/N 31002350118 | 60,000 |

| Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM | | |

| Qty. | Description | Orderly Liquidation Value |
|------|-------------|---------------------------|
|      |             | $ |
| Lot- | Flour Tortilla Line, Consisting of: | 750,000 |
|      | • Koenig Model DW240-H, Stainless Steel Bowl Mixer, S/N N/A | |
|      | • Lawrence Model OCL7002-07, Vertical Bowl Lift, S/N C6271 (New 2017) | |
|      | • Lawrence Model ODR0109-03, Divider, S/N DR617 (New 2018) | |
|      | • Lawrence Model ODF3001-21, Automatic Dough Feeder, S/N DF550 (New 2018) | |
|      | • Lawrence Model OSC3001-40, Proofer, S/N SC516 (New 2018), with Lawrence Model OAL15004 Dough Feeder, S/N AL639 (New 2018) | |
|      | • Lawrence Model OMP5252-3, Tortilla Mega Press, S/N MP634 (New 2018) | |
|      | • Lawrence Model OFO5216-58, 30'L Natural Gas Fired Oven, S/N F0703 (New 2018) | |
|      | • Lawrence Model OCC5420-32, 13-Tier Cooling Conveyor, S/N CC931 (New 2018) | |
|      | • Lawrence Model OIR3254-01, Inspection Station, S/N IR183 (New 2012) | |
|      | • Lawrence Model DPS1654-18, 6-Row Tortilla Stacker, S/N P5443 (New 2015) | |
|      | • Lawrence Model APA5410-04, 10' Accumulation Conveyor, S/N PA153 (New 2015) | |

*Continued...*

| | Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM | |

| Qty. | Description | Orderly Liquidation Value $ |
| --- | --- | --- |
| | *Continued...* | |
| | • Lawrence Model OSI1054-18, 6-Row Co Stacker, S/N SI263 (New 2015), with Interlocking Belt Exit Conveyor<br>• Hartmann Model Automat VS-320, Horizontal Flow Wrapper, S/N 629-VS (New 2015) | |
| Lot- | Corn Line, Consisting of:<br>• Manufacturer Unknown Model HCM6000, 600-Lb. Horizontal Mixer, S/N CMHCM6<br>• Lawrence Model OMS0600, 14"W Sheeter, S/N MS363 (New 2008), with Presheeter, Bowl Elevator<br>• Lawrence Model 4518, 30'L Natural Gas Fired Oven, S/N C0314 (New 2008)<br>• Lawrence Model OCC4720-01, 9-Tier Cooling Conveyor, S/N CC741 (New 2008)<br>• Lawrence Model OVE4613-01, 13-Tier Cooling Conveyor, S/N FS119 (New 2008)<br>• Lawrence Model OPS2646-11, 6-Row Counter Stacker, S/N PS279 (New 2008) | 300,000 |

## Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM

| Qty. | Description | Orderly Liquidation Value |
|------|-------------|---------------------------|
| | | $ |
| Lot- | Chip Line,  (New 2021), Consisting of: | 1,200,000 |
| | • (2) JC Ford Model SSU-SS-F, Vertical Super Sack Unloaders, S/N SSU211004 SSU211003 (New 2021), with Shared JC Ford Model FFS-SS Stainless Steel Filter, S/N FFR211003 (New 2021), with Gardner Denver Model PBC99A 40-HP Central Vacuum, S/N 5638240 (New 202 JC Ford Model BSS-SS Bag Break Stati S/N BBR21103 (New 2021) | |
| | • JC Ford Model MM1000, Masa Mixer, S/N MM211007 (New 2021), Top Feed, Bottom Discharge, Mezzanine Mounted | |
| | • JC Ford Model TC-1248-12, Tortilla Sheeter, S/N PS211018 (New 2021), with JC Ford Model DC-1248 Sheeter Discharge | |
| | • JC Ford Model TO-2020-50, 28"W x 30'L Natural Gas Fired Oven, S/N T0211020 (New 2021), 4.4 Million BTU Per Hour, PLC Control | |
| | • JC Ford Model CEQ-15-3-50, 6-Tier Cooling Conveyor, S/N ZEQ211003 (New 2021) | |
| | • JC Ford Model U2500-HX, 4'W x 30'L Continuous Fryer, S/N U211005 (New 2021), Natural Gas Fired, with JC Ford Model HX-3.0 Heat Exchanger, S/N HX211005 (New 2021), Quick Draft Fume Filter, S/N N/A, JC Ford Model FCS-2500 Oil Skimmer, S/N FR211005 (New 2021) | |
| | *Continued...* | |

| Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM | | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | Continued... | |
| | • JC Ford Model FAC-10-15, 4' x 10' Forc Air Cooling Conveyor, S/N FAC211103 (2021), with Heat and Control Model Fast Back 8' Oscillating Conveyor | |
| | • Spray Dynamics Model Unispense III, 36" Dia. x 10'L Rotary Seasoner, S/N 1254 (New 2021), Hopper Feed, Scarf Plate Feeder, Heat and Control Model Fast Back Entry and Exit Oscillating Conveyors | |
| | • Heat & Control Model CV-BT-UR, 14"W Incline Bucket Conveyor, S/N 1204 (New 2021), Approx. 10'H | |
| | • (2) Heat & Control Model Fast Back, 12'L Oscillating Conveyors, S/N N/A, with Heat and Control 6' Oscillating Conveyor | |
| Lot- | Packaging Line, Consisting of: | 2,600,000 |
| | • Manufacturer Unknown 15' x 50' Stainless Steel Mezzanine, S/N N/A, with Stairway, Safety Flooring, Etc. | |
| | • Heat and Control Model CU-PT-UR, 20"W Incline Bucket Conveyor, S/N 205 (New 2021), Approx. 20'T | |
| | • (12) Heat and Control Model Fast Back, 10'L Oscillating Conveyors, S/N N/A (New 2021 Est.) | |
| | Continued... | |

| Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM |
|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Douglas Model 2554SPWELEL, Hot Wat Washer and Sanitizer, S/N 21/14604 (Ne 2021) | |
| | • Ishida Model CCW-RV-214W-1S/30-SS-ITPS, 14-Head Vertical Weigh Scale, S/N 100557421 (New 2021), with Ishida Model Atlas-2042-ITPS Vertical Form Fill and Seal Machine, S/N 1005547420 (New 2021), with Videojet Model Dataflex 6530 Inkjet Coder, Becker Vacuum Pump, Ceia Model THS/G21E Fall Through Metal Detector, S/N N/A | |
| | • Ishida Model CCW-RV-214W-1S/30-SS-ITPS, 14-Head Vertical Weigh Scale, S/N 100557422 (New 2021), with Ishida Model Atlas-2042-ITPS Vertical Form Fill and Seal Machine, S/N 100557425 (New 2021), with Videojet Model Dataflex 6530 Inkjet Coder, Becker Vacuum Pump, Ceia Model THS/G21E Fall Through Metal Detector, S/N N/A | |
| | *Continued...* | |

| Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM |
|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|

Continued...

- Ishida Model CCW-RV-214W-1S/30-SS-14-Head Vertical Weigh Scale, S/N 100564085 (New 2021), with Ishida Mod Atlas-2042-ITPS Vertical Form Fill and Seal Machine, S/N 100565269 (New 202 with Videojet Model Dataflex 6530 Inkjet Coder, Becker Vacuum Pump, Ceia Mod THS/G21E Fall Through Metal Detector, S/N N/A
- Ishida Model CCW-RV-214W-1S/30-SS-ITPS, 14-Head Vertical Weigh Scale, S/N 100564086 (New 2021), with Ishida Model Atlas-2042-ITPS Vertical Form Fill and Seal Machine, S/N 100565270 (New 2021), with Videojet Model Dataflex 6530 Inkjet Coder, Becker Vacuum Pump, Ceia Model THS/G21E Fall Through Metal Detector, S/N N/A
- Ishida Model CCW-RV-214W-1S/30-SS-ITPS, 14-Head Vertical Weigh Scale, S/N 100564087 (New 2021), with Ishida Model Atlas-2042-ITPS Vertical Form Fill and Seal Machine, S/N 100565272 (New 2021), with Videojet Model Dataflex 6530 Inkjet Coder, Becker Vacuum Pump, Ceia Model THS/G21E Fall Through Metal Detector, S/N N/A

Continued...

| Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM |
|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|

Continued...

- Ishida Model CCW-RV-214W-1S/30-SS-14-Head Vertical Weigh Scale, S/N 100564088 (New 2021), with Ishida Mod Atlas-2042-ITPS Vertical Form Fill and Seal Machine, S/N 100565273 (New 202 with Videojet Model Dataflex 6530 Inkjet Coder, Becker Vacuum Pump, Ceia Mod THS/G21E Fall Through Metal Detector, S/N N/A
- BPA Bag Orientator, S/N N/A, with PLC Control, Infeed Feed and Exit Conveyor
- BPA Bag Orientator, S/N N/A, with PLC Control, Infeed Feed and Exit Conveyor
- BPA Bag Orientator, S/N N/A, with PLC Control, Infeed Feed and Exit Conveyor
- BPA Bag Orientator, S/N N/A, with PLC Control, Infeed Feed and Exit Conveyor
- BPA Bag Orientator, S/N N/A, with PLC Control, Infeed Feed and Exit Conveyor
- BPA Bag Orientator, S/N N/A, with PLC Control, Infeed Feed and Exit Conveyor
- Interpack Model USA-2324, Case Taper, S/N TM43022F031
- Interpack Model USA-2324, Case Taper, S/N TM430-22F-033
- Interpack Model USA-2324, Case Taper, S/N TM430-21L-067

Continued...

**Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Interpack Model USA-2324, Case Taper, S/N TM430-21L-070 | |
| | • Ceia Model THS, 6" x 12" Metal Detector, S/N 21800204113 | |
| | **WAREHOUSE** | |
| 1- | PTR Vertical Cardboard Baler, S/N N/A | 3,000 |
| 1- | Manufacturer Unknown 500-Gallon Vertical Receiver, S/N N/A, with Pneumatec Model PE500 Air Dryer, S/N 9705-S126578-83539 | 1,500 |
| 2- | Hydro Tek Central Hot Water Pressure Washers, S/N 20201351 & 20201350 (New 2020) | 1,500 |
| 2- | Lochinvar Hot Water Heaters, S/N N/A | 600 |
| 1- | Lantech Model QC400, Pallet Stretch Wrapper, S/N QM0058276 | 5,000 |
| | **THROUGHOUT FACILITY** | |
| Lot- | Miscellaneous Stored Equipment Throughout Facility, Consisting of: <br> • (9) Climate Control 3-Fan Condensers and Blowers, S/N N/A, (Please Note: Still Crated at Time of Inspection) <br> *Continued...* | 1,200,000 |

**Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • (2) Durango Model MBI-1500, Mixers, S/N 0003, 0004 (New 2022) | |
| | • (2) Manufacturer Unknown 12'L Natural Gas Fired Ovens, S/N N/A | |
| | • (2) Lawrence 8-Tier Cooling Conveyors, S/N N/A, Approx. 20'L | |
| | • Globe Stand Mixer, S/N N/A | |
| | • Lawrence Bowl Lifter, S/N N/A | |
| | • (2) Lawrence Heated Tortilla Presses, S/N N/A | |
| | • Dason 28"W Sheeter, S/N 2271B (New 2018) | |
| | • Electra Food 16"W x 12'L Continuous Fryer, S/N N/A | |
| | • Superior Model 16A, Double Corn Head, S/N 18-4AAT7 | |
| | • Lawrence Proofer, S/N N/A | |
| | • Sullair Model LS1605, Rotary Screw Air Compressor, S/N US0122110659 (New 2022) | |
| | • FFS Model TCF10, Tortilla Fryer, S/N 2022-01-TCF-1 (New 2022) | |
| Lot- | Miscellaneous Machinery and Equipment Throughout Maintenance, Consisting of: Miller Model Millermatic 255 Welding Power Supply, Jet 48"W Finger Break, Assorted Racks, Conveyor, Hand and Power Tools, Hoists, Etc. | 7,500 |

| Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM | | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value |
|---|---|---|
| | | $ |
| Lot- | Miscellaneous Equipment Throughout CIP Room, Consisting of: 3-Stations Stainless Steel Wash Sink, Assorted Carts, Racks, Foamers, Etc. | 3,500 |
| Lot- | Miscellaneous Equipment Throughout Facility, Consisting of: Stainless Steel Sinks, Stainless Steel Workstations, Shovels, Brooms, Trash Cans, CIP Foamers, Portable Racks, Proofing Racks, Stainless Steel Tubs, Metro Racks, Ladders, Mezzanines, Pumps, Pipings, Tanks, Pans, Conveyor, Floor Jacks, Assorted Lab Equipment, Battery Chargers, Etc. | 15,000 |
| Lot- | Office Furniture and Fixtures Throughout Facility, Consisting of: Laminate Desks, Chairs, Conference Room and Related Equipment, File Cabinets, PC's & Monitors, Laptops, Computers, Printers, Fax Machines, Copiers, Server Room and Related Equipment, Telephones, Security Equipment, Break Room Equipment, Etc. | 7,500 |

**MOBILE EQUIPMENT. NOT INSPECTED BY APPRAISER. INFORMATION PROVIDED BY COMPANY**

| Qty. | Description | Value |
|---|---|---|
| 1- | Toyota Model 7FBCU25, 5,000-Lb. LPG Forklift Truck, S/N 66025 | 4,000 |
| 1- | Crown Model WP3035-45, Electric Pallet Jack, S/N 7A258095 | 500 |

| Karsten Tortilla Factory, 2810 Karsten Ct. SE, Albuquerque, NM | | |
|---|---|---|
| Qty. | Description | Orderly Liquidation Value $ |
| **TOTAL ORDERLY LIQUIDATION VALUE** | | **$6,257,100** |

**BCI, 1598 Motor Inn Drive, Girard, OH**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|------------------------------|
| | **MIXING AREA #1** | |
| 1- | Peerless 300-Lb. Rotary Paddle Mixer, S/N 66039, Stainless Steel Construction | 15,000 |
| 1- | 48" Dia. Stainless Steel Mixing Bowl, with Top Mounted Agitator | 2,500 |
| 1- | 36" Dia. x 48"H Heated Stainless Steel Mixing Tank, with Top Mounted Agitator | 10,000 |
| 1- | Electro Steam Natural Gas Fired Boiler | 4,000 |
| 1- | Shaffer 900-Lb. Rotary Paddle Mixer, Stainless Steel Construction, with 75-HP Electric Drive Motor | 40,000 |
| | **MIXING AREA #2** | |
| 1- | Mepaco Model 170, 48"W x 72"L Round Bottom Mixer, S/N 11577, Stainless Steel Construction, 2,000-Lb. Capacity | 15,000 |
| 1- | 48"W x 72"L Round Bottom Mixer, Stainless Steel Construction, 2,000-Lb. Capacity | 15,000 |
| | **WAREHOUSE** | |
| 1- | **#14** Jungheinrich Model EJE 120, Electric Pallet Jack | 1,750 |

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|----------------------------|
| 1- | Ingersoll Rand Model 2475N7.5, 7.5-HP Vertical Tank Mounted Reciprocating Air Compressor, S/N 30TC862519 | 800 |
| 2- | Flammable Storage Cabinets | 500 |
| Lot- | (19) Sections 42"D x 8"W x 15'H 1-2 Tier Pallet Racking | 2,000 |
| Lot- | (3) Sections 8'D x 8'W x 15'H 3-Tier Push Back Pallet Racking | 900 |
| 1- | Section of 8'D x 4'W x 15'H 3-Tier Push Back Pallet Racking | 250 |
| 1- | Wulftec Model WSML-150-B, Rotary Pallet Wrapper, S/N 88850-1-1112 | 5,000 |
| 1- | 8'W x 15'D x 10'H Walk In Refrigerator | 5,000 |
| Lot- | Miscellaneous, Office and Support Equipment Consisting of; Trash Cans, Pallet Jacks, Hand Trucks, Material Carts, Hoppers, Ladders, Tables, Computers, Desks, Chairs, Etc. | 2,000 |

**BCI, 1598 Motor Inn Drive, Girard, OH**

| TOTAL ORDERLY LIQUIDATION VALUE | $119,700 |
|---|---|

BCI, 4718 Belmont Ave., Youngstown, OH

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|------------------------------|
| | **PRODUCTION AREA** | |
| Lot- | Protein Bar Line No. 1, Consisting of: | 545,000 |

- Imperial Design Rotary Bar Manufacturing Machine, S/N 256-1 (New 2013)
- Wexxar Packaging Inc. Model 5150-180212, Top and Bottom Case Sealer
- 24"W x 6'L Belt Conveyor
- 8"W x 15'L 90° Turn Link Belt Conveyor
- Bradman-Lake Model RA-90-L-R, Case Sealer, S/N 16339 (New 2018), with NEO Model Jet 2 Printer, Nordson ProBlue 7 Glue Melt Machine
- Bradman-Lake Model HS2/60+6, Case Erector, S/N 15802 (New 2006)
- Span Tech 8"W x Approx. 30'L U-Shaped Link Belt Conveyor
- ProPack Model LJTRTD, Robotic Carton Packaging Machine, S/N 121-12455 (New 2012), with (1) ABB Flex Picker, Pick and Place Robot
- 10"W x 15'L Plastic Belt Conveyor
- (2) Span Tech 8"W x 10'L Link Belt Conveyors
- Mettler Toledo Model XE2, High Speed Inline Scale, S/N 15055511

*Continued...*

| BCI, 4718 Belmont Ave., Youngstown, OH |
|:---:|

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|:---:|

*Continued...*

- SIG Pack Model Linium 301, Bar Packagi Machine, S/N 01-23048
- SIG 8"W x 10'L Belt Conveyor, with Stainless Steel Support Stand
- 12"W x 10'L Belt Conveyor, with Stainless Steel Support Stand
- 32"W x 10'L Belt Conveyor, with Stainless Steel Support Stand
- 32"W x 7'L Belt Conveyor, with Stainless Steel Support Stand
- Nielsen 32"W x 60'L Cooling Tunnel, S/N 020909, Stainless Steel Construction, with Rubber Belt Conveyor
- Sollich Model Encomat B6-820, Chocolate Applicating Machine, S/N 34476-010 (New 2020)
- Sollich Model Gittertisch, 42"W x 24'L Mesh Chain Conveyor, S/N 34476005 (New 2020)
- 42"W 90° Turn Belt Conveyor
- Imperial Design 32"W x 30'L Cooling Tunnel, S/N 209-10 (New 2013), Stainless Steel Construction, with Rubber Belt
- Nielsen 32"W Water Fall Chocolate Applicator, S/N 020908

*Continued...*

| BCI, 4718 Belmont Ave., Youngstown, OH | | |

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|-----------------------------|
| | *Continued...* | |
| | • Kruger Salecker Model DOS-D800, 2-He ABB Flex Pick and Place Machine, S/N 1746 (New 2019), with Belt Conveyor | |
| Lot- | Protein Bar Line No. 2, Consisting of:<br>• Kruger Salecker Model 0000142, Rotary Mold Bar Extruder, S/N 1612 (New 2017)<br>• 32"W x 40'L Cooling Tunnel, Stainless Steel Construction, with Rubber Belt<br>• 2-Roll Bar Flattening and Forming Machine, with Belt Conveyor<br>• 32"W x 20'L Cooling Tunnel, Stainless Steel Construction, with Rubber Belt<br>• 32"W Bar Slitter<br>• 32"W x 15'L Slat Belt Conveyor<br>• Bakery 24" x 8'L Belt Conveyor<br>• 40"W 90° Turn Belt Conveyor<br>• Egan 32"W Single Head Guillotine Cutter, S/N 11-1005 (New 2011)<br>• 8"W x 10'L Belt Conveyor<br>• Eriez Model Xtreme 8 x 4, Inline Metal Detector, S/N 338404<br>• Bradman-Lake Model FT120 & SPF, Automated Bar Packaging Machine, S/N 20653-20654 (New 2015) | 320,000 |
| | *Continued...* | |

| | BCI, 4718 Belmont Ave., Youngstown, OH | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Mettler Toledo Model XE2, High Speed Inline Scale, S/N 17063601 | |
| | • 12"W x 20'L Belt Conveyor | |
| | • Mettler Toledo Model XC3, High Speed Inline Scale, S/N 36600928 | |
| | • Texwrap Packaging Systems Model ST-2215R-MTX52374, Heat L-Bar Sealer, S/N T2215-MTX52374 | |
| | • Heat Seal Model T3417/10-LDR, 12"W Shrink Wrap Tunnel Oven, S/N CKA22199 | |
| | • Belcor Model 150, Top and Bottom Case Sealer, S/N 072693 | |
| | • Expandable Skate Roller Conveyor | |
| Lot- | Protein Bar Line No. 3, Consisting of: | 500,000 |
| | • Egan Rotary Bar Extruder, S/N 17-1093 | |
| | • Bakery Technology Enterprises Model AFE CT060003016, 32"W x 30'L Cooling Tunnel, S/N 1216G08A003, with Rubber Belt | |
| | • 10"W x 12'L Belt Conveyor, Stainless Steel Construction | |
| | • Sacmi Model Flow Pack JT-Pro, Bar Packaging Machine, S/N IPPC21MA081.4.2 (New 2021) | |
| | • Dorner Model Flex Move, 3"W x 45'L Conveyor | |
| | *Continued...* | |

**BCI, 4718 Belmont Ave., Youngstown, OH**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|-----------------------------|
| | *Continued...* | |
| | • Sacmi Model ISOLA Trifunzionale, Fully Automated Case Forming Packing Sealin Machine, S/N IPPC21MA027.5.1 (New 2 **(Please Note:**  Not Yet in Service, Still in Testing Phase At Time of Inspection) | |
| Lot- | Miscellaneous Spare Equipment Not in Use At Time of Inspection, Consisting of: <br> • Wexxar Model 5150, Top and Bottom Case Sealer, S/N 114191 <br> • (2) Clamco Model 6600, Automatic Heat L-Bar Sealers <br> • Span Tech 8"W x 6'L Slat Belt 90° Turn Conveyor | 10,500 |
| 1- | Wulftec Model WSML-150-B, Rotary Pallet Wrapper, S/N 72531-1-1210 | 5,000 |
| | **MIXING AREA** | |
| 2- | Rheem Model GHE100ES-200, 100-Gallon Natural Gas Fired Water Heaters, S/N A161712976, A161712948 | 3,000 |
| 1- | Approx. 5-Ton Portable Chiller | 1,500 |
| 1- | **#3** <br> Blommer Model 2009, Rotary Mixer, Carbon Steel Construction, with Approx. 10-HP Motor | 10,000 |

| | BCI, 4718 Belmont Ave., Youngstown, OH | |
| --- | --- | --- |

| Qty. | Description | Orderly Liquidation Value $ |
| --- | --- | --- |
| 1- | **#4** Chocolate Concepts Approx. 60" Dia. x 48"H Heated Holding Tank, Carbon Steel Construction, with Heating Unit | 25,000 |
| 1- | Blommer Model 2004, Rotary Chocolate Mixer, S/N 1514, Carbon Steel Construction, with 3-HP Motor, Gear Box | 10,000 |
| 1- | Rotary Chocolate Mixer, Approx. 5'W x 48"H Rounded Bottom, Heated, with 3-HP Motor, Gear Box | 15,000 |
| 1- | Approx. 36" Dia. x 24"D Stainless Steel Bowl Mixer, with Top Mounted Agitator | 15,000 |
| 1- | Blommer Model 2011, 60"W x 96"L x 60"H Round Bottom Rotary Chocolate Mixer, with Electric Drive Motor, Gear Box | 15,000 |

**MIXING ROOM 2 AREA**

| | | |
| --- | --- | --- |
| 1- | Shaffer Rotary Paddle Mixer, Approx. 48"W, Stainless Steel Construction, with 30-HP Drive Motor | 15,000 |

**WASHING AREA**

| | | |
| --- | --- | --- |
| 1- | Douglas Machines Inc. 72"W x 36"H Front Loading Gas Fired Steam Washer, Stainless Steel Construction | 6,000 |

**BCI, 4718 Belmont Ave., Youngstown, OH**

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **WAREHOUSE** | |
| Lot- | (54) Sections 42"D x 8'W x 15'H Pallet Racking | 5,500 |
| Lot- | (5) Sections 4'W x 15'H x 30'D 3-Tier Push Back Pallet Racking | 1,250 |
| 1- | 48" x 48" Platform Scale, with Digital Readout | 600 |
| | **MOBILE EQUIPMENT** | |
| 1- | Hyster Model W40XTC, 4,000-Lbs. Electric Pallet Jack, S/N A45N02363Z (New 2002) | 2,000 |
| 5- | Jungheinrich Model EJE120, Electric Pallet Jacks | 8,750 |
| | **OUTSIDE AREA** | |
| 1- | Compa Model TSA15054DN1G, Chiller, S/N 5616E05222 | 3,500 |
| 1- | Compa Model TSA15054DN1G, Chiller, S/N 5616F00612 | 3,500 |

| BCI, 4718 Belmont Ave., Youngstown, OH | | |
| --- | --- | --- |
| Qty. | Description | Orderly Liquidation Value $ |
| | **THROUGHOUT FACILITY** | |
| Lot- | Miscellaneous, Office and Support Equipment Consisting of; Trash Cans, Pallet Jacks, Hand Trucks, Material Carts, Hoppers, Ladders, Hand Tools, Shelves, Tables, Computers, Desks, Chairs, Etc. | 1,500 |
| **TOTAL ORDERLY LIQUIDATION VALUE** | | **$1,522,600** |

| | NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **RICE STEAMING ROOM** | |
| Lot- | Rice Steaming Line, Consisting of: | 120,000 |
| | • Flexicon 36" x 36" Stainless Steel Hopper/Feeder, with 4" Dia. x 12' Incline Screw | |
| | • Lyco Model Clean Flow CKFP, Steam Injected Rice Cooker, S/N 4007C75176 (New 2014), with Alfa Laval Heat Exchanger | |
| | • Lyco Model Plenum, Rice Cooler, S/N PCT0617-84543 (New 2017) | |
| | • Layton 6'L Dewatering Shaker, S/N 7187-01 (New 2017) | |
| | • Manufacturer Unknown Labeler | |
| | • Enercon Model Super Seal NM5022-216, Band Sealer, S/N 1467114-1-1 | |
| | **KITCHEN 1** | |
| 1- | Groen Model N-300SP, 300-Gal. Stainless Steel Jacketed Kettle (New 1971), with Top Mounted Lightin Mixer | 10,000 |
| 1- | Lee Industries Model INA/2-250, 250-Gal. Stainless Steel Steam Jacketed Kettle, S/N 00399-1 (New 2012) | 15,000 |
| 1- | Groen 150-Gal. Stainless Steel Jacketed Kettle, S/N 00362-1 (New 2000) | 10,000 |

| | NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| 1- | Groen 150-Gal. Stainless Steel Jacketed Kettle, S/N 00362-2 (New 2000) | 10,000 |
| 1- | MTC Model HLC-2, 800-Lb. Bowl Elevator, S/N 20153930001 | 5,000 |
| 1- | MTC Model HLC-2, 800-Lb. Bowl Elevator, S/N 161708600 | 5,000 |
| Lot- | Miscellaneous Equipment Throughout Hot Water System, Consisting of: (2) Alfa Laval Heat Exchangers, Pump, 500-Gal. Holding Tank, Etc. | 5,000 |

**KITCHEN 2**

| Qty. | Description | Value |
|---|---|---|
| 1- | Manufacturer Unknown Stainless Steel Horizontal Steam Washer, S/N N/A | 1,500 |
| 1- | Manufacturer Unknown Horizontal Band Sealer | 300 |
| 4- | Afco Portable SIP Foamer | 1,000 |
| 1- | Breddo 350-Gal. Likwifier, with Pump, Platform | 40,000 |
| 1- | Manufacturer Unknown 150-Gal. Steam Kettle, S/N N/A | 10,000 |
| 1- | Groen Model N-500SP, 500-Gal. Stainless Steel Jacketed Mixing Kettle, S/N 32541 | 15,000 |
| 1- | Groen Model NEM-600, 600-Gal. Stainless Steel Jacketed Mixing Kettle, S/N 61031-1 (New 1990) | 20,000 |

## NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| 1- | Gorman Rupp Model 1800TRA20, 10-HP Positive Displacement Pump, S/N 08B5736 | 5,000 |
| 1- | Manufacturer Unknown Stainless Steel Pump, with 10-HP Pump, 24" Dia. Hopper Feed | 15,000 |
| 1- | Sealed Air Cryovac Model RC2045C, Vertical Form Fill and Seal Machine, S/N 115, with Exit Conveyor, Incline Conveyor | 35,000 |
| 1- | Dohmeyer DOH-CCT-8750, 30'L x 10' Dia. Rocker Type Stainless Steel Cryogenic Chiller, S/N N/A, 2,500-Gal., Paddle Wheel Agitation, Alfa Laval Heat Exchanger **(Please Note:** Leased) | Leased |
| 1- | Lee Industries Model 200D9MS, 200-Gal. Stainless Steel Jacketed Mixing Kettle, S/N 15277-1-1 (New 2001) | 15,000 |
| 1- | RCP 200-Gal. Stainless Steel Jacketed Mixing Kettle, S/N R104-87 (New 1987) | 10,000 |
| 1- | RCP 200-Gal. Stainless Steel Jacketed Mixing Kettle, S/N R103-87 (New 1987) | 10,000 |
| 1- | MTC Model HLC-2, 800-Lb. Bowl Elevator, S/N 20153928001 (New 2005) | 5,000 |

| | NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **MIXING ROOM** | |
| 1- | Manufacturer Unknown Stainless Steel Above Ground Digital Platform Scale, with Read Out | 1,500 |
| 1- | Manufacturer Unknown 1,500-Lb. Stainless Steel Horizontal Mixer, S/N N/A | 20,000 |
| 1- | Manufacturer Unknown 1,500-Lb. Stainless Steel Horizontal Mixer, S/N N/A | 20,000 |
| | **SEALED BAG ROOM** | |
| Lot- | Equipment Throughout Sealed Bag Room, Consisting Of: Ishida 15-Head Vertical Weigh Scale S/N N/A Mezzanine Mounted with 12' Bucket Elevator Hopper Feed, Ilapak Model 500 Form Fill and Seal Machine S/N V-5000 | 50,000 |
| | **ASSEMBLY ROOM** | |
| Lot- | Burrito Line No. 1, Consisting of:<br>• Unifiller Stainless Steel Piston Depositor, S/N N/A, with Hopper Feed<br>• Manufacturer Unknown 4'W x 25'L Manual Burrito Folding Conveyor, with 16" x 20'L Interlocking Return Conveyor | 250,000 |

*Continued...*

**NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM**

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|-----------------------------|

*Continued...*

- Pro Seal Model GT1E, Automatic High-Speed In-Line Tray Sealer, S/N SN-M-0413 (New 2017)
- Pro Seal Model GT1E, Automatic High-Speed In-Line Tray Sealer, S/N SN-M-017018 (New 2022)
- Pro Seal Model GT1E, Automatic High-Speed In-Line Tray Sealer, S/N SN-M-05872 (New 2020)
- Manufacturer Unknown 20-Tier Spiral Freezer, 24"W Belt, 6" Belt Height, with Frigid Cool Heat Exchanger
- Adco Model 15HCS50WD, End Load Cartoner, S/N 5447HG (New 2013)
- Adco Model 15HCS50WD, End Load Cartoner, S/N 5857HD (New 2017)
- Ceia Model THS/SM21, 12" x 6" Metal Detector, S/N 33002110074
- Markem Model Imaje 9450, Inkjet Coder
- 3M Top and Bottom Case Taper, S/N N/A
- Adco Model 15DZ-50SS, Horizontal Hand Load Cartoner, S/N 5655HG (New 2015), with Nordson Hot Melt Gluer

*Continued...*

| | NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • 3M Model 7000 R Pro, Top and Bottom Case Taper, S/N SBB0003827 | |
| Lot- | Burrito Line No. 2, Consisting of: | 200,000 |
| | • Reiser Model Vemag DP3, Vacuum Stuffer, S/N 138-0457 (New 2018) | |
| | • Reiser Model Vemag DP3, Vacuum Stuffer, S/N N/A (New 2018) | |
| | • Manufacturer Unknown 4'W x 25'L Manual Burrito Folding Conveyor, with Bladder Pump, 24" Incline Conveyor | |
| | • York 20-Tier Spiral Freezer, 24"W Stainless Steel Belt, 6" Distance Between Belts with Heat Exchanger | |
| | • Ilapak Model Correra 500, Horizontal Flow Wrapper, S/N 06804311085 (New 2020) | |
| | • Ilapak Model Correra 500, Horizontal Flow Wrapper, S/N 0680431150 (New 2021) | |
| | • (2) Markem Imaje Model 9450, Inkjet Coders, S/N N/A | |
| | • Ceia Model THS/MS21, 12" x 6" Metal Detector, S/N 34002100033, with Pneumatic Reject Push Out | |
| | • Manufacturer Unknown 5'W x 25'L Accumulation Conveyor, with Pneumatic Diverter | |
| | *Continued...* | |

| NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Adco Model 15HCS, End Load Cartoner, 5791HG (New 2016), with Nordson Hot M Gluer, Markem Imaje 9450 Inkjet Coder, Exit Conveyor | |
| | • 3M Top and Bottom Case Taper, S/N N/A | |
| Lot- | Flauta Line 3, Consisting of: | 275,000 |
| | • Reiser Model Vemag V-500, Vacuum Stuffer, S/N 1284834 | |
| | • Reiser Model Vemag V-500, Vacuum Stuffer, S/N N/A | |
| | • Manufacturer Unknown 5'W x 25'L Manual Burrito Folding Conveyor | |
| | • Reiser Model Vemag DP3, Vacuum Stuffer | |
| | • EFS Model APF-45, 45"W Continuous Deep Fryer, S/N 2019-03-APF-1 (New 2019), 2,000,000-Btu, EFS Model RFD30 30-Gal. Oil Skimmer S/N 2019-03-REF-1 (New 2019) with Heat Exchanger, Pump and Tank | |
| | • Reiser Model Vemag, Vacuum Stuffer, S/N N/A | |
| | • Northfield York Approx. 15-Tier Spiral Freezer, 24"W Stainless Steel Belt, 6" Distance Between Belts, with Heat Exchanger | |
| | • Manufacturer Unknown 24"W x 12'L Motorized Belt Conveyor | |
| | *Continued...* | |

| | | |
|---|---|---|
| **NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM** | | |

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Ilapak Model Carrera 1000/40, Horizontal Flow Wrapper, S/N 0640490156 (New 20 with Markem Imaje Model 9450 Inkjet Coder | |
| | • Ceia Model THS/SN21, 12" x 6" Metal Detector, S/N 3400210032, with Pneumatic Reject Push Off | |
| | • Manufacturer Unknown 5' x 25' Accumulation Conveyor | |
| | • Sealed Air Model A27A, Carton Flow Wrapper, S/N A17013-01, with Sealed Air Model T7H 4'L Heat Shrink Tunnel S/N T17019-01 12" x 24" Opening | |
| | **MAINTENANCE SHOP** | |
| 1- | BHS Model BTC-24, 24" Battery Transfer Carriage, S/N L0176095 (New 2012) | 750 |
| 1- | Groen Model DA/2-600, 600-Gal. Stainless Steel Mixing Kettle, S/N 63120-2 (New 1990) | 15,000 |

| NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM |
|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| Lot- | Miscellaneous Equipment Throughout Maintenance Shop, Consisting of: Jet Pedestal Type Drill Press, Variable Speed Milling Machine, Jet 12" x 40" Geared Head Engine Lathe, Lacfer 15" x 3' Geared Head Engine Lathe, H-Frame Presses, Manual Finger Brake, Welders, Hand and Power Tools, Hoists, Etc. | 7,500 |

**OUTSIDE**

| Lot- | Ammonia System, Consisting of: | 112,500 |
|---|---|---|
| | • (2) Evapco Roof Mounted Evaporative Coolers, 6,000-Gal. Accumulation Tank, 3,500-Gal. Recirculation Tank, 8,300-Gal. Ammonia Receiver Tank, Heat Exchangers, 5,000-Gal. Tank, All Associated Pumping, Piping & Storage Equipment | |
| | • Mycom Model N160VCDD-T-200, 250-HP Ammonia Compressor, S/N SU-2439L | |
| | • Mycom Model N160VCDD-T-200, 250-HP Ammonia Compressor, S/N SU-2439-B | |
| | • Mycom Model N160VCDD-T-200, 250-HP Ammonia Compressor, S/N N/A | |
| | • Mayekawa Model N200VLD-T-350, 350-HP Ammonia Compressor, S/N SU-2803 | |

*Continued...*

| | NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Mycom Model N320VCDSS13-T-400, 40 Ammonia Compressor, S/N SU2440 | |
| 1- | Victory Energy 8,625-Lb. Per./Hr. Natural Gas Fired Boiler, S/N 14123 (New 2017), with Associated Equipment | 15,000 |
| 1- | Mohawk Model 4/5/625, 4,312-Lb. Per./Hr. Natural Gas Fired Boiler, S/N 9591 (New 1985) | 7,500 |
| 1- | Ingersoll Rand Model SSR-EP150, 150-HP Rotary Screw Air Compressor, S/N F12697U9529 (New 1995), with Hankinson Air Dryer, Receiver | 7,500 |
| 1- | Fulton Model ST-0760-F, 150-Gal. Hot Oil Boiler, S/N 2950-C (New 1995) | 3,500 |
| | **OUTSIDE STORAGE** | |
| Lot- | Miscellaneous Equipment Throughout Outside Storage, Consisting of: • Burrito Folder • 250-Gal. Continuous Fryer, with Tank, Oil Filter, Etc. | 15,000 |

| | NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | **OIL ROOM** | |
| Lot- | Equipment Located In Oil Room, Consisting of: | 15,000 |
| | • 6,000-Gal. Vertical Stainless Steel Oil Tank, with Top Mounted Agitator | |
| | • 3,600-Gal. Vertical Stainless Steel Oil Tank | |
| | • (2) 1,000-Gal. Vertical Stainless Steel Oil Tanks | |
| | **THROUGHOUT FACILITY** | |
| 1- | O'Ryan Model LFD, Stretch Wrapper, S/N V5726 | 4,000 |
| Lot- | Miscellaneous Racking Throughout Cooler, Consisting of: (65) Sections of 16'H x 8'W x 4'D Heavy Duty Adjustable Steel Pallet Racking, (52) Sections of 4-Position Pallet Push Back Racking S/N N/A 4-Position High | 23,725 |
| Lot- | Miscellaneous Equipment in Storage, Consisting of: | 75,000 |
| | • Bizerba Weigh Scale Conveyor | |
| | • Shanklin Heat Shrink Tunnel | |
| | • Manufacturer Unknown Horizontal Cartoner, S/N N/A | |
| | • (2) Ilapak Model Carrera, Carton Flow Wrappers | |
| | *Continued...* | |

| | NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | |
|---|---|---|

| Qty. | Description | Orderly Liquidation Value $ |
|---|---|---|
| | *Continued...* | |
| | • Ishida Weigh Scale, with Vertical Form Fill and Seal | |
| | • Metal Detectors, Weigh Scales, Bowl Elevators, Grinders, Steamers, Accumulation Conveyor, Flow Wrappers, Heat Shrink Tunnels, Assorted Conveyor, Etc. | |
| 1- | Lochinvar Model CWN0495PW, Hot Water Boiler, S/N H06H00190064, Natural Gas Fired | 6,500 |
| | (**Please Note:** Located in Boiler Room 1) | |
| Lot- | Miscellaneous Equipment Throughout QA Lab, Consisting of: Motak 4-Door Stainless Steel Refrigerator, Pipettes, Balances, Computers, PH Meters, Etc. | 6,500 |
| Lot- | Miscellaneous Equipment Throughout Production Storage, Consisting of: Herschel Model CA Slicer S/N 3829, Piston Filler, Safeline Model SL2000 30" x 80" Metal Detector S/N 24135-02, Bosch Model B550 Band Sealer S/N 18-3510, Hobart Cheese Extruder, Manufacturer Unknown 300-Lb. Stainless Steel Mixer, Etc. | 10,000 |

| NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM | | |
| --- | --- | --- |

| Qty. | Description | Orderly Liquidation Value $ |
| --- | --- | --- |
| Lot- | Miscellaneous Equipment Throughout Facilities, Consisting of: Stainless Steel Sinks, Stainless Steel Workstations, Shovels, Brooms, Trash Cans, CIP Foamers, Portable Racks, Proofing Racks, Stainless Steel Tubs, Metro Racks, Ladders, Mezzanines, Pumps, Pipings, Tanks, Pans, Conveyor, Floor Jacks, Battery Chargers, Etc. | 20,000 |
| Lot- | Office Furniture and Fixtures Throughout Facility, Consisting of: Laminate Desks, Chairs, Conference Room and Related Equipment, File Cabinets, PC's & Monitors, Laptops, Computers, Printers, Fax Machines, Copiers, Server Room and Related Equipment, Telephones, Security Equipment, Break Room Equipment, Etc. | 10,000 |
| | **MOBILE EQUIPMENT. NOT INSPECTED BY APPRAISER. INFORMATION PROVIDED BY COMPANY** | |
| 1- | Raymond Model 425-C40TT, 4,000-Lb. Electric Stand Up Reach Type Forklift Truck, S/N 425-14-40253 (New 2014 Est.) | 3,500 |
| 1- | Raymond Model 425-C40TT, 4,000-Lb. Electric Stand Up Reach Type Forklift Truck, S/N 425-14-40259 (New 2014 Est.) | 3,500 |
| 1- | Raymond Model 425-C40TT, 4,000-Lb. Electric Stand Up Reach Type Forklift Truck, S/N 425-14-40283 (New 2014 Est.) | 3,500 |

## NM Holdings, 1700 Desert Surf Circle, Albuquerque, NM

| Qty. | Description | Orderly Liquidation Value $ |
|------|-------------|------------------------------|
| 1- | Raymond Model 425-C40TT, 4,000-Lb. Electric Stand Up Reach Type Forklift Truck, S/N 425-14-40299 (New 2014 Est.) | 3,500 |
| 1- | Raymond Model 8400, Electric Pallet Jack, S/N 840-08-79569 (New 2008) | 500 |
| 5- | Yale Model MPB045VGN24T2646, Electric Pallet Jacks, Serial Numbers: A245C11915W, A245C11917W, A245C11919W, A245C11927W & A245C11929W | 2,500 |

| TOTAL ORDERLY LIQUIDATION VALUE | $1,551,275 |
|----------------------------------|------------|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "B"**

**[FORM APA – TO FOLLOW]**

# EXHIBIT "2"

# [Form APA – TO FOLLOW]

EXHIBIT "3"

# Edward J. Bidanset    "Ed"

**39W372 W Curtis Square | Geneva, IL 60134| Cell 312-330-0938 | E-mail Edbidanset@outlook.com**

---

*C level turnaround executive able to execute strategy, with industry specific experience in both middle market and private equity companies, with proven success in building and leading teams. Record of technical experience and innovation that generates bottom line results.*

| | |
|---|---|
| Jun 2022 to Jan 2023 | **Astech Engineered Products, LLC – Santa Anna, CA – C.O.O.** |

- Interim C.O.O. for an aerospace company - owned by a family office - selected for turnaround.
- Customer / company conflicts lead to Chapter 11 – Sub Chapter 5 – reorganization or 363 sale.
- Bespoke equipment and sole use IP amongst customers.
- Court approved voiding contract – sale of company to customer group.

| | |
|---|---|
| Dec 2021 to Jun 2022 | **InterimExecs RED Team - Stapleton – Spence Packing, LLC. Gridley, CA – C.E.O.** |

- Engaged for generational transition or road show and CIM to sell the business.
- Assessment revealed the business was distressed and began windown / liquidation.
- ABC and WARN ACT – bank paid in full, family litigation.

| | |
|---|---|
| Nov 2019 to Dec 2021 | **Morris Anderson –Castwell Products, LLC. Skokie ILL – CRO** |

- Assignment for the Benefit of the Creditors- Automotive / Defense foundry – Revenue $60 M.
- Real Estate under contract. Paid the secured and unsecured 100% - accommodation agreement,
- WARN ACT – 3 extensions. Updated EPA reporting and Phase 1.

| | |
|---|---|
| July 2019 to Oct 2019 | **Morris Anderson – Seating Concepts, Inc. Joliet ILL – CRO** |

- Turnaround – Refinance of a restaurant furniture manufacturer – Revenue $25 M.
- Re-financed and updated standard costing and quoting system. Assisted in hiring new CFO.
- Built data room – assisted the owner in the sale of the business.

| | |
|---|---|
| Jan 2019 to July 2019 | **Morris Anderson – Amstore, Inc Grand Rapids – CRO** |

- WARN ACT - Wind down of a retail furniture manufacturer – Revenue $80 M.
- Conducted Customer Road Show, Sold Real Estate and paid secured and unsecured 100%.

| | |
|---|---|
| Dec 2017 to Jan 2019 | **The Finley Group - Diverse Label Printing, LLC – Burlington, NC – CRO**<br>**Cargill Beef – RICO Act – Chapter 11 – Bankruptcy Western District NC** |

- Conducted auction/sale of the company to pay secured lenders and satisfy Cargill's claims of survivor liability. Witness, CEO, CRO and trustee for $112 M claims.

| | |
|---|---|
| Oct 2015 to Nov 2017 | **Mazzetta & Company, Inc. – Highland Park, IL – C.O.O.    Morris Anderson Client**<br>**Privately Held Company - $600 million in Revenue**<br>Distributor / Processor of frozen shrimp, lobster, and fish – retail & foodservice. |

- Managed Gloucester processing plant prior to and during closing - outsourcing program.
- Developed KPI's for yield, output, and QA (MSC / HACCP) reporting.
- Reviewed annual sales plan by category, product, and channel to optimize go to market strategy.
- Monetized aged inventory and culled product line SKU's.
- Participated in the marketing road show with PWC / McKinsey / Duff & Phelps / Antarctica LLC

| | |
|---|---|
| Aug 2012 to Sept 2015 | **Bradley Caldwell, Inc. – Hazleton, PA – VP of Operations / IT       Morris Anderson Client**<br>**Privately Held Company - $160 million in Revenue**<br>Distributer of pet, equine, aquatics, farm, lawn & garden, and consumer goods products. |

- Transitioned from consultant to VP of Operations / IT.
- Developed optimal warehouse layout with a quick pick zone, five categories and 25K SKU's.
- Achieved daily shipment increase of 30%, mandating pick rates, 100% daily receiving & put up.
- Installed logistics software, optimizing routes (Appian) & electronic logs / GPS (PeopleNet) saving $1.0 million in fuel, consolidated and closed satellite warehouse.
- SOP's and RF of goods picked reduced customer returns and credits by 50%.
- IT Steering committee – AS 400 – FTP sites, SharePoint, Sage, WMS, EDI and purchasing interface.

| | |
|---|---|
| Dec 2008 to Jul 2012 | **Morris Anderson & Associates Ltd – Chicago, IL – Managing Director** |

Provides turnaround, restructuring, performance and interim management services.

- Restructuring/Liquidations/Start-up/M & A and Workout Experience, Financial and operational background in metal stamping, plastic medical devices, electronics, printing, financial services, consumer goods, retail (large box), automotive and assisted living.
- Sold the DriveSol plant in Sweden for Sun Capital - paid the secured lender 30 % during the automotive downturn in 2008.
- My ability to blend crisis management, a sense of urgency and a strong understanding of the basics of the business has allowed me to be an effective and successful (CRO, CFO) turnaround executive for domestic and international companies in the middle market. Union contract experience.

Aug 2001 to Nov 2008      **CE, Inc.  - Consultant in the retail & leasing industry**

Assisted brokers and trading companies with the importation of products from China. End users included. Bed, Bath and Beyond, Target, Costco and Wal-Mart. Projects included building a supply chain, installing EDI software, and factory qualifications. Experience in plastics, metal, wood, and fabrics. Sourcing contacts in China, Hong Kong, and Taiwan.

Mar 1999 to Aug 2001      **Middle Atlantic Products – Riverdale, NJ - Chief Financial Officer**
**PNC Bank Portfolio Company - $110 million in Revenue**
Manufacturer of sheet metal racks and enclosures.

- Financed equity buy-out of co-founder.
- Developed banking relationship for Canadian subsidiary.
- Negotiated middle market loan with Chase Manhattan Bank replacing an ABL credit line.

Sep 1997 to Mar 1999      **Scott Printing Corporation – New Providence, NJ - Chief Financial Officer**
**PNC Bank Portfolio Company - $55 million in Revenue**
Financial printer for Wall Street and various equity research firms.

- Responsible for finance, purchasing, administration, annual audit, and tax.
- Assisted salespeople with printing quotes for Prudential and Paine Webber.
- Instituted zero base budgeting and cost reduction review.
- Financed two Heidelberg sheetfeed presses - $20 + million.
- Institutionalized an audit process for customer invoices increasing profitability, reducing DSO.

Sep 1992 to Sep 1997      **Imtek / Holliday-Tyler Printing – Bridgeport, N J – C.F.O. / C.O.O.**
**Private Equity Company - $60 million in Revenue**
Commercial – Specialty Printer.

- Liquidated parent company Holliday-Tyler, complied with NLRB & unions contracts.
As C.O.O., managed the Imtek Greenfield.
- Responsible for AAA Triptik printing and distribution nationwide.
- Installed order entry software I.V.R. with integrated MRP system for printing and fulfillment of over 1,000 locations with 6,000 different shipments per month.

Sep 1988 to Sep 1992      **Cardiovascular Diagnostics (Coeur Labs) - Raleigh, NC – Chief Financial Officer –**
**Private Equity Portfolio Company - $20 million in Revenue**
Manufacturer of disposable plastic medical devices.

- Managed accounting and IT – process and job costing (two divisions).
- Raised $3.0 million equity via private placement, with three PEG's
- Successfully negotiated the divestiture of the company's labware division.

Sep 1983 to Sep 1988      **Exide Electronics – Raleigh, NC – Marketing Controller**
**LBO – Private Equity Company - $150 million in Revenue**
Manufacturer of Uninterruptible Power Systems.

Aug 1980 to Sep 1983      **Ingersoll-Rand - Charlotte, NC – Financial Analyst – Fortune 500 Company**
Manufacturer of industrial equipment – Air compressor group.

Aug 1978 to Aug 1980      **Scovill Inc. – Charlotte, NC – General Accountant – Fortune 500 Company**
Manufacturer of consumer goods - Formerly Eaton Yale Towne & Lock
Team member for system migration from Eaton Corp to Scovill, Inc. for accounting systems.

## EDUCATION, ARTICLES & AWARDS

M.B.A. 1986, Duke University, Fuqua School of Business, Durham, NC
Associates Computer Science, C.P.C.C., Charlotte, NC
B.A. Economics, SUNY at Cortland, NY

N.C. Banking Commission
Member Turnaround Management Association
Article for A.C.G. – "To Big to Succeed? The Challenges of Rapid Growth".
Page Marking Device – US Patent # 6896294 – Used to mark pages with an adhesive paper label/flag
Tri-State Association for Corporate Renewal – Program Speaker –Turnarounds What Works, What Doesn't

# EXHIBIT "4"

# Matthew LoCascio

**Principal at SC&H Capital**

Washington DC-Baltimore Area

## Contact

6011 University Blvd #490 Ellicott City, MD
443-951-4846 (Work)
mlocascio@schgroup.com

www.linkedin.com/in/matthew-locascio (LinkedIn)
www.schgroup.com/services/investment-banking-advisory/ (Company)

## Top Skills

Business Analysis
Sales
Transaction Banking

## Certifications

Series 79
Certified Value Builder

## Honors-Awards

Emerging Leader
Consumer Products Restructuring of the Year
Special Situation M&A Deal of the Year
Turnaround of the Year - Small Middle Markets

## Publications

Buyers, Investors Paying Up for Tasty Food Deals

## Summary

With more than 20 years of experience working with middle-market companies, often family-owned and multi-generational, I take great pride in my work's impact on the individual lives of employees, vendors, and customers. Having worked on over 150 client engagements that involve sale or restructuring transactions on behalf of companies often facing operational and financial challenges, I've gained the trust of clients and their shareholders throughout the country.

With keen attention to detail, the ability to drive results, and a commitment to my client's needs, I work hard to find value where others have not.

My team and I have experience across a broad spectrum of manufacturing, retail, and service industries, including food, consumer products, technology, printing, wholesale distribution, home components, automotive, fabrication, and plastics.

Our involvement in over 600 transactions across the U.S. is just one of the reasons we're regarded as a premier middle-market advisor and a creative investment bank for companies in transition.

I have been a speaker on numerous panels related to M&A processes, have been published in TMA's Journal for Corporate Renewal, and have also testified in multiple bankruptcy courts regarding sales processes and procedures.

I am a graduate of the University of Pennsylvania and have a Bachelor of Applied Science in Systems Engineering. I have been a member of the American Bankruptcy Institute for more than ten years and currently serve as the Co-Chair for the ABI Asset Sales Committee, having previously served as its Education Director, Special Projects Coordinator, and before that,

Communications Manager.  I am a FINRA Registered Investment Banking Representative (Series 79).

———

## Experience

### SC&H Capital
Principal
January 2020 - Present (3 years 7 months)
Washington DC-Baltimore Area

SC&H Capital is an investment banking and business valuation advisory firm for middle-market businesses. We support our investment banking activity with a full suite of strategic and financial resources to assist companies develop and execute strategic plans and initiatives. Our services empower our clients to manage companies more effectively and efficiently, thereby positioning the company to achieve its growth goals.

### Equity Partners HG
14 years 8 months

Managing Director
March 2011 - January 2020 (8 years 11 months)
Baltimore, Maryland Area

Equity Partners works with companies and properties to arrange new funding in the form of debt/refinancing or equity investments, to create joint venture relationships, or to organize going concern sales of the business or property. We are a subsidiary of Heritage Global Inc. (NASDAQ: HGBL), a value-driven, innovative leader in tangible and intangible asset valuations and transactions.

Director
June 2005 - March 2011 (5 years 10 months)
Baltimore, Maryland Area

Formerly known as Equity Partners, Inc., we were founded in 1988 and advise businesses around the US to find new equity, joint-venture partners, or an outright sale of the business.

### Marsh
Risk Analyst
June 2003 - June 2005 (2 years 1 month)
Greater Philadelphia Area

Marsh is a global leader in corporate insurance and risk management. Managed the renewal process for new and existing clients, including market negotiations, program design and implementation.

———

## Education

University of Pennsylvania

BAS, Systems Engineering · (1999 - 2003)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **DEBTORS' NOTICE OF MOTION AND MOTION TO: (1) APPROVE AUCTION(S) AND BID PROCEDURES FOR THE SALE OF EQUITY AND/OR ASSETS AND (2) SET SCHEDULING FOR A MOTION TO APPROVE THE SALE OF EQUITY AND/OR ASSETS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 1, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Mark A Amendola    mamendola@martynlawfirm.com**
- **Todd M Arnold    tma@lnbyg.com**
- **Marshall J August    maugust@frandzel.com, rsantamaria@frandzel.com**
- **Tanya Behnam    tbehnam@polsinelli.com,
  tanyabehnam@gmail.com;ccripe@polsinelli.com;ladocketing@polsinelli.com**
- **Michael Jay Berger    michael.berger@bankruptcypower.com,
  yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com**
- **Robert Carrasco    rmc@lnbyg.com**
- **Abram Feuerstein    abram.s.feuerstein@usdoj.gov**
- **John-Patrick M Fritz    jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com**
- **Everett L Green    everett.l.green@usdoj.gov**
- **David S Hagen    davidhagenlaw@gmail.com**
- **Mark S Horoupian    mark.horoupian@gmlaw.com,
  mhoroupian@ecf.courtdrive.com;cheryl.caldwell@gmlaw.com;karen.files@gmlaw.com**
- **K Kenneth Kotler    kotler@kenkotler.com, linda@kenkotler.com**
- **Aaron J Malo    amalo@sheppardmullin.com,
  clopez@sheppardmullin.com;abilly@sheppardmullin.com**
- **Ron Maroko    ron.maroko@usdoj.gov**
- **Kyle J Mathews    kmathews@sheppardmullin.com**
- **David W. Meadows    david@davidwmeadowslaw.com**
- **Angela Z Miller    amiller@phillipslytle.com, styrone@phillipslytle.com**
- **John A Moe    john.moe@dentons.com,
  glenda.spratt@dentons.com;derry.kalve@dentons.com**
- **Alan I Nahmias    anahmias@mbn.law, jdale@mbn.law**
- **David L. Neale    dln@lnbyg.com**
- **Matthew D. Resnik    Matt@rhmfirm.com,
  roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.co
  m;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;rus
  s@rhmfirm.com**
- **Edward Rubacha    er@jhkmlaw.com, docket@jhc.law;am@jhc.law**
- **Amit Kumar Sharma    amit.sharma@aisinfo.com**
- **David Samuel Shevitz    david@shevitzlawfirm.com,
  shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.co
  m**
- **Lindsey L Smith    lls@lnbyg.com, lls@ecf.inforuptcy.com**
- **Alan G Tippie    Alan.Tippie@gmlaw.com,
  atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denis
  e.walker@gmlaw.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Glenn S Walter    gwalter@honigman.com**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                          **F 9013-3.1.PROOF.SERVICE**

1

**2. SERVED BY UNITED STATES MAIL**: On **August 1, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

2

3

4

☒ *Additional service per Proof of Service to be filed by **Stretto***

5

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 1, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

6

7

8

**SERVED BY PERSONAL DELIVERY**

9

Honorable Sandra R. Klein
United States Bankruptcy Court
255 E. Temple Street, Suite 1582
Courtroom 1575
Los Angeles, CA 90012

10

11

12

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

13

| August 1, 2023 | Lourdes Cruz | /s/ Lourdes Cruz |
|----------------|--------------|------------------|
| Date | Type Name | Signature |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                   **F 9013-3.1.PROOF.SERVICE**