MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Nancy A. Valentine (Admitted *Pro Hac Vice*)
valentine@millercanfield.com
Ronald A. Spinner (Admitted *Pro Hac Vice*)
spinner@millercanfield.com
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Tel: 313 963 6420

DENTONS US LLP
Tania M. Moyron (SBN 235736)
tania.moyron@dentons.com
John A. Moe, II (SBN 66893)
john.moe@dentons.com
601 S. Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Tel: 213.623.9300 / Fax: 213.623.9924

Attorneys for SACMI USA, Ltd.

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

In re:

☐ ITTELLA INTERNATIONAL, LLC, a California limited liability company,

☐ ITTELLA'S CHEF, LLC, a California limited liability company,

☐ TATTOOED CHEF, INC., a Delaware corporation,

☐ MYJOJO, INC., a Delaware corporation

☐ NEW MEXICO FOOD DISTRIBUTORS, INC., a New Mexico corporation

☐ KARSTEN TORTILLA FACTORY, LLC, a New Mexico limited liability company,

☑ BCI ACQUISITION, INC., a Delaware corporation,

☐ TTCF-NM HOLDINGS INC., a New Mexico corporation

☐ All Debtors,

Debtors and
Debtors-in-Possession.

Lead Case No. 2:23-bk-14154-SK

Jointly administered with Case Nos.:
2:23-bk-14159-SK; 2:23-BK-14161-SK;
2:23-bk-14157-SK; 2:23-bk-14158-SK;
2:23-bk-14155-SK; 2:23-bk-14156-SK; and
2:23-bk-14160-SK

Chapter 11

**LIMITED OBJECTION TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF; DECLARATION OF MARK LOZANO IN SUPPORT THEREOF**

Date:        August 16, 2023
Time:        9:00 a.m.
Place:        Courtroom 1575

124527141\V-1

SACMI USA, Ltd. ("SACMI") hereby files this limited objection ("Limited Objection") to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Motion") on a final basis[1] filed by the above-captioned debtors (the "Debtors"), requests adequate protection, and proposes an interim resolution of its Limited Objection. Counsel for SACMI and counsel for the Debtors have been engaging in ongoing discussions in an attempt to reach a resolution of the Limited Objection, but have not reached an agreement as of the filing of this Limited Objection.

In support of this Limited Objection, SACMI respectfully sets forth as follows:

## I.

## **INTRODUCTION**

SACMI has two principal objections. First, SACMI asserts (and has asserted to Debtors and DIP Lender prior to the filing of this Limited Objection) liens in certain of the Debtors' equipment (the Equipment Lines, defined below) that are senior in priority to the Prepetition Lender Liens and, as such, constitute Permitted Prior Liens. SACMI has been unable to obtain acknowledgment from the Debtors or the DIP Lender, however, that SACMI's liens are Permitted Prior Liens. Debtors have asserted that the terms of the current interim order and anticipated final order as written protect that assertion if SACMI later proves its position and no further clarity at this stage is required. As described below, SACMI asserts further clarity is appropriate even if that is not a determination of its specific lien status at this stage. Second, the credit bidding provisions requested by the Debtors and the DIP Lender do not appear sufficient to safeguard Permitted Prior Liens, so that even if SACMI were informed that its liens would be treated as Permitted Prior Liens, SACMI's legal interests would not be adequately protected by the relief the Debtors request in the Motion.

---

[1] The Court granted the Motion on an interim basis on July 6, 2023 (Docket #77), authorizing, among other things, the Debtors to obtain postpetition financing from, and to grant postpetition liens and superpriority interests to, UMB Bank, N.A. ("DIP Lender").

124527141\V-1

Without being afforded these protections, SACMI is concerned that the DIP Lender's liens might be deemed or treated as priming SACMI's liens, but without the provision of adequate protection for SACMI's liens as required by 11 U.S.C. § 364(d)(1)(B). Furthermore, even if SACMI's liens are not primed (or if adequate protection were provided) by the order granting the Motion, SACMI's interests still would be at risk in a sale of the Debtors' assets if the DIP Lender were to credit bid all or any portion of its liens at a sale of the Equipment Lines, a right that may have been afforded the DIP Lender in the interim financing order (¶22) and the proposed final order on the Motion.

Hence, SACMI files this Limited Objection, and seeks: (1) clarification in the final order that, notwithstanding anything else in the final order to the contrary or otherwise, SACMI's right to assert such lien rights and priority in the Equipment Lines as Permitted Prior Liens are expressly preserved under any final order, that adequate protection of SACMI's interest in the Equipment Lines is provided, as required by 11 U.S.C. § 364(d)(1)(B) (and as proposed in paragraph 29 below),[2] as the Debtors have the burden of proof on the issue of adequate protection of each lien that is being primed regardless of lien priority, pursuant to 11 U.S.C. §§ 364(d)(2) and 363(p)(1), and that there is a process to determine its lien rights and priorities timely and efficiently and, in any event, prior to any sale of the Equipment Lines in these bankruptcy cases; and (2) clarification that the credit bidding rights of the DIP Lender remain subject to Permitted Prior Liens, *i.e.*, that the DIP Lender's right to credit bid on any of its collateral be conditioned explicitly on the requirement that the DIP Lender satisfy any Permitted Prior Liens in that collateral, in full and in cash on or before the closing date of any sale, should the DIP Lender be the winning bidder in such a sale.

## II.

## BACKGROUND

1.     On or about March 12, 2021, SACMI and Belmont Confections, Inc. ("Belmont") entered into an agreement ("Flow Wrapper Agreement," attached as Exhibit 1) for SACMI to sell

---

[2] As SACMI understands it, Debtors' counsel is discussing the request for Monthly Payments with the Debtors and will respond back to SACMI as it is able.

(and Belmont to buy) certain packaging equipment ("Flow Wrapper"), along with ancillary installation services, on credit terms.[3]

2.      Pursuant to Section 4.5 of the Flow Wrap Agreement, such agreement required Belmont to pay the $ 335,600 purchase price of the Flow Wrapper by delivering to Plaintiff (a) a down payment of thirty percent (30%) of the total purchase price or $ 100,680, and (b) the balance in equal payments over thirty-six months commencing on April 1, 2021, in the monthly amount of $ 6,883.64 each ("Flow Wrap Monthly Payment").

3.      Contemporaneously with entry into the Flow Wrapper Agreement, Belmont executed and delivered to SACMI a Security Agreement ("Flow Wrapper Security Agreement," attached as Exhibit 2) granting SACMI a first priority security interest in and to the Flow Wrapper and securing all obligations due and owing under the Flow Wrapper Agreement.

4.      Also, on or about January 28, 2021, SACMI and Belmont entered into an agreement ("Packing Cell Agreement," attached as Exhibit 3 and with the Flow Wrapper Agreement, the "Contracts") for SACMI to sell (and Belmont to buy) certain packaging equipment ("Packing Cell Secondary Line," and together with the Flow Wrapper, the "Equipment Lines"), along with ancillary installation services, on credit terms.

5.      Pursuant to Section 4.5 of the Packing Cell Agreement, such agreement required Belmont to pay the $625,000 purchase price of the Packing Cell Secondary Line by delivering to Plaintiff (a) a down payment of thirty percent (30%) of the total purchase price or $125,000, and (b) the balance in equal payments over thirty-six months commencing on February 1, 2021, in the monthly amount of $ 9,095.87 each (the "Packing Cell Monthly Payment" and together with the Flow Wrap Monthly Payment (the "Monthly Payments").

6.      Upon information and belief, the Equipment Lines have remained in use by Debtor BCI Acquisition (and/or the Debtors) continuously since the filing of these bankruptcy cases and have generated revenue for the Debtors, without providing SACMI with adequate protection for their continued use.

---

[3] Attached as Exhibit 9 is the Declaration of Mark Lozano, Vice President of North American Operations for SACMI, in support of this Limited Objection and authenticating Exhibits 1-8 attached to this Limited Objection.

124527141\V-1

7.    Contemporaneously with the entry into the Packing Cell Agreement, Belmont executed and delivered to SACMI a Security Agreement ("Packing Cell Security Agreement," attached as Exhibit 4, and together with the Flow Wrapper Security Agreement, the "Security Agreements") granting SACMI a first priority security interest in and to the Packing Cell Secondary Line and securing all obligations due and owing under the Packing Cell Agreement.

8.    The Equipment Lines were delivered to "Belmont Confections" on or around March 20, 2022, as shown by the Homeland Security Entry Summary, attached as Exhibit 5.

9.    To perfect its interest in the Flow Wrapper, on March 1, 2022, SACMI filed a UCC-1 Financing Statement with the Delaware Secretary of State at File No. 2022 1752260 (the "Flow Wrapper UCC," attached as Exhibit 6).

10.    To perfect its interest in the Packing Cell Secondary Line, on March 1, 2022, SACMI filed a UCC-1 Financing Statement with the Delaware Secretary of State at File No. 2022 1752682 (the "Packing Cell UCC," attached as Exhibit 7, and together with the Flow Wrap UCC, the "Original UCCs").

11.    Each of the Original UCCs named Belmont as the Debtor.

12.    Belmont made the payments under the Contracts initially.

13.    Upon information and belief, Debtor BCI Acquisition, Inc. ("BCI") purchased the assets and assumed the liabilities of Belmont on or about December 21, 2021, including the Contracts and their associated Security Agreements, under an Asset Purchase Agreement.

14.    BCI continued making the payments required by the Contracts until approximately July of 2022.

15.    On or about January 12, 2023, SACMI filed UCC-3 Financing Statement Amendments, attached as Exhibit 8, amending each of the Original UCCs to add BCI as a debtor party at Amendment Nos. 2023 0327048 and 2023 0327055.

16.    On information and belief, the DIP Lender (UMB Bank, N.A.) first perfected its liens in the Debtors' collateral in or around September of 2022.

124527141\V-1

**III.**

**<u>ARGUMENT</u>**

**A.     SACMI's LIENS ARE VALIDLY PERFECTED, OF HIGHER PROPERTY THAN THOSE OF UMB BANK, N.A., AND PERMITTED PRIOR LIENS**

17.     UCC 9-508 states "Except as otherwise provided in this section, a filed financing statement naming an original debtor is effective to perfect a security interest in collateral in which a new debtor has or acquires rights to the extent that the financing statement would have been effective had the original debtor acquired rights in the collateral." Cal. Com. Code § 9508(a); Del. Code tit. 6, § 9-508(a).

18.     Although, on information and belief, BCI's purchase of Belmont's assets and assumption of its liabilities occurred on or around December 21, 2022, and thus predated SACMI's filing of the Original UCCs in Belmont's name, under the Uniform Commercial Code, SACMI's liens are properly perfected and have priority.

19.     If, as here, the name of the new debtor is sufficiently different from the original debtor as to make a filing against the original debtor "seriously misleading" with respect to the new debtor, then the filing is only effective to perfect "a security interest in collateral acquired by the new debtor before, and within four months after, the new debtor becomes bound under [the original debtor's security agreement]. Cal. Com. Code § 9508(b)(1); Del. Code tit. 6, § 9-508(b)(1); *see also* Cal. Com. Code § 9203(d)(2); Del. Code tit. 6, § 9-203(d)(2).

20.     BCI assumed the obligations under, and became bound by, the Security Agreements on or around December 21, 2021.

21.     Under UCC 9-508, the Original UCCs perfected SACMI's interest in the Equipment Lines so long as BCI acquired an interest in the Equipment Lines within four months of December 21, 2021, or by April 21, 2022.

22.     The Equipment Lines were delivered to BCI on or around March 20, 2022, well within the four-month window permitted under UCC 9-508 to maintain perfection and priority.

23.     The Original UCCs perfected SACMI's interest in the Equipment Lines as of March 1, 2022, the filing date of the Original UCCs.

124527141\V-1

24.      The Original UCCs predate the UCC filings by the DIP Lender, which makes them senior in priority to those of the DIP Lender.

25.      Given the foregoing, BCI and the DIP Lender should have confirmed that SACMI's liens are Permitted Prior Liens but have not done so. This is especially true given the Declaration, attached Exhibits 1 through 8 establishing both perfection and priority, and the legal effect of UCC 9-508. BCI and the DIP Lender should be required to raise a good faith reason to dispute the lien and/or its priority or otherwise confirm as Permitted Prior Liens the liens established in this Limited Objection.

**B.      SACMI's LIENS CANNOT BE PRIMED UNLESS THEY ARE ADEQUATELY PROTECTED**

26.      The Debtors propose that the liens granted to the DIP Lender be senior to all other liens, subject to certain exceptions. Motion, Memorandum of Points and Authorities, ¶ 25. The Bankruptcy Code permits this, provided that adequate protection is provided to any liens primed. 11 U.S.C. § 364(d)(1)(B). The burden of proving that adequate protection has been provided to the holder of each primed lien lies with the debtor. 11 U.S.C. §§ 364(d)(2) and 363(p)(1); In re Hollister, 628 B.R. 154, 159 (Bankr. C.D. Cal. 2021).

27.      SACMI consulted with the Debtors and the DIP Lender and provided them with copies of the documents establishing the basis for SACMI's claim of perfection and priority of its interest in the Equipment Lines; and, both indicated that it could not yet make a determination on the status and priority of SACMI's claimed lien or acknowledge that such lien is a Permitted Prior Lien under the proposed final DIP order and would be treated as such. While SACMI understands the timing concerns from the Debtors' perspective and continues to work with the Debtors to reach a resolution, the Final DIP Order should afford protections to SACMI as discussed above and include adequate protection in the interim in the amount of the Monthly Payments, which total $15,979.51 per month and would otherwise provide SACMI with adequate protection of its interest

124527141\V-1

in the Equipment Lines. SACMI is awaiting a response from the Debtors as to the Monthly Payments.[4]

28.    Absent such assurance, SACMI must object to the Motion unless and until it either receives a confirmation or determination that its liens in the Equipment Lines are Permitted Prior Liens and will remain first priority liens that will not be primed under the final order granting the Motion or that it will be adequately protected with Monthly Payments in the total amount of $15,979.51 per month, and its rights clearly reserved, until confirmation by Debtors and DIP Lender of, or determination as to, its lien rights and priority in the Equipment Lines can be made.

29.    The following forms of adequate protection of SACMI's liens in the Equipment Lines should be included in the Final DIP Order to resolve SAMI's concerns:

    a.    Monthly Payments to be made to SACMI on the first day of each month commencing with a payment for the month of August (which payment shall be made upon entry of the final order on the Motion) and continuing each month thereafter;

    b.    All proceeds of any lease, sale or other disposition of the Equipment Lines be set aside and escrowed until a final determination is made regarding SACMI's asserted lien against the Equipment Lines as a Permitted Prior Lien, notwithstanding any other provision in any order approving the Motion, including paragraph 23 of the interim order or any final order granting the Motion; and

    c.    The final DIP Order approving the Motion is entered without prejudice to any right of SACMI to establish that its lien in the Equipment Lines is a Permitted Prior Lien, and to exercise all associated rights and remedies, notwithstanding anything in the interim order or final order to the contrary.

## C.    The DIP LENDER'S RIGHT TO CREDIT BID REMAINS SUBJECT TO SACMI'S LIENS

30.    The Debtors request that the DIP Lender be provided with the right to credit bid in any sale of the Debtors' assets. Motion, Memorandum of Points and Authorities, ¶ 42.

31.    The right to credit bid is permitted under the Bankruptcy Code unless the court for cause orders otherwise. 11 U.S.C. §§ 363(k), 1129(b)(2)(A)(ii). There is no reason to make that determination as part of a final order granting the Motion. There may be existing or future reasons

---

[4] To the extent the liens on the Equipment Lines are not Permitted Prior Liens, there has been no adequate demonstration that the value of those liens on the Equipment Lines will be adequately protected after the grant of priming liens to the proposed DIP Lender, as is the Debtors' burden of proof to establish.

124527141\V-1

to hold that sufficient cause exists to deny, condition, or circumscribe that right at an appropriate time. Furthermore, the right to credit bid is not unfettered. A holder of a junior lien may credit bid on collateral but must satisfy any senior liens in full if it is the winning bidder. *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010).

32.    Here, there is no provision in the interim order granting the Motion enforcing this requirement (Doc. No. 77, ¶¶ 22, 23) or in the proposed final order. Indeed, the provision for direct payment of net sale proceeds to the DIP Lender without a requirement that senior liens be satisfied first could be read as overriding the rights of senior lienors. (*See* Doc. No. 77, ¶ 23.) SACMI objects to the extent that the Motion seeks an unfettered right to credit bid without the protection required for senior liens, such as the Permitted Prior Liens, described in the Motion and without preservation of the right to show sufficient cause to eliminate, condition, or circumscribe the right to credit bid at an appropriate and relevant time.

**IV.**

**CONCLUSION**

SACMI respectfully asks the Court to require the inclusion of the following provisions in any final DIP Order as a condition to approving the final DIP order: (1)(i) providing adequate protection in the form of Monthly Payments commencing August 1, 2023, for SACMI's liens in the Equipment Lines and the additional relief set forth in paragraph 29 of this Limited Objection, and (ii) stating that notwithstanding anything contained in the final order, SACMI has not waived and expressly reserves its right to establish that it has a Permitted Prior Lien, and to exercise all rights and remedies associated therewith; and (2) providing that the DIP Lender's right to credit bid is conditioned on the DIP Lender satisfying any Permitted Prior Liens in full and in cash on or before closing of any sale of collateral that includes the Equipment Lines as a condition of DIP Lender's purchase by credit bid. SACMI also asks the Court to grant such other and further relief as may be just and proper.

Dated: August 2, 2023

DENTONS US LLP
TANIA M. MOYRON
JOHN A. MOE, II

By: /s/Tania M. Moyron
Tania M. Moyron

Attorneys for SACMI USA, Ltd.

Dated: August 2, 2023

MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
RONALD A. SPINNER
NANCY A. VALENTINE

By: _____
Nancy A. Valentine

124527141\V-1

## DECLARATION OF MARK LOZANO

I, Mark Lozano, declare that if called as a witness, I could and would competently testify based on my own personal knowledge, as follows:

1.      I am the Vice President of North American Operations for Creditor SACMI USA, Ltd. aka SACMI Packaging & Chocolate USA, a Delaware corporation ("SACMI"), with principal operations in Des Moines, Iowa.

2.      SACMI is a member of the SACMI Group and is a worldwide supplier of machines and complete plants for the ceramics and packaging industries, provides services to its customers, and carries a full line of spare parts to maintain its customers equipment lines and machinery throughout North America.

3.      In the performance of my duties as Vice President of North American Operations for SACMI, I have access to and knowledge of the Contracts and Security Agreements,[5] and the business records related thereto.

4.      This Declaration is made and proffered in support of the Limited Objection. It is based upon my own personal knowledge and a review of the business records made, kept, and maintained in the course of SACMI's regularly conducted business activity. Based on my review of those business records, if called as a witness I could testify competently to the truth of the matters set forth in this Declaration.

5.      On or about March 12, 2021, SACMI and Belmont entered into the Flow Wrapper Agreement for SACMI to sell (and Belmont to buy) that certain Flow Wrapper, along with ancillary installation services, on credit terms. A true and accurate copy of the Flow Wrapper Agreement is attached as Exhibit 1.

6.      Contemporaneously with entry into the Flow Wrapper Agreement, Belmont executed and delivered to SACMI the Flow Wrapper Security Agreement granting SACMI a first

---

[5] Unless otherwise indicated, all capitalized terms used in this Declaration have the same meanings as set forth in the Limited Objection to Debtors' Emergency Motion for Entry Of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "Limited Objection").

priority security interest in and to the Flow Wrapper and securing all obligations due and owing under the Flow Wrapper Agreement. A true and accurate copy of the Flow Wrapper Security Agreement is attached as Exhibit 2.

7.      Also, on or about January 28, 2021, SACMI and Belmont entered into the Packing Cell Agreement for SACMI to sell (and Belmont to buy) the Packing Cell Secondary Line along with ancillary installation services, on credit terms. A true and accurate copy of the Packing Cell Agreement is attached as Exhibit 3.

8.      Contemporaneously with the entry into the Packing Cell Agreement, Belmont executed and delivered to SACMI the Packing Cell Security Agreement granting SACMI a first priority security interest in and to the Packing Cell Secondary Line and securing all obligations due and owing under the Packing Cell Agreement. A true and accurate copy of the Packing Cell Security Agreement is attached as Exhibit 4.

9.      The Equipment Lines were delivered to "Belmont Confections" on or around March 20, 2022, as shown by the Homeland Security Entry Summary. A true and accurate copy of such Homeland Security Entry Summary is attached as Exhibit 5.

10.      To perfect its interest in the Flow Wrapper, on March 1, 2022, SACMI filed a UCC-1 Financing Statement, the Flow Wrapper UCC, with the Delaware Secretary of State at File No. 2022 1752260. A true and accurate copy of the Flow Wrapper UCC is attached as Exhibit 6.

11.      To perfect its interest in the Packing Cell Secondary Line, on March 1, 2022, SACMI filed a UCC-1 Financing Statement, the Packing Cell UCC, with the Delaware Secretary of State at File No. 2022 1752682. A true and accurate copy of the Packing Cell UCC is attached as Exhibit 7.

12.      On or about January 12, 2023, SACMI filed UCC-3 Financing Statement Amendments, amending each of the Original UCCs to add BCI as a debtor party at Amendment Nos. 2023 0327048 and 2023 0327055. A true and accurate copy of the UCC Amendments are attached as Exhibit 8.

I declare under penalty of perjury that the foregoing is true and correct in accordance with the laws of the United States of America.

124527141\V-1

Executed this __29__ day of July, 2023, in <u>Argyle</u>, <u>Texas</u>.

By: <u>/s/</u> _____
Mark Lozano
Vice President of North American
Operations, SACMI USA, Ltd.

MILLER, CANFIELD,
PADDOCK AND STONE,
P.L.C.
ATTORNEYS AT LAW

124493218\V-1

- 11 -                                    2:23-BK-14154-SK

# *FLOW WRAP AGREEMENT*

# EXHIBIT 1



**SACMI**
**PACKAGING & CHOCOLATE**
Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com



confections

## 4718 Belmont Ave,
## Youngstown, OH 44505
## USA


**QUOTATION: 20-034565-A4**

**PROJECT:**    Bar project    Primary Packaging

**DATE:**    22nd February 2021


**YOUR REF.:**    Sebastian Clemens
Sr. Area Manager – North America
Mobile: +1 (515) 608-3786
E-Mail: sebastian.clemens@sacmigroup.com

**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## TABLE OF CONTENTS

1.  *PROJECT SPECIFICATION & SOLUTION DESCRIPTION* .................................................... 3
2.  *SCOPE OF THE SUPPLY* ....................................................................................................... 4
3.  *PRICE SUMMARY* ................................................................................................................... 8
4.  *SALES CONDITIONS* ............................................................................................................ 10
5.  *GENERAL TECHNICAL CHARACTERISTICS* ...................................................................... 11
6.  *DOCUMENTATION* ................................................................................................................ 11
7.  *TESTS, INSTALLATIONS, COMMISSIONING AND TRAININGS* ......................................... 12
8.  *GENERAL SALES CONDITIONS* .......................................................................................... 14

## ANNEXES

- Standard Mechanical Component List (August 2020 release)
- Standard Electrical Component List (August 2020 release)

**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail. info@sacmiusa.com

www.sacmi.com

# 1. PROJECT SPECIFICATION & SOLUTION DESCRIPTION

The scope of this project is the design and construction of a primary packaging EDS (Electronic row distribution system) line dedicate to flow wrap an extruded nutritional bar product.

### 1.1 Products

## Products and tolerances to be approved by SACMI P&C



**SACMI**
**PACKAGING & CHOCOLATE**
Carle & Montanari | OPM | FIMA

Sacmi USA Ltd.
3454 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# 2. SCOPE OF THE SUPPLY

## 2.1. Interface condition.

Products should arrive short side leading from the upstream belt.

➢ Products arrive from the upstream belt in regular pattern and continuous flow

➢ Maximum number of products missing in a cross row must not exceed 3 pieces and/or max. 10% of products missing in a row.

➢ Products will be sufficiently cooled and consistently good quality for automatic handling. There should be no condensation on product surface.

Following pattern at the interface point builds the base for the efficiency calculation:

**2.1.1.** The min. gap between the rows of product on the conveyor belt must be according to the values in the table below.

| V<br>[m/min] | X<br>[mm] |
|---|---|
| < 4 | 10 |
| 6 | 20 |
| >8 | 30 |



V = Constant speed of conveyor belt
X = Minimum gap between the rows of products

**2.1.2.** Within a rows, the products must not be staggered by more then 1/3 of a product length or max 30 mm (A).



**2.1.3.** The products must be lengthwise on the belt and they should not be at angle greater than +/- 5° to their axis of travel.



**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | ⵀⵉⵎⵉ | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## 2.2. PROJECT:

The supply includes:

### 2.2.1. One "EWF" - Electronic Wrapper Feeders

The products received long side leading from the upstream belt, will be transferred on a series of conveyors able to:

- Close big gaps between rows to create a uniform flow,
- Rotate products and align so they are traveling short-side leading,
- Inspect for product shape and reject any possible defective or mis-aligned products,
- Check the products with a metal detector group and reject contaminated products,
- Organize products using a series of no-contact conveyors, with independent drives,
- Synchronize products with the flowpack infeed lugs.

All belts of the infeed are cantilevered, allowing easy access for cleaning and rapid tool-less disassembly. The lateral safety guards are openable, removable for easy cleaning. Safety switches control openable guards.
All belts will be driven by Brushless servomotors (maintenance free), generously dimensioned for a good dynamic response.

#### Description of the groups:

- **TT3 Gap closing:** Composed of No.3 conveyor belts with independent servo drives. The function of these conveyors is to smooth the product flow to the wrapper by reducing the gaps between the rows arriving from the distribution system.

- reject system for contaminated products, equipped with optical device to confirm successful reject. Rejects are collected in a dedicated bin complete with locked door.

- **SFC 5 In-line feeder:** Product phasing Conveyors composed of No.5 servo driven belt with independent motorization in order to organize products with no contact.

- **Electrical cabinet:** Brushless motors are controlled by the flow wrapping machine CPU with related card, which is placed in the electrical cabinet. Main electrical components dedicate for the feeding leg are controlled by the flow wrapper cabinet.

### 2.2.2. JT PRO Flow-wrapper

#### Functional description
"JT-PRO" model is a medium speed, multi purpose flow wrapper, fully electronic and servo-driven horizontal form / fill / tri-seal pillow-pack flow-wrapping machine. Designed and assembled according to the most recent "state-of-the-art" technology, the machine achieves the highest standards in terms of reliability, efficiency, accessibility, user-friendly, easy changeover, easy cleaning and low maintenance.

**SACMI**

**PACKAGING & CHOCOLATE**

Carle &
Montanari | OPM | FIMA

3434 106th Circle
Dos Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

### General features

- Fully servo-driven machine: 5 (five) independent brushless servomotors for product in-feed conveyor, wrapping material unwiding power roller, longitudinal sealing and folding rollers, transversal sealing crimper and outfeed conveyor belt.
- Wrapping material max speed up to 70 mt/min or 600 packs per minute
- Digitally electronic control machine
- Cantilevered and modular construction
- Transparent safety guards for optimal accessibility and operational controls
- Available in right-hand and left-hand execution
- Painted version RAL 7035 (other colors or stainless steel available)
- Ergonomic operating height for comfortable operations
- Crumb collecting trays placed underneath the entire product flow areas
- Electrical control cabinet in rear position completely separated from the machine mechanical or driven parts

### Product infeed conveyor
The unit includes:

- In-feed lug chain, cantilevered supported and driven by a brushless servomotor
- Guided chain lug with mechanical cam
- Easily removable lugs for quick format changes and easy cleaning
- Chain tensioning device
- Easy replacement of the infeed lug chain
- Product contact parts made in stainless steel or approved food-safe plastic
- Machine infeed interface designed to match with upstream automatic feeding systems

### Wrapping material unwinding power roller
The unit mainly consists of:

- Double film reel holder module with anodized aluminium frame, built in the machine main framework
- Power unwind roller to feed and control wrapping material tension driven by a brushless servomotor
- Film tensioning performed by electronic synchronization between film unwind and long seal rollers
- Reel film spindle with pneumatic reel locking
- Max film width: 500 mm
- Max film reel diameter: 400 mm
- Film reel core diameter: 76 mm
- Film reel holder spindle height from the floor: 1,450 mm (with product level at 850 mm)
- Manual film reel tracking
- Mechanical brakes on reel film spindles
- Automatic splicing device without machine stoppage, including end film reel and film breakage detection
- Ready for printing unit installation (printer indicated as optional) - mechanical brakets are included, coder is excluded
- Photocell for registration mark

### Longitudinal sealing and folding rollers
The unit includes:



3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

- Three (3) cantilevered pairs of sealing rotary wheels, driven by the same servomotor, each installed in a separate housing:
  - ✓ First pair of wheels, not heated, pulls film from reel holder to the longitudinal sealing unit. The wheels are manually tiltable to control film tube tightness and pneumatically openable
  - ✓ Second and third pair of wheels, heated by independently controlled resistances, seal the longitudinal fin by pressure. Automatic opening in case of machine stoppage
  - ✓ Each pair of sealing roller can be finely adjusted to optimize film sealing process by means of accurate compressed air regulator and mechanical fine pitch screw
- A cantilevered pair of folding rollers, conic shapes, driven by cardanic shaft, to allow exact positioning to perform proper fin seal folding against the pack
  - ✓ right-hand and left-hand folding can be achieved by repositioning (mirroring) the rollers

### Transversal sealing crimper head

The unit mainly includes:
- Rotary cross crimper head, servo-driven
- Separated frame, fully cantilevered, designed for easy and complete unit exchange
- Upper and lower jaws heated with independently controlled temperature
- Sealing jaws equipped with electronic safety clutch
- Cross sealing pressure adjustable by high-load springs
- Cutting knife standard configuration: straight
- Sealing jaws stop in the open position in case of machine stoppage, except for emergency stops. Automatic re-synchronisation at machine restart.
- Sealing jaws in hard stainless steel and knurling performed by electro-erosion.
- OPTIONAL: mechanical gusseting device.
- OPTIONAL: "Long-dwell" cross sealing head, sealing jaws driven by D shaped cams to achieve better package sealing, by longer sealing time and positive transversal cut

### Product outfeed conveyor belt

The unit mainly consists of:
- Product outfeed belt conveyor driven by separated servomotor
- Upper roller fitted on the outfeed conveyor, to assure positive pack separation and position for downstream secondary packaging
- Air blast to reject bags that are empty, spliced, not cut, out of register

### Machine frame

The unit includes:
- Cantilevered frame, with main support plate in anodised aluminium.
- Integrated electrical cabinet, while fully separated from all mechanical and moving parts.
- Hygienic design and construction
- Adjustable floor levelling supports

### Control system

The unit mainly consists of:
- Allen Bradley digital control platform for Logic & Motion
- Human Machine Interface (HMI): 10 inch., high resolution, colour touch screen operator panel



3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## 3. PRICE SUMMARY

**EQUIPMENT:**

| Pos. | Description | Q.ty | Price ($) |
|------|-------------|------|-----------|
| 2.2 | JT PRO - Flow-wrapper<br><br>**EWF - Electronic wrapper feeder**<br>*(as described in section 1.2.3)*<br><br>Format P1 for the JT PRO Flow-wrapper | 1 | 335,600.00 |
| | **PRICE OF GOODS AND LABOR (EXW SACMI P&C) ($)** | | **335,600.00** |

**SERVICES:**

| | | | |
|------|-------------|------|-----------|
| 2.3 | Seaworthy packing | 1 | 3,300.00 |
| 2.4 | Installation Test I/O and Dry run with 1 Format, expenses excluded | 1 | 65,000.00 |
| 2.5 | Expenses of travel, board and lodging | 1 | At cost |

**OPTIONS:**

| Pos. | Description | Q.ty | Price ($) |
|------|-------------|------|-----------|
| 2.6 | Checkweigher | 1 | 46,300.00 |
| 2.7 | MARKEM Thermal transfer printer | 1 | 12,000.00 |
| 2.8 | Format P2 for the JT PRO Flow-wrapper | 1 | 44,600.00 |
| 2.9 | Estimate Recommended spare parts, tbd after technical clarification | 1 | 20,000.00 |

***Please Note 1:*** *Quotations are bonded to technical definition, tests with product and blank samples and final approval by SACMI P&C.*

***Please Note 2:*** *The calculation of Erection and Commissioning estimate is based on the Service Rates shown in the below chart, considering No.8 working hours of labor Monday – Saturday and Travel rate cost. Final amount, including expenses and extra hours, will be calculated on ex-post basis.*



Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## Service Rates for Tech

| | |
|---|---|
| **TRAVEL Per Hour** | **$ 135** |
| **LABOR** Monday – Friday (8 hours) **Per Hour** | **$ 160** |
| **LABOR** Saturday & Sunday (8 hours) **Per Hour** | **$ 210** |
| **LABOR** Overtime (Exceeding 8 hours) **Per Hour** | **$ 210** |
| **TRAINING** Monday – Friday (8 hours) **Per Hour** | **$ 160** |
| **TRAINING** Materials – customer expenses | **At Cost** |
| **LAYOVER** Day not worked, i.e. – weekend **Per Day** | **$ 300** |
| **EXPENSES** Transportation expenses (Airfare, Car Rental, Mileage, etc.) | **At Cost** |
| **EXPENSES** Board and Lodging | **At Cost** |



SACMI

**PACKAGING** & **CHOCOLATE**

Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## 4. SALES CONDITIONS

### 4.1. Safety standard

In case the goods supplied shall be delivered in a country where the directive 2006/42/EC of the European Union is not applicable, the Parties agree that said country is considered an "Assimilated Country" in accordance to paragraph B of Enclosure no.1, and the related provisions shall apply.

### 4.2. Delivery time

Delivery **FCA**, including set-up and testing at SACMI P&C, shall be made in **6/7 months** from order receipt and down payment on SACMI P&C bank account and completion or clarification of all technical and commercial details, subject to our production schedule at the time of order.

### 4.3. Terms of delivery

Goods shall be delivered on terms **EXW SACMI PACKAGING&CHOCOLATE (Incoterms 2020)**.

All transport, Goods unloading, insurance and custom duty shall be borne by the Buyer.

### 4.4. Packing

Quoted.

### 4.5. Payment terms

Payments shall have to be effected as follows:

- 30%  as down payment by means of SWIFT direct bank transfer due with order receiving
- 70%  as equal payments over 36 months by means of SWIFT direct bank transfer, interest will be determined at time of order.

All payments against SACMI PACKAGING&CHOCOLATE 's invoices.

### 4.6. Warranty

Warranty period shall last 12 months from the date of start up at customer's site, or 15 months from date of shipment, whichever comes first.
Detailed warranty conditions will be listed and agreed upon in a formal contract, should the sale be finalized.

### 4.7. Quotation Validity

60 days

### 4.8. Exclusions



**PACKAGING & CHOCOLATE**

Carle &
Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

- Civil works
- Internal transport at customer's site
- Electrical and pneumatic connections to Buyer's network
- PLC connection to Buyer's network
- Production and alarm data collection and storage
- Machine Remote Troubleshooting and Diagnostics
- Electronic Training Course
- Spare parts
- What has not been specifically described in this offer
- Variations to what has been described and quoted in this offer

## 5. GENERAL TECHNICAL CHARACTERISTICS

### 5.1. OPERATOR INTERFACE

Standard language for operator interfaces on the machines is English. Different language shall be quoted separately.

### 5.2. PAINTING

Line's equipment not made of stainless steel shall be painted in grey RAL 7035.

Different colours shall be quoted separately.

### 5.3. ELECTRICAL SUPPLY

Line's equipment shall be connected to Buyer's electrical network.
Electrical supply required is 3-phase, 400 V ± 5%, 50 Hz, Neutral + Earth (to be confirmed).

### 5.4. PNEUMATIC SUPPLY

Line's equipment shall be connected to Buyer's compressed air network, oil-free.
Minimum pressure required is 6 bar.

## 6. DOCUMENTATION

- No. 1 hard and No. 1 soft copy of the Instruction Manual in **English** language.
- No. 1 hard and No. 1 soft copy of the Wiring Diagram
- No. 1 soft copy wherever applicable for software and parameters
- Recommended Spare Parts List
- "CE Conformity Statement" and the application of the "CE" mark in **English** language.
- Main Commercial Devices Technical Documentation (copies in original language of the suppliers)



5434 106th Circle
Dos Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmlusa.com

www.sacml.com

# 7. TESTS, INSTALLATIONS, COMMISSIONING AND TRAININGS

## 7.1. Test Material

Product, wrapping material and blank samples are required for engineering and tests purpose, **and shall be delivered DDP SACMI PACKAGING&CHOCOLATE (Incoterms 2020)**, according to following schedule:

- Samples for engineering within 15 days from order date
- Samples for tests not later than 90 days before delivery date

Any delay in delivering test material will result in changing delivery time.

## 7.2. Factory Acceptance Test (F.A.T.)

All equipment will be set up, assembled together and run to verify the functionality of the system at SACMI PACKAGING&CHOCOLATE prior to shipment.

Factory Acceptance Test shall be performed at SACMI PACKAGING&CHOCOLATE's premises with the presence of Buyer's personnel. Upon positive result, a F.A.T. certificate will be duly signed by both parties.

Price for Factory Acceptance Test is included in the total contract value, excluding travel and lodging costs of Buyer's participants.

## 7.3. Erection and commissioning

Erection and Commissioning up to hand-over shall be performed at Buyer's premises by SACMI PACKAGING&CHOCOLATE Service Technicians.

Commissioning of the line is conditioned to continuous product flow receiving in accordance with project specifications (product data and tolerances, production capacity, etc.) for a minimum of 1 working shift (8 hours) per day.

Should these conditions, for reasons not attributable to SACMI PACKAGING&CHOCOLATE, not be guaranteed, the Buyer shall pay all incurred costs covering the extended period of commissioning.

Price includes basic training for line's operators in the operation of the machines performed during erection and commissioning period.

Additional formats specified in the offer shall be executed immediately after line's installation.

Should the commissioning of the additional formats not follow immediately after the successful and complete commissioning of the first format, then a new technical intervention will be scheduled and all expenses charged to Customer.

All expenses for production assistance after handing-over and Site Acceptance Test are excluded.



3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

### 7.4. Site Acceptance Test (S.A.T.)

SACMI PACKAGING&CHOCOLATE shall perform the Site Acceptance Test: this shall verify the line's performance and the production output requested. The line shall be considered accepted when the output and efficiency are achieved as stated in the project specification.

Site Acceptance Test shall be performed during line commissioning on basis of 1 working shift (8 hours).

Once the Site Acceptance Test is declared successful by the Buyer, then SACMI PACKAGING&CHOCOLATE shall hand-over the line to the Buyer after mutually signing the Line Acceptance Certificate.

### 7.5. Trainings

Upon request, dedicated and customized training courses can be proposed to the Buyer, in addition to the Basic training included in this offer.



SACMI

**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# 8. GENERAL SALES CONDITIONS

**Art. 1 - Definitions and commercial terms of delivery.**

1.1 - For the purposes of each contract (the "Contract") stipulated between Sacmi Packaging & Chocolate S.p.A. (the "Seller") and the company to which the Seller supplies the machinery as indicated in the Enclosures of the Contract (the "Buyer"), the following terms shall have the meanings duly indicated below.

- "engineering": shall mean the drawings and plans relating to the installation of the machinery which shall be supplied by the Seller to the Buyer according to the description in the Enclosures to the Contract. All drawings and plans relating to civil works and the general systems and plants shall not however be included.
- "know-how": shall mean the technical knowledge, the recipes and set-up, the procedures, the instructions and the indications which may be used in relation to the type of production foreseen by the Contract, which are communicated by the Seller to the Buyer in accordance with the terms and conditions of the Enclosures to the Contract.
- "End-user's plant": shall mean the place where the building or the buildings in which the machinery supplied by the Seller shall be assembled.
- "place of destination": shall mean the place to and in which such items as the Seller shall supply for the purposes of installing the machinery shall be delivered and stored. This place may be the same place in which the machinery supplied by the Seller shall be assembled.
- "shipment": shall, as the case may be, mean (i) the delivery by the Seller to the first carrier (or to any other party designated by the Buyer) or (ii) the putting of the goods at the Buyer's disposal in the case of an Ex Works delivery.

1.2 - Any reference in the Contract to commercial terms of delivery, for example "EX WORKS", "FOB", "CIF", etc. shall have the meanings ascribed to them in the "Incoterms" of the International Chamber of Commerce in the version in force as at the date the Contract is entered into. If not otherwise expressly agreed upon by the parties to the Contract, the term "Ex Works" shall apply.

**Art. 2 - Subject matter.**

2.1 - The subject matter of the Contract shall consist exclusively in the supply, by the Seller to the Buyer, of the machinery expressly and specifically indicated herein. The supply of any machinery, goods and/or services that is not expressly and specifically undertaken by the Seller as indicated in the Contract and its Enclosures shall be deemed excluded from the subject matter of the Contract.

**Art. 3 - Effectiveness of the Contract.**

3.1 - The prices agreed between the Seller and the Buyer – net of VAT – shall be deemed fixed and unchangeable provided that the Contract enters into force and effect no later than 3 months after the date of signature thereof by the Seller. The Contract enters into force and effect upon the occurrence of one of the following events: signature of the Contract, its Enclosures and these general conditions by the Buyer, payment of the advance payment by the Buyer to the Seller and/or any other event specified for this purpose by the parties in the Contract and/or in the relevant Enclosures thereof, being understood that the obligation of the Seller to start the activities for the carrying out of the supply in question shall be subject to the payment of the down payment (or, as the case may be, to the issuance of a documentary credit or letter of credit) being carried out as provided by the Contract and the carrying out of any other fulfilment possibly provided for to be borne by the Buyer.

**Art. 4 - Means of payment of the price. Claims.**

4.1 - The payments due from the Buyer shall only be deemed to have been made at such time as the relevant funds have been credited in favour of the Seller on the latter's bank account.

4.2 - In the event of any unjustified delay in payment by the Buyer, the Seller shall be entitled, at its sole discretion, to charge interest on late payments (at a rate equal to LIBOR over six months, calculated as at the original or deferred due date and increased by a spread of 5 percentage points, or at any other possible lower rate being the maximum rate provided by the applicable law), without prejudice to any and all of the Seller's rights arising out of the Buyer's failure to pay on the relevant due date/s.

In the event that payment hereunder is made on an instalment basis, should the Buyer fail to pay even a single instalment in accordance with the terms of the Contract, then the Seller shall be entitled to declare that the Buyer has lost its right to pay on an instalment basis and demand the immediate payment of all or part of the amount outstanding.

4.3 - Any possible claim concerning the performance and the carrying out of the Contract shall not entitle the Buyer to suspend or delay payments.

4.4 - The Seller shall be entitled to terminate the Contract with immediate effect:

a) in the event that the Buyer fails to duly fulfil its obligations to pay the price (including the failure to make the advance payment) in accordance with the terms of the Contract;

b) in the event that the Buyer is subjected to any form of insolvency proceedings, or in the event that the assets of the Buyer change substantially so as to clearly endanger the ability of said party to carry out its obligations hereunder (it being understood that the Contract may be terminated upon simple request by the Seller).

4.6 - In the event of any material breach (e.g. failure to pay any sum/instalments due under the Contract) by the Buyer of its obligations under the Contract and these general conditions, then, the Seller shall be entitled to retain, by way of liquidated damages, the advance payment made by the Buyer, without prejudice to the Seller's right to claim compensation for any further damages suffered.

**Art. 5 - Retention of title.**

5.1 - In the event that payment, be it in whole or in part, is to be made after delivery, then, to the extent permitted under the laws of the country where the delivered machinery (including any possible equipment and spare parts) is located, the Seller shall retain title thereto until full payment of the price.

5.2 Should the Buyer fail to pay even one instalment, which is greater than an amount equal to one eighth of the total purchase price of the goods or should the Buyer fail to pay two instalments, in accordance with the terms hereof, then the Seller shall be entitled either to terminate the Contract which will effect as of such time as notice has been given to the Buyer or to declare that the Buyer has lost its right to pay on an instalment basis and demand the immediate payment of all or part of the amounts outstanding. In the case of termination of the Contract for reasons attributable to the Buyer, the Seller shall be entitled to obtain the immediate return of the machinery and shall also be entitled to retain any instalments received from the Buyer by way of compensation for the use of the machinery, without prejudice to the Seller's rights to claim compensation for any further damages suffered.

5.3. The Buyer hereby undertakes to take all steps necessary in order to either (i) create a valid retention of title in said country in favour of the Seller, which retention of title is in the widest form permitted under the laws of said country and is duly enforceable, inter alia, as against third parties or (ii) create a guarantee in favour of the Seller which has the same legal value and effect as such a retention of title.

5.4. The Buyer hereby undertakes not to sell or assign the machinery to, or allow use of the machinery by, third parties, as well as not to remove the machinery without the Seller's consent which shall be provided in accordance with the terms of Art.17 below.

**Art. 6 - Terms of delivery.**

6.1 - Any delay by the Buyer in supplying any necessary element for carrying out the Contract as well as any delay in fulfilling its obligations under the Contract (in particular, its obligations to pay the amount due by way of the advance payment, to open documentary credits, to provide and/or create guarantees, to send credit instruments, inter alia, to be held on fiduciary deposit or to comply with other payment terms) and these general conditions shall entitle the Seller to postpone the delivery of the machinery (including any possible equipment and spare parts) for a period to be reasonably fixed by the Seller according to the internal production schedule of the Seller, but in any event not shorter than the length of the delay on the part of the Buyer, without prejudice to any other right of the Seller hereunder (including but not limited to the rights to terminate the Contract).

6.2 - In the event that the Buyer fails to comply with the payment terms relating to the supply of goods and services hereunder, then the Seller shall be entitled to suspend the performance of its obligations under the Contract.

6.3 - All events of force majeure, pursuant to Art. 16.1 below, will cause the agreed delivery schedule to be postponed by a period corresponding to the duration of the particular event of force majeure and possibly – at the Seller's discretion – for a further period fixed by taking into account the Seller's production load times and the project schedule originally agreed by the parties; it being understood that said period must in any event be appropriate so as to allow performance of the Contract.

6.4 - In the event that delays occur in delivery due to reasons attributable to the Seller, then the Buyer, having duly proved to have suffered damages as a result thereof and provided that all of its obligations pursuant to the Contract have been duly and timely fulfilled, may request, after a grace period of 30 days, by way of full and final satisfaction of any damages and claims relating to such a delay, payment of liquidated damages equal to 0,5% of the price agreed for the part of the supply in relation to which the delay occurred, up to a maximum of 3% (three per cent) of this price for every completed late week following said grace period. Any other remedy – or liability to compensate in respect of any other damages – are hereby expressly excluded.

6.5 - In the event that it is not possible to deliver the machinery (including any possible equipment and spare parts) which are ready for shipment for reasons beyond the Seller's control, then once 15 days have passed from the Seller having advised the Buyer that the goods are ready, then the Seller shall be entitled to issue the relevant invoice and put into effect the agreed payment terms, subject to the above machinery, equipment and any possible spare parts being deposited in the name and on behalf of the Buyer, in the general warehouses or consigned to a carrier which is registered in the Italian register of carriers; it being understood that all risks and expenses relating thereto shall be borne by the Buyer. In the event of the above circumstances, if necessary, the Seller shall also have the right to appoint a carrier, in the name and on behalf of the Buyer, and duly arrange the transportation and delivery of the goods (excluding customs clearance) to the place of destination.

6.6 - The Seller shall raise no objections by any request of the Buyer to inspect the machinery (including any possible equipment and spare parts) prior to each shipment, provided that such request is made at least 2 (two) months prior to the date agreed upon (be it the original date or the rescheduled date) for shipment. All expenses relating to this inspection shall be borne by the Buyer.

6.7 - Any possible modifications which the Seller may regard as being necessary, during the course of the Contract, due to local conditions or which may be deemed advantageous as they amount to technical and/or technological improvements which have occurred in the meantime, shall be allowed by the Buyer provided that the Buyer does not have to bear any further costs for said modifications and provided that the production warranties indicated herein are fulfilled.

6.8 - In the event that the terms of payment agreed between the parties require the negotiation of documents and instruments which represent the goods (for example, but not by way of limitation, Bills of lading), the Seller shall not be liable for delays - caused by the time required, or in any event not caused by negligence on the part of the Seller - in the circulation/transmission of said documents and instruments.

**Art. 7 - Delivery and packaging.**

7.1 - The machinery indicated in Enclosures to the Contract shall be delivered by the Seller to the Buyer appropriately packed; it being understood that the packaging provided by the Seller is suitable for a period of storage/transit not exceeding 60 days.

3454 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmiusa.com

7.2 - It is understood that all risks shall pass to the Buyer in accordance with the agreed delivery term (INCOTERMS). With each shipment the Seller shall send the Buyer a copy of the invoices and a packing list. It is also understood that, in the event that the Buyer is responsible for the transport of the goods subject matter of the Contract, the Seller will act and be deemed as sender of such goods merely and exclusively on behalf of the Buyer, with the exclusion of any possible liability on the part of the Seller in relation to the transport and with the obligation of the Buyer to indemnify and hold the Seller harmless in respect o f any possible claims / requests o f payment and/or damages directly or indirectly related to such transport.

7.3 - In the event that the Parties agree that the goods which are the subject matter of the Contract are to be delivered with insurance being arranged by the Seller, then in the event of any damage being caused to the goods, the Buyer is obliged to do the following, failing which it will lose any and all rights to damages:
a)   immediately advise the insurers of any notices or information related to the occurrence/damage;
b)   recover the insured goods and keep them safe;
c)   safeguard and keep any claims against third parties alive, duly taking all necessary steps, under its own initiative.

### Art. 8 - Storage of the goods by the Buyer
8.1 - The goods which are shipped shall be stored by the Buyer at the place of destination and/or at the End-user's plant in premises which are suitable for the purposes of protecting the goods from any type of damage or deterioration, and insured, at the Buyer's expense, against risks of theft, fire, destruction and catastrophes.
8.2 - The Buyer shall ensure that the machinery, equipment and spare parts delivered by the Seller, being complete and in a perfect condition for the installation thereof, shall be duly placed on the site designated for assembly.

### Art. 9 - Assembly.
9.1 – Unless otherwise agreed between the parties under the Enclosures to the Contract, assembly of the machinery shall be carried out by the Buyer and at its expense and under its supervision and management and the Seller shall only provide the technical assistance in relation to the assembly and start-up of the machinery and the equipment by means of skilled personnel selected by it. The Buyer shall co-operate accordingly so that entry visas and work permits for the Seller's personnel, in addition to any other authorisation which may be necessary, shall be obtained in a timely fashion. In the event that the Seller undertakes to entirely carry out the activities necessary for the assembly of the machinery, then the assembly shall be carried out in accordance with the terms set forth in the Enclosures to the Contract.
9.2 – Unless otherwise agreed between the parties under the Enclosures to the Contract, the Buyer undertakes to:
a)   supply the equipment, the lifting gear and means of transport, and everything else required by the Seller's technicians as technically necessary in order to carry out the assembly, including any possible labour, the management and supervision of which shall at all times remain the responsibility of the Buyer. The machines and any equipment provided by the Buyer to the Seller's technicians shall be supplied with the safety features imposed by law;
b)   arrange for the assembly operations to start immediately after the arrival of the Seller's technicians and proceed on a continuous basis until completion; it being in any event understood that any periods of inactivity/waiting periods shall be for the Buyer's account;
c)   sign the attendance sheet that the Seller's technicians are provided with in order to ascertain the hours worked by the personnel; it being understood that otherwise, the hours indicated by the Seller in the relevant invoice shall be considered as valid and correct;
d)   be responsible for the assistance of the Seller in respect of any travel expenses (return ticket) incurred by the Seller's technicians in travelling from the Seller's place of business to the End-user's plant,
e)   directly pay all the expenses relating to the stay of the Seller's personnel (travel, board and lodging etc); accommodate the Seller's technicians in a hotel of standard of not less than a second-class European hotel and ensure that the Seller's technicians have a means of transport to and from their hotel/lodgings and the work site;
f)   not engage the Seller's technicians in any activities other than those which fall within their sphere of competence and in respect of which they are specifically authorised by the Seller;
g)   be responsible for, indemnify and hold the Seller harmless in respect of any and all obligations relating to local health and safety at work regulations, without prejudice to the other terms of this Contract relating to health and safety at work, given that the Parties both acknowledge that the health and safety at work regulations apply on a territorial basis and therefore the laws of each country regulate the activities which are carried out in the territory of the country in question, with the result that the local health and safety at work regulations shall apply to the activities which, under the terms of this Contract, shall be carried out in the place of installation of the goods supplied;
h)   adopt all safety measures and precautions necessary to prevent accidents and safeguard the Seller's technicians and the other assembly workers against physical injury, in compliance with all regulations imposed by law; in particular, provide the assembly workers with all protective measures necessary to safeguard the workers against physical injury and for safety and health in general, inform the Seller's workers and technicians in respect of the specific risks to which they are exposed and bring the basic safety and health regulations to their attention by means of affixing appropriate notices in the work areas or indeed by other means, in addition to demanding that the workers observe the regulations regarding safety and duly use the protective clothing and measures with which they are provided;
9.3 - In the event that, for reasons not attributable to the Seller, assembly takes longer than the time scheduled by the Seller, then the period originally scheduled shall be extended accordingly; in such case the fees relating to the services provided hereunder shall be those in force at that time said services are effectively carried out

### Art. 10 - Test.
10.1 - Upon completion of assembly, the goods supplied hereunder shall be tested in accordance with the terms set forth in the Enclosures to the Contract. The Buyer shall, at its own expense, provide the Seller with the packaging materials and any other material necessary for carrying out the test pursuant to that provided in the Contract and the relevant Enclosures. It being understood that the Seller shall not be liable vis-à-vis the Buyer in the event of malfunctioning of the machinery and/or failure of the test, which may directly or indirectly be due to moulds or to other parts supplied under the Contract, pursuant to specifications/instructions provided by the Buyer.
10.2 It being understood that the Buyer shall not have the right to use the machinery supplied for productive purposes, until the parties have signed the test report, and should the Buyer contravene this provision he shall bear every risk and responsibility related to the use of the goods that shall be deemed to have been finally accepted.
10.3 - In case the test is not performed, the machinery and goods supplied under the present Contract shall be deemed to have passed the running test if after 10 (ten) day from the term indicated by the Seller for the performance of the test such test is not executed for causes not attributable to the Seller or in case the Customer fails to sign the certificate of acceptance without good reason.

### Art. 11 - After sales service.
11.1 - For a period of 10 (ten) years from the date of the shipment of the machinery, the Seller undertakes to supply to the Buyer, according to availability at the time of the request, with spare parts and technical services as requested by the Buyer. The prices for such spare parts and services shall be based on the list prices and service fees in force at the time each such request is made and all the other terms of supply shall be agreed in good faith between the Seller and the Buyer.

### Art. 12 - Warranty period.
12.1 - With regard to any possible defectiveness in the supply under the Contract, only a warranty in respect of mechanical and electrical, design and/or assembly defects in the machinery and equipment, shall apply and shall consist either of the repair or replacement, at the Seller's sole discretion and at its expense, of the structural parts of the machinery which may prove to be broken or defective due to manufacturing defects, excluding the parts which are subject to normal wear and tear. The above guarantee shall run for a period of 12 months as of the date of the putting into operation of the machinery, but will not in any event extend beyond a period of 15 months following the date of shipment. The parts which are to be replaced as per above shall be delivered Ex Works the Seller's factory. The Seller does not assume any liability whatsoever in relation to any possible defects and/or malfunctioning of the moulds or of other parts supplied under the Contract pursuant to specifications/instructions provided by the Buyer, it being understood that for the so called "commercial components" and generally speaking for outside sourced components only the respective manufacturer's original warranty terms shall apply.
12.2 - The warranty shall lose any and all effect and the Seller shall not be liable for any damages of whatever nature caused by:
a)   improper use on the part of the Buyer's personnel;
b)   use of unsuitable raw materials;
c)   faulty or negligent treatment;
d)   excessive use of the goods supplied;
e)   equipment or spare parts not supplied by the Seller installed in the machines;
f)   modifications made without the Seller's consent;
g)   assembly or commissioning thereof not having been carried out according to the technical instructions of the Seller's personnel;
h)   poor maintenance and/or generally any acts which are not in line with the maintenance and user instructions;
i)   any other reason not attributable to the Seller.
12.3 - The Seller shall replace or repair the defective parts in the shortest time possible.
12.4 - The Buyer shall be solely responsible for ensuring that the products manufactured using the machinery supplied by the Seller are in compliance with the safety regulations in force and the Buyer shall in any event be liable for any claims made by any party which may have possibly suffered damages and it shall duly hold the Seller harmless from and against any such claims.
12.5 - The warranty shall be subject to the Buyer duly informing the Seller, in accordance with the terms of Article 17 below within 8 (eight) days following the discovery thereof of the particular defect, or lack of quality (failing which the Buyer shall lose its rights under the warranty in respect thereof) and shall also be subject to the Buyer making an express request to the Seller, in accordance with the terms of Article 17 below, to provide assistance under the warranty.
12.6 - Any other damages, including any possible damages resulting from the lack of or a reduction in production, in addition to any direct, indirect or consequential damages, and the right to terminate the Contract, are expressly excluded from the warranty.

### Art. 13 - Confidentiality obligations and industrial property rights.
13.1 - The Buyer shall keep strictly confidential and will not disclose any technical information (such as, but not limited to, drawings, schedules, documentation, formulae, recipes, set-up and correspondence) received from the Seller or in any way learnt during the course of the Contract.
13.2 - Any and all industrial or intellectual property rights relating to the machinery and the components of the supply under the Contract shall remain the exclusive property of the Seller.

**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

**Art. 14 - Seller's Liabilities.**

14.1 – The Seller's warranties, guarantees and liability under and in connection with this Contract are limited to those expressly set forth in this Contract.

It is understood that, in the event of non-performance or breach on the part of the Seller of its obligations under this Contract, the Seller's liability shall not exceed a total amount equal to 3% of the contract price. Said amount pre-determines the maximum amount of damages payable, subject to the Buyer demonstrating that it has suffered damages as a result of said non-performance or breaches and said non-performance or breaches are not of minor importance, and completely discharges the Seller from any liability (and any other remedy or liability to compensate in respect of any other damages is hereby expressly excluded).

However, in the event of non-performance or breach on the part of the Seller of its obligations under this Contract, any possible liability on the part of the Seller for damages in respect of the lack of or a reduction in production, lack of or a reduction in opportunities, lack of or a reduction in profit, lack of or a reduction in contracts, lack of or a reduction in use, in addition to any indirect or consequential damages, is hereby excluded.

**Art. 15 - Visits to the End-user's plant by the Seller's customers.**

15.1 - The Seller reserves the right to request the Buyer authorisation to carry out visits with Italian or foreign delegations to the premises in which the machinery supplied hereunder is installed so as to allow such delegations to view said machinery, in the event that this is compatible with the Buyer's requirements.

**Art. 16. - Force majeure.**

16.1 – Force majeure shall mean any act or event which is unforeseeable, beyond the parties' will or control and in respect of which a remedy may not be found in a timely manner (such as, for example, acts of war, even if undeclared, embargo, riot, insurrection, fire, sabotage, natural disaster, epidemics, acts or provisions of government authorities, inability to procure raw materials, equipment, fuel, energy, components, labour or transport).

16.2 - Upon the occurrence of any event of force majeure which is such as to prevent either party hereto from fulfilling its obligations hereunder, then the time for the party so affected to fulfil its obligations shall be automatically extended for a period corresponding to the duration of the event of force majeure and possibly – at the Seller's discretion – for a further period fixed by taking into account the Seller's production lead times and the project schedule originally agreed by the parties, without any damages (including liquidated damages) being payable by said party, save for the Buyer's obligation to pay the amounts due by way of the price, in respect of which the contractually agreed due dates shall remain in full force and effect. It is further understood that in the event that the above payment is to be effected, in whole or in part, by means of a documentary credit, then upon the occurrence of an event of force majeure and upon the Seller's request, the Buyer shall be obliged to extend the term of said documentary credit, failing which, by way of exception to all the above terms, the Seller shall be entitled to effect delivery of the goods, inter alia, to the general warehouses and cash in said documentary credit.

16.3 - Should the parties hereto be unable to carry out their obligations in accordance with the time schedule provided under the Contract for a period of 6 (six) months or more as a result of an event of force majeure, then the parties shall meet as soon as possible in order to examine the impact of such events on the terms of the Contract, in particular, on the prices and on the delivery schedule, and they shall come to an agreement as regards the terms and conditions for the continuance of their respective obligations. In the event of a possible disagreement between the parties or equally in the event that either party refuses to take part in such meetings, then the matter may be submitted solely to conciliation and/or arbitration pursuant to Art. 23 below.

**Art. 17 - Notices.**

17.1 - All notices provided under the Contract shall be in writing (this term being deemed to include e-mailand facsimiles).

**Art. 18 - Taxes and duties.**

18.1 - All taxes, duties, levies and charges (including any administrative charges) of the same nature, be they present or future, which may be due in the Buyer's and/or End-user's country in relation to this Contract shall be borne by the Buyer.

18.2 - The Buyer shall be responsible for obtaining any authorisations which, in accordance with the monetary laws and regulations of the Buyer's country, are necessary for the purposes of the regular fulfilment of the obligations provided under the Contract in relation to the payment terms. It is understood that the effectiveness of the Contract shall not remain pending as a result of non-compliance by the Buyer with the above-mentioned obligation.

**Art. 19 - No assignment of the Contract. Assignment of credits.**

19.1 - Neither party hereto may assign the Contract without the prior written consent of the other party hereto.

19.2 - However, the Seller shall be entitled to assign, in whole or in part, to third parties its credit relating to the payment of the sums due from the Buyer hereunder. The Seller shall not be obliged to obtain the Buyer's consent to any such assignment of credit and it is understood that, with regard to providing notice of any such assignment, to the extent necessary so as to ensure a valid and effective assignment of the credit, a simple written notice thereof to the Buyer shall suffice. It is understood that in the event of assignment of the above credit, then the Seller shall also be entitled to assign, in whole or in part, to the assignee of the credit the rights provided under Art. 5 above. Should the above rights fail to be assigned to the assignee of the credit, then said rights may continue to be exercised by the Seller, directly or through a representative, in the event of non-performance or breach on the part of the Buyer of its payment obligations under this Contract.

**Art. 20 - Excessive onerousness.**

20.1 - Without prejudice to the terms of Art. 16 above, if, due to events which were unforeseen (and which were reasonably unforeseeable) by the parties at the time the Contract was entered into, the balance between the parties' respective obligations under the Contract alters considerably, thus rendering excessively onerous the obligations of either of the parties hereto, then the party so affected may request that the parties' respective obligations be realigned. It is however understood that the loss or increase in value of one national currency compared to one or more other currencies or equally the replacement of one national currency by another currency (for example, following the introduction of the Euro) shall have no effect for the purposes of this Article. In the event of a possible disagreement between the parties in relation to this issue, then the matter may be submitted to arbitration pursuant to Art. 23 below.

**Art. 21 - Third party rights**

21.1 – The Buyer shall indemnify the Seller and hold the Seller harmless from and against any and all claims or actions against the Seller by third parties and any damages or expenses relating thereto, concerning any infringement of patents or other intellectual property rights arising out of or relating to the manufacture, use and/or of the products manufactured using the machinery and equipment supplied by the Seller.

**Art. 22. Conclusion of the Contract.**

22.1 - The Contract shall be binding upon the parties as of the date of signature of the Contract by both parties hereto or as of the date of payment of the advance payment by the Buyer or as of any other event specified for this purpose by the parties in the Contract and/or in the relevant Enclosures thereof.

22.2 - The Contract may also be accepted by the Buyer by means of telefax or by means of the opening of the documentary credit as agreed between the parties, the opening of which has been duly advise by the bank and which contains an express reference to the Contract or to the pro-forma invoice mentioned in the Contract (no. – date – amount).

**Art. 23 - Arbitration clause and Governing law.**

23.1. Any and all disputes between the parties which may arise out of this Contract shall be settled exclusively and finally in accordance with the Rules of Arbitration of the International Chamber of Commerce by a board of three arbitrators appointed in accordance with said Rules. The arbitration proceedings shall be held in Geneva. The arbitration proceedings shall be held in the language provided by Art. 24 below, which shall be the governing language for the purposes of interpreting this Contract.

23.2. By way of partial exception to the foregoing, the Seller shall be entitled to initiate legal proceedings before the courts of the location of the Seller's registered offices or before the courts of the location of the Buyer's registered offices or any other courts which have jurisdiction vis-à-vis the Buyer, both for urgent and/or precautionary injunction or relief (including, by way of example and not by way of limitation, proceedings for the return to the Seller of goods sold with reservation of title), and for preliminary judgment, upon the condition however that, in the latter case, the Buyer has not previously initiated arbitration proceedings. The possible invalidity of this article 23.2 shall in no way affect the validity of article 23.1.

23.3. This Contract shall be governed by Italian law (with the result that, save to the extent varied by the terms hereof, the provisions of the United Nations convention on contracts for the international sale of goods signed in Vienna on 11th April 1980 shall apply).

**Art. 24 - Interpretation of the Contract.**

24.1 - The English text hereof shall be the only authentic text of the Contract, even if the Contract is drawn up in an additional language.

24.2 - The Contract supersedes any and all prior agreements between the parties, be they oral or in writing, with regard to the subject matter hereof and the terms hereof may only be amended in writing.

**Art. 25 – Dual use and export control**

25.1 - The Buyer hereby declares that the Plant will be used exclusively for civil purposes and will not be used – be it in whole or in part – for military or nuclear explosive purposes, in nuclear civilian activities in installations not covered by safeguards by the International Atomic Energy Agency ("IAEA") or in applications related to the development and/or production of other weapons of mass destruction and missiles that may be used as carriers of such weapons. The Buyer also undertakes not to re-export, transfer or divert imported goods during the journey.

25.2 - The Buyer hereby guarantees that the possible exportation of the goods subject matter of the Contract will not in any way result to be in breach of any national, European and American law in force and applicable in export control and international economic sanctions matters (hereinafter the "Laws"). The Buyer also hereby guarantees that it shall not resale and/or use the goods subject matter of the Contract in such a way to breach the Laws and hereby acknowledges that, in the event of breach of the guarantees set forth in this paragraphs, the Seller shall be entitled to terminate, in whole or in part, the Contract. In any event, either in case the Seller decides to terminate the Contract or not, the Buyer hereby undertakes to indemnify and hold the Seller harmless from any prejudicial consequence resulting from the breach of the Laws and hereby waives all rights of objection regarding any possible co-responsibility on the part of the Seller in respect thereof. In the event that, for the purpose of complying with the Laws, the Seller should bear expenses for practices/procedures of administrative nature (or of any other kind) and/or for making modifications to the Plant, the Buyer undertakes to bear the relating costs. The parties agree that the Seller's obligations in relation to the performance of the Contract shall be suspended, and the relating terms shall be extended accordingly, in the event that it results necessary to determine practices/procedures and/or technical modifications aimed at avoiding a breach of the Laws. In the event of disagreement with the Buyer, the Seller shall be entitled to



3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

determine them at its own discretion and the Buyer shall bear the relating expenses to the extent that such expenses are not greater than an amount equal to 10% of the Contract price. Alternatively, the Seller shall be entitled to terminate the Contract, in whole or in part, without any charge on its account

**Art. 26. Informative note in respect of the treatment of personal data.**
26.1 - In relation to Article 13 of Regulation (EU) 2016/679 ("General Data Protection Regulation", hereinafter "Regulation"), each Party informs the other Party that the personal data provided during the present Contract will be collected, recorded, organized, stored and generally processed, for purposes of fulfillment of the contractual obligations in progress between the Parties and the related obligations of law. The aforementioned data may be communicated to third parties exclusively in relation to the purposes for which they were collected. Each Party declares to be aware and to have been informed with regard to any provision and rule provided by Regulation (EU) 2016/679, and more particularly by article 15, in relation with the "Right of access by the data subject". The present shall be considered as information in accordance with the above mentioned provisions and rules, and each Party expressly declares to grant its consent at the processing of its personal data for said purpose.

Place and date: _3 - 12 - 2021_

The Buyer                                                                                    The Seller

.................................                                                       .................................

In addition to approving the whole text of this Contract in accordance with Article 1341 of the Italian Civil Code, the Parties specifically approve the clauses contained in the following articles of this Contract: Art. 3 (Effectiveness of the Contract), Art. 4 (Means of payment of the Price, Claims), Art. 5 (Retention of title), Art. 6 (Terms of delivery and extension thereof; suspension of performance under the Contract; liquidated damages which the Seller may be liable to pay in relation to delay in delivery and limitation of liability), Art. 7 (Packaging, risks related to goods supplied, insurance), Art. 9 (Assembly), Art. 10 (Test; limitation of liability), Art. 12 (Warranty period, terms of warranty and limitation of liability), Art. 13 (Confidentiality obligations and industrial property rights), Art. 14 (Seller's Liabilities), Art. 16 (Force majeure), Art. 18 (Taxes and duties), Art. 19 (No assignment of the Contract; assignment of credits), Art. 20 (Excessive onerousness), Art. 21 (Third party rights), Art. 22 (Conclusion of the Contract), Art. 23 (Arbitration clause and Governing law), Art. 25 (Dual use and Export control).

Place and date: _3 - 12 - 2021_

The Buyer                                                                                    The Seller

.................................                                                       .................................

**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

### ENCLOSURE NO. 1

With regard to the issue of certifications and markings of the machinery the subject matter of this Contract, provided for by the safety regulations applicable to said machinery, the obligations of the Parties shall be those resulting from the following summary.

**A.    European Union countries, Countries where Directive 2006/42/EC of the European Union is applied.**

For the European Union countries and the Countries where Directive 2006/42/EC is applied, the obligations of the Seller shall solely be those set out below at points A1 to A5.

The Buyer declares to the Seller that the configuration of the machinery resulting from the specifications referred to in this Contract and the related attachments is sufficient for the purposes of the applicable regulations at the site of use of the machinery itself.

It is in any case understood that it shall be the responsibility of the Buyer to verify that the goods supplied by the Seller are compliant to the applicable regulations at the site of use of the goods themselves, committing as of now- in the absence of such compliance- to adopt every measure and take all necessary action in order to achieve such compliance or in any case prevent damage to objects belonging to third parties or third parties. It is understood that with regard to the foregoing the Buyer undertakes to indemnify and hold the Seller harmless from any third party claim (including public authorities) and from any prejudicial consequence resulting from the non-fulfilment of the obligations of the Buyer.

**A.1.    Machinery**
With regard to the supply on the part of the Seller of a machinery pursuant to Art. 2 (a) of the Directive 2006/42/EC of the European Union and out of the cases provided for by the following points 2), 3) and 4) of this Exhibit, the Seller shall provide for the drawing up of the EC declaration of conformity of the machinery in accordance with Annex II, Part 1, Section A of the Directive 2006/42/EC and shall affix the CE marking on such machinery.

**A.2.    Partly completed machinery**
With regard to the supply on the part of the Seller of a mechanical device which, in accordance with the Directive 2006/42/EC of the European Union, constitutes a so-called 'partly completed machinery', which is (i) by itself, unsuitable to guarantee a well determined application and (ii) is solely intended to be incorporated and/or assembled in other machinery or equipments of the Buyer, the Buyer undertakes to hold harmless the Seller in relation to any and all obligations of certification and/or marking relating to said device, arising out of its incorporation or assembly, pursuant to Art. 2 (g) of the above mentioned Directive 2006/42/EC (including the obligations relating to the putting into service of the whole machinery, line or plant in which said device is incorporated/assembled). Therefore, in accordance with the terms provided for by said Directive, the Seller shall solely draw up a declaration of incorporation according to Annex II, Part 1, Section B of the Directive 2006/42/EC. It is understood that the Seller shall be in any event entitled to affix its own markings on said device.

**A.3.    Complete Line or Plant**
With regard to the supply on the part of the Seller of a set of machinery and/or mechanical devices connected, disposed and set up in order to form a complete line or a complete plant pursuant to Art.2(a) of the Directive 2006/42/EC of the European Union and to art. 38 of the "Guide to application of the Machine Directive2006/42/EC, edition 2.2, October 2019", the Seller shall provide for the drawing up of the EC declaration of conformity of such complete line or plant in accordance with Annex II, Part 1, Section A of the Directive 2006/42/EC and shall affix the CE marking on said complete line or plant, in case it is required according to art. 38 of the "Guide to application of the Machine Directive2006/42/EC, edition 2.2, October 2019".

**A.4.    Not complete Line or Plant**
With regard to the supply on the part of the Seller of a set of machinery and/or mechanical devices which is (i) by itself, unsuitable to guarantee a well determined application and (ii) is solely intended to be incorporated and/or assembled in other machinery or equipment of the Buyer, in order to form a complete line or plant, the Buyer undertakes to hold the Seller harmless in relation to any and all obligations of certification and/or marking relating to said set of machinery/devices, in accordance with the Directive 2006/42/EC of the European Union, arising out of its incorporation or assembly with the other machines and/or equipment with which it forms a complete line or plant (including the obligations relating to the putting into service of the complete line or plant in which said set of machinery/devices is incorporated/assembled). Therefore, in accordance with the terms provided for by said Directive, the Seller shall solely draw up the declaration of incorporation according to Annex II, part 1, Section B of the Directive 2006/42/EC. It is understood that the Seller shall be in any event entitled to affix its own markings.

**A5.    Machinery/Partly completed machinery/set of machines in an existing line**
With regard to the supply by the Seller of a machinery/partly completed machinery/set of machines to be inserted in an existing line (already in use with the Buyer) the Seller shall provide for certification, in accordance with that required by Directive 2006/42/EC, solely for that which has been supplied and not also for the existing line. Every assessment relating to the interfacing between that sold and that existing shall be borne by the Buyer.

**A.6    Modification Kit for machinery or partly completed machinery**



3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

With regard to the supply by the Seller of a modification Kit (by which is meant, by way of example and not limited to, a set of components to be assembled, which might be accompanied by equipment necessary for its assembly, having a single and defined technical purpose) for machinery or partly completed machinery already in use with the Buyer, the Seller shall provide for, when required, certification, in accordance with that required by Directive 2006/42/EC, only for the above-mentioned Kit supplied or the parts which compose it. In any case it is understood that any possible burden, obligation and responsibility related to the possible need for a new 'CE' marking arising out of or related to the carrying out of the technical assistance in relation to the machinery or partly completed machinery on which the Kit is installed shall be exclusively borne by the Buyer, with total exemption of the Seller from all liability in this regard and in general with regard to the certification of the machinery or partly completed machinery on which the Kit is installed.

### B.  Assimilated Countries (this definition refers to the Countries for which the machinery is destined, different Countries to those referred to in the previous paragraph A, and for which the Parties expressly agree for compliance with the Directive 2006/42/EC of the European Union)

For the goods supplied by delivery to the Buyer having its registered office in an Assimilated Country or in any case for installation in an Assimilated Country (a) the Parties agree that the Seller's obligations will be in accordance with the Directive 2006/42/CE as well as with the provisions of paragraph A, with the only exception that documentation and HMI will be in the contractual-agreed language and not in one of the official language of the Assimilated Country and (b) the technical adjustments, the procedures and the certification/markings provided for by the applicable local laws shall be the responsibility of the Buyer and borne by the Buyer, provided that these elements are not already expressly provided for as part of the supply (and of the relative price) according to that indicated by this Contract.

The supply referred to in this Contract is carried out with the express exclusion of all responsibility by the Seller with regard to the technical configuration of the goods supplied in terms of safety devices according to the regulations of the Assimilated Countries to which this paragraph B applies.

The Buyer declares to the Seller that the configuration of the machinery resulting from the specifications referred to in this Contract and the related attachments is sufficient for the purposes of the applicable regulations at the site of use of the machinery itself.

It is in any case understood that it shall be the responsibility of the Buyer to verify that the goods supplied by the Seller are compliant to the applicable regulations at the site of use of the goods themselves in the Assimilated Countries, committing as of now- in the absence of such compliance- to adopt every measure and take all necessary action in order to achieve such compliance or in any case prevent damage to objects belonging to third parties or third parties. It is understood that with regard to the foregoing the Buyer undertakes to indemnify and hold the Seller harmless from any third party claim (including public authorities) and from any prejudicial consequence resulting from the non-fulfilment of the obligations of the Buyer.

### C.  Different Countries to those referred to in the previous paragraphs A and B

Unless otherwise provided for by this Contract, for the goods supplied by delivery to the Buyer having its registered office in a different Country to those referred to in the previous paragraphs A and B or in any case for installation in a different country to those referred to in the previous paragraphs A and B (a) the certification referred to above shall not be completed and delivered to the Buyer and (b) the technical adjustments, the procedures and the certification/markings provided for by the applicable local laws shall be the responsibility of the Buyer and borne by the Buyer, provided that these elements are not already expressly provided for as part of the supply (and of the relative price) according to that indicated by this Contract.

The supply referred to in this Contract is carried out with the express exclusion of all responsibility by the Seller with regard to the technical configuration of the goods supplied in terms of safety devices according to the regulations of the Countries to which this paragraph C applies.

The Buyer declares to the Seller that the configuration of the machinery resulting from the specifications referred to in this Contract and the related attachments is sufficient for the purposes of the applicable regulations at the site of use of the machinery itself.

It is in any case understood that it shall be the responsibility of the Buyer to verify that the goods supplied by the Seller are compliant to the applicable regulations at the site of use of the goods themselves, committing as of now- in the absence of such compliance- to adopt every measure and take all necessary action in order to achieve such compliance or in any case prevent damage to objects belonging to third parties or third parties. It is understood that with regard to the foregoing the Buyer undertakes to indemnify and hold the Seller harmless from any third party claim (including public authorities) and from any prejudicial consequence resulting from the non-fulfilment of the obligations of the Buyer.

**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# SACMI PACKAGING&CHOCOLATE
## MECHANICAL COMPONENTS LIST

August 2020

| COMPONENT | BUILDER |
|---|---|
| THREE-PHASE MOTORS / MOTOR-REDUCERS | SEW EURODRIVE , BONFIGLIOLI |
| REDUCERS | SEW EURODRIVE , BONFIGLIOLI |
| PLANETARY REDUCERS | WITTENSTEIN, GIRARD, STOBER |
| VACUM EJECTOR | PIAB |
| VACUUM PUMPS | BECKER , Elmo Rietschle |
| PNEUMATIC COMPONENTS | FESTO |
| BEARINGS | SKF, FAG, CFC |
| LINEAR GUIDES | STAR, THK, INA, IKO, IWIN |
| BELTS | HABASIT, AMMERAAL |
| PLASTIC CHAIN CONVEYORS | REXNORD, INTRALOX,FLEX-LINK , BOSCH |
| GLUE DISPENSERS | NORDSON, ROBATECH , GRACO |

- *Any request of modification of the above list must be agreed. SACMI Packaging&Chocolate reserves the possibility to change above listed components if necessary for improving efficiency and reliability of the machinery.*

- *Equipment part of the project but not manufactured by SACMI Packaging&Chocolate may not comply with above component list.*

# SACMI
**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## SACMI PACKAGING&CHOCOLATE
## STANDARD ELECTRICAL COMPONENTS LIST

August 2020

| COMPONENT | BUILDER |
|---|---|
| PLC | ROCKWELL LOGIX Series |
| MOTION CONTROLLERS | ROCKWELL |
| AUTOMATIC BREAKERS | EATON |
| MAIN CIRCUIT BREAKERS | EATON |
| CONTACTORS | EATON |
| SWITCH DISCONNECTOR | EATON |
| BRUSHLESS MOTORS | ROCKWELL |
| DRIVES | ROCKWELL |
| INVERTERS | DANFOSS |
| PUSH BUTTONS | EATON |
| PHOTOCELLS | SICK - WENGLOR |
| PROXIMITY SWITCHES | SICK - WENGLOR |
| SAFETY SWITCHES | ROCKWELL |
| SAFETY RELAIS | ROCKWELL |
| DISTRIBUTING BOXES | ZANARDO - ETA |
| ELECTRICAL CABINETS | ZANARDO - ETA |
| LIGHT TOWERS | BANNER |
| TRUNKING | Basket trays |
| DISPLAY AND OPERATING PANELS | SACMI HMI |
| ETHERNET SWITCH | ROCKWELL |
| POWER SUPPLY 24 Vdc | MURR ELEKTRONIK |

*Any request of modification of the above list must be agreed. SACMI PACKAGING&CHOCOLATE reserves the possibility to change above listed components if necessary for improving efficiency and reliability of the machinery.*
*Equipment part of the project but not manufactured by SACMI PACKAGING&CHOCOLATE may not comply with above component list.*

*CONDUCTOR COLOUR CODING according to standard specification EN 60204-1*

- AC and DC power circuits                          BLACK
- Neutral                                          LIGHT BLUE
- AC control circuits                              RED
- DC control circuits                             BLUE
- External equipment interlock control circuits   ORANGE
- Earth conductors                               YELLOW-GREEN

# *FLOW WRAP SECURITY AGREEMENT*

# **EXHIBIT 2**



**SECURITY AGREEMENT - GENERAL FORM**
**CAVEAT: DO NOT USE THIS FORM IF THIS TRANSACTION**
**IS A CONSUMER CREDIT TRANSACTION**

1. **GRANT OF SECURITY INTEREST.** For value received, as security for the Obligations (as defined below) the undersigned ("Debtor") hereby grants, creates, and provides to <u>Sacmi USA, Ltd.</u> ("Secured Party") a security interest in the property described in the paragraphs checked below:

   [ __ ] All of Debtor's inventory now owned or hereafter acquired;
   [ __ ] All of Debtor's accounts, Deposit Accounts, Investment Property, Letter of Credit Rights, Supporting Obligations, now existing or hereafter arising, together with all interest of Debtor in any goods, the sale or lease of which give rise to any of Debtor's accounts, and all chattel paper, documents and instruments relating to accounts;
   [ __ ] All of Debtor's general intangibles, now owned or hereafter acquired;
   [ __ ] All of Debtor's equipment now owned or hereafter acquired;
   [ __ ] All of Debtor's farm products now owned or hereafter acquired;
   [ __ ] All of Debtor's fixtures on the real estate described in Paragraph 3 below;
   [ x_ ] Property described as <u>See 1 in Addendum</u>.

   together with the proceeds, products, increase, issue, accessions, attachments, accessories, parts, additions, repairs, replacements and substitutes of, to, and for all of the foregoing. Debtor will promptly deliver to Secured Party, duly endorsed when necessary, all such chattel paper, documents and instruments and related guaranties, now on hand or hereafter received.

   All such property in which a security interest is granted is herein called the "Collateral."

2. **OBLIGATIONS.** The aforesaid security interests secure payment and performance of the following obligations (the "Obligations"): <u>See Addendum 2</u> together with all other obligations of Debtor to Secured Party now existing or hereafter arising, whether direct or indirect, contingent or absolute and whether as maker or surety and including, but not limited to, future advances and amounts advanced and expenses and attorneys' fees incurred pursuant to this Security Agreement.

3. **REAL ESTATE.** Any Collateral attached to, or grown upon, land (such as fixtures, crops, timber or minerals) will be grown upon or attached to the following described real estate: <u>N/A</u> and the name of the record owner of such real estate (if other than Debtor) is:
   _____

4. **COPY - FILING.** A carbon, photocopy or other reproduction of this Security Agreement may be filed as a financing statement. IF FOR FIXTURES, TIMBER OR MINERALS, SUCH A FILING SHALL BE FILED FOR RECORDING IN THE REAL ESTATE RECORDS.

5. **DEBTORS.** Each of the undersigned, if more than one, execute this Security Agreement as his, her, its, their joint and several obligation and it shall be binding upon and fully enforceable against either or both, or any or all of them, and reference herein to "Debtor" shall in such case be deemed to be plural, provided however that nothing contained herein shall extend personal liability under any of the Obligations as to which such Debtor is not otherwise liable.

6. **REPRESENTATIONS.**  Debtor represents, warrants and agrees:
    a.  All Collateral is bona fide and genuine and Debtor is authorized to grant a
      security interest in the Collateral, free and clear of all liens and encumbrances,
      except the security interest created hereby and except <u>N/A.</u>
    b.  Debtor's principal place of business is the address shown herein, and Debtor shall
      promptly give Secured Party written notice of any change thereof, unless prior
      written consent of Secured Party is obtained. All Collateral and all of the Debtor's
      business records are now kept, and shall continue to be kept, at such address, or if
      not, at <u>4718 Belmont Avenue, Youngstown, OH 44505</u>.
    c.  Debtor is an individual or, if not, is the following type of entity:  limited liability
      company organized in the state of <u>Delaware</u> with an organization number of
      <u>200714301504</u>.  If an individual, Debtor resides in the state of _____.
      Debtor's exact legal name is <u>Belmont Confections, Inc.</u>

    THIS AGREEMENT SPECIFICALLY INCLUDES ALL OF THE ADDITIONAL
PROVISIONS SET FORTH BELOW AND ON THE REVERSE SIDE HEREOF. DEBTOR
ACKNOWLEDGES RECEIPT OF A FULLY COMPLETED COPY OF THIS SECURITY
AGREEMENT.

    DATED: ___3-2-2022___ .

Belmont Confections, Inc.

By: _Jim Holcomb_
Name: _Jim Holcomb_
Title: _Controller_
         (Debtor)

ADDRESS OF SECURED PARTY (FROM
WHICH INFORMATION CONCERNING
THE SECURITY INTEREST MAY BE
OBTAINED)

4718 Belmont Avenue
Youngstown, OH 44505
(Address)_

3434 106th Circle
Des Moines, IA 50322
(Address)

1. REPRESENTATIONS AND AGREEMENTS.   Debtor represents and warrants to Secured Party, and agrees that:

a. If a corporation or other business entity, Debtor is duly organized, existing, and is qualified and in good standing in all states in which it is doing business, and the execution, delivery and performance of this Security Agreement are within Debtor's powers, have been duly authorized, and are not in contravention of law or the terms of Debtor's charter, bylaws if any, or any indenture, agreement or undertaking to which Debtor is a party, or by which it is bound. If an individual, Debtor is of legal age. Debtor will not change his, her or its name, or identity unless written notice is given in advance to Secured Party.

b. Debtor shall maintain insurance upon the Collateral which is tangible property against all customarily insured risks for the full insurable value thereof (and furnish Secured Party with duplicate policies if Secured Party so requests), loss to be payable to Debtor and Secured Party as their respective interests may appear. The Secured Party's interest shall be protected in accordance with a standard or union-type loss payable clause. In the event of any loss or damage to any Collateral, Debtor will give Secured Party written notice thereof forthwith, promptly file proof of loss with the appropriate insurer and take all other steps necessary or appropriate to collect such insurance. If Secured Party so elects, Secured Party shall have full authority to collect all such insurance and to apply any amount collected to amounts owed hereunder, whether or not matured. Secured Party shall have no liability for any loss which may occur by reason of the omission or the lack of coverage of any such insurance.

c. Debtor shall at all times maintain Collateral which is tangible property in good condition and repair, defend at Debtor's expense all Collateral from all adverse claims and shall not use any of the Collateral for any illegal purpose.

d. Debtor shall (i) keep such books and records pertaining to the Collateral and to Debtor's business operations as shall be satisfactory to Secured Party; (ii) permit representatives of Secured Party at any time to inspect the Collateral and inspect and make abstracts from Debtor's books and records; and (iii) furnish to Secured Party such information and reports regarding the Collateral and Debtor's business operations and its financial status, as Secured Party may from time to time reasonably require. SECURED PARTY IS HEREBY AUTHORIZED TO REQUEST CONFIRMATION OF SUCH INFORMATION OR ADDITIONAL INFORMATION OF ANY KIND WHATSOEVER DIRECTLY FROM ANY THIRD PARTY HAVING DEALINGS WITH DEBTOR. SECURED PARTY IS FURTHER IRREVOCABLY AUTHORIZED TO ENTER DEBTOR'S PREMISES TO INSPECT THE COLLATERAL.

e. Debtor shall give such notice in writing (including but not limited to notice of assignment or notice to pay Secured Party directly) as Secured Party may require at any time to any or all account debtors, with respect to accounts which are Collateral, and, if Secured Party shall so request, deliver to Secured Party copies of any and all such notices.

f. Debtor shall promptly transmit to Secured Party all information that it may have or receive with respect to Collateral or with respect to any account debtor which might in any way affect the value of the Collateral or Secured Party's rights or remedies with respect thereto.

g. Unless in default under this Security Agreement, Debtor may sell inventory in the ordinary course of business and consume any raw materials or supplies, the use and consumption of which are necessary to carry on Debtor's business. Debtor shall not otherwise consume, assign or transfer any Collateral without prior written consent of Secured Party. The

provision of this Security Agreement granting a security interest in proceeds shall not be construed to mean that Secured Party consents to any sale or disposition of any Collateral.

h. Debtor shall pay when due all taxes, assessments, and any other governmental levy which is, or may be, levied against any Collateral, and shall otherwise maintain the Collateral free of all liens, charges, and encumbrances (except liens set forth herein and the security interest created hereby)

i. Debtor shall not store any Collateral with any warehouseman without Secured Party's consent.

j. Debtor shall promptly, unless Secured Party shall waive such requirement in writing, deliver to Secured Party all certificates of title, if any, (or any other documents evidencing title) to all Collateral with such proper notations, assignments or endorsements as may be necessary or appropriate to create, preserve or perfect Secured Party's security interest in the Collateral.

k. Debtor shall, at its cost and expense, execute, deliver, file or record (in such manner and form as Secured Party may require) any assignment, financing statement or other paper that may be necessary or desirable, or that Secured Party may request, in order to create, preserve or perfect any security interest granted hereby or to enable Secured Party to exercise and enforce its rights hereunder or under any Collateral. Secured Party is further granted the power, coupled with an interest, to sign on behalf of Debtor as attorney-in-fact and to file one or more financing statements under the Uniform Commercial Code naming Debtor as debtor and Secured Party as secured party and describing the Collateral herein specified.

2. EXPENSES. Debtor upon demand shall pay to Secured Party forthwith the amounts of all expenses, including reasonable attorneys' fees and legal expenses, incurred by Secured Party in seeking to collect any sums secured hereunder or to enforce any rights in the Collateral. Such amounts shall be secured hereby, and if not paid on demand shall bear interest at the highest rate payable on any of the Obligations.

3. COLLECTION AUTHORITY ON ACCOUNTS. Debtor hereby irrevocably appoints Secured Party its true and lawful attorney, with full power of substitution, in Secured Party's name, Debtor's name or otherwise, for Secured Party's sole use and benefit, but at Debtor's cost and expense, to exercise, if Secured Party shall elect after an event of default has occurred (whether or not Secured Party then elects to exercise any other of its rights arising upon default) all or any of the following powers with respect to all or any accounts which are Collateral:

a. To execute on Debtor's behalf assignments of any or all accounts which are Collateral to Secured Party, and to notify account debtors thereunder to make payments directly to Secured Party;

b. To demand, sue for, collect, receive and give acquittance for any and all moneys due or to become due upon or by virtue thereof;

c. To receive, take, endorse, assign and deliver any and all checks, notes, drafts, documents and other negotiable and non-negotiable instruments and chattel paper taken or received by Secured Party in connection therewith;

d. To settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto;

e. To sell, transfer, assign or otherwise deal in or with the same or the proceeds thereof or the relative goods, as fully and effectually as if Secured Party were the absolute owner

thereof; and

      f. To extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference thereto.

Any funds collected pursuant to such powers shall be applied to the payment of the Obligations. The exercise by Secured Party of, or failure to so exercise, any of the foregoing authority, shall in no manner affect Debtor's liability to Secured Party on any of the Obligations. Secured Party shall be under no obligation or duty to exercise any of the powers hereby conferred upon it and it shall be without liability for any act or failure to act in connection with the collection of or the preservation of any rights under any such accounts. Secured Party shall not be bound to take any steps necessary to preserve rights in any instrument or chattel paper against prior parties.

4. SET OFF.   In the event of default hereunder, Secured Party, at its option at any time, and without notice to Debtor, may apply against the Obligations any property of Debtor held by Secured Party. As additional security for payment of the Obligations, Debtor hereby grants to Secured Party a security interest in any funds or property of Debtor now or hereafter in possession of Secured Party and with respect thereto Secured Party will have all rights and remedies herein specified.

5. WAIVER.   Debtor waives protest, notice of dishonor, and presentment of all commercial paper at any time held by Secured Party on which Debtor is in any way liable, notice of non-payment at maturity of any account or chattel paper, and notice of any action taken by Secured Party except where notice is expressly required by this Security Agreement or cannot by law be waived.

6. DEFAULT.   Debtor will be in default upon the occurrence of any of the following events: (a) failure to make the payment, when due and payable of any of the Obligations, (b) failure of the performance of any obligation or covenant contained or referred to herein, (c) any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made or furnished (d) any event which results in the acceleration of the maturity of the indebtedness of Debtor or any guarantor or co-maker of any of the Obligations to others under any indenture, agreement or undertaking; (e) loss, theft, damage, destruction or encumbrance to, or of, the Collateral or the making of any levy, seizure of attachment thereof or thereon; (f) death of, dissolution of, termination of existence of, insolvency of, business failure of, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding under any bankruptcy or insolvency law by or against, Debtor or any guarantor or co-maker of any of the Obligations; (g) the occurrence or nonoccurrence of any event or events which causes the Secured Party, in good faith, to deem itself insecure for any reason whatsoever.

In any such event Secured Party may at its option declare any or all of the Obligations to be due and payable and such sums shall then be due and payable immediately, without notice or demand.

7. RIGHTS AND REMEDIES ON DEFAULT.   After the occurrence of any event of default, Secured Party may exercise at any time and from time to time any rights and remedies available

to it under applicable law, including but not limited to the right to sell, lease or otherwise dispose of the Collateral and the right to take possession of the Collateral. FOR THAT PURPOSE SECURED PARTY MAY ENTER UPON ANY PREMISES ON WHICH THE COLLATERAL OR ANY PART THEREOF MAY BE SITUATED AND REMOVE IT. Secured Party may require Debtor to assemble the Collateral and make it available at a place to be designated by Secured Party which is reasonably convenient to both parties. If at the time of repossession any of the Collateral contains other personal property not included in the Collateral, Secured Party may take such personal property into custody and store it at the risk and expense of Debtor. Debtor agrees to notify Secured Party within **forty-eight (48)** hours after repossession of the Collateral of any such other personal property claimed, and failure to do so will release Secured Party and its representatives from any liability for loss or damage thereto. Any notice of intended disposition of any of the Collateral required by law shall be deemed reasonable if such notice is given at least **ten (10)** days before the time of such disposition. Any proceeds of any disposition by Secured Party of any of the Collateral may be applied by it to the payment of expenses in connection with the Collateral, including but not limited to repossession expenses and reasonable attorneys' fees and legal expenses, and any balance of such proceeds shall be then applied against the Obligations and other amounts secured hereby in such order of application as Secured Party may elect.

8. GENERAL

a. Secured Party may, as its option, pay any tax, assessment, or other Governmental levy, or insurance premium or any other expense or charge relating to Collateral which is payable by Debtor (and not timely paid by it), and further may pay any filing or recording fees. Any amount or amounts so paid, with interest thereon at the highest rate payable on any of the obligations (from the date of payment until repaid) shall be secured hereby and shall be payable upon demand.

b. Secured Party shall not be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by Debtor unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

c. Any notice, if mailed, shall be deemed given when mailed postage prepaid, addressed to Debtor at its address shown above, or at any other address of Debtor appearing on Secured Party's records.

d. Covenants, representations, warranties and agreements herein set forth shall be binding upon Debtor, its legal representatives, successors and assigns. This Security Agreement may be assigned by Secured Party and all rights and privileges of Secured Party under this Security Agreement shall then inure to the benefit of its successors and assigns.

e. If any provision of this Security Agreement shall be for any reason held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, but this Security Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

f. If Debtor is a guarantor, endorser, co-maker, or an accommodation party with respect to the Obligations, Debtor hereby waives the benefit of any and all defenses and claims of damage which are dependent upon Debtor's character as a party other than the maker. Each

party to any of the Obligations hereby consents to and waives notice of (1) any and all extensions
(whether or not for longer than the original period) granted as to the time of payment of any or
all of the Obligations, and (2) any renewal of any or all of the Obligations.

g. This Security Agreement and all rights and duties hereunder, including but not
limited to all matters of construction, validity, and performance, shall be governed by the law of
Iowa.

h. Unless otherwise defined or the context otherwise requires, all terms used
herein which are defined in the Iowa Uniform Commercial Code shall have the meanings therein
stated. The rights and remedies herein conferred upon Secured Party shall be in addition to, and
not in substitution or in derogation of, rights and remedies conferred by the Iowa Uniform
Commercial Code and other applicable law.

i. All words and phrases used herein shall be construed as in the singular or plural
number, and as masculine, feminine or neuter gender, as the context may require.

j. Captions are inserted for convenience only and shall not be taken as altering the
text.

9. CERTIFICATION

a. Secured Party and Debtor each certify that they are not acting, directly or
indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order
of the United States Treasury Department as a terrorist, "Specially Designated National and
Blocked Person" or any other banned or blocked person, entity, nation or transaction pursuant to
any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets
Control; and are not engaged in this transaction, directly or indirectly on behalf of, or instigating
or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity
or nation.

b. Each party hereby agrees to defend, indemnify and hold harmless the other
party from and against any and all claims, damages, losses, risks, liabilities and expenses
(including attorney's fees and costs) arising from or related to any breach of the foregoing
certification.

## ADDENDUMS

Addendum 1:

JT Pro Flow-wrapper, EWF Electronic wrapper feeder, Format P1 for the JT Pro flow-wrapper, and other items described in Offer #20-034565-A4 dated February 22, 2021 sold to Debtor by Secured Party.

Addendum 2:

All payments of Debtor to Secured Party including, but not limited to, obligations with respect to the above-referenced collateral pursuant to Offer #20-034565-A4 dated February 22, 2021 sold to Debtor by Secured Party.

# *PACKING CELL AGREEMENT*

# **EXHIBIT 3**



Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

*1-28-21*
*CT*



## 4718 Belmont Ave,
## Youngstown, OH 44505
## USA

**QUOTATION: 20-034566-A0**

**PROJECT:**   **Bar project – Secondary Packaging**

**DATE:**   **26th January 2021**

**YOUR REF.:**   **Sebastian Clemens**
   **Sr. Area Manager – North America**
   **Mobile: +1 (515) 608-3786**
   **E-Mail: sebastian.clemens@sacmigroup.com**

**SACMI**

PACKAGING & CHOCOLATE

Carle & Montanari | OPM | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## TABLE OF CONTENTS

1.  PROJECT SPECIFICATION & SOLUTION DESCRIPTION ........................................................3
2.  SUPPLY DESCRIPTION ........................................................................................................4
3.  PRICE SUMMARY .................................................................................................................7
4.  SALES CONDITIONS.............................................................................................................9
5.  GENERAL TECHNICAL CHARACTERISTICS.......................................................................11
6.  DOCUMENTATION ...............................................................................................................11
7.  TESTS, INSTALLATIONS, COMMISSIONING AND TRAININGS..........................................12
8.  GENERAL SALES CONDITIONS ..........................................................................................14

## ANNEXES

- Standard Mechanical Component List (August 2020 release)
- Standard Electrical Component List (August 2020 release)
- Layout: PXXXXXX.XX

**SACMI**

PACKAGING & CHOCOLATE

Carle&
Montanari | **៣២៣** | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# 1. PROJECT SPECIFICATION & SOLUTION DESCRIPTION

Scope of the project is to pack single horizontal 15 g products into 3-side-flap cartons. The solution consist of a fully automatic secondary packaging system that is mainly composed by No.1 "three-Functions Robotic Packing Cell" (Forming+Loading+Closing).

### 1.1 Products



 

| Product Description | Unwrapped Product dimensions | Wrapped Product dimensions | Product Speed |
|---|---|---|---|
| One Bar | 102 x 44 x 14mm | 165 x 57 x 14mm | 250ppm |

| Carton Description | Products per carton | Product collation | Carton dimensions | Blank dimensions | Carton Speed |
|---|---|---|---|---|---|
| One Bar | 4 | 111 x 38 x 19mm | 102 x 131 x 51mm | 204 x 427mm | 62.5cpm |

Products and tolerances to be approved by SACMI P&C.

---

**Please Note:**
- *All products out of the above mentioned specifications will cause loss of guaranteed performance, for which SACMI P&C shall not be responsible.*
- *All packaging materials are subject to SACMI P&C's approval through tests with product and blank samples.*
- *The overall dimensions of the machine offered in the present quotation could undergo modifications for factory layout needs. For a deeper analysis of this issue, it is necessary to receive the final factory layout signed.*

---



SACMI USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

### 1.2 Product presentation / interface

Upstream flow-wrappers must be equipped with rejection unit for:

- empty packs
- damaged packs
- open / unsealed packs
- double / multiple packs



Products must arrive at interface to SACMI P&C equipment with:

- cross seal leading
- aligned
- not damaged
- with constant rate and gap between products according to below scheme



$$(L + 0,4\,L) \leq (X) \leq (L + 0,6\,L)$$

### 1.3 Secondary Packaging Style and Material

Products will be secondary packed in 3-side-flap cartons.
Boxes to be formed from flat blanks.
Cardboard flat blanks E-flute **min weight = 350 gr/sqm**. To be defined according to box dimensions.

### 1.4 Machinery Colour

Equipment not made of stainless steel shall be painted in silver gray RAL 7035.
Safety guard door's supports shall be painted in orange RAL 2004.
Different colours shall be quoted separately.

### 1.5 Production Ambient Conditions

- Temperature = < 30°C
- Humidity = max 60%.

**SACMI**

PACKAGING & CHOCOLATE

Carle & Montanari | OPM | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# 2. SUPPLY DESCRIPTION

- *Functional description*



SACMI P&C TLP model is a Modular Robotic Top-loading Packing Cell, (Forming + Loading + Closing), designed and assembled according to the most recent "state-of-the-art" technology; the machine achieves highest standards in terms of reliability, efficiency, accessibility, user friendly, easy changeover and low maintenance.



**No. 1 Display Forming Station,** No. 1 Base format F01 included.

**No. 1 Robotic Display Loading Station**, No. 1 Base format F01 valid for displays included and mainly equipped with:

- No. 1 right angle in-feed belt system for products, each equipped with optical check of gaps between products, rejection unit by means of air blast and two synchronized vertical lateral belts to drive and centre products insertion in the collator's pockets.
  *Meter and accelerate products for the correct in-feed into the dynamic collators*
- No. 1 dynamic collator for products indexing, driven by 2 servomotors and equipped with 1 set of pockets valid for 1 format size F01
  *Receive and capture individual products and position them to be picked up by the Robot top-loader. One train of pockets under in-feed according to the arrival of the products and the other one stops into the pick-up area of the Robot*
- No. 1 SACMI P&C TLP Top-Loading Robot with 2 controlled axes, equipped with:
  - anti-collision device
  - No. 1 easily exchangeable pick-up tool valid for one (1) format F01 capable of picking up products by suction cups, equipped with control device to check products presence
  - No. 1 software valid for No. 1 format F01



Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

- No. 1 Shuttle conveyor systems, able to carry the cartons from the forming to the filling section and from this last position to the closing station. These shuttles will be equipped with vacuum holder able to guarantee the correct referent position of the cartons during the various stages of movement. The system will be also equipped with fix vacuum holder supports in each stage to support and keep the carton in position as well.
- Holds displays in a precise position during the entire forming + loading + closing process.

**No. 1 Robotic Display Closing Station**, No.1 format valid for cartons F01 included and mainly equipped with:



- No. 1 SACMI P&C TLP Top-Lidding Robot with 2 controlled axes, equipped with:
  - anti-collision device
  - 1 easily exchangeable closing tool valid for 1 format F01
  - 1 software valid for 1 format F01
- Cartons exit conveyor.
- No. 1 Automatic Glue Dispenser hot-melt glue for Forming and Closing stations, each one equipped with distributors fitted on adjustable trolleys with position indicator.

Electric Cabinets integrated in the Packing Cell frame equipped with:
  - **Allen Bradley**
  - Servo Drives for controlling TLP Robots and Product Collator

The operator interface is a keyboard with Start, Stop and Emergency push-buttons and an operating touch panel, where all important functions and faults are clearly shown and can be called up and changed in order to modify all variable parameters for machine controlling (product pick-up and release points, machine speed, acceleration, timing, etc.). The machine is equipped with a light tower for signalling the machine status.

Common frame for all machine modules in electro-welded painted structure with floor levelling devices.

Safety guard door system in transparent polycarbonate, located all around the external perimeter of the Work Cell, complete with double safeties, electrical and mechanical, wired inside the door supports.

_**Note 1**: SACMI P&C reserves to change machinery configuration during fulfilment, if it is necessary, maintaining scope of supply._

**SACMI**

PACKAGING & CHOCOLATE

Carle & Montanari | OPM | FIMA

**Sacmi USA Ltd.**
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## 3. PRICE SUMMARY

**EQUIPMENT:**



| Pos. | Description | Q.ty | Price ($) |
|------|-------------|------|-----------|
| 3.1 | Modular Robotic Top-loading Packing Cell (as described in 2) | 1 | $547.000,00 |
| 3.2 | Format P1 for the Work Cell above listed | 1 | 60,000.00 |
| 3.3 | Recommended spare parts | 1 | 18,000.00 |
| **PRICE OF GOODS AND LABOR (EXW SACMI USA) ($)** | | | **625,000.00** |

**SERVICES:**

| 3.4 | Packing for domestic transport | 1 | 3,800.00 |
|------|-------------------------------|---|----------|
| 3.5 | Installation; Test I/O with 1 Format, expenses excluded | 1 | 52,000.00 |
| 3.6 | Expenses of travel, board and lodging | 1 | At cost |

**OPTIONS:**

| Pos. | Description | Q.ty | Price ($) |
|------|-------------|------|-----------|
| 3.7 | Open flaps checking device and reject station | 1 | 9,200.00 |
| 3.8 | UL listed certification with label | 1 | 20,000.00 |

***Please Note 1:*** *Quotations are bonded to technical definition, tests with product and blank samples and final approval by SACMI P&C.*

***Please Note 2:*** *The calculation of Erection and Commissioning estimate is based on the Service Rates shown in the below chart, considering No.8 working hours of labor Monday – Saturday and Travel rate cost. Final amount, including expenses and extra hours, will be calculated on ex-post basis.*



**Sacmi USA Ltd.**
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## Service Rates for Tech



| | |
|---|---|
| **TRAVEL** Per Hour | **$ 135** |
| **LABOR** Monday – Friday (8 hours) **Per Hour** | **$ 160** |
| **LABOR** Saturday & Sunday (8 hours) **Per Hour** | **$ 210** |
| **LABOR** Overtime (Exceeding 8 hours) **Per Hour** | **$ 210** |
| **TRAINING** Monday – Friday (8 hours) **Per Hour** | **$ 160** |
| **TRAINING** Materials – customer expenses | **At Cost** |
| **LAYOVER** Day not worked, i.e. -- weekend **Per Day** | **$ 300** |
| **EXPENSES** Transportation expenses (Airfare, Car Rental, Mileage, etc.) | **At Cost** |
| **EXPENSES** Board and Lodging | **At Cost** |

![SACMI logo]

**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | **OPM** | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# 4. SALES CONDITIONS

### 4.1. Safety standard

In case the goods supplied shall be delivered in a country where the directive 2006/42/EC of the European Union is not applicable, the Parties agree that said country is considered an "Assimilated Country" in accordance to paragraph B of Enclosure no.1, and the related provisions shall apply.



### 4.2. Delivery time

Delivery **FCA**, including set-up and testing at SACMI P&C, shall be made in **7 months** from order receipt and down payment on SACMI P&C bank account and completion or clarification of all technical and commercial details, subject to our production schedule at the time of order.

### 4.3. Terms of delivery

Goods shall be delivered on terms **EXW SACMI PACKAGING&CHOCOLATE (Incoterms 2020)**.

All transport, Goods unloading, insurance and custom duty shall be borne by the Buyer.

### 4.4. Packing

Quoted.

### 4.5. Payment terms

Payments shall have to be effected as follows:

- 20%    as down payment by means of SWIFT direct bank transfer due with order receipt
- 80%    as equal monthly payments over 60 months by means of SWIFT direct bank transfer

Addendum A_Payment Schedule

All payments against SACMI PACKAGING&CHOCOLATE 's invoices.

### 4.6. Warranty

Warranty period shall last 24 months from the date of start up at customer's site, or 27 months from date of shipment, whichever comes first.
Detailed warranty conditions will be listed and agreed upon in a formal contract, should the sale be finalized.



Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

### 4.7. Quotation Validity

30 days

### 4.8. Exclusions



- Civil works
- Internal transport at customer's site
- Electrical and pneumatic connections to Buyer's network
- PLC connection to Buyer's network
- Production and alarm data collection and storage
- Machine Remote Troubleshooting and Diagnostics
- Electronic Training Course
- Spare parts
- What has not been specifically described in this offer
- Variations to what has been described and quoted in this offer

**SACMI**

PACKAGING & CHOCOLATE

Carle & Montanari | OPM | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: Info@sacmiusa.com

www.sacmi.com

# 5. GENERAL TECHNICAL CHARACTERISTICS

### 5.1. OPERATOR INTERFACE

Standard language for operator interfaces on the machines is English. Different language shall be quoted separately.



### 5.2. PAINTING

Line's equipment not made of stainless steel shall be painted in grey RAL 7035.

Different colours shall be quoted separately.

### 5.3. ELECTRICAL SUPPLY

Line's equipment shall be connected to Buyer's electrical network.
Electrical supply required is 3-phase, 400 V ± 5%, 50 Hz, Neutral + Earth (to be confirmed).

### 5.4. PNEUMATIC SUPPLY

Line's equipment shall be connected to Buyer's compressed air network, oil-free.
Minimum pressure required is 6 bar.

# 6. DOCUMENTATION

- No. 1 hard and No. 1 soft copy of the Instruction Manual in **English** language.
- No. 1 hard and No. 1 soft copy of the Wiring Diagram
- No. 1 soft copy wherever applicable for software and parameters
- Recommended Spare Parts List
- "CE Conformity Statement" and the application of the "CE" mark in **English** language.
- Main Commercial Devices Technical Documentation (copies in original language of the suppliers)

**SACMI**

**PACKAGING & CHOCOLATE**

Carle &
Montanari | OPM | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# 7. TESTS, INSTALLATIONS, COMMISSIONING AND TRAININGS

### 7.1. Test Material

Product, wrapping material and blank samples are required for engineering and tests purpose, **and shall be delivered DDP SACMI PACKAGING&CHOCOLATE (Incoterms 2020)**, according to following schedule:



- Samples for engineering within 15 days from order date
- Samples for tests not later than 90 days before delivery date

Any delay in delivering test material will result in changing delivery time.

### 7.2. Factory Acceptance Test (F.A.T.)

All equipment will be set up, assembled together and run to verify the functionality of the system at SACMI PACKAGING&CHOCOLATE prior to shipment.

Factory Acceptance Test shall be performed at SACMI PACKAGING&CHOCOLATE's premises with the presence of Buyer's personnel. Upon positive result, a F.A.T. certificate will be duly signed by both parties.

Price for Factory Acceptance Test is included in the total contract value, excluding travel and lodging costs of Buyer's participants.

### 7.3. Erection and commissioning

Erection and Commissioning up to hand-over shall be performed at Buyer's premises by SACMI PACKAGING&CHOCOLATE Service Technicians.

Commissioning of the line is conditioned to continuous product flow receiving in accordance with project specifications (product data and tolerances, production capacity, etc.) for a minimum of 1 working shift (8 hours) per day.
Should these conditions, for reasons not attributable to SACMI PACKAGING&CHOCOLATE, not be guaranteed, the Buyer shall pay all incurred costs covering the extended period of commissioning.

Price includes basic training for line's operators in the operation of the machines performed during erection and commissioning period.

Additional formats specified in the offer shall be executed immediately after line's installation.

Should the commissioning of the additional formats not follow immediately after the successful and complete commissioning of the first format, then a new technical intervention will be scheduled and all expenses charged to Customer.

All expenses for production assistance after handing-over and Site Acceptance Test are excluded.



Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

### 7.4. Site Acceptance Test (S.A.T.)

SACMI PACKAGING&CHOCOLATE shall perform the Site Acceptance Test: this shall verify the line's performance and the production output requested. The line shall be considered accepted when the output and efficiency are achieved as stated in the project specification.

Site Acceptance Test shall be performed during line commissioning on basis of 1 working shift (8 hours).

Once the Site Acceptance Test is declared successful by the Buyer, then SACMI PACKAGING&CHOCOLATE shall hand-over the line to the Buyer after mutually signing the Line Acceptance Certificate.

### 7.5. Trainings

Upon request, dedicated and customized training courses can be proposed to the Buyer, in addition to the Basic training included in this offer.

**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# 8. GENERAL SALES CONDITIONS

**Art. 1 - Definitions and commercial terms of delivery.**

1.1 - For the purposes of each contract (the "Contract") stipulated between Sacmi Packaging & Chocolate S.p.A (the "Seller") and the company to which the Seller supplies the machinery as indicated in the Enclosures of the Contract (the "Buyer"), the following terms shall have the meanings duly indicated below.

- "engineering": shall mean the drawings and plans relating to the installation of the machinery which shall be supplied by the Seller to the Buyer according to the description in the Enclosures to the Contract. All drawings and plans relating to civil works and the general systems and plants shall not however be included.
- "know-how": shall mean the technical knowledge, the recipes and set-up, the procedures, the instructions and the indications which may be used in relation to the type of production foreseen by the Contract, which are communicated by the Seller to the Buyer in accordance with the terms and conditions of the Enclosures to the Contract.
- "End-user's plant": shall mean the place where the building or the buildings in which the machinery supplied by the Seller shall be assembled.
- "place of destination": shall mean the place to and in which such items as the Seller shall supply for the purposes of installing the machinery shall be delivered and stored. This place may be the same place in which the machinery supplied by the Seller shall be assembled.
- "shipment": shall, as the case may be, mean (i) the delivery by the Seller to the first carrier (or to any other party designated by the Buyer) or (ii) the putting of the goods at the Buyer's disposal in the case of an Ex Works delivery.

1.2 - Any reference in the Contract to commercial terms of delivery, for example "EX WORKS", "FOB", "CIF", etc. shall be deemed to have the meanings ascribed to them in the "Incoterms" of the International Chamber of Commerce in the version in force as at the date the Contract is entered into. If not otherwise expressly agreed upon by the parties to the Contract, the term "Ex Works" shall apply.

**Art. 2 - Subject matter.**

2.1 - The subject matter of the Contract shall consist exclusively in the supply, by the Seller to the Buyer, of the machinery expressly and specifically indicated herein. The supply of any machinery, goods and/or services that is not expressly and specifically undertaken by the Seller as indicated in the Contract and its Enclosures shall be deemed excluded from the subject matter of the Contract.

**Art. 3 - Effectiveness of the Contract.**

3.1 - The prices agreed between the Seller and the Buyer – net of VAT – shall be deemed fixed and unchangeable provided that the Contract enters into force and effect no later than 3 months after the date of signature thereof by the Seller. The Contract enters into force and effect upon the occurrence of one of the following events: signature of the Contract, its Enclosures and these general conditions by the Buyer, payment of the advance payment by the Buyer to the Seller and/or any other event specified for this purpose by the parties in the Contract and/or in the relevant Enclosures thereof, being understood that the obligation of the Seller to start the activities for the carrying out of the supply in question shall be subject to the payment of the down payment (or, as the case may be, to the issuance of a documentary credit or letter of credit) being carried out as provided by the Contract and the carrying out of any other fulfilment possibly provided for to be borne by the Buyer.

**Art. 4 - Means of payment of the price. Claims.**

4.1 - The payments due from the Buyer shall only be deemed to have been made at such time as the relevant funds have been credited in favour of the Seller on the latter's bank account.

4.2 - In the event of any unjustified delay in payment by the Buyer, the Seller shall be entitled, at its sole discretion, to charge interest on late payments (at a rate equal to LIBOR over six months, calculated as at the original or deferred due date and increased by a spread of 5 percentage points, or at any other possible lower rate being the maximum rate provided by the applicable law), without prejudice to any and all of the Seller's rights arising out of the Buyer's failure to pay on the relevant due dates.

In this event that payment hereunder is made on an instalment basis, should the Buyer fail to pay even a single instalment in accordance with the terms of the Contract, then the Seller shall be entitled to declare that the Buyer has lost its right to pay on an instalment basis and demand the immediate payment of all or part of the amount outstanding.

4.3 - Any possible claim concerning the performance and the carrying out of the Contract shall not entitle the Buyer to suspend or delay payments.

4.4 - The Seller shall be entitled to terminate the Contract with immediate effect:
a)    In the event that the Buyer fails to duly fulfil its obligations to pay the price (including the failure to make the advance payment) in accordance with the terms of the Contract;
b)    In the event that the Buyer is subjected to any form of insolvency proceedings, or in the event that the assets of the Buyer change substantially so as to clearly endanger the ability of said party to carry out its obligations hereunder (it being understood that the Contract may be terminated upon simple request by the Seller).

4.5 - In the event of any material breach (e.g. failure to pay any sum/instalments due under the Contract) by the Buyer of its obligations under the Contract and these general conditions, then, the Seller shall be entitled to retain, by way of liquidated damages, the advance payment made by the Buyer, without prejudice to the Seller's right to claim compensation for any further damages suffered.

**Art. 5 - Retention of title.**

5.1 - In the event that payment, be it in whole or in part, is to be made after delivery, then, to the extent permitted under the laws of the country where the delivered machinery (including any possible equipment and spare parts) is located, the Seller shall retain title thereto until full payment of the price.

5.2 Should the Buyer fail to pay one instalment a 60 day non cumulative grace period would be applied, or should the Buyer fail to pay two instalments, in accordance with the terms hereof, then the Seller shall be entitled either to terminate the Contract with effect as of such time as notice has been given to the Buyer the Buyer has lost its right to pay on an instalment basis and demand the immediate payment of all or part of the amounts outstanding. In the case of termination of the Contract for reasons attributable to the Buyer, the Seller shall be entitled to obtain the immediate return of the machinery sold and shall also be entitled to retain all instalments received from the Buyer by way of compensation for the use of the machinery, without prejudice to the Seller's rights to claim compensation for any further damages suffered.

5.3. The Buyer hereby undertakes to take all steps necessary in order to either (i) create a valid retention of title in said country in favour of the Seller, which retention of title is in the widest form permitted under the laws of said country and is duly enforceable, inter alia, as against third parties or (ii) create a guarantee in favour of the Seller which has the same legal value and effect as such a retention of title.

5.4. The Buyer hereby undertakes not to sell or assign the machinery to, or allow use of the machinery by, third parties, as well as not to remove the machinery without the Seller's consent which shall be provided in accordance with the terms of Art.17 below.

**Art. 6 - Terms of delivery.**

6.1 - Any delay by the Buyer in supplying any necessary element for carrying out the Contract as well as any delay in fulfilling its obligations under the Contract (in particular, its obligations to pay the amount due by way of the advance payment, to open documentary credits, to provide and/or create guarantees, to send credit instruments, inter alia, to be held on fiduciary deposit or to comply with other payment terms) and these general conditions shall entitle the Seller to postpone the delivery of the machinery (including any possible equipment and spare parts) for a period to be reasonably fixed by the Seller according to the internal production schedule of the Seller, but in any event not shorter than the length of the delay on the part of the Buyer, without prejudice to any other right of the Seller hereunder (including but not limited to the rights to terminate the Contract).

6.2 - In the event that the Buyer fails to comply with the payment terms relating to the supply of goods and services hereunder, then the Seller shall be entitled to suspend the performance of its obligations under the Contract.

6.3 - All events of force majeure, pursuant to Art. 16.1 below, will cause the agreed delivery schedule to be postponed by a period corresponding to the duration of the particular event of force majeure and possibly – at the Seller's discretion – for a further period fixed by taking into account the Seller's production lead times and the project schedule originally agreed by the parties; it being understood that said period must in any event be appropriate so as to allow performance of the Contract.

6.4 - In the event that delays occur in delivery due to reasons attributable to the Seller, then the Buyer, having duly proved to have suffered damages as a result thereof and provided that all of its obligations pursuant to the Contract have been duly and timely fulfilled, may request, after a grace period of 30 days, by way of full and final satisfaction of any damages and claims relating to such a delay, payment of liquidated damages equal to 0,5% of the price agreed for the part of the supply in relation to which the delay occurred, up to a maximum of 3% (three per cent) of this price for every completed late week following said grace period. Any other remedy – or liability to compensate in respect of any other damages – are hereby expressly excluded.

6.5 - In the event that it is not possible to deliver the machinery (including any possible equipment and spare parts) which are ready for shipment for reasons beyond the Seller's control, then once 15 days have passed from the Seller having advised the Buyer that the goods are ready, then the Seller shall be entitled to issue the relevant invoice and put into effect the agreed payment terms, subject to the above machinery, equipment and any possible spare parts being deposited in the name and on behalf of the Buyer, in the general warehouses or consigned to a carrier which is registered in the Italian register of carriers; it being understood that all risks and expenses relating thereto shall be borne by the Buyer. In the event of the above circumstances, if necessary, the Seller shall also have the right to appoint a carrier, in the name and on behalf of the Buyer, and duly arrange the transportation and delivery of the goods (excluding customs clearance) to the place of destination.

6.6 - The Seller shall raise no objections to any request of the Buyer to inspect the machinery (including any possible equipment and spare parts) prior to each shipment, provided that such request is made at least 2 (two) months prior to the date agreed upon (be it the original date or the rescheduled date) for shipment. All expenses relating to the inspection shall be borne by the Buyer.

6.7 - Any possible modifications which the Seller may regard as being necessary, during the course of the Contract, due to local conditions or which may be deemed advantageous as they amount to technical and/or technological improvements which have occurred in the meantime, shall be allowed by the Buyer provided that the Buyer does not have to bear any further costs for said modifications and provided that the production warranties indicated herein are fulfilled.

6.8 - In the event that the terms of payment agreed between the parties require the negotiation of documents and instruments which represent the goods (for example, but not by way of limitation, Bills of lading), the Seller shall not be liable for delays - caused by the time required, or in any event not caused by negligence on the part of the Seller - in the circulation/transmission of said documents and instruments.

**Art. 7 - Delivery and packaging.**

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

**7.1** - The machinery indicated in Enclosures to the Contract shall be delivered by the Seller to the Buyer appropriately packed; it being understood that the packaging provided by the Seller is suitable for a period of storage/transit not exceeding 60 days.

**7.2** - It is understood that all risks shall pass to the Buyer in accordance with the agreed delivery term (INCOTERMS). With each shipment the Seller shall send the Buyer a copy of the invoices and a packing list. It is also understood that, in the event that the Buyer is responsible for the transport of the goods subject matter of the Contract, the Seller will act and be deemed as sender of such goods merely and exclusively on behalf of the Buyer, with the exclusion of any possible liability on the part of the Seller in relation to the transport and with the obligation of the Buyer to indemnify and hold the Seller harmless in respect o f any possible claims / requests o f payment and/or damages directly or indirectly related to such transport.

**7.3** - In the event that the Parties agree that the goods which are the subject matter of the Contract are to be delivered with insurance being arranged by the Seller, then in the event of any damage being caused to the goods, the Buyer is obliged to do the following, failing which it will lose any and all rights to damages:
a)    immediately advise the insurers of any notices or information related to the occurrence/damage;
b)    recover the insured goods and keep them safe;
c)    safeguard and keep any claims against third parties alive, duly taking all necessary steps, under its own initiative.

**Art. 8 - Storage of the goods by the Buyer**

**8.1** - The goods which are shipped shall be stored by the Buyer at the place of destination and/or at the End-user's plant in premises which are suitable for the purposes of protecting the goods from any type of damage or deterioration, and insured, at the Buyer's expense, against risks of theft, fire, destruction and catastrophes.

**8.2** - The Buyer shall ensure that the machinery, equipment and spare parts delivered by the Seller, being complete and in a perfect condition for the installation thereof, shall be duly placed on the site designated for assembly.

**Art. 9 - Assembly.**

**9.1** - Unless otherwise agreed between the parties under the Enclosures to the Contract, assembly of the machinery shall be carried out by the Buyer and at its expense and under its supervision and management and the Seller shall only provide the technical assistance in relation to the assembly and start-up of the machinery and the equipment by means of skilled personnel selected by it. The Buyer shall co-operate accordingly so that entry visas and work permits for the Seller's personnel, in addition to any other authorisation which may be necessary, shall be obtained in a timely fashion. In the event that the Seller undertakes to entirely carry out the activities necessary for the assembly of the machinery, then the assembly shall be carried out in accordance with the terms set forth in the Enclosures to the Contract.

**9.2** - Unless otherwise agreed between the parties under the Enclosures to the Contract, the Buyer undertakes to:
a)    supply the equipment, the lifting gear and means of transport, the power supply, water and everything else required by the Seller's technicians as technically necessary in order to carry out the assembly, including any possible labour, the management and supervision of which shall at all times remain the responsibility of the Buyer. The machines and any equipment provided by the Buyer to the Seller's technicians shall be supplied with the safety features imposed by law;
b)    arrange for the assembly operations to start immediately after the arrival of the Seller's technicians and proceed on a continuous basis until completion; it being in any event understood that any periods of inactivity/waiting shall be at the Buyer's account;
c)    sign the attendance sheet that the Seller's technicians are provided with in order to ascertain the hours worked by the personnel; it being understood that otherwise, the hours indicated by the Seller in the relevant invoice shall be considered as valid and correct;
d)    be responsible for and reimburse the Seller in respect of any travel expenses (return ticket) incurred by the Seller's technicians in travelling from the Seller's place of business to the End-user's plant;
e)    directly pay all the expenses relating to the stay of the Seller's personnel (travel, board and lodging etc); accommodate the Seller's technicians in a hotel of standard of not less than a second-class European hotel and ensure that the Seller's technicians have a means of transport to and from their hotel/lodgings and the work site;
f)    not engage the Seller's technicians in any activities other than those which fall within their sphere of competence and in respect of which they are specifically authorised by the Seller;
g)    be responsible for, indemnify and hold the Seller harmless in respect of any and all obligations relating to local health and safety at work regulations, without prejudice to the other terms of this Contract relating to health and safety at work, given that the Parties both acknowledge that the health and safety at work regulations apply on a territorial basis and therefore the laws of each country regulate the activities which are carried out in the territory of the country in question, with the result that the local health and safety at work regulations shall apply to the activities which, under the terms of this Contract, shall be carried out in the place of installation of the goods supplied;
h)    adopt all safety measures and precautions necessary to prevent accidents and safeguard the Seller's technicians and the other assembly workers against physical injury, in compliance with all regulations imposed by law; in particular, provide the assembly workers with all protective measures necessary to safeguard the workers against physical injury and for safety and health in general, inform the Seller's workers and technicians in respect of the specific risks to which they are exposed and bring the basic safety and health regulations to their attention by means of affixing appropriate notices in the work area or indeed by other means, in addition to demanding that the workers observe the regulations regarding safety and duly use the protective clothing and measures with which they are provided;

**9.3** - In the event that, for reasons not attributable to the Seller, assembly takes longer than the time scheduled by the Seller, then the period originally scheduled shall be extended accordingly; in such case the fees relating to the services provided hereunder shall be those in force at that time said services are effectively carried out.

**Art. 10 - Test.**

**10.1** - Upon completion of assembly, the goods supplied hereunder shall be tested in accordance with the terms set forth in the Enclosures to the Contract. The Buyer shall, at its own expense, provide the Seller with the packaging materials and any other material necessary for carrying out the test pursuant to that provided in the Contract and the relevant Enclosures. It being understood that the Seller shall not be liable vis-à-vis the Buyer in the event of malfunctioning of the machinery and/or failure of the test, which may directly or indirectly be due to moulds or to other parts supplied under the Contract, pursuant to specifications/instructions provided by the Buyer.

**10.2** It being understood that the Buyer shall not have the right to use the machinery supplied for productive purposes, until the parties have signed the test report, and should the Buyer contravene this provision he shall bear every risk and responsibility related to the use of the goods that shall be deemed to have been finally accepted.

**10.3** - In case the test is not performed, the machinery and goods supplied under the present Contract shall be deemed to have passed the running test if after 10 (ten) day from the term indicated by the Seller for the performance of the test such test is not executed for causes not attributable to the Seller or in case the Customer fails to sign the certificate of acceptance without good reason.

**Art. 11 - After sales service.**

**11.1** - For a period of 10 (ten) years from the date of the shipment of the machinery, the Seller undertakes to supply to the Buyer, according to availability at the time of the request, with spare parts and technical services as requested by the Buyer. The prices for such spare parts and services shall be based on the list prices and service fees in force at the time each such request is made and all the other terms of supply shall be agreed in good faith between the Seller and the Buyer.

**Art. 12 - Warranty period.**

**12.1** - With regard to any possible defectiveness in the supply under the Contract, only a warranty in respect of mechanical and electrical, design and/or assembly defects in the machinery and equipment, shall apply and shall consist either of the repair or replacement, at the Seller's sole discretion and at its expense, of the structural parts of the machinery which may prove to be broken or defective due to manufacturing defects, excluding the parts which are subject to normal wear and tear. The above guarantee shall run for a period of 12 months as of the date of the putting into operation of the machinery, but will not in any event extend beyond a period of 15 months following the date of shipment. The parts which are to be replaced as per above shall be delivered Ex Works the Seller's factory. The Seller does not assume any liability whatsoever in relation to any possible defects and/or malfunctioning of the moulds or of other parts supplied under the Contract pursuant to specifications/instructions provided by the Buyer, it being understood that for the so called "commercial components" and generally speaking for outside sourced components only the respective manufacturer's original warranty terms shall apply.

**12.2** - The warranty shall lose any and all effect and the Seller shall not be liable for any damages of whatever nature caused by:
a)    improper use on the part of the Buyer's personnel;
b)    use of unsuitable raw materials;
c)    faulty or negligent treatment;
d)    excessive use of the goods supplied;
e)    equipment or spare parts not supplied by the Seller installed in the machines;
f)    modifications made without the Seller's consent;
g)    assembly or commissioning thereof not having been carried out according to the technical instructions of the Seller's personnel;
h)    poor maintenance and/or generally any acts which are not in line with the maintenance and user instructions;
i)    any other reason not attributable to the Seller.

**12.3** - The Seller shall replace or repair the defective parts in the shortest time possible.

**12.4** - The Buyer shall be solely responsible for ensuring that the products manufactured using the machinery supplied by the Seller are in compliance with the safety regulations in force and the Buyer shall in any event be liable for any claims made by any party which may have possibly suffered damages and it shall duly hold the Seller harmless from and against any such claims.

**12.5** - The warranty shall be subject to the Buyer duly informing the Seller, in accordance with the terms of Article 17 below within 8 (eight) days following the discovery thereof of the particular defect, or lack of quality (failing which the Buyer shall lose its rights under the warranty in respect thereof) and shall also be subject to the Buyer making an express request to the Seller, in accordance with the terms of Article 17 below, to provide assistance under the warranty.

**12.6** - Any other damages, including any possible damages resulting from the lack of or a reduction in production, in addition to any direct, indirect or consequential damages, and the right to terminate the Contract, are expressly excluded from the warranty.

Project: 20-034566-A0 Bar Project – Secondary Packaging

**SACMI**

**PACKAGING & CHOCOLATE**

Carle & Montanari | OPM | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

**Art. 13 - Confidentiality obligations and Industrial property rights.**

13.1 - The Buyer shall keep strictly confidential and will not disclose any technical information (such as, but not limited to, drawings, schedules, documentation, formulae, recipes, set-up and correspondence) received from the Seller or in any way learnt during the course of the Contract.

13.2 - Any and all industrial or intellectual property rights relating to the machinery and the components of the supply under the Contract shall remain the exclusive property of the Seller.

**Art. 14 - Seller's Liabilities.**

14.1 – The Seller's warranties, guarantees and liability under and in connection with this Contract are limited to those expressly set forth in this Contract.

It is understood that, in the event of non-performance or breach on the part of the Seller of its obligations under this Contract, the Seller's liability shall not exceed a total amount equal to 3% of the contract price. Said amount pre-determines the maximum amount of damages payable, subject to the Buyer demonstrating that it has suffered damages as a result of said non-performance or breach and said non-performance or breaches are not of minor importance, and completely discharges the Seller from any liability (and any other remedy or liability to compensate in respect of any other damages is hereby expressly excluded).

However, in the event of non-performance or breach on the part of the Seller of its obligations under this Contract, any possible liability on the part of the Seller for damages in respect of the lack of or a reduction in production, lack of or a reduction in opportunities, lack of or a reduction in profit, lack of or a reduction in contracts, lack of or a reduction in use, in addition to any indirect or consequential damages, is hereby excluded.

**Art. 15 - Visits to the End-user's plant by the Seller's customers.**

15.1 - The Seller reserves the right to request the Buyer authorisation to carry out visits with Italian or foreign delegations to the premises in which the machinery supplied hereunder is installed so as to allow such delegations to view said machinery, in the event that this is compatible with the Buyer's requirements.

**Art. 16 - Force majeure.**

16.1 - Force majeure shall mean any act or event which is unforeseeable, beyond the parties' will or control and in respect of which a remedy may not be found in a timely manner (such as, for example, acts of war, even if undeclared, embargo, riot, insurrection, fire, sabotage, natural disaster, epidemics, acts or provisions of government authorities, inability to procure raw materials, equipment, fuel, energy, components, labour or transport).

16.2 - Upon the occurrence of any event of force majeure which is such as to prevent either party hereto from fulfilling its obligations hereunder, then the time for the party so affected to fulfil its obligations shall be automatically extended for a period corresponding to the duration of the event of force majeure and possibly – at the Seller's discretion – for a further period fixed by taking into account the Seller's production lead times and the project schedule originally agreed by the parties, without any damages (including liquidated damages) being payable by said party, save for the Buyer's obligation to pay the amounts due by way of the price, in respect of which the contractually agreed due dates shall remain in full force and effect. It is further understood that in the event that the above payment is to be effected, in whole or in part, by means of a documentary credit, then upon the occurrence of an event of force majeure and upon the Seller's request, the Buyer shall be obliged to extend the term of said documentary credit, failing which, by way of exception to all the above terms, the Seller shall be entitled to direct delivery of the goods, inter alia, to the general warehouses and cash in said documentary credit.

16.3 - Should the parties hereto be unable to carry out their obligations in accordance with the time schedule provided under the Contract for a period of 6 (six) months or more as a result of an event of force majeure, then the parties shall meet as soon as possible in order to examine the impact of such events on the terms of the Contract, in particular, on the prices and on the delivery schedule, and they shall come to an agreement as regards the terms and conditions for the continuance of their respective obligations. In the event of a possible disagreement between the parties or equally in the event that either party refuses to take part in such meetings, then the matter may be submitted solely to conciliation and/or arbitration pursuant to Art. 23 below.

**Art. 17 - Notices.**

17.1 - All notices provided under the Contract shall be in writing (this term being deemed to include e-mailand facsimiles).

**Art. 18 - Taxes and duties.**

18.1 - All taxes, duties, levies and charges (including any administrative charges) of the same nature, be they present or future, which may be due in the Buyer's and/or End-user's country in relation to this Contract shall be borne by the Buyer.

18.2 - The Buyer shall be responsible for obtaining any authorisations which, in accordance with the monetary laws and regulations of the Buyer's country, are necessary for the purposes of the regular fulfilment of the obligations provided under the Contract in relation to the payment terms. It is understood that the effectiveness of the Contract shall not remain pending as a result of non-compliance by the Buyer with the above-mentioned obligation.

**Art. 19 - No assignment of the Contract. Assignment of credits.**

19.1 - Neither party hereto may assign the Contract without the prior written consent of the other party hereto.

19.2 - However, the Seller shall be entitled to assign, in whole or in part, to third parties its credit relating to the payment of the sums due from the Buyer hereunder. The Seller shall not be obliged to obtain the Buyer's consent to any such assignment of credit and it is understood that, with regard to providing notice of any such assignment, to the extent necessary so as to ensure a valid and effective assignment of the credit, a simple written notice thereof to the Buyer shall suffice. It is understood that in the event of assignment of the above credit, then the Seller shall also be entitled to assign, in whole or in part, to the assignee of the credit the rights provided under Art. 5 above. Should the above rights fail to be assigned to the assignee of the credit, then said rights may continue to be exercised by the Seller, directly or through a representative, in the event of non-performance or breach on the part of the Buyer of its payment obligations under this Contract.

**Art. 20 - Excessive onerousness.**

20.1 - Without prejudice to the terms of Art. 16 above, if, due to events which were unforeseen (and which were reasonably unforeseeable) by the parties at the time the Contract was entered into, the balance between the parties' respective obligations under the Contract alters considerably, thus rendering excessively onerous the obligations of either of the parties hereto, then the party so affected may request that the parties' respective obligations be realigned. It is however understood that the loss or increase in value of one national currency compared to one or more other currencies or equally the replacement of one national currency by another currency (for example, following the introduction of the Euro) shall have no effect for the purposes of this Article. In the event of a possible disagreement between the parties in relation to this issue, then the matter may be submitted solely to arbitration pursuant to Art. 23 below.

**Art. 21 - Third party rights**

21.1 - The Buyer shall indemnify the Seller and hold the Seller harmless from and against any and all claims or actions against the Seller by third parties and any damages or expenses relating thereto, concerning any infringement of patents or other intellectual property rights arising out of or relating to the manufacture, use and/or of the products manufactured using the machinery and equipment supplied by the Seller.

**Art. 22. Conclusion of the Contract.**

22.1 - The Contract shall be binding upon the parties as of the date of signature of the Contract by both parties hereto or as of the date of payment of the advance payment by the Buyer or as of any other event specified for this purpose by the parties in the Contract and/or in the relevant Enclosures thereof.

22.2 - The Contract may also be accepted by the Buyer by means of telefax or by means of the opening of the documentary credit as agreed between the parties, the opening of which has been duly advise by the bank and which contains an express reference to the Contract or to the pro-forma invoice mentioned in the Contract (no. – date – amount).

**Art. 23 - Arbitration clause and Governing law.**

23.1. Any and all disputes between the parties which may arise out of this Contract shall be settled exclusively and finally in accordance with the Rules of Arbitration of the International Chamber of Commerce by a board of three arbitrators appointed in accordance with said Rules. The arbitration proceedings shall be held in Geneva. The arbitration proceedings shall be held in the language provided by Art. 24 below, which shall be the governing language for the purposes of interpreting this Contract.

23.2. By way of partial exception to the foregoing, the Seller shall be entitled to initiate legal proceedings before the courts of the location of the Seller's registered offices or before the courts of the location of the Buyer's registered offices or any other courts which have jurisdiction vis-à-vis the Buyer, both for urgent and/or precautionary injunction or relief (including, by way of example and not by way of limitation, proceedings for the return to the Seller of goods sold with retention of title), and for trial/ordinary judgment, upon the condition however that, in the latter case, the Buyer has not previously initiated arbitration proceedings. The possible invalidity of this article 23.2 shall in no way affect the validity of article 23.1.

23.3. This Contract shall be governed by the laws of Delaware (with the result that, save to the extent varied by the terms hereof, the provisions of the United Nations convention on contracts for the international sale of goods signed in Vienna on 11th April 1980 shall apply).

**Art. 24 - Interpretation of the Contract.**

24.1 - The English text hereof shall be the only authentic text of the Contract, even if the Contract is drawn up in an additional language.

24.2 - The Contract supersedes any and all prior agreements between the parties, be they oral or in writing, with regard to the subject matter hereof and the terms hereof may only be amended in writing.

**Art. 25 – Dual use and export control**

25.1 - The Buyer hereby declares that the Plant will be used exclusively for civil purposes and will not be used – be it in whole or in part – for military or nuclear explosive purposes, in nuclear civilian activities in installations not covered by safeguards by the International Atomic Energy Agency ("IAEA") or in applications related to the development and/or production of other weapons of mass destruction and missiles that may be used as carriers of such weapons. The Buyer also undertakes not to re-export, transfer or divert imported goods during the journey.

25.2 - The Buyer hereby guarantees that the possible exportation of the goods subject matter of the Contract will not in any way result to be in breach of any national, European and American law in force and applicable in export control and international economic sanctions matters (hereinafter the "Laws"). The Buyer also hereby guarantees that it shall not resale and/or use the goods subject matter of the Contract in a way to breach the Laws and hereby acknowledges that, in the event of breach of the guarantees set forth in this paragraphs, the Seller shall be entitled to terminate, in whole or in part,



**SACMI**

PACKAGING & CHOCOLATE

Carle & Montanari | OPM | FIMA

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

the Contract. In any event, either in case the Seller decides to terminate the Contract or not, the Buyer hereby undertakes to indemnify and hold the Seller harmless from any prejudicial consequence resulting from the breach of the Laws and hereby waives all rights of objection regarding any possible co-responsibility on the part of the Seller in respect thereof. In the event that, for the purpose of complying with the Laws, the Seller should bear expenses for practices/procedures of administrative nature (or of any other kind) and/or for making modifications to the Plant, the Buyer undertakes to bear the relating costs. The parties agree that the Seller's obligations in relation to the performance of the Contract shall be suspended, and the relating terms shall be extended accordingly, in the event that it results necessary to determine practices/procedures and/or technical modifications aimed at avoiding a breach of the Laws. In the event of disagreement with the Buyer, the Seller shall be entitled to determine them at its own discretion and the Buyer shall bear the relating expenses to the extent that such expenses are not greater than an amount equal to 10% of the Contract price. Alternatively, the Seller shall be entitled to terminate the Contract, in whole or in part, without any charge on its account.

**Art. 26. Informative note in respect of the treatment of personal data.**
26.1 - In relation to Article 13 of Regulation (EU) 2016/679 ("General Data Protection Regulation", hereinafter "Regulation"), each Party informs the other Party that the personal data provided during the present Contract will be collected, recorded, organized, stored and generally processed, for purposes of fulfilment of the contractual obligations in progress between the Parties and the related obligations of law. The aforementioned data may be communicated to third parties exclusively in relation to the purposes for which they were collected. Each Party declares to be aware and to have been informed with regard to any provision and rule provided by Regulation (EU) 2016/679, and more particularly by article 15, in relation with the "Right of access by the data subject". The present shall be considered as information in accordance with the above mentioned provisions and rules, and each Party expressly declares to grant its consent at the processing of its personal data for said purpose

Place and date: _____ January 28, 2021

The Buyer

The Seller

*Sebastian Clemens*

In addition to approving the whole text of this Contract in accordance with Article 1341 of the Italian Civil Code, the Parties specifically approve the clauses contained in the following articles of this Contract: Art. 3 (Effectiveness of the Contract), Art. 4 (Means of payment of the Price, Claims), Art. 5 (Retention of title), Art. 6 (Terms of delivery and extension thereof; suspension of performance under the Contract; liquidated damages which the Seller may be liable to pay in relation to delay in delivery and limitation of liability), Art. 7 (Packaging, risks related to goods supplied, insurance), Art. 9 (Assembly), Art. 10 (Test; limitation of liability), Art. 12 (Warranty period, terms of warranty and limitation of liability), Art. 13 (Confidentiality obligations and industrial property rights), Art. 14 (Seller's Liabilities), Art. 16 (Force majeure), Art. 18 (Taxes and duties), Art. 19 (No assignment of the Contract; assignment of credits), Art. 20 (Excessive onerousness), Art. 21 (Third party rights), Art. 22 (Conclusion of the Contract), Art. 23 (Arbitration clause and Governing law), Art. 25 (Dual use and Export control).

Place and date:    1 - 28 - 2021

The Buyer

The Seller

*Sebastian Clemens*



**SACMI**

**PACKAGING & CHOCOLATE**

**Carle & Montanari** | **OPM** | **FIMA**

Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

### ENCLOSURE NO. 1

With regard to the issue of certifications and markings of the machinery the subject matter of this Contract, provided for by the safety regulations applicable to said machinery, the obligations of the Parties shall be those resulting from the following summary.

### A. European Union countries, Countries where Directive 2006/42/EC of the European Union is applied.

For the European Union countries and the Countries where Directive 2006/42/EC is applied, the obligations of the Seller shall solely be those set out below at points A1 to A5.

The Buyer declares to the Seller that the configuration of the machinery resulting from the specifications referred to in this Contract and the related attachments is sufficient for the purposes of the applicable regulations at the site of use of the machinery itself.

It is in any case understood that it shall be the responsibility of the Buyer to verify that the goods supplied by the Seller are compliant to the applicable regulations at the site of use of the goods themselves, committing as of now- in the absence of such compliance- to adopt every measure and take all necessary action in order to achieve such compliance or in any case prevent damage to objects belonging to third parties or third parties. It is understood that with regard to the foregoing the Buyer undertakes to indemnify and hold the Seller harmless from any third party claim (including public authorities) and from any prejudicial consequence resulting from the non-fulfilment of the obligations of the Buyer.

### A.1.    Machinery
With regard to the supply on the part of the Seller of a machinery pursuant to Art. 2 (a) of the Directive 2006/42/EC of the European Union and out of the cases provided for by the following points 2), 3) and 4) of this Exhibit, the Seller shall provide for the drawing up of the EC declaration of conformity of the machinery in accordance with Annex II, Part 1, Section A of the Directive 2006/42/EC and shall affix the CE marking on such machinery.

### A.2.    Partly completed machinery
With regard to the supply on the part of the Seller of a mechanical device which, in accordance with the Directive 2006/42/EC of the European Union, constitutes a so-called 'partly completed machinery', which is (i) by itself, unsuitable to guarantee a well determined application and (ii) is solely intended to be incorporated and/or assembled in other machinery or equipments of the Buyer, the Buyer undertakes to hold harmless the Seller in relation to any and all obligations of certification and/or marking relating to said device, arising out of its incorporation or assembly, pursuant to Art. 2 (g) of the above mentioned Directive 2006/42/EC (including the obligations relating to the putting into service of the whole machinery, line or plant in which said device is incorporated/assembled). Therefore, in accordance with the terms provided for by said Directive, the Seller shall solely draw up a declaration of incorporation according to Annex II, Part 1, Section B of the Directive 2006/42/EC. It is understood that the Seller shall be in any event entitled to affix its own markings on said device.

### A.3.    Complete Line or Plant
With regard to the supply on the part of the Seller of a set of machinery and/or mechanical devices connected, disposed and set up in order to form a complete line or a complete plant pursuant to Art.2(a) of the Directive 2006/42/EC of the European Union and to art. 38 of the "Guide to application of the Machine Directive2006/42/EC, edition 2.2, October 2019", the Seller shall provide for the drawing up of the EC declaration of conformity of such complete line or plant in accordance with Annex II, Part 1, Section A of the Directive 2006/42/EC and shall affix the CE marking on said complete line or plant, in case it is required according to art. 38 of the "Guide to application of the Machine Directive2006/42/EC, edition 2.2, October 2019".

### A.4.    Not complete Line or Plant
With regard to the supply on the part of the Seller of a set of machinery and/or mechanical devices which is (i) by itself, unsuitable to guarantee a well determined application and (ii) is solely intended to be incorporated and/or assembled in other machinery or equipment of the Buyer, in order to form a complete line or plant, the Buyer undertakes to hold the Seller harmless in relation to any and all obligations of certification and/or marking relating to said set of machinery/devices, in accordance with the Directive 2006/42/EC of the European Union, arising out of its incorporation or assembly with the other machines and/or equipment with which it forms a complete line or plant (including the obligations relating to the putting into service of the complete line or plant in which said set of machinery/devices is incorporated/assembled). Therefore, in accordance with the terms provided for by said Directive, the Seller shall solely draw up the declaration of incorporation according to Annex II, part 1, Section B of the Directive 2006/42/EC. It is understood that the Seller shall be in any event entitled to affix its own markings.

### A5.    Machinery/Partly completed machinery/set of machines in an existing line
With regard to the supply by the Seller of a machinery/partly completed machinery/set of machines to be inserted in an existing line (already in use with the Buyer) the Seller shall provide for certification, in accordance with that required by Directive 2006/42/EC, solely for that which has been supplied and not also for the existing line. Every assessment relating to the interfacing between that sold and that existing shall be borne by the Buyer.



Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

#### A.6    Modification Kit for machinery or partly completed machinery

With regard to the supply by the Seller of a modification Kit (by which is meant, by way of example and not limited to, a set of components to be assembled, which might be accompanied by equipment necessary for its assembly, having a single and defined technical purpose) for machinery or partly completed machinery already in use with the Buyer, the Seller shall provide for, when required, certification, in accordance with that required by Directive 2006/42/EC, only for the above-mentioned Kit supplied or the parts which compose it. In any case it is understood that any possible burden, obligation and responsibility related to the possible need for a new 'CE' marking arising out of or related to the carrying out of the technical assistance in relation to the machinery or partly completed machinery on which the Kit is installed shall be exclusively borne by the Buyer, with total exemption of the Seller from all liability in this regard and in general with regard to the certification of the machinery or partly completed machinery on which the Kit is installed.



#### B.    Assimilated Countries (this definition refers to the Countries for which the machinery is destined, different Countries to those referred to in the previous paragraph A, and for which the Parties expressly agree for compliance with the Directive 2006/42/EC of the European Union)

For the goods supplied by delivery to the Buyer having its registered office in an Assimilated Country or in any case for installation in an Assimilated Country (a) the Parties agree that the Seller's obligations will be in accordance with the Directive 2006/42/CE as well as with the provisions of paragraph A, with the only exception that documentation and HMI will be in the contractual-agreed language and not in one of the official language of the Assimilated Country and (b) the technical adjustments, the procedures and the certification/markings provided for by the applicable local laws shall be the responsibility of the Buyer and borne by the Buyer, provided that these elements are not already expressly provided for as part of the supply (and of the relative price) according to that indicated by this Contract.

The supply referred to in this Contract is carried out with the express exclusion of all responsibility by the Seller with regard to the technical configuration of the goods supplied in terms of safety devices according to the regulations of the Assimilated Countries to which this paragraph B applies.

The Buyer declares to the Seller that the configuration of the machinery resulting from the specifications referred to in this Contract and the related attachments is sufficient for the purposes of the applicable regulations at the site of use of the machinery itself.

It is in any case understood that it shall be the responsibility of the Buyer to verify that the goods supplied by the Seller are compliant to the applicable regulations at the site of use of the goods themselves in the Assimilated Countries, committing as of now- in the absence of such compliance- to adopt every measure and take all necessary action in order to achieve such compliance or in any case prevent damage to objects belonging to third parties or third parties. It is understood that with regard to the foregoing the Buyer undertakes to indemnify and hold the Seller harmless from any third party claim (including public authorities) and from any prejudicial consequence resulting from the non-fulfilment of the obligations of the Buyer.

#### C.    Different Countries to those referred to in the previous paragraphs A and B

Unless otherwise provided for by this Contract, for the goods supplied by delivery to the Buyer having its registered office in a different Country to those referred to in the previous paragraphs A and B or in any case for installation in a different country to those referred to in the previous paragraphs A and B (a) the certification referred to above shall not be completed and delivered to the Buyer and (b) the technical adjustments, the procedures and the certification/markings provided for by the applicable local laws shall be the responsibility of the Buyer and borne by the Buyer, provided that these elements are not already expressly provided for as part of the supply (and of the relative price) according to that indicated by this Contract.

The supply referred to in this Contract is carried out with the express exclusion of all responsibility by the Seller with regard to the technical configuration of the goods supplied in terms of safety devices according to the regulations of the Countries to which this paragraph C applies.

The Buyer declares to the Seller that the configuration of the machinery resulting from the specifications referred to in this Contract and the related attachments is sufficient for the purposes of the applicable regulations at the site of use of the machinery itself.

It is in any case understood that it shall be the responsibility of the Buyer to verify that the goods supplied by the Seller are compliant to the applicable regulations at the site of use of the goods themselves, committing as of now- in the absence of such compliance- to adopt every measure and take all necessary action in order to achieve such compliance or in any case prevent damage to objects belonging to third parties or third parties. It is understood that with regard to the foregoing the Buyer undertakes to indemnify and hold the Seller harmless from any third party claim (including public authorities) and from any prejudicial consequence resulting from the non-fulfilment of the obligations of the Buyer.



Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

# SACMI PACKAGING&CHOCOLATE
## MECHANICAL COMPONENTS LIST

August 2020



| COMPONENT | BUILDER |
|---|---|
| THREE-PHASE MOTORS / MOTOR-REDUCERS | SEW EURODRIVE , BONFIGLIOLI |
| REDUCERS | SEW EURODRIVE , BONFIGLIOLI |
| PLANETARY REDUCERS | WITTENSTEIN, GIRARD, STOBER |
| VACUM EJECTOR | PIAB |
| VACUUM PUMPS | BECKER , Elmo Rietschle |
| PNEUMATIC COMPONENTS | FESTO |
| BEARINGS | SKF, FAG, CFC |
| LINEAR GUIDES | STAR, THK, INA, IKO, IWIN |
| BELTS | HABASIT, AMMERAAL |
| PLASTIC CHAIN CONVEYORS | REXNORD, INTRALOX,FLEX-LINK , BOSCH |
| GLUE DISPENSERS | NORDSON, ROBATECH , GRACO |

- *Any request of modification of the above list must be agreed. SACMI Packaging&Chocolate reserves the possibility to change above listed components if necessary for improving efficiency and reliability of the machinery.*

- *Equipment part of the project but not manufactured by SACMI Packaging&Chocolate may not comply with above component list.*



Sacmi USA Ltd.
3434 106th Circle
Des Moines, IA 50322
USA

Tel. +1 515 276 2052
Fax +1 515 276 2084
E-mail: info@sacmiusa.com

www.sacmi.com

## SACMI PACKAGING&CHOCOLATE
## STANDARD  ELECTRICAL  COMPONENTS LIST

August 2020



| COMPONENT | BUILDER |
|---|---|
| PLC | ROCKWELL LOGIX Series |
| MOTION CONTROLLERS | ROCKWELL |
| AUTOMATIC BREAKERS | EATON |
| MAIN CIRCUIT BREAKERS | EATON |
| CONTACTORS | EATON |
| SWITCH DISCONNECTOR | EATON |
| BRUSHLESS MOTORS | ROCKWELL |
| DRIVES | ROCKWELL |
| INVERTERS | DANFOSS |
| PUSH BUTTONS | EATON |
| PHOTOCELLS | SICK - WENGLOR |
| PROXIMITY SWITCHES | SICK - WENGLOR |
| SAFETY SWITCHES | ROCKWELL |
| SAFETY RELAIS | ROCKWELL |
| DISTRIBUTING BOXES | ZANARDO - ETA |
| ELECTRICAL CABINETS | ZANARDO - ETA |
| LIGHT TOWERS | BANNER |
| TRUNKING | Basket trays |
| DISPLAY AND OPERATING PANELS | SACMI HMI |
| ETHERNET SWITCH | ROCKWELL |
| POWER SUPPLY 24 Vdc | MURR ELEKTRONIK |

*Any request of modification of the above list must be agreed. SACMI PACKAGING&CHOCOLATE
reserves the possibility to change above listed components if necessary for improving efficiency
and reliability of the machinery.
Equipment part of the project but not manufactured by SACMI PACKAGING&CHOCOLATE may not
comply with above component list.*

*CONDUCTOR COLOUR CODING according to standard specification EN 60204-1*

- AC and DC power circuits                           BLACK
- Neutral                                            LIGHT BLUE
- AC control circuits                                RED
- DC control circuits                                BLUE
- External equipment interlock control circuits      ORANGE
- Earth conductors                                   YELLOW-GREEN

| Rate # | Payment Date | Initial Balance | Payment | Capital | Balance |
|---|---|---|---|---|---|
| 1 | 2/1/2021 | $500,000.00 | $9,095.87 | $7,637.54 | $492,362.46 |
| 2 | 3/1/2021 | $492,362.46 | $9,095.87 | $7,659.82 | $484,702.65 |
| 3 | 4/1/2021 | $484,702.65 | $9,095.87 | $7,682.16 | $477,020.49 |
| 4 | 5/1/2021 | $477,020.49 | $9,095.87 | $7,704.56 | $469,315.93 |
| 5 | 6/1/2021 | $469,315.93 | $9,095.87 | $7,727.03 | $461,588.89 |
| 6 | 7/1/2021 | $461,588.89 | $9,095.87 | $7,749.57 | $453,839.32 |
| 7 | 8/1/2021 | $453,839.32 | $9,095.87 | $7,772.17 | $446,067.15 |
| 8 | 9/1/2021 | $446,067.15 | $9,095.87 | $7,794.84 | $438,272.30 |
| 9 | 10/1/2021 | $438,272.30 | $9,095.87 | $7,817.58 | $430,454.72 |
| 10 | 11/1/2021 | $430,454.72 | $9,095.87 | $7,840.38 | $422,614.34 |
| 11 | 12/1/2021 | $422,614.34 | $9,095.87 | $7,863.25 | $414,751.10 |
| 12 | 1/1/2022 | $414,751.10 | $9,095.87 | $7,886.18 | $406,864.92 |
| 13 | 2/1/2022 | $406,864.92 | $9,095.87 | $7,909.18 | $398,955.73 |
| 14 | 3/1/2022 | $398,955.73 | $9,095.87 | $7,932.25 | $391,023.48 |
| 15 | 4/1/2022 | $391,023.48 | $9,095.87 | $7,955.39 | $383,068.09 |
| 16 | 5/1/2022 | $383,068.09 | $9,095.87 | $7,978.59 | $375,089.50 |
| 17 | 6/1/2022 | $375,089.50 | $9,095.87 | $8,001.86 | $367,087.64 |
| 18 | 7/1/2022 | $367,087.64 | $9,095.87 | $8,025.20 | $359,062.44 |
| 19 | 8/1/2022 | $359,062.44 | $9,095.87 | $8,048.61 | $351,013.83 |
| 20 | 9/1/2022 | $351,013.83 | $9,095.87 | $8,072.08 | $342,941.75 |
| 21 | 10/1/2022 | $342,941.75 | $9,095.87 | $8,095.63 | $334,846.13 |
| 22 | 11/1/2022 | $334,846.13 | $9,095.87 | $8,119.24 | $326,726.89 |
| 23 | 12/1/2022 | $326,726.89 | $9,095.87 | $8,142.92 | $318,583.97 |
| 24 | 1/1/2023 | $318,583.97 | $9,095.87 | $8,166.67 | $310,417.30 |
| 25 | 2/1/2023 | $310,417.30 | $9,095.87 | $8,190.49 | $302,226.81 |
| 26 | 3/1/2023 | $302,226.81 | $9,095.87 | $8,214.38 | $294,012.43 |
| 27 | 4/1/2023 | $294,012.43 | $9,095.87 | $8,238.34 | $285,774.10 |
| 28 | 5/1/2023 | $285,774.10 | $9,095.87 | $8,262.36 | $277,511.73 |
| 29 | 6/1/2023 | $277,511.73 | $9,095.87 | $8,286.46 | $269,225.27 |
| 30 | 7/1/2023 | $269,225.27 | $9,095.87 | $8,310.63 | $260,914.64 |
| 31 | 8/1/2023 | $260,914.64 | $9,095.87 | $8,334.87 | $252,579.77 |
| 32 | 9/1/2023 | $252,579.77 | $9,095.87 | $8,359.18 | $244,220.58 |
| 33 | 10/1/2023 | $244,220.58 | $9,095.87 | $8,383.56 | $235,837.02 |
| 34 | 11/1/2023 | $235,837.02 | $9,095.87 | $8,408.01 | $227,429.01 |
| 35 | 12/1/2023 | $227,429.01 | $9,095.87 | $8,432.54 | $218,996.47 |
| 36 | 1/1/2024 | $218,996.47 | $9,095.87 | $8,457.13 | $210,539.34 |
| 37 | 2/1/2024 | $210,539.34 | $9,095.87 | $8,481.80 | $202,057.54 |
| 38 | 3/1/2024 | $202,057.54 | $9,095.87 | $8,506.54 | $193,551.00 |
| 39 | 4/1/2024 | $193,551.00 | $9,095.87 | $8,531.35 | $185,019.65 |
| 40 | 5/1/2024 | $185,019.65 | $9,095.87 | $8,556.23 | $176,463.42 |
| 41 | 6/1/2024 | $176,463.42 | $9,095.87 | $8,581.19 | $167,882.23 |
| 42 | 7/1/2024 | $167,882.23 | $9,095.87 | $8,606.22 | $159,276.02 |
| 43 | 8/1/2024 | $159,276.02 | $9,095.87 | $8,631.32 | $150,644.70 |
| 44 | 9/1/2024 | $150,644.70 | $9,095.87 | $8,656.49 | $141,988.21 |
| 45 | 10/1/2024 | $141,988.21 | $9,095.87 | $8,681.74 | $133,306.47 |
| 46 | 11/1/2024 | $133,306.47 | $9,095.87 | $8,707.06 | $124,599.40 |
| 47 | 12/1/2024 | $124,599.40 | $9,095.87 | $8,732.46 | $115,866.95 |
| 48 | 1/1/2025 | $115,866.95 | $9,095.87 | $8,757.93 | $107,109.02 |
| 49 | 2/1/2025 | $107,109.02 | $9,095.87 | $8,783.47 | $98,325.55 |

| Rate # | Payment Date | Initial Balance | Payment | Capital | Balance |
|--------|-------------|-----------------|---------|---------|---------|
| 50 | 3/1/2025 | $98,325.55 | $9,095.87 | $8,809.09 | $89,516.46 |
| 51 | 4/1/2025 | $89,516.46 | $9,095.87 | $8,834.78 | $80,681.68 |
| 52 | 5/1/2025 | $80,681.68 | $9,095.87 | $8,860.55 | $71,821.12 |
| 53 | 6/1/2025 | $71,821.12 | $9,095.87 | $8,886.39 | $62,934.73 |
| 54 | 7/1/2025 | $62,934.73 | $9,095.87 | $8,912.31 | $54,022.42 |
| 55 | 8/1/2025 | $54,022.42 | $9,095.87 | $8,938.31 | $45,084.11 |
| 56 | 9/1/2025 | $45,084.11 | $9,095.87 | $8,964.38 | $36,119.73 |
| 57 | 10/1/2025 | $36,119.73 | $9,095.87 | $8,990.52 | $27,129.21 |
| 58 | 11/1/2025 | $27,129.21 | $9,095.87 | $9,016.75 | $18,112.46 |
| 59 | 12/1/2025 | $18,112.46 | $9,095.87 | $9,043.04 | $9,069.42 |
| 60 | 1/1/2026 | $9,069.42 | $9,095.87 | $9,042.97 | $0.00 |

# PACKING CELL SECURITY AGREEMENT

# EXHIBIT 4



**SECURITY AGREEMENT - GENERAL FORM**
CAVEAT: DO NOT USE THIS FORM IF THIS TRANSACTION
IS A CONSUMER CREDIT TRANSACTION

1. **GRANT OF SECURITY INTEREST.**  For value received, as security for the Obligations (as defined below) the undersigned ("Debtor") hereby grants, creates, and provides to <u>Sacmi USA, Ltd.</u> ("Secured Party") a security interest in the property described in the paragraphs checked below:

    [ __ ] All of Debtor's inventory now owned or hereafter acquired;

    [ __ ] All of Debtor's accounts, Deposit Accounts, Investment Property, Letter of Credit Rights, Supporting Obligations, now existing or hereafter arising, together with all interest of Debtor in any goods, the sale or lease of which give rise to any of Debtor's accounts, and all chattel paper, documents and instruments relating to accounts;

    [ __ ] All of Debtor's general intangibles, now owned or hereafter acquired;

    [ __ ] All of Debtor's equipment now owned or hereafter acquired;

    [ __ ] All of Debtor's farm products now owned or hereafter acquired;

    [ __ ] All of Debtor's fixtures on the real estate described in Paragraph 3 below;

    [ x ] Property described as <u>See 1 in Addendum</u>.

together with the proceeds, products, increase, issue, accessions, attachments, accessories, parts, additions, repairs, replacements and substitutes of, to, and for all of the foregoing. Debtor will promptly deliver to Secured Party, duly endorsed when necessary, all such chattel paper, documents and instruments and related guaranties, now on hand or hereafter received.

    All such property in which a security interest is granted is herein called the "Collateral."

2. **OBLIGATIONS.**  The aforesaid security interests secure payment and performance of the following obligations (the "Obligations"): <u>See Addendum 2</u> together with all other obligations of Debtor to Secured Party now existing or hereafter arising, whether direct or indirect, contingent or absolute and whether as maker or surety and including, but not limited to, future advances and amounts advanced and expenses and attorneys' fees incurred pursuant to this Security Agreement.

3. **REAL ESTATE.**  Any Collateral attached to, or grown upon, land (such as fixtures, crops, timber or minerals) will be grown upon or attached to the following described real estate: <u>N/A</u> and the name of the record owner of such real estate (if other than Debtor) is:

_____

4. **COPY - FILING.**  A carbon, photocopy or other reproduction of this Security Agreement may be filed as a financing statement. IF FOR FIXTURES, TIMBER OR MINERALS, SUCH A FILING SHALL BE FILED FOR RECORDING IN THE REAL ESTATE RECORDS.

5. **DEBTORS.**  Each of the undersigned, if more than one, execute this Security Agreement as his, her, its, their joint and several obligation and it shall be binding upon and fully enforceable against either or both, or any or all of them, and reference herein to "Debtor" shall in such case be deemed to be plural, provided however that nothing contained herein shall extend personal liability under any of the Obligations as to which such Debtor is not otherwise liable.

6. **REPRESENTATIONS.**  Debtor represents, warrants and agrees:

    a.  All Collateral is bona fide and genuine and Debtor is authorized to grant a

       security interest in the Collateral, free and clear of all liens and encumbrances, except the security interest created hereby and except <u>N/A.</u>

   b. Debtor's principal place of business is the address shown herein, and Debtor shall promptly give Secured Party written notice of any change thereof, unless prior written consent of Secured Party is obtained. All Collateral and all of the Debtor's business records are now kept, and shall continue to be kept, at such address, or if not, at <u>4718 Belmont Avenue, Youngstown, OH 44505</u>.

   c. Debtor is an individual or, if not, is the following type of entity: limited liability company organized in the state of <u>Delaware</u> with an organization number of <u>200714301504</u>. If an individual, Debtor resides in the state of _____. Debtor's exact legal name is <u>Belmont Confections, Inc.</u>

     THIS AGREEMENT SPECIFICALLY INCLUDES ALL OF THE ADDITIONAL PROVISIONS SET FORTH BELOW AND ON THE REVERSE SIDE HEREOF. DEBTOR ACKNOWLEDGES RECEIPT OF A FULLY COMPLETED COPY OF THIS SECURITY AGREEMENT.

     DATED:   3-2-2022 .

Belmont Confections, Inc.

By: _Jim Holcomb_
Name: _Jim Holcomb_
Title: _Controller_
             (Debtor)

4718 Belmont Avenue
<u>Youngstown, OH 44505</u>
(Address)

ADDRESS OF SECURED PARTY (FROM WHICH INFORMATION CONCERNING THE SECURITY INTEREST MAY BE OBTAINED)

3434 106th Circle
<u>Des Moines, IA 50322</u>
(Address)

1. REPRESENTATIONS AND AGREEMENTS.  Debtor represents and warrants to Secured Party, and agrees that:

a. If a corporation or other business entity, Debtor is duly organized, existing, and is qualified and in good standing in all states in which it is doing business, and the execution, delivery and performance of this Security Agreement are within Debtor's powers, have been duly authorized, and are not in contravention of law or the terms of Debtor's charter, bylaws if any, or any indenture, agreement or undertaking to which Debtor is a party, or by which it is bound. If an individual, Debtor is of legal age. Debtor will not change his, her or its name, or identity unless written notice is given in advance to Secured Party.

b. Debtor shall maintain insurance upon the Collateral which is tangible property against all customarily insured risks for the full insurable value thereof (and furnish Secured Party with duplicate policies if Secured Party so requests), loss to be payable to Debtor and Secured Party as their respective interests may appear. The Secured Party's interest shall be protected in accordance with a standard or union-type loss payable clause. In the event of any loss or damage to any Collateral, Debtor will give Secured Party written notice thereof forthwith, promptly file proof of loss with the appropriate insurer and take all other steps necessary or appropriate to collect such insurance. If Secured Party so elects, Secured Party shall have full authority to collect all such insurance and to apply any amount collected to amounts owed hereunder, whether or not matured. Secured Party shall have no liability for any loss which may occur by reason of the omission or the lack of coverage of any such insurance.

c. Debtor shall at all times maintain Collateral which is tangible property in good condition and repair, defend at Debtor's expense all Collateral from all adverse claims and shall not use any of the Collateral for any illegal purpose.

d. Debtor shall (i) keep such books and records pertaining to the Collateral and to Debtor's business operations as shall be satisfactory to Secured Party; (ii) permit representatives of Secured Party at any time to inspect the Collateral and inspect and make abstracts from Debtor's books and records; and (iii) furnish to Secured Party such information and reports regarding the Collateral and Debtor's business operations and its financial status, as Secured Party may from time to time reasonably require. SECURED PARTY IS HEREBY AUTHORIZED TO REQUEST CONFIRMATION OF SUCH INFORMATION OR ADDITIONAL INFORMATION OF ANY KIND WHATSOEVER DIRECTLY FROM ANY THIRD PARTY HAVING DEALINGS WITH DEBTOR. SECURED PARTY IS FURTHER IRREVOCABLY AUTHORIZED TO ENTER DEBTOR'S PREMISES TO INSPECT THE COLLATERAL.

e. Debtor shall give such notice in writing (including but not limited to notice of assignment or notice to pay Secured Party directly) as Secured Party may require at any time to any or all account debtors, with respect to accounts which are Collateral, and, if Secured Party shall so request, deliver to Secured Party copies of any and all such notices.

f. Debtor shall promptly transmit to Secured Party all information that it may have or receive with respect to Collateral or with respect to any account debtor which might in any way affect the value of the Collateral or Secured Party's rights or remedies with respect thereto.

g. Unless in default under this Security Agreement, Debtor may sell inventory in the ordinary course of business and consume any raw materials or supplies, the use and consumption of which are necessary to carry on Debtor's business. Debtor shall not otherwise consume, assign or transfer any Collateral without prior written consent of Secured Party. The

provision of this Security Agreement granting a security interest in proceeds shall not be
construed to mean that Secured Party consents to any sale or disposition of any Collateral.

   h. Debtor shall pay when due all taxes, assessments, and any other governmental
levy which is, or may be, levied against any Collateral, and shall otherwise maintain the
Collateral free of all liens, charges, and encumbrances (except liens set forth herein and the
security interest created hereby)

   i. Debtor shall not store any Collateral with any warehouseman without Secured
Party's consent.

   j. Debtor shall promptly, unless Secured Party shall waive such requirement in
writing, deliver to Secured Party all certificates of title, if any, (or any other documents
evidencing title) to all Collateral with such proper notations, assignments or endorsements as
may be necessary or appropriate to create, preserve or perfect Secured Party's security interest in
the Collateral.

   k. Debtor shall, at its cost and expense, execute, deliver, file or record (in such
manner and form as Secured Party may require) any assignment, financing statement or other
paper that may be necessary or desirable, or that Secured Party may request, in order to create,
preserve or perfect any security interest granted hereby or to enable Secured Party to exercise
and enforce its rights hereunder or under any Collateral. Secured Party is further granted the
power, coupled with an interest, to sign on behalf of Debtor as attorney-in-fact and to file one or
more financing statements under the Uniform Commercial Code naming Debtor as debtor and
Secured Party as secured party and describing the Collateral herein specified.

  2. EXPENSES. Debtor upon demand shall pay to Secured Party forthwith the amounts
of all expenses, including reasonable attorneys' fees and legal expenses, incurred by Secured
Party in seeking to collect any sums secured hereunder or to enforce any rights in the Collateral.
Such amounts shall be secured hereby, and if not paid on demand shall bear interest at the
highest rate payable on any of the Obligations.

  3. COLLECTION AUTHORITY ON ACCOUNTS. Debtor hereby irrevocably appoints
Secured Party its true and lawful attorney, with full power of substitution, in Secured Party's
name, Debtor's name or otherwise, for Secured Party's sole use and benefit, but at Debtor's cost
and expense, to exercise, if Secured Party shall elect after an event of default has occurred
(whether or not Secured Party then elects to exercise any other of its rights arising upon default)
all or any of the following powers with respect to all or any accounts which are Collateral:

   a. To execute on Debtor's behalf assignments of any or all accounts which are
Collateral to Secured Party, and to notify account debtors thereunder to make payments directly
to Secured Party;

   b. To demand, sue for, collect, receive and give acquittance for any and all
moneys due or to become due upon or by virtue thereof;

   c. To receive, take, endorse, assign and deliver any and all checks, notes, drafts,
documents and other negotiable and non-negotiable instruments and chattel paper taken or
received by Secured Party in connection therewith;

   d. To settle, compromise, compound, prosecute or defend any action or
proceeding with respect thereto;

   e. To sell, transfer, assign or otherwise deal in or with the same or the proceeds
thereof or the relative goods, as fully and effectually as if Secured Party were the absolute owner

thereof; and

        f. To extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference thereto.

Any funds collected pursuant to such powers shall be applied to the payment of the Obligations. The exercise by Secured Party of, or failure to so exercise, any of the foregoing authority, shall in no manner affect Debtor's liability to Secured Party on any of the Obligations. Secured Party shall be under no obligation or duty to exercise any of the powers hereby conferred upon it and it shall be without liability for any act or failure to act in connection with the collection of or the preservation of any rights under any such accounts. Secured Party shall not be bound to take any steps necessary to preserve rights in any instrument or chattel paper against prior parties.

4. SET OFF. In the event of default hereunder, Secured Party, at its option at any time, and without notice to Debtor, may apply against the Obligations any property of Debtor held by Secured Party. As additional security for payment of the Obligations, Debtor hereby grants to Secured Party a security interest in any funds or property of Debtor now or hereafter in possession of Secured Party and with respect thereto Secured Party will have all rights and remedies herein specified.

5. WAIVER. Debtor waives protest, notice of dishonor, and presentment of all commercial paper at any time held by Secured Party on which Debtor is in any way liable, notice of non-payment at maturity of any account or chattel paper, and notice of any action taken by Secured Party except where notice is expressly required by this Security Agreement or cannot by law be waived.

6. DEFAULT. Debtor will be in default upon the occurrence of any of the following events: (a) failure to make the payment, when due and payable of any of the Obligations, (b) failure of the performance of any obligation or covenant contained or referred to herein, (c) any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made or furnished (d) any event which results in the acceleration of the maturity of the indebtedness of Debtor or any guarantor or co-maker of any of the Obligations to others under any indenture, agreement or undertaking; (e) loss, theft, damage, destruction or encumbrance to, or of, the Collateral or the making of any levy, seizure of attachment thereof or thereon; (f) death of, dissolution of, termination of existence of, insolvency of, business failure of, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding under any bankruptcy or insolvency law by or against, Debtor or any guarantor or co-maker of any of the Obligations; (g) the occurrence or nonoccurrence of any event or events which causes the Secured Party, in good faith, to deem itself insecure for any reason whatsoever.

In any such event Secured Party may at its option declare any or all of the Obligations to be due and payable and such sums shall then be due and payable immediately, without notice or demand.

7. RIGHTS AND REMEDIES ON DEFAULT. After the occurrence of any event of default, Secured Party may exercise at any time and from time to time any rights and remedies available

to it under applicable law, including but not limited to the right to sell, lease or otherwise dispose of the Collateral and the right to take possession of the Collateral. FOR THAT PURPOSE SECURED PARTY MAY ENTER UPON ANY PREMISES ON WHICH THE COLLATERAL OR ANY PART THEREOF MAY BE SITUATED AND REMOVE IT. Secured Party may require Debtor to assemble the Collateral and make it available at a place to be designated by Secured Party which is reasonably convenient to both parties. If at the time of repossession any of the Collateral contains other personal property not included in the Collateral, Secured Party may take such personal property into custody and store it at the risk and expense of Debtor. Debtor agrees to notify Secured Party within **forty-eight (48)** hours after repossession of the Collateral of any such other personal property claimed, and failure to do so will release Secured Party and its representatives from any liability for loss or damage thereto. Any notice of intended disposition of any of the Collateral required by law shall be deemed reasonable if such notice is given at least **ten (10)** days before the time of such disposition. Any proceeds of any disposition by Secured Party of any of the Collateral may be applied by it to the payment of expenses in connection with the Collateral, including but not limited to repossession expenses and reasonable attorneys' fees and legal expenses, and any balance of such proceeds shall be then applied against the Obligations and other amounts secured hereby in such order of application as Secured Party may elect.

### 8. GENERAL

a. Secured Party may, as its option, pay any tax, assessment, or other Governmental levy, or insurance premium or any other expense or charge relating to Collateral which is payable by Debtor (and not timely paid by it), and further may pay any filing or recording fees. Any amount or amounts so paid, with interest thereon at the highest rate payable on any of the obligations (from the date of payment until repaid) shall be secured hereby and shall be payable upon demand.

b. Secured Party shall not be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by Debtor unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

c. Any notice, if mailed, shall be deemed given when mailed postage prepaid, addressed to Debtor at its address shown above, or at any other address of Debtor appearing on Secured Party's records.

d. Covenants, representations, warranties and agreements herein set forth shall be binding upon Debtor, its legal representatives, successors and assigns. This Security Agreement may be assigned by Secured Party and all rights and privileges of Secured Party under this Security Agreement shall then inure to the benefit of its successors and assigns.

e. If any provision of this Security Agreement shall be for any reason held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, but this Security Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

f. If Debtor is a guarantor, endorser, co-maker, or an accommodation party with respect to the Obligations, Debtor hereby waives the benefit of any and all defenses and claims of damage which are dependent upon Debtor's character as a party other than the maker. Each

party to any of the Obligations hereby consents to and waives notice of (1) any and all extensions (whether or not for longer than the original period) granted as to the time of payment of any or all of the Obligations, and (2) any renewal of any or all of the Obligations.

      g. This Security Agreement and all rights and duties hereunder, including but not limited to all matters of construction, validity, and performance, shall be governed by the law of Iowa.

      h. Unless otherwise defined or the context otherwise requires, all terms used herein which are defined in the Iowa Uniform Commercial Code shall have the meanings therein stated. The rights and remedies herein conferred upon Secured Party shall be in addition to, and not in substitution or in derogation of, rights and remedies conferred by the Iowa Uniform Commercial Code and other applicable law.

      i. All words and phrases used herein shall be construed as in the singular or plural number, and as masculine, feminine or neuter gender, as the context may require.

      j. Captions are inserted for convenience only and shall not be taken as altering the text.

9. CERTIFICATION

      a. Secured Party and Debtor each certify that they are not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person" or any other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; and are not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation.

      b. Each party hereby agrees to defend, indemnify and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

## ADDENDUMS

Addendum 1:

Modular Robotic Top-loading Packing Cell, Format P1 for the Work Cell, and other items
described in Offer #20-034566-A0 dated January 26, 2021 sold to Debtor by Secured Party.

Addendum 2:

All payments of Debtor to Secured Party including, but not limited to, obligations with respect to
the above-referenced collateral pursuant to Offer #20-034566-A0 dated January 26, 2021 sold to
Debtor by Secured Party.

# *HOMELAND SECURITY ENTRY SUMMARY*

# **EXHIBIT 5**

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB APPROVAL NO. 1651-0022
EXPIRATION DATE 01/31/2021

# ENTRY SUMMARY

| Summary Status | | |
|---|---|---|
| Team | | JBP |

| 1. Filer Code/Entry Number | 2. Entry Type | 3. Summary Date | 4. Surety Number | 5. Bond Type | 6. Port Code | 7. Entry Date |
|---|---|---|---|---|---|---|
| 113-9989680-9 | 01 ABI/A | 03/31/22 | 897 | 8 | 4601 | 03/20/2022 |

| 8. Importing Carrier | 9. Mode Of Transport | 10. Country of Origin | 11. Import Date |
|---|---|---|---|
| MSC AMALFI (MEDU) | 11 | IT | 03/20/2022 |

| 12. B/L or AWB Number | 13. Manufacturer ID | 14. Exporting Country | 15. Export Date |
|---|---|---|---|
| MEDUIG942879 | ITSACPAC44ROZ | IT | 03/06/2022 |

| 16. I.T. Number | 17. I.T. Date | 18. Missing Docs | 19. Foreign Port of Lading | 20. U.S. Port of Unlading |
|---|---|---|---|---|
| | | | 47537 | 4601 |

| 21. Location of Goods/G.O. Number | 22. Consignee Number | 23. Importer Number | 24. Reference Number |
|---|---|---|---|
| | SAME | 76-071890900 | |

| 25. Ultimate Consignee Name (Last, First, M.I.) and Address | 26. Importer of Record Name (Last, First, M.I.) and Address |
|---|---|
| | SACMI USA LTD<br>3434 106TH CIR |
| City          State OH          Zip | City  DES MOINES          State  IA   Zip  50322 |

| 27 | 28. Description of Merchandise | | | 32. | 33. | 34. Duty and I.R. Tax |
|---|---|---|---|---|---|---|
| Line No. | 29.<br>A. HTSUS Number<br>B. ADA/CVD Number | 30.<br>A. Gross Weight<br>B. Manifest Qty. | 31.<br>Net Quantity in HTSUS Units | A. Entered Value<br>B. CHGS<br>C. Relationship | A. HTSUS Rate<br>B. ADA/CVD Rate<br>C. IRC Rate<br>D. Visa Number | Dollars          Cents |

I.T. DATE   I.T. NO.        MASTER BILL/AWB        HOUSE BILL        SUBHOUSE BILL        BILL QTY
                            MEDUIG942879                                                3 PK

| 001 | Invoice Number  001/2022200294 | | | Y | | |
| | MACHINES FOR WRAPPING CAND | | | | | |
| | 8422.40.1110 | 3768 KG | 1 NO | 257,351 | Free | 0.00 |
| | | | | C722 | | |
| | 499 MERCHANDISE PROCESSING FEE (MPF) | | | | 0.3464% | 891.46 |
| | 501 HARBOR MAINTENANCE FEE (HMF) | | | | 0.125% | 321.69 |
| | Invoice Number         001/2022200294 | | | | | |
| | Invoice Value USD         257,350.79 | | | | | |
| | Total Entered Value (Invoice)    257,351.00 | | | | | |

| Other Fee Summary (for Block 39) | 35. Total Entered Value | CBP USE ONLY | | TOTALS |
|---|---|---|---|---|
| 501 Harbor Maintenance Fee   $1,113.18 | $890,541.00 | A. LIQ CODE | B. Ascertained Duty | 37. Duty |
| 499 Merchandise Processing Fee  $538.40 | Total Other Fees | | | 0.00 |
| | | REASON CODE | C. Ascertained Tax | 38. Tax |
| | $1,651.58 | | | 0.00 |
| | | | D. Ascertained Other | 39. Other |
| | | | | 1,651.58 |
| | | | E. Ascertained Total | 40. Total |
| | | | | 1,651.58 |

36. DECLARATION OF IMPORTER OF RECORD (OWNER OR PURCHASER) OR AUTHORIZED AGENT

I declare that I am the ☐  Importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above, OR☒ owner or purchaser or agent thereof.  I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true, OR ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief.  I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.
I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

| 41. DECLARANT NAME (LAST,FIRST, M.I.) | TITLE | SIGNATURE | DATE |
|---|---|---|---|
| GEODIS USA, LLC | ATTY-IN-FACT | | 03/18/2022 |
| | | Anne Harrison | |

| 42. Broker/Filer Information Name (Last,First, M.I.) and Phone Number | 43. Broker/Importer File Number |
|---|---|
| GEODIS USA, LLC<br>2000 ARTHUR AVE STE A,  CHICAGO, IL 60007<br>PHONE: +18479819500  FAX: +18479811371 | BCH22200001651 |

CBP Form 7501 (12/19)

Page 1 of 2

# DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

## ENTRY SUMMARY CONTINUATION SHEET

| 1. Filer Code/Entry Number |
|---|
| 113-9989680-9 |

| 27 | 28. Description of Merchandise | | | 32. | 33. | 34. Duty and I.R. Tax | |
|---|---|---|---|---|---|---|---|
| Line No. | 29. A. HTSUS No. B. ADA/CVD No. | 30. A. Gross Weight B. Manifest Qty. | 31. Net Quantity in HTSUS Units | A. Entered Value B. CHGS C. Relationship | A. HTSUS Rate B. ADA/CVD Rate C. IRC Rate D. Visa No. | Dollars | Cents |
| | Invoice Number  002/2022200295 | | | Y | | | |
| 002 | MACHINES FOR WRAPPING CAND | | | | | | |
| | 8422.40.1110 | 9272 KG | 1 NO | 633,190 | Free | | 0.00 |
| | | | | C1778 | | | |
| | 499 MERCHANDISE PROCESSING FEE (MPF) | | | | 0.3464% | | 2,193.37 |
| | 501 HARBOR MAINTENANCE FEE (HMF) | | | | 0.125% | | 791.49 |
| | Invoice Number | | 002/2022200295 | | | | |
| | Invoice Value USD | | 633,190.22 | | | | |
| | Total Entered Value (Invoice) | | 633,190.00 | | | | |

CBP Form 7501 (12/19)

# *FLOW WRAP UCC*

# EXHIBIT 6

124487975\V-1

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| (515) 283-3120 |

**B. E-MAIL CONTACT AT FILER** (optional)

NWESTIN@NYEMASTER.COM

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

NEAL K WESTIN

700 WALNUT STREET

SUITE 1600

DES MOINES, IA 50309

Delaware Department of State
U.C.C. Filing Section
Filed: 09:36 AM 03/01/2022
U.C.C. Initial Filing No: 2022 1752260

Service Request No: 20220808623

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| BELMONT CONFECTIONS, INC. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4718 BELMONT AVENUE | YOUNGSTOWN | OH | 44505 | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| SACMI USA, LTD. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3434 106TH CIRCLE | DES MOINES | IA | 50322 | US |

4. **COLLATERAL:** This financing statement covers the following collateral:
JT Pro Flow-wrapper, EWF Electronic wrapper feeder, Format P1 for the JT Pro flow-wrapper, and other items described in Offer #20-034565-A4 dated February 22, 2021 sold to Debtor by Secured Party.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
1423500-0058

# *PACKING CELL UCC*

# **EXHIBIT 7**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
(515) 283-3120

**B. E-MAIL CONTACT AT FILER (optional)**
NWESTIN@NYEMASTER.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

NEAL K WESTIN

700 WALNUT STREET

SUITE 1600

DES MOINES, IA 50309

Delaware Department of State
U.C.C. Filing Section
Filed: 09:43 AM 03/01/2022
U.C.C. Initial Filing No: 2022 1752682

Service Request No:  20220808905

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BELMONT CONFECTIONS, INC. | | | |

| 1b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4718 BELMONT AVENUE | YOUNGSTOWN | OH | 44505 | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SACMI USA, LTD. | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3434 106TH CIRCLE | DES MOINES | IA | 50322 | US |

4. **COLLATERAL:** This financing statement covers the following collateral:
**Modular Robotic Top-loading Packing Cell, Format P1 for the Work Cell, and other items described in Offer #20-034566-A0 dated January 26, 2021 sold to Debtor by Secured Party.**

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
1423500-0058

International Association of Commercial Administrators

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# *UCC AMENDMENT*

# **EXHIBIT 8**

124487975\V-1

# UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC 800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
FILINGDEPT@CSCINFO.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

801 ADLAI STEVENSON DR [247475329]

SPRINGFIELD, IL 62703

US

Delaware Department of State
U.C.C. Filing Section
Filed: 05:49 PM 01/12/2023
U.C.C. Initial Filing No: 2022 1752260
Amendment No: 2023 0327048
Service Request No:  20230122612

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 20221752260 | (or recorded) in the REAL ESTATE RECORDS<br>Filer  attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):**  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:**  Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:     **AND** Check one of these three boxes to:

This Change affects ☑ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c    ☑ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| BCI ACQUISITION, INC. |

| OR | 7b. INDIVIDUAL'S SURNAME |
|---|---|
| | |
| | INDIVIDUAL'S FIRST PERSONAL NAME |

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|
| | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1598 MOTOR INN DRIVE | GIRARD | OH | 44420 | US |

8. ☐ **COLLATERAL CHANGE:**  Also check one of these four boxes: ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR,** check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME |
|---|
| SACMI USA, LTD. |

| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

10. **OPTIONAL FILER REFERENCE DATA:**
BELMONT CONFECTIONS, INC. - NAV (161821-1) BH

International Association of Commercial Administrators

**FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)**

# UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS**

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
FILINGDEPT@CSCINFO.COM

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

801 ADLAI STEVENSON DR [247297175]

SPRINGFIELD, IL 62703

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:49 PM 01/12/2023**
**U.C.C. Initial Filing No: 2022 1752682**
**Amendment No: 2023 0327055**
**Service Request No:  20230122613**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 20221752682 | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial):  Provide name of Assignee in item 7a or 7b, **and** address of Assignee in item 7c **and** name of Assignor in item 9
For partial assignment, complete items 7 and 9 **and** also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ **PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:     **AND** Check **one** of these three boxes to:

This Change affects ☑ Debtor or ☐ Secured Party of record  ☐ CHANGE name and/or address: Complete item 6a or 6b, **and** item 7a or 7b **and** item 7c  ☑ ADD name: Complete item 7a or 7b, **and** item 7c  ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only **one** name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | BCI ACQUISITION, INC. | | | |
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1598 MOTOR INN DRIVE | GIRARD | OH | 44420 | US |

8. ☐ **COLLATERAL CHANGE:**  Also check **one** of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | SACMI USA, LTD. | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

10. OPTIONAL FILER REFERENCE DATA:
BELMONT CONFECTIONS, INC. - NAV (161821-1) BH

International Association of Commercial Administrators

**FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
601 S. Figueroa St., Suite 2500 Los Angeles, CA 90017

*A true and correct copy of the foregoing document entitled (specify):*    *Limited Objection To Debtors' Emergency*
*Motion For Entry Of Interim And Final Orders (I) Authorizing Debtors To Obtain Postpetition Financing, (II) Authorizing*
*Debtors To Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Claims, (IV)*
*Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, And (VII) Granting Related*
*Relief; Declaration Of Mark Lozano*
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
August 2, 2023____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

**SEE ATTACHED SERVICE LIST**

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) August 2, 2023____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

Stretto
410 Exchange
Suite 100
Irvine, CA 92602

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)_____, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 2, 2023 | Glenda Spratt | *Glenda Spratt* |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## SERVICE LIST CONTINUED
## ITTELLA INTERNATIONAL, LLC
## Lead Case No. 2:23-bk-14154-SK

- **Mark A Amendola** mamendola@martynlawfirm.com
- **Todd M Arnold** tma@lnbyg.com
- **Marshall J August** maugust@frandzel.com, rsantamaria@frandzel.com
- **Tanya Behnam** tbehnam@polsinelli.com, tanyabehnam@gmail.com;ccripe@polsinelli.com;ladocketing@polsinelli.com
- **Michael Jay Berger** michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Robert Carrasco** rmc@lnbyg.com
- **Abram Feuerstein** abram.s.feuerstein@usdoj.gov
- **John-Patrick M Fritz** jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com
- **Everett L Green** everett.l.green@usdoj.gov
- **David S Hagen** davidhagenlaw@gmail.com
- **Mark S Horoupian** mark.horoupian@gmlaw.com, mhoroupian@ecf.courtdrive.com;cheryl.caldwell@gmlaw.com;karen.files@gmlaw.com
- **K Kenneth Kotler** kotler@kenkotler.com, linda@kenkotler.com
- **Aaron J Malo** amalo@sheppardmullin.com, clopez@sheppardmullin.com;abilly@sheppardmullin.com
- **Ron Maroko** ron.maroko@usdoj.gov
- **Kyle J Mathews** kmathews@sheppardmullin.com
- **David W. Meadows** david@davidwmeadowslaw.com
- **Angela Z Miller** amiller@phillipslytle.com, styrone@phillipslytle.com
- **John A Moe** john.moe@dentons.com, glenda.spratt@dentons.com;derry.kalve@dentons.com
- **Alan I Nahmias** anahmias@mbn.law, jdale@mbnlawyers.com
- **David L. Neale** dln@lnbyg.com
- **Matthew D. Resnik** Matt@rhmfirm.com, roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com
- **Amit Kumar Sharma** amit.sharma@aisinfo.com
- **David Samuel Shevitz** david@shevitzlawfirm.com, shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com
- **Lindsey L Smith** lls@lnbyg.com, lls@ecf.inforuptcy.com
- **Alan G Tippie** Alan.Tippie@gmlaw.com, atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Glenn S Walter** gwalter@honigman.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
124527141\V-1

**F 9013-3.1.PROOF.SERVICE**