JEFFREY A. KRIEGER (SBN 156535)
JKrieger@ggfirm.com
GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:    310-553-3610
Facsimile:    310-553-0687

THOMAS D. WALKER *(Pending Order on Pro Hac Vice Application)*
TWalker@WalkerLawPC.com
WALKER & ASSOCIATES, P.C.
500 Marquette NW, Suite 650
Albuquerque, New Mexico 87102
Telephone:    505 766-9272
Attorneys for Lessor Larry Gutierrez

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES**

In re:

☐ ITTELLA INTERNATIONAL LLC,
a California limited liability company
☐ ITTELLA'S CHEF, LLC,
a California limited liability company
☐ TATTOOED CHEF, INC.,
a Delaware corporation
☐ MYJOJO, INC.,
a Delaware corporation
☐ NEW MEXICO FOOD DISTRIBUTORS, INC.,
a New Mexico corporation
☐ KARSTEN TORTILLA FACTORY, LLC,
a New Mexico limited liability company
☐ BCI ACQUISITION, INC.,
a Delaware corporation
☐ TTCF-NM HOLDINGS INC.,
a New Mexico corporation
☒ All Debtors

    Debtors and Debtors-in-Possession.

Lead Case No.: 2:23-bk-14154-SK

Jointly Administered with Case Nos.:
2:23-bk-14159-SK; 2:23-bk-14161-SK;
2:23-bk-14157-SK; 2:23-bk-14158-SK;
2:23-bk-14155-SK; 2:23-bk-14156-SK;
and 2:23-bk-14160-SK

Chapter 11 Cases

**DECLARATION OF ROBB HALTOM IN SUPPORT OF LESSOR LARRY GUTIERREZ'S LIMITED OBJECTION TO DEBTORS' NOTICE OF MOTION AND MOTION TO: (1) APPROVE AUCTION(S) AND BID PROCEDURES FOR THE SALE OF EQUITY AND/OR ASSETS AND (2) SET SCHEDULING FOR A MOTION TO APPROVE THE SALE OF EQUITY AND/OR ASSETS**

*[Limited Objection to Bidding Procedures Motion filed concurrently herewith]*

<u>Hearing</u>
  Date:    August 16, 2023
  Time:    9:00 a.m.
  Location: Courtroom 1575
            255 East Temple Street
            Los Angeles, CA 90012

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

DECLARATION OF ROBB HALTOM ISO OF
LARRY GUTIERREZ'S LIMITED OBJECTION

1

## DECLARATION OF ROBB HALTOM

2

I, Robb Haltom, declare as follows:

3      1.      I have personal knowledge of the matters set forth in this declaration and, if called

4  upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have

5  knowledge regarding Larry Gutierrez's (the "Lessor") interest in the Property because I manage

6  the Property at issue as the authorized agent for Lessor and I am employed by the Lessor as

7  Controller.

8      2.      I am one of the custodians of the books, records and files of Lessor as to those books,

9  records and files that pertain to the rental of this Property. I have personally worked on books,

10  records and files, and as to the following facts, I know them to be true of my own knowledge or I

11  have gained knowledge of them from the business records of Lessor on behalf of Lessor, which

12  were made at or about the time of the events recorded, and which are maintained in the ordinary

13  course of Lessor's business at or near the time of the acts, conditions or events to which they relate.

14  Any such document was prepared in the ordinary course of business of Lessor by a person who had

15  personal knowledge of the event being recorded and had or has a business duty to record accurately

16  such event. The business records are available for inspection and copies can be submitted to the

17  court if required.

18      3.      The Property is a commercial, nonresidential property the address of which is 3041

19  University Boulevard SE, Albuquerque, NM 87106.

20      4.      Lessor is the legal owner of the Property. A true and correct copy of the Lease

21  between Lessor and New Mexico Food Distributors, Inc., is attached as Exhibit B.

22      5.      New Mexico Food Distributors, Inc. is the Lessee under the Lease and is a debtor in

23  this bankruptcy proceeding.

24      6.      The Lease was terminated by Notice of Termination dated May 4, 2023. A true and

25  correct copy of the Notice of Termination is attached as Exhibit A. Copies of some of the notices

26  of default that preceded termination of the Lease are attached hereto as Exhibit D.

27      7.      The Lessee failed to pay (a) late fees as required by Lease; (b) payments in lieu of

28  taxes required by Sec. 5.10 of 2nd Amended IRB Lease, a true and correct copy of which is attached

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

DECLARATION OF ROBB HALTOM ISO OF
LARRY GUTIERREZ'S LIMITED OBJECTION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

hereto as Exhibit C (see tax summary attached as <u>Exhibit E</u>); (c) holdover rental rate as required by Lease Section XIV on page 8 of the Lease; and, (d) Lessee has failed to submit reports to Bernalillo County, New Mexico as required by Sections 4.17 and 4.18 of the IRB lease.

8.      Lessee asserts a possessory interest in the Property based upon a month-to-month tenancy as a holdover tenant. The Lessee does not have any other interest in the Property.

9.      After the Notice of Termination was sent to the Lessee, Thom Rindt, a local manager and the spokesperson for the Lessee in Albuquerque agreed that the Lessee would move out when I and Ray Padilla, an attorney for the Lessor, met with him right after the Notice of Termination was sent. Mr. Rindt, Mr. Padilla, and I discussed the Lessee making payments for storing Lessee's equipment while it was moving out, since there was no longer a lease. Shortly thereafter, in May 2023, Lessor Larry Gutierrez and I met with Rindt again and discussed what would be left in the building when they moved out. The entire meeting was under the premise that the Lease was terminated and Lessee was moving out. Mr. Rindt gave us a date by which the Lessee would be moved out, which changed a few times. The only reason Lessor did not give a 3-day notice to quit and file an FEUD action to evict was because Lessee did not dispute that the Lease was terminated and had agreed to move out without the expense of the legal action.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: August 7, 2023

_____
Robb Haltom

# EXHIBIT "A"

**WALKER & ASSOCIATES**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

THOMAS D. WALKER
SAMUEL I. ROYBAL

500 MARQUETTE N.W., SUITE 650
ALBUQUERQUE, NM 87102

CHRIS W. PIERCE
OF COUNSEL

TELEPHONE
(505) 766-9272
FACSIMILE
(505) 766-9287

May 4, 2023

**VIA FED EX OVERNIGHT**
Tattooed Chef, Inc., on behalf of
New Mexico Food Distributors, Inc.
Attention: Stephanie Dieckmann
6305 Alondra Blvd.
Paramount, CA 90723

Re:   **NOTICE OF TERMINATION of Lease Dated May 12, 2021 (the "Lease") of 3041
University Blvd SE, Albuquerque, NM 87106 (the "Premises")**

Dear Ms. Dieckmann:

This firm represents Larry Gutierrez ("Lessor"). This letter serves as notice that **Lessor
has terminated the Lease, effective immediately,** based on Lessee's failure to cure monetary
default pursuant to Section XVIII of the Lease.

Section XVIII of the Lease provides in part that upon the occurrence of a monetary default
that is not cured within 15 days of Lessor's written notice of default to Lessee, Lessor may
terminate the Lease and re-enter the Premises. On multiple occasions, including March 14, March
16, March 23, and April 5, 2023, Lessor gave Lessee written notice of Lessee's failure to pay the
late fee, which constitutes Additional Rent, owed by Lessee under Section III.D of the Lease for
Lessee's failure to timely remit the March 2023 rent payment.

Furthermore, Lessor is informed by Bernalillo County that Lessee has failed to pay the
payment in lieu of taxes in the amount of approximately $8,000.00, of which Lessee was notified,
and which was due in January 2023. Lessee's failure to pay this amount constitutes additional
grounds for the termination of the Lease.

Under Section XVIII of the Lease, Lessee must surrender the Premises immediately to
Lessor. **Please vacate the Premises immediately and deliver all keys to my office**. **Time is of
the essence.** Lessee is not to remove any property from the Premises, all of which is subject to
Lessor's first priority lien. If Lessee does not immediately surrender the Premises, Lessor may
exercise all remedies available to it, including but not limited to, a suit for forceable entry and
detainer or eviction.

Tattooed Chef, Inc. on behalf of New Mexico Food Distributors, Inc.
May 4, 2023
Page 2

Other breaches of the Lease exist, and Lessor reserves all rights and remedies and waives none. The termination of the Lease does not relieve Lessee of any of its liabilities and obligations under this Lease, and such liabilities and obligations shall survive this termination.

Please contact my office with any questions.

Sincerely,

Thomas D. Walker
For the Firm

cc: Rutan & Tucker, LLP
    18575 Jamboree Road, Suite 900
    Irvine, CA 92612
    Attention: Ellis Wasson

    Larry Gutierrez
    Robb Haltom
    Ray Padilla, Esq.

Exhibit A
6



ORIGIN ID:ONMA   (505) 766-9272
THOMAS D. WALKER
WALKER & ASSOCIATES, P.C.
500 MARQUETTE NW, #650
ALBUQUERQUE NM 87102
UNITED STATES US

SHIP DATE: 04MAY23
ACTWGT: 1.00 LB
CAD: 5858408/INET4610

BILL SENDER

TO  STEPHANIE DIECKMANN
TATTOOED CHEF, INC.,NM FOOD DIST.
6305 ALONDRA BLVD

PARAMOUNT CA 90723
(723) 723-7233
INV
PO                    REF
DEPT.

FedEx
Express

FRI - 05 MAY 8:00A
FIRST OVERNIGHT

TRK#  7720 5304 1995
0201

X1 LGBA          90723
           CA-US  LGB

5/4/23, 5:00 PM

FedEx Ship Manager - Print Your Label(s)

Do not ship liquids, blood or clinical specimens in this packaging.

Insert shipping document here.

REMOVE TO EXPOSE ADHESIVE

ADHESIVE

Exhibit A
7



ORIGIN ID:ONMA    (505) 766-9272
THOMAS D. WALKER
WALKER & ASSOCIATES, P.C.
500 MARQUETTE NW, #650

ALBUQUERQUE, NM 87102
UNITED STATES US

SHIP DATE: 04MAY23
ACTWGT: 1.00 LB
CAD: 5858408/INET4610

BILL SENDER

TO **ELLIS WASSON**

**RUTAN & TUCKER, LLP**

**18575 JAMBOREE ROAD, SUITE 900**

**IRVINE CA 92612**
(723) 723-7233

REF.

DEPT.

FedEx
Express

E

**FRI - 05 MAY 8:00A**
**FIRST OVERNIGHT**

TRK#
0201    **7720 5303 2501**

**92612**
CA-US    **SNA**

**X1 NZJA**

FedEx Ship Manager - Print Your Label(s)

Do not ship liquids, blood or clinical specimens in this packaging.

5/4/23, 4:58 PM

Exhibit A
8

# EXHIBIT "B"

## LEASE

THIS LEASE (this "**Lease**"), made this 12th day of May 2021, by and between Larry Gutierrez, hereinafter, whether singular or plural, masculine, feminine, or neuter, designated as "**Lessor**," which expression shall include Lessor's heirs, personal representatives, assigns, and successors in interest, and New Mexico Food Distributors, Inc., a New Mexico corporation, having its offices at 3041 University Blvd. SE, Albuquerque, NM 87106 hereinafter, whether singular or plural, masculine, feminine, or neuter, designated as "**Lessee**", which expression shall include all Lessees, jointly and severally, and shall include Lessee's heirs, personal representatives, assigns, and successors in interest, WITNESSETH:

### I.       DEMISE OF PREMISES.

Lessor, for and in. consideration of the covenants and agreements herein contained to be kept and performed by Lessee, Lessee's heirs, personal representatives, assigns, and successors in interest, and upon the terms and conditions herein contained, does hereby let, lease, and demise to the Lessee certain real property commonly known as 3041 University Blvd. SE, situated in Albuquerque in the County of Bernalillo, State of New Mexico 87106 (hereafter "**Premises**" or "**Demised Premises**"), as legally described on Exhibit A attached hereto.  For purposes of this Lease the rentable square footage area of the Premises shall be deemed to be 62,000 rentable square feet.

### II.      TERM OF LEASE.

The term of this Lease ("**Term**") shall be for a period of five (5) years, beginning on the Closing as defined in the Stock Purchase Agreement ("**Commencement Date**"), and ending on the last day of the sixtieth (60th) full calendar month after the Commencement Date.

### III.     RENT.

Lessee, for and in consideration of this Lease and the demise of the said premises by Lessor to Lessee, hereby agrees and covenants with Lessor to pay as rent for the said premises, without notice or demand, on the 1st day of each month commencing on the Commencement Date through April 30, 2026:

### BASE TERM

| PERIOD | ANNUAL AMOUNT | MONTHLY AMOUNT |
|---|---|---|
| Months 1-24 | $372,000 | $31,000.00 |
| Months 25-48 | $383,160 | $31,930.00 |
| Months 49-60 | $394,656 | $32,888.00 |

1

## OPTION YEARS

| PERIOD | ANNUAL AMOUNT | MONTHLY AMOUNT |
|---|---|---|
| Months 61-72 | $394,656 | $32,888.00 |
| Months 73-96 | $406,500 | $33,875.00 |
| Months 97-120 | $418,692 | $34,891.00 |
| Months 121-132 | $431,256 | $35,938.00 |
| Months 133-144 | $444,192 | $37.016.00 |
| Months 145-156 | $457,512 | $38,126.00 |
| Months 157-168 | $471,240 | $39,270.00 |
| Months 169-180 | $485,376 | $40,448.00 |

Rent for any partial month during the Term shall be prorated based on the actual number of days in such month.

        A.    **Options to renew:** Lessor grants Lessee two (2) five (5) year options to extend the term of this Lease at the monthly rental rates listed above and otherwise on all of the terms and conditions set forth herein. To exercise an option, Lessee shall give Lessor prior written notice no earlier than 180 days and no later than 90 days before the end of the current Lease term.

        **B.**    **Common Area and Maintenance:**

Subject to Section V below, Lessee is responsible for all costs associated with the repair and maintenance of the building and any common area on the land comprising the Premises. Lessee agrees to pay all real estate taxes, building insurance, and utilities (the three "Nets") on the Premises.

        **C.**    **Additional Rent.**

Lessee and Lessor hereby covenant and agree that any charges other than rent to be paid by the Lessee pursuant to the provisions of this Lease shall be deemed "**Additional Rent**." Additional Rent shall include, but not be limited to, real property taxes, building insurance, utility charges, and any other fees, taxes, or charges payable by Lessee hereunder.

        **D.**    **Late Fees.**

Lessee and Lessor hereby covenant and agree that should Lessee fail to pay when due any installment of rent or any other sum payable to Lessor under the terms of this lease, and should the same remain unpaid within ten (10) days after Tenant's receipt of written notice of the failure to pay the same when due, Lessee shall pay a late charge equal to the greater of five percent (5%) of the total amount due or One Hundred Dollars ($100.00), whichever is greater. In addition, all unpaid sums which are not paid within ten (10) days after Tenant's receipt of written notice of the failure to pay the same when due, shall bear interest from the date due to the date of payment at the rate of

five percent (5%) per annum or the maximum interest rate allowable by law, whichever is lesser.

All Rent and Additional Rent shall be paid by Lessee to Lessor or Lessor's order in lawful money of the United States at 12040 N. 133rd Way, Scottsdale, AZ 85259, or at such other place as Lessor may designate from time to time for this purpose.

**IV.**      **USE OF PREMISES.**

Lessee, for an in consideration of this Lease and the demise of the said Premises by Lessor to Lessee, hereby agrees and covenants with Lessor to use and occupy the said Premises for the purpose of **food manufacturing, storage and distribution, associated office uses, and any other legal uses ancillary thereto ("Permitted Use"),** and for no other purpose without first obtaining the written consent of Lessor therefore; the Lessee shall not use or occupy or permit the demised premises to be used or occupied, or do or permit anything to be done in or on the Demised Premises, in a manner which will make void or voidable any insurance then in force with respect thereto, or which will make it impossible to obtain fire or other insurance required to be furnished hereunder, or which will cause or be likely to cause structural damage to the Demised Premises or any portion thereof, or which will constitute a public or private nuisance; provided, however, that Lessor represents and warrants to Lessee that the use of the Premises for the Permitted Use shall not make void or voidable the current insurance maintained on the Premises. Further, Lessee shall not use or occupy or permit the Demised  Premises to be used or occupied for any business, purpose, or use deemed disreputable or extra-hazardous or for any purpose or in any manner which is in violation of any present or future municipal, state, and federal ordinances, laws, rules, and regulations.  Lessee shall have the exclusive right to use all parking located on the Premises at no additional charge during the Term and any extension thereof. Lessee shall have access to the Premises, including, without limitation, all parking thereon, 24 hours a day, 7 days per week, 52 weeks per year.

**V.**      **CONDITION OF PREMISES AND REPAIRS.**

**A.**      **Condition of the Premises.**

Lessee, for and in consideration of this Lease and the demise of the said Premises, hereby agrees and covenants with Lessor that Lessee has examined the said Premises prior to the execution hereof, knows the condition thereof, and acknowledges that Lessee has received the said Demised Premises in good order and condition and that no representation or warranty as to the condition or repair of the said Premises has been made by Lessor, except as expressly set forth herein. Notwithstanding the foregoing, Lessor has agreed to fill cracks in the parking lot and "tune-up" the roof to make it leak-free prior to the Commencement Date at Lessor's sole cost and expense, and shall deliver possession of the Premises to on the Commencement Date free of hazardous substances (except for such cleaning materials, office supplies and other substances which are used in the ordinary course of business of Lessee at the Premises and used and stored in compliance with applicable law), with all building systems in good working order and condition and with the Premises in compliance with applicable laws, ordinances and code requirements, including, without limitation, any sanitation procedures required or recommended by any applicable governmental or quasigovernmental authority for a food processing facility.  If Lessor

Exhibit B
12

fails to perform such work or cause the Premises to be in compliance with the foregoing sentence prior to the Commencement Date, and such failure continues for five (5) business days after receipt of written notice thereof, Lessee shall have the right to perform such work at Lessor's expense, the actual and reasonable cost of which shall be due and payable within thirty (30) days after receipt of written demand together with appropriate supporting documentation, and if Lessor fails to reimburse Lessee for such costs within such thirty (30) day period, Lessee shall have the right to deduct the cost thereof from Rent next due and owing hereunder.

**B.    Lessee's Obligations.**

Lessee shall repair, maintain and replace the Demised Premises in good condition and repair and, at the expiration of the term of this Lease, or any renewal or extension thereof,  Lessee will yield up peaceably the Demised Premises to Lessor in as good order and condition as when the same were entered upon by the Lessee, loss by fire or inevitable accident, damage by the elements, condemnation, matters which are Lessor's obligation hereunder, and reasonable use and wear excepted.  Lessee will, at Lessee's own expense, repair during the term of this Lease, or any extension or renewal thereof, any and all damage, including, but not limited to, damage to nonstructural portions of the walls, floors, heating and cooling units, plumbing, glass, and all other appurtenances, that may occur from time to time; that Lessee hereby waives any and all right to have such repairs or replacements made by Lessor or at Lessor's expense; and that, if Lessee fails to make such repairs and replacements promptly or if such repairs and replacements have not been made within fifteen (15) days after the occurrence of damage and such failure continues for fifteen (15) days after receipt of written notice thereof (or within five (5) business days for any condition which Lessor reasonably indicates poses an imminent risk of damage to persons or property), Lessor may, at Lessor's option, make such repairs and replacements, and Lessee hereby agrees and covenants to repay the actual and reasonable cost thereof to Lessor within thirty (30) days after receipt of written demand therefor together with appropriate supporting documentation.

C.    **Lessor's Obligations**.

Lessor shall repair, maintain and replace the roof, the structural portions of the roof, slab and foundation of the Premises, the parking lots, drive aisles, driveways and sidewalks, and cause the same to be maintained in good condition and repair, at Lessor's sole cost and expense. If Lessor fails to perform such work within fifteen (15) days after receipt of written notice of the need for such work (or within five (5) business days for any condition which Lessee reasonably indicates poses an imminent risk of damage to persons or property or interruption of Lessee's business at the Premises), Lessee shall have the right to perform such work at Lessor's expense, the actual and reasonable cost of which shall be due and payable within thirty (30) days after receipt of written demand together with appropriate supporting documentation, and if Lessor fails to reimburse Lessee for such costs within such thirty (30) day period, Lessee shall have the right to deduct the cost thereof from Rent next due and owing hereunder.

**VI.        LIABILITY OF LESSOR**

Lessee, for and in consideration of this Lease and the demise of the said Premises, hereby

agrees and covenants with Lessor that Lessor shall not be liable for any damage to person or property arising from any cause whatsoever, which shall occur in any manner in or about the said Premises, except to the extent resulting from the negligence, willful misconduct or breach of this Lease by Lessor or its agents, representatives, employees, contractors or consultants, and Lessee hereby agrees to indemnify and save harmless Lessor from any and all claims and liability for damage to persons or property arising from any cause whatsoever, which shall occur in any manner in or about the said Premises, except to the extent resulting from the negligence, willful misconduct or breach of this Lease by Lessor or its agents, representatives, employees, contractors or consultants. Further, Lessee hereby agrees and covenants with Lessor that Lessor shall not be liable for any damage to the said Demised Premises, or to any part thereof, or to any property or effects therein or thereon, caused by leakage from the roof of said Premises or by bursting, leakage, or overflowing of any waste pipes, water pipes, tanks, drains, or stationary washstands, or by reason of any damage whatsoever caused by water from any source whatsoever, except to the extent resulting from the negligence, willful misconduct or breach of this Lease by Lessor or its agents, representatives, employees, contractors or consultants, and Lessee hereby agrees and covenants to indemnify and save harmless Lessor from any and all claims and liability for any damage to the said Demised Premises, or to any part thereof, or to any property or effects therein or thereon, except to the extent resulting from the negligence, willful misconduct or breach of this Lease by Lessor or its agents, representatives, employees, contractors or consultants.

## VII.    REQUIREMENTS OF PUBLIC AUTHORITY.

Lessee, for and in consideration of this Lease and the demise of the said Premises, hereby agrees and covenants with Lessor that, Subject to Section V above, during the term of this Lease, Lessee shall, at its own cost and expense, promptly observe and comply with all present and future municipal, state, and federal ordinances, laws, rules, and regulations affecting the Demised Premises or appurtenances thereto, or any part thereof, whether the same are in force and effect at the time of the commencement of the term of this Lease or may in the future be passed, enacted, or directed and Lessee shall pay all costs, expenses, liabilities, losses, damages, fines, penalties, claims and demands, including reasonable attorney's fees, that may in any manner arise out of or be imposed because of the failure of Lessee to comply with the covenants and agreements of this paragraph VII. Further, Lessee hereby agrees and covenants with Lessor that if Lessee fails to comply promptly with any present or future municipal, state or federal ordinances, laws, rules, and regulations, or fails to comply by such time that compliance may be required by law and such failure continues for fifteen (15) days after Lessee's receipt of written notice thereof, Lessor may, at Lessor's option, take such actions as may be necessary to comply with all present and future municipal, state and federal ordinances, laws, rules, and regulations, and Lessee hereby agrees and covenants to repay Lessor within thirty (30) days after receipt of written demand, together with appropriate supporting documentation, the actual and reasonable cost incurred by Lessor in taking such action.

## VIII.    ALTERATIONS, ADDITIONS, AND IMPROVEMENTS.

Lessee, for and in consideration of this Lease and the demise of the said Premises, hereby agrees and covenants with Lessor that Lessee shall not make or suffer or permit to be made, any alterations, additions, or improvements whatsoever in or about the said Demised Premises without first obtaining the

5

written consent of Lessor therefore, which shall not be unreasonably withheld, conditioned or delayed; provided, however, that such consent, if given, shall be subject to the express condition that any and all alterations, additions, and improvements shall be done at Lessee's own expense and in accordance and compliance with all applicable municipal, state and federal ordinances, laws, rules and regulations, and that Lessee hereby covenants and agrees with Lessor that in doing and performing such work Lessee shall do and perform the same at Lessee's own expense, in conformity and compliance with all applicable municipal, state, and federal ordinances, laws, rules, and regulations, and that no liens of mechanics, materialmen, laborers, architects, artisans, contractors, sub-contractors, or any other lien of any kind whatsoever shall be created against or imposed upon the said Demised Premises, or any part thereof, and that Lessee shall indemnify and save harmless Lessor from any and all liability and claims for damages of every kind and nature which might be made, or from judgments rendered against Lessor or against said Demised Premises on account of or arising out of such alterations, additions, or improvements performed by or on behalf of Lessee. Notwithstanding the foregoing, Lessee shall have the right, without the consent of Lessor, to make such nonstructural alterations or modifications to the Premises as Lessee shall desire provided that all such alterations shall be performed in a lien free manner and in compliance with all applicable laws. If the Lessor shall give consent to Lessee for any alterations, additions or improvements, then before proceeding with or causing any such work to begin, Lessee shall procure and maintain, and shall cause such contractors and subcontractors engaged by or on behalf of Lessee to procure and maintain insurance coverage against such risks, in such amounts as Lessor may reasonably require in light of the scope of the proposed work, in connection with any such alteration, addition or improvement.

**IX.**    **OWNERSHIP OF ALTERATIONS, ADDITIONS, AND IMPROVEMENTS.**

Lessee, for and in consideration of this Lease and the demise of the said Premises, hereby agrees and covenants with Lessor that any and all alterations, additions, and improvements, except for signs, shelving, furniture, fixtures, trade fixtures, equipment and personal property, including, without limitation, any signs, shelving, furniture, fixtures, trade fixtures, equipment and personal property acquired by Tattooed Chef, Inc., a Delaware Corporation ("**Buyer**") pursuant to the Stock Purchase Agreement dated as of May 2, 2021 ("**Stock Purchase Agreement**") between Lessee, Buyer, and the Sellers named therein (collectively, "**Lessee's FF&E**"), whether or not attached to the roof, walls, floors, foundations, or the Premises in any manner whatsoever, shall immediately merge and become a permanent part of the realty, and any and all interest of the Lessee therein shall immediately vest in Lessor, and all such alterations, additions, and improvements shall remain on the said Premises and shall not be removed by Lessee at the termination of this Lease. Lessee's FF&E shall be removed by Lessee at Lessee's expense on or before the termination of the Lease, and Lessee shall repair any damage caused by the removal of Lessee's FF&E at Lessee's own expense, such that the Premises shall be in as good order and condition, reasonable wear and tear, damage by casualty and condemnation, and matters which are Landlord's obligation excepted, as when the same were entered upon by Lessee.

**X.**    **ASSIGNMENT AND SUBLETTING.**

Lessee, for and in consideration of this Lease and the demise of the said Premises, hereby agrees and covenants with Lessor that neither Lessee nor Lessee's heirs, personal representatives, assigns, or successors in interest shall assign this Lease or sublet the said Demised Premises, in whole

or in part, without first obtaining the written consent of Lessor therefor, which shall not be unreasonably withheld, conditioned or delayed; that no assignment of this Lease or any subletting of the said Demised Premises, in whole or in part, shall be valid except by and with the written consent of Lessor first obtained; that the consent of Lessor to any such assignment or subletting shall not operate to discharge Lessee or Lessee's heirs, personal representatives, assigns, or successors in interest from their liability upon the agreements and covenants of this Lease, and Lessee, Lessee's heirs, personal representatives, assigns, and successors in interest shall remain liable for the full and complete performance of all of the terms, conditions, covenants, and agreements herein contained as principals and not as guarantors or sureties, to the same extent as though no assignment or sublease had been made; that any consent of Lessor to any such assignment or subletting shall not operate as a consent to further assignment or subletting or as a waiver of this covenant and agreement against assignment and subletting, and that following any such assignment or subletting, the assignee and/or sublettee shall be bound by all of the terms, conditions, covenants, and agreements herein contained including the covenant against assignment and subletting. notwithstanding the foregoing, Lessee shall have the right, without the prior written consent of Lessor but upon written notice to Lessor, to assign this Lease or sublet the Premises, in whole or in part, to any entity which is controlled by, controls or is under common control with Lessee, the successor by merger with Lessee, or any purchaser of substantially all of Lessee's assets with respect to its business operated at the Premises.

## XI.    UTILITY AND OTHER CHARGES.

Lessee, for and in consideration of this Lease and the demise of the said Premises, hereby agrees and covenants with Lessor to pay promptly, all utility and other charges of whatsoever kind and nature, including charges for electrical, gas, water, refuse, telephone, and other services, which may be incurred in connection with Lessee's use of the said Premises, and indemnify and save harmless Lessor therefrom.

## XII.    LESSOR'S RIGHT OF ENTRY AND TO MAKE ALTERATIONS, ADDITIONS, AND IMPROVEMENTS.

Lessee, for and in consideration of this Lease and the demise of the said Premises, hereby agrees and covenants with Lessor that Lessor, Lessor's heirs, personal representatives, assigns, agents, attorneys, and successors in interest shall have the right at any time, at reasonable times during normal business hours and upon not less than 24 hours prior notice to Lessee, to enter upon the said Premises to inspect the same and to make any and all repairs necessary to the Premises which are required or permitted to be made by Lessor hereunder. At all times, and in any event, Lessor shall have the right to enter the Demised Premises for the purpose of responding to an emergency or apparent emergency provided that Lessor shall provide Lessee notice of any such entry within twenty-four hours after such entry.

## XIII.    TAXES, OTHER ASSESSMENTS, AND INSURANCE.

Lessee and Lessor hereby covenant and agree that all taxes  and special and general assessments of whatsoever kind and nature, extraordinary as well as ordinary, which have been or

7

may be levied upon the said Demised Premises and upon any alterations, additions, and improvements thereon during the Term of this Lease, shall be paid by Lessee directly to the taxing authority prior to delinquency. Lessor shall promptly deliver to Lessee copies of any and all invoices, assessments or other correspondence received from the taxing authority relating to the Premises, and that all taxes and special and general assessments of whatsoever kind and nature, extraordinary as well as ordinary, which have been or may be levied upon the personal property located upon the said Demised Premises shall be paid by Lessee prior to delinquency, provided that Lessee shall have no obligation to pay any penalties, late fees, or other fees or charges ("Lessor's Fees"), which arise as a result of the negligence, willful misconduct or breach of this Lease by Lessor, or taxes or Lessor's Fees which relate to periods before or after the term of this Lease, all of which shall expressly be the responsibility of Lessor.  If any Lessor's Fees or taxes or Lessor's Fees which relate to periods before or after the term of this Lease are paid by Lessee, Lessor shall reimburse Lessee for such amounts within fifteen (15) days after receipt of written demand therefor, failing which Lessee shall have the right to offset such amount against rent next due and owing hereunder until offset in full. Lessee shall have the right to contest any taxes or assessments levied upon the Premises and Lessor shall reasonably cooperate with any such contest at Lessee's sole cost and expense, except to the extent relating to an increase in taxes or assessments due to the action or inaction of Lessor, in which event Lessor shall be responsible for the cost of such contest. Lessee, for and in consideration of this Lease, and the demise of the said premises, hereby agrees and covenants with Lessor to carry and maintain in full force and effect during the term of this Lease, and any extension or renewal thereof, at Lessee's expense, commercial general liability insurance covering bodily injury and proper damage liability, in a form and with an insurance company acceptable to Lessor, with limits of coverage of not less than $10,000.00 for each person and $1,000,000.00 in the aggregate for bodily injury or death liability for each accident, and $1,000,000.00 for property damage liability for each accident for the benefit of both Lessor and Lessee as protection  against all liability claims arising from the Premises. Lessee hereby agrees and covenants with Lessor to deliver a copy of the insurance policy or policies to Lessor at the beginning of the term of this Lease, or as soon thereafter as practicable, and to give Lessor  written notice informing Lessor of the expiration of any such policy. Fire and extended coverage insurance upon all buildings, alterations, and improvements upon the said premises shall be provided for **by Lessee,** and fire and extended coverage insurance upon all the contents and other personal property situated upon the said Premises shall be provided for **by Lessee.** It is understood  and agreed by and  between  the parties that a copy of each policy of fire and extended coverage insurance shall be provided to the parties, hereto at the beginning of the term of this Lease, or as soon thereafter as practicable, and that the party who is responsible for paying the premiums on each policy of fire and extended coverage insurance shall give the other party written notice informing the other party of the expiration of any such policy.

## XIV.        HOLDING OVER

Lessee, for and in consideration of this Lease and the demise of the said Premises, agrees and covenants with Lessor that no holding over by  Lessee after the expiration  of  this Lease,or any renewal or extension thereof, whether with or without the consent of Lessor, shall operate to extend or renew this Lease, and that any such holding over shall be construed as a tenancy from month to month at 110% of the monthly rental  which shall have been  payable at the time immediately  prior

to when such holding over shall have commenced, and such tenancy shall be subject to all the terms, conditions and covenants and agreements of this Lease, provided that such tenancy may be terminated by Lessee on thirty (30) days' notice to Lessor.

**XV.      BANKRUPTCY AND CONDEMNATION.**

Lessee, for and in consideration of this Lease and the demise of the said Premises,hereby agrees and covenants that Lessee shall give written notice to Lessor within ten (10) days of the happening of any of the following events ("Article XV Notice"): Lessee makes an assignment for the benefit of creditors or should be adjudged a bankrupt, either by voluntary or involuntary proceedings, or a bankruptcy proceeding is filed by Lessee, or if otherwise a receiver or trustee should be appointed by any court of competent jurisdiction for Lessee because of any insolvency, or any execution, attachment, replevin, or other court order should be issued against the Lessee or any of Lessee's property whereby the Demised Premises or any building or buildings, or alterations, additions, or improvements thereon shall be taken or occupied or attempted to be taken or occupied by someone other than the Lessee. If the occurrence of any such event described in the Article XV Notice shall not be released or dismissed within sixty (60) days from the date of the Article XV Notice, then such event shall, in the sole and absolute discretion of the Lessor, be deemed a breach of this Lease, and in such event Lessor shall have the option to immediately terminate this Lease and to re-enter the said Demised Premises and to take possession thereof, whereupon Lessee shall quit and surrender peaceably the said Demised Premises to Lessor.  In no event shall this Lease be deemed an asset of  Lessee after the assignment for the benefit of creditors, in any voluntary or involuntary bankruptcy proceeding,  the appointment of a receiver  or trustee, or the issuance of a Writ of Execution, a Writ of Attachment, a Writ of Replevin, or other court order against Lessee or Lessee's property whereby the Demised Premises or any building or buildings, or alterations, additions, or improvements thereon shall be taken or occupied or attempted to be taken or occupied by someone other than the Lessee. Further, Lessee hereby covenants and agrees with Lessor that in the event the said Demised Premises, or any part thereof, shall be taken for any public or quasi-public use under any statute or by right of eminent domain,this Lease shall automatically terminate as to the part so taken, as of the date possession shall have been taken, and the rent reserved shall be adjusted so that Lessee shall be required to pay for the remainder of the term that portion of the rent reserved in the proportion that the said Demised Premises remaining after the taking for public or quasi-public use bears to the whole of the said Demised Premises before the taking for public or quasi-public use of the said Demised Premises.  In the event of a partial taking, if Lessee determines that the remaining portion of the Premises is insufficient for the conduct of its business at the Premises, Lessee shall have the right to terminate this Lease by delivering written notice to Lessor not less than thirty (30) days prior to the designated termination date.  In the event of any taking of all or any part of the Premises, whether permanent or temporary, Lessee shall be entitled to an award from the condemning authority for Lessee's moving and relocation costs, loss of good will, damage to Lessee's FF&E and any other improvements or alterations constructed by Lessee and any separately compensable claim to which Lessee may be entitled.

**XVI.      DESTRUCTION.**

Lessee, for and in consideration of this Lease and the demise of the said Premises,agrees

and covenants with Lessor that if at any time during the term of this Lease, or any extension or renewal thereof, the said Demised Premises shall be totally or partially destroyed by fire, flood, earthquake, or other calamity, then Lessor shall have the option to rebuild or repair the building or buildings, and any alterations, additions, or improvements on the Demised Premises, in as good condition as they were immediately prior to such calamity; provided, however, that such rebuilding or repair shall be commenced within a period of thirty (30) days after notice in writing to Lessor of such destruction or damage. In such case, a just and proportionate part of the rental herein specified shall be abated until such Demised Premises shall have been rebuilt and repaired. In case, however, Lessor shall within thirty days following notice in writing to him of such damage elect not to rebuild or repair said premises, Lessor shall so notify Lessee and, thereupon, Lessee shall have the option to repair the Premises (subject to Lessee's receipt of insurance proceeds therefor) or terminate this Lease, by delivering written notice thereof to Lessor. Additionally, if Lessor shall fail to promptly commence or diligently prosecute the repair to completion, Lessee shall have the right to perform the same or to terminate this Lease by delivering written notice to Lessor not less than thirty (30) days prior to the date of termination. Moreover, in no event, shall Lessor have any duty or obligation to rebuild or repair any signs, shelving, moveable furniture, equipment not affixed to the roof, walls, or floors as a permanent part of the realty, or any other personal property owned or leased by the Lessee and used to carry out the purpose for which Lessee is leasing the demised premises.

## XVII.  SIGNS

Lessor and Lessee covenant and agree that Lessee may at Lessee's own expense erect and maintain a sign or signs to carry out the purpose for which Lessee is leasing the said Demised Premises; provided, however, the location, type and design of all exterior signs shall be first approved in writing by Lessor, which shall not be unreasonably withheld, conditioned or delayed. Upon the expiration of this Lease, or any renewal or extension thereof, Lessee shall remove such sign or signs and shall repair any damage to the premises caused by the removal of such signage at Lessee's own expense. Further, at any time within thirty days prior to the termination of this Lease, or any renewal or extension thereof, provided that Lessee has not exercised any then available options to extend, Lessor shall have the right to place upon any portion of said demised premises any "For Rent" or "For Lease" signs that Lessor may select in a location mutually approved by the parties.

## XVIII.  TERMINATION AND REMEDIES.

Lessee, for and in consideration of this Lease and the demise of the said Premises by Lessor to Lessee, hereby agrees and covenants that it is expressly understood and agreed between the parties hereto, that upon the occurrence of any event of default or breach of this Lease which is not cured within (a) fifteen (15) days after receipt of written notice with respect to a monetary default or (b) for any nonmonetary default, thirty (30) days after Lessee's receipt of written notice thereof (provided that if such breach or default is not capable of cure within such thirty (30) day period, Lessee shall have such additional time as may be necessary to effect a cure provided that Lessee commences to cure within such thirty (30) day period and thereafter diligently prosecutes the same to completion), and at any time thereafter, it shall and may be lawful for the Lessor, at Lessor's election, to declare said term ended and to re-enter the said Premises, or any part thereof, either

10

with or without process of law, and to expel, remove, and put out the Lessee or any other person or persons occupying the Demised Premises, using such force as may be necessary in so doing, and to repossess and enjoy the same Premises again as in its first and former state, and to distrain for any rent that may be due thereon any property belonging to Lessee, whether or not the same be exempt from execution and distress by law, and Lessee in that case hereby waives any and all legal rights which Lessee, now has or may have, to hold or retain any such property under any exemption laws now or thereafter in force in the State of New Mexico, or in any other way. It is the intent of the parties hereto to hereby recognize in Lessor, a valid first lien as provided by the laws of the State of New Mexico, upon all goods, chattels, and other property belonging to Lessee and located in said Premises, as security for the payment of said rent and fulfillment of the faithful performance of the agreements, covenants, terms, and conditions hereof as herein provided, anything hereinbefore mentioned to the contrary notwithstanding. And if at any time said terms shall be ended at such election of Lessor, as aforesaid, or in any other way, Lessee, does hereby covenant and agree to surrender and deliver up the above-described Premises and property peaceably to Lessor immediately upon the termination of said terms as aforesaid, and if Lessee shall remain in possession of the same ten (10) days after notice of such default, or after the termination of the lease in any of the ways above named, Lessee shall be deemed guilty of a forcible detainer of said Premises under the laws of New Mexico and shall be subject to all the conditions and provisions above named and shall also be subject to eviction and removal, forcible or otherwise, with or without process of law as above stated. Further, it is covenanted and agreed by and between the parties hereto that at any time after any such termination, the Lessor may re-let the Demised Premises, or any part thereof, in the name of the Lessor or otherwise, for such term and on such conditions as the Lessor, in Lessor's sole and absolute discretion, may determine, and may collect and receive the rent therefor. Moreover, in the event Lessor relets the Demised Premises, or any part thereof, it is explicitly understood and agreed byand between the parties hereto that the term may be greater or lesser than the period which would otherwise have constituted the balance of the Term of this Lease, and the conditions may includefree rent or other concessions which may be reasonably required to induce another party to lease the Demised Premises. Notwithstanding anything herein to the contrary, the Lessor shall have no obligation hereunder to re-let the Demised Premises, or any part thereof, and shall in no way be responsible or liable for any failure to collect any rent due upon such re-letting. It is also covenanted and agreed by and between the parties hereto that no such termination of this Lease shall relieve the Lessee of its liabilities and obligations under this Lease, and such liabilities and obligations shall survive any such termination. In the event of any such termination, whether or not the Demised Premises, or any part thereof, shall have been re-let, the total remaining balance of the rent which would be due and payable for the remainder of the term of this Lease, if this Lease were still in effect, less the net proceeds of any re-letting effect pursuant to the Lessor's sole discretion, after deducting from the net proceeds all of the Lessor's expenses in connection with such re-letting, including, without limitation, all repossession costs, brokerage commissions, legal expenses, reasonable attorneys' fees, alteration costs, and expenses of preparation of such re-letting, shall become immediately due and payable, as and for liquidated damages of the Lessee's default. Nothing herein contained, however, shall limit or prejudice the right of Lessor to prove for and obtain as liquidated damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater than, equal to, or less than, the amount of the difference referred to above,

11

and whether or not such amount shall be immediately or otherwise due and payable. Further, it is covenanted and agreed to by and between the parties hereto, that in addition to other remedies provided for in this Lease, the Lessor shall be entitled to restraint by injunction of the violation, or attempted or threatened violation, of any agreement or covenant of this Lease, or to a decree specifically compelling performance of any such agreement or covenant. The Lessee hereby expressly waives, so far as permitted by law, the service of any notice of intention to re-enter provided for in any statute, or of the institution of legal proceedings to that end. Lessee also hereby expressly waives any right or redemption or re-entry or repossession or to restore the operation of this Lease in case the Lessee shall be dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by the Lessor. It is further covenanted and agreed by and between the parties hereto, that the Lessee shall pay and discharge all costs, reasonable attorneys' fees, and expenses incurred by Lessor in pursuing any or all remedies which are or may be available hereunder or allowed at law or in equity, or incurred by Lessor in connection with re-letting the Demised Premises.

### XIX.        LESSOR'S REMEDIES ARE CUMULATIVE.

The specified remedies to which the Lessor may resort under the terms of this Lease are cumulative and are not intended to be exclusive of any other remedies or means of redress to which the Lessor may be lawfully entitled in case of any breach or threatened breach by the Lessee of any of the agreements and covenants herein contained.

### XX.        WAIVERS.

Lessee, for and in consideration of this Lease and the demise of the said Premises, agrees and covenants with Lessor that the delay or omission in the enforcement of any of the agreements and covenants herein contained, or in the exercise of any of Lessor's rights hereunder, shall not affect the duty of the Lessee to thereafter faithfully fulfill and perform all of the agreements and covenants herein contained, and that the failure, neglect, or omission of Lessor to terminate this Lease for any one or more breaches of any agreements and covenants hereof, shall not be deemed a consent by Lessor of such breach and shall not impede, impair, estop, bar, or prevent Lessor from thereafter terminating this Lease, either for such violation, or for prior or subsequent violations of any covenant or agreement hereof.

### XXI.        BINDING ON HEIRS, PERSONAL REPRESENTATIVES, ASSIGNS, ANDSUCCESSORS IN INTEREST.

It is understood and agreed by and between the parties hereto that the agreements, covenants, terms, conditions, provisions, and undertakings in this Lease, or in any extension or renewal thereof, shall extend to and be binding upon the heirs, personal representatives, assigns, and successors in interest of the respective parties hereto, as if they were in every case named andexpressed, and shall be construed as covenants running with the land; and wherever reference is made to either of the parties hereto, it shall be held to and include and apply also to the heirs, personal representatives, successors, and assigns of such party, as if in each case so expressed.

## XXII.    ADDRESSES FOR NOTICES.

Any and all notices required or permitted to be given hereunder shall be considered to have been given if in writing and delivered to the respective party designated below upon the date of such personal delivery, upon receipt if sent by overnight courier, or upon a date three (3) days following the mailing of any such notice by certified or registered mail, return receipt requested, addressed to the respective party at the respective addresses set forth below, or at such other address as either party may furnish the other as herein provided:

| NOTICES TO LESSOR: | NOTICES TO LESSEE: |
| --- | --- |
| Larry Gutierrez<br>12040 N. 133rd Way<br>Scottsdale, AZ 85259 | Tattooed Chef, Inc., on behalf of<br>New Mexico Food Distributors, Inc.<br>6305 Alondra Blvd.<br>Paramount, CA 90723<br>Attention: Stephanie Dieckmann<br>Email: stephanie@<br>        tattooedchef.com |
| | and: |
| | Rutan & Tucker, LLP<br>18575 Jamboree Road,<br>Suite 900<br>Irvine, CA 92612<br>Attention: Ellis Wasson |

## XXIII.    DECLARATION OF CONTRACTUAL LIABILITY.

If there is more than one party named Lessee, the covenants and agreements of the Lessee shall be joint and several obligations of each such party.

## XXIV.    GRAMMATICAL USAGE.

In construing this Lease, feminine or neuter pronouns shall be substituted for masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.

## XXV.    COVENANT TO EXECUTE ADDITIONAL INSTRUMENTS.

The parties hereto hereby agree to execute and deliver any instruments in writing necessary to carry out any agreement, covenant, term, condition, or assurance in this Lease whenever an occasion shall arise and a request for such instrument shall be made.

## XXVI.    SEVERABILITY.

If any provision of this Lease, or any application thereof, shall be declared invalid or unenforceable by any court of competent jurisdiction, the remainder of this Lease, and any other application of such provision, shall continue in full force and effect.

## XXVII.    CAPTIONS.

The section or article headings are for convenience of reference only and shall nototherwise affect the meaning hereof.

## XXVIII.    GOVERNING LAW.

This Lease shall be governed by and construed in accordance with the laws of the State of New Mexico.

## XXIX.    AMENDMENTS.

It is understood and agreed by and between the parties hereto that this Lease shallnot be altered, changed, or amended except by instrument in writing executed by the parties hereto.

## XXIX.    FORCE MAJEURE

Whenever a period of time is prescribed in this Lease for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, delays due to strikes; riots; acts of God; shortages of labor or materials; war; epidemics, pandemics, governmental laws, regulations, restrictions, or public health orders to shelter in place, reduce operations, or close; or any other causes of any kind whatsoever which are beyond the control of such party. The foregoing shall not excuse, however, the timely payment of Rent by Lessee under the provisions of this Lease, unless and until further agreement is reached between Lessor and Lessee on mutually acceptable terms to defer Rent.

## XXXI.    BUSINESS INTERRUPTION

Lessor shall not be responsible for, and Lessee releases and discharges Lessor from, and Lessee further waives any right of recovery from Lessor for, any loss for or from business interruption or loss of use of the Premises suffered by Lessee in connection with Lessee's use or occupancy of the Premises, except to the extent resulting from the negligence, willful misconduct or breach of this Lease by Landlord or its agents, representatives, employees, contractors or consultants.

## XXXII.    LESSOR ASSIGNMENT

Lessor shall not assign, transfer, sell or encumber its interest in the Premises or this Lease ("**Lessor Transfer**") without the prior written consent of Lessee, which shall not be unreasonably withheld provided that (a) Lessor shall provide Lessee not Lessee than ninety (90)

14

days' prior notice of any such Lessor Transfer, (b) Lessee shall have the option to purchase the Premises pursuant to Sections XXXV (if applicable) and XXXVI below, (c) in the event of an assignment, transfer or sale of the Premises, such transferee shall execute an assumption of this Lease in form and substance reasonably acceptable to Lessee acknowledging that it is bound by all provisions of this Lease (including, without limitation, any options to extend the Term, the Purchase Option and the Refusal Right), (d) in the event of any encumbrance, mortgage or deed of trust or other security interest in the Premises, the holder or beneficiary of such instrument shall enter into a nondisturbance agreement, acceptable to Lessee in its sole and absolute discretion, which provides among other things that Lessee's interest in the Premises and rights under the Lease (including, without limitation, any options to extend the Term, the Purchase Option and the Refusal Right) shall not be disturbed or diminished, so long as Lessee is not in default under this Lease after the expiration of all applicable grace, notice and cure periods, and (e) any such Lessor Transfer shall not result in a breach or a default under the IRB Lease, adversely affect the IRB (as defined in the Stock Purchase Agreement) or result in any cancellation, termination or extinguishment of the IRB Purchase Option; notwithstanding the foregoing, Lessor reserves the right to assign this Lease to a limited liability company which is owned and controlled by Lessor or his spouse, children or grandchildren, or to a trust in which Lessor or his direct relatives his spouse, children or grandchildren are the trustees ("**Successor Lessor**") during the Term of Lease, including any option terms, subject to the terms and conditions set forth herein; provided that (i) Lessor shall provide Lessee not less than ninety (90) days' prior notice of any such assignment (or such shorter period of time as may be appropriate in the event of a Lessor Transfer which is triggered by the death or incapacity of the initially named Lessor), (ii) Lessee shall have the option to purchase the Premises pursuant to Sections XXXV (if applicable) and XXXVI below, (iii) such transferee shall execute an assumption of this Lease in form and substance reasonably acceptable to Lessee acknowledging that it is bound by all provisions of this Lease (including, without limitation, any options to extend the term or purchase the Premises), and (iv) provided further that any such assignment shall not result in a breach or a default under the IRB Lease or result in any cancellation, termination or extinguishment of the IRB Purchase Option.  Any such assignment shall not relieve Lessor of any obligation hereunder.  In the event of any such Lessor Transfer, the Successor Lessor shall assume all of Lessor's obligations hereunder and such Successor Lessor shall take the Lease subject to the Purchase Option and Right of First Refusal.  Upon receipt of written notice from Lessor, Lessee agrees to remit all payments due under this Lease to Successor Lessor.

## XXXIII.    IRB LEASE

This Lease is subject and subordinate to that certain Second Amended and Restated Lease Agreement dated as of May 1, 2013 between Bernalillo County, New Mexico, a New Mexico political subdivision (the "**County**") and New Mexico Food Distributors, Inc., a New Mexico corporation ("**NMFD**").  Lessor represents and warrants to Lessee that NMFD is the tenant under the IRB Lease, that there are no defaults or any facts or circumstances which, with the giving of notice and/or passage of time would constitute a default by any party under the terms of the IRB Lease.  Lessor further represents and warrants to Lessee that Lessor is the sole owner of the purchase option contained in Section 9.1 of the IRB Lease ("**IRB Purchase Option**"), which was assigned from NMFD to Lessor pursuant to that certain Amended and Restated Assignment of Purchase Option dated December 29, 2015, and no portion of such right has been further

assigned, pledged, transferred, hypothecated, conveyed or encumbered.  Lessor represents and warrants to Lessee that Lessor has not exercised the IRB Purchase Option.  Lessor shall at all times comply with the IRB Lease.  Lessor shall not further transfer, assign, pledge, transfer, hypothecate, convey or encumber the IRB Purchase Option ("**Purchase Option Transfer**"), without the prior written consent of Lessee, which shall not be unreasonably withheld, provided that (a) Lessor shall provide Lessee not Lessee than ninety (90) days' prior notice of any such Purchase Option Transfer, (b) Lessee shall have the option to purchase the Premises pursuant to Sections XXXV (if applicable) and XXXVI below, (c) in the event of an assignment, transfer or sale of the IRB Purchase Option, such transferee shall execute an assumption of this Lease in form and substance reasonably acceptable to Lessee acknowledging that it is bound by all provisions of this Lease (including, without limitation, any options to extend the Term, the Purchase Option or the Refusal Right), (d) in the event of any encumbrance, mortgage or deed of trust or other security interest in the Purchase Option, the holder or beneficiary of such instrument shall enter into a nondisturbance agreement, acceptable to Lessee in its sole and absolute discretion, which provides among other things that Lessee's interest in the Premises and rights under the Lease (including, without limitation, any options to extend the Term, the Purchase Option and the Refusal Right) shall not be disturbed or diminished, so long as Lessee is not in default under this Lease after the expiration of all applicable grace, notice and cure periods, and (e) any such Purchase Option Transfer shall not result in a breach or a default under the IRB Lease, adversely affect the IRB (as defined in the Stock Purchase Agreement) or result in any cancellation, termination or extinguishment of the IRB Purchase Option.  Lessor shall provide to Lessee any written notice received from the County in connection with the IRB Lease within one (1) business day of Lessor's receipt thereof.  Lessor shall not exercise the IRB Purchase Option without the prior written consent of Lessee, which may be granted or withheld in Lessee's sole and absolute discretion.  Lessor shall indemnify, defend and hold Lessee harmless from and against any claims, losses, costs, expenses, damages, causes of action, including, without limitation, reasonable attorneys' fees, incurred by Lessee in the event of any breach by Lessor of the IRB Lease, including, without limitation, any relocation costs, moving expenses and other expenses incurred by Lessee in the event this Lease is terminated as a result of the IRB Lease being terminated due to Lessor's default thereunder.  The provisions of this Section XXXIII will survive the termination of this Lease.

## XXXIV.    COUNTERPARTS

This Lease may be executed in counterparts, each of which shall be deemed an original, but such counterparts, when taken together, shall constitute one agreement.  The parties may also deliver executed copies of this Lease to each other by electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.  No party may raise the use of any image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of this Lease.  At the request of either party, the parties will confirm signatures by signing and delivering an original document.

## XXXV.    RIGHT OF FIRST REFUSAL

Exhibit B
25

(a)    Grant of Refusal Right.  Lessor hereby grants to Lessee a right of first refusal to purchase Lessor's interest in the Premises (including, without limitation, the IRB Purchase Option) (the "**Refusal Right**") on the terms and conditions set forth in this Section XXXV.  The Refusal Right shall be binding upon Lessor and its successors and assigns in interest to the Premises.

(b)    Offer Notice.  Within thirty (30) days following the receipt by Lessor of a bona fide offer from a third party (a "**Third Party**") to purchase and acquire all of Lessor's interest in the Premises which Lessor desires to accept (a "**Third Party Offer**"), Lessor shall notify Lessee of the price and other material monetary terms on which Lessor is willing to sell the Premises ("**First Refusal Offer Notice**").  The First Refusal Offer Notice shall include a copy of the Third Party Offer.  Any party succeeding to the interest of Lessor in all or any part of the Premises shall take such interest subject to the Refusal Right hereby granted to Lessee.

(c)    Acceptance or Rejection of Offer.  Within thirty (30) days from receipt of the First Refusal Offer Notice, Lessee shall have the right, but not the obligation, to exercise the Refusal Right upon the terms and conditions set forth in the Third Party Offer; provided, however, that notwithstanding anything to the contrary in the Third Party Offer, Lessee shall have the right in its sole and absolute discretion, to purchase the Premises subject to the existing indebtedness secured by the Mortgage (as defined in the IRB Lease), in which event the purchase price shall be reduced by the outstanding principal balance of the indebtedness as of the closing date of the purchase of the Premises.  If Lessee desires to exercise the Refusal Right, Lessee must deliver written notice to Lessor within such thirty (30) day period which states Lessee's agreement to purchase the Premises on the terms and conditions set forth in the Third Party Offer, except as otherwise expressly provided herein ("**Exercise Notice**").  If Lessee fails to deliver the Exercise Notice to Lessor within such thirty (30) day period, Lessee shall be deemed to have elected not to exercise the Refusal Right, and Lessor may thereafter consummate the sale of the Premises pursuant to the terms and conditions set forth in the Third Party Offer.  However, in the event of any material change in the terms and conditions set forth in the Third Party Offer that are materially more favorable to the party that made the Third Party Offer which Lessor desires to accept, Lessor shall give written notice to Lessee of such material change within two (2) business days after Lessor's receipt thereof and Lessee will then have thirty (30) days from such notice of material change to exercise the Refusal Right based upon such revised terms and conditions in accordance with the provisions of the Third Party Offer.  If Lessee fails to deliver the Exercise Notice to Lessor within such thirty (30) day period, Lessor may thereafter consummate the sale of the Premises pursuant to the new terms and condition.  For purposes of this Section XXXV, the term "material change" shall mean the following:  (i)  a decrease in the purchase price by more than five percent (5%); (ii) an extension in the due diligence period or closing date for more than thirty (30) days; (iii) an increase in the non-cash portion of the purchase price by more than ten percent (10%); (iv) a reduction in the interest rate charged on seller financing of more than one percent (1%); or (v) an extension in the term of seller financing of more than one (1) year.  Notwithstanding anything to the contrary set forth in this Section XXXV or the terms set forth in the Third Party Offer, Lessee shall have a period of not less than ninety (90) days following exercise of the Refusal Right to complete its purchase of the Premises, and shall be entitled to deliver cash in the amount of the fair market value of any non-cash consideration for the Premises provided for in the Third Party Offer.

## XXXVI.    PURCHASE OPTION

Lessor hereby grants to Lessee an option to purchase Lessor's interest the Premises (including, without limitation, the IRB Purchase Option) ("**Purchase Option**") upon the terms and conditions herein set forth.  The Purchase Option shall be binding upon Lessor and its successors and assigns in interest to the Premises. Any party succeeding to the interest of Lessor in all or any part of the Premises shall take such interest subject to the Purchase Option hereby granted to Lessee.  In order to exercise the Purchase Option, Lessee must give written notice of the exercise of the Purchase Option to Lessor prior to the date that is Expiration Date (the "**Option Period**"). If Lessee elects to exercise the Purchase Option, the purchase price to be paid by Lessee shall be the then-current appraised fair market value of the Premises (excluding any increase in the value of the Premises as a result of any tenant improvements performed by or on behalf of and paid for by Lessee) ("**FMV**"); provided, however, that Lessee shall have the right, in its sole and absolute discretion, to purchase the Premises subject to the existing indebtedness secured by the Mortgage (as defined in the IRB Lease), in which event the purchase price shall be reduced by the outstanding principal balance of the indebtedness as of the closing date of the purchase of the Premises. Following the exercise of the option, Lessee shall deliver to Lessor an appraisal of the FMV of the Premises performed by a licensed appraiser with not less than five (5) years' experience as a commercial real estate appraiser in the Bernalillo County, New Mexico market area and experience with appraising industrial and manufacturing facilities ("**Appraiser**"), which appraisal shall be dated within one hundred eighty (180) days of the date the Purchase Option is exercised.  If Lessor objects to the FMV determined by Lessee's Appraiser, Lessor shall deliver written notice of such objection within ninety (90) days after receipt thereof, together with an appraisal of the FMV of the Premises performed by an Appraiser selected by Lessor.  If Lessor fails to deliver written notice of its objection together with its Appraisal within such 90 day period, Lessor shall be deemed to have approved the FMV determined by Lessee's appraiser.  Within ninety (90) after the receipt of the Lessor's appraisal, the two Appraisers shall select a third Appraiser who has no prior business relationship with Lessor or Lessee and such third Appraiser shall deliver its appraisal of the FMV of the Premises within ninety (90) days after its selection.  In such event the FMV shall be the average of the two appraisals which are closest to each other and the third appraisal shall be disregarded.  Lessor and Lessee shall pay all costs and fees of their own Appraiser and 50% of the cost of the third Appraiser.  Lessor and Lessee shall thereafter negotiate in good faith on the form of a commercially reasonable purchase and sale agreement, which will provide for, among other things, a close of escrow to occur within three hundred sixty-five (365) days after the expiration of the Term, that Lessor's interest in the Premises shall be transferred to Lessee subject only to the title exceptions approved in writing by Lessee, in its sole and absolute discretion, and standard representations and warranties from Lessor as the seller thereunder. Until the close of escrow, the terms of this Lease shall remain in full force and effect.

## XXXVII.    REPRESENTATIONS AND WARRANTIES

Lessor and Lessee (each in such capacity, the "**Representing Party**") each represents

18

and warrants to the other that (a) each individual executing this Lease on behalf of the Representing Party is authorized to do so, (b) the Representing Party is not, and the entities or individuals constituting the Representing Party or which may own or control the Representing Party or which may be owned or controlled by the Representing Party are not, among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 (or any related or successor type of Applicable Law) for the purpose of identifying suspected terrorists, (c) if the Representing Party is an entity, the Representing Party is (and shall continue to be for as long as this Lease is in effect) duly organized, validly existing and in good standing under the laws of the state of its organization, and is (and shall continue to be for as long as this Lease is in effect) qualified to do business in the state in which the Premises is located, and (d) the Representing Party has not been involved in any bankruptcy, insolvency or similar action or proceeding.

**[Signatures Follow]**

Exhibit A

Legal Description of Premises

## SCHEDULE 1

Lot numbered Three-A (3-A) in Block numbered Two (2) of SUNPORT PARK, Albuquerque, New Mexico, as the same is shown and designated on the replat of Lots 1, 2 & 3, Block 2 of said Subdivision, filed in the Office of the County Clerk of Bernalillo County, New Mexico, on August 21, 1990, in Plat Book 90C, Folio 195; less

3-2
BERNALILLO COUNTY/NM FOOD DISTRIBUTION INC. C/O FINANCE DEPT. ATTN. DAN MAYFIELD

A CERTAIN PARCEL OF LAND SITUATE WITHIN THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER (NE ¼ SW ¼) F OF SECTION 33, TOWNSHIP 10 NORTH, RANGE 3 EAST, NEW MEXICO PRINCIPAL MERIDIAN, COUNTY OF BERNALILLO, STATE OF NEW MEXICO, COMPRISING A PORTION OF LOT 3-A, BLOCK 2, SUNPORT PARK, AS SHOWN ON THE PLAT ENTITLED "LOT 1-A, 2-A & 3-A IN BLOCK 2, SUNPORT PARK ", FILED FOR RECORD IN THE OFFICE OF THE COUNTY CLERK OF BERNALILLO COUNTY ON AUGUST 21, 1990, IN VOLUME 90C, FOLIO195, AND BEING MORE PARTICULARLY DESCRIBED BY NEW MEXICO STATE PLANE GRID CENTRAL ZONE (NAD 83) BEARINGS AND GROUND DISTANCES AS FOLLOWS:

BEGINNING AT A POINT 70.74 FEET TO THE LEFT OF, WESTERLY AND OPPOSITE OF NAP A300111 CONSTRUCTION CENTERLINE POC STATION 114+96.73, A POINT ON THE EXISTING PRESENT (2017) NORTHERLY RIGHT-OF-WAY LINE OF WOODWARD ROAD, S E. MARKING THE SOUTHWEST CORNER OF DESCRIBED PARCEL, WHENCE A TIE TO FOUND A.G.R.S. BRASS CAP STATION STAMPED "5_M14" BEARS S 84°35'11"W A DISTANCE OF 4,610.92 FEET;

THENCE ALONG A CURVE TO THE LEFT, HAVING AN ARC LENGTH OF 20.35 FEET, A RADIUS OF 25.00 FEET, A DELTA ANGLE OF 46°38'58', A CHORD BEARING OF N 48°56'38' E, AND A CHORD LENGTH OF 19.80 FEET;

THENCE N 00°17'01" W, A DISTANCE OF 368.07 FEET TO A POINT OF CURVATURE;

THENCE ALONG A NON-TANGENT CURVE TO THE LEFT, HAVING AN ARC LENGTH OF 20.36 FEET, A RADIUS OF 25.00 FEET, A DELTA ANGLE OF 46°39'04', A CHORD BEARING OF N 45°32'31" W, AND A CHORD LENGTH OF 19.80 FEET TO A POINT OF CURVATURE ON THE EXISTING PRESENT (2017) SOUTHERLY RIGHT OF WAY LINE OF FLIGHTWAY AVENUE, S.E. MARKING THE NORTHWEST CORNER OF DESCRIBED PARCEL;

THENCE ALONG SAID EXISTING WESTERLY RIGHT OF WAY LINE OF UNIVERSITY BOULEVARD, S.E., ALONG A REVERSE NON-TANGENT CURVE TO THE RIGHT, HAVING AN ARC LENGTH OF 43.22 FEET, A RADIUS OF 30.00 FEET, A DELTA ANGLE OF 82°32'47', A CHORD BEARING OF S 41°20'55" E, AND A CHORD LENGTH OF 39.58 FEET TO AN ANGLE POINT MARKED BY A FOUND NO. 5 REBAR WITH YELLOW PLASTIC CAP "9750";

THENCE S 00°17'01" E, ALONG SAID EXISTING WESTERLY RIGHT OF WAY LINE OF UNIVERSITY BOULEVARD, S.E., A DISTANCE OF 334.02 FEET TO A POINT OF CURVATURE MARKED BY A FOUND NO. 5 REBAR WITH YELLOW PLASTIC CAP "11608";

THENCE ALONG SAID EXISTING WESTERLY RIGHT OF WAY LINE OF UNIVERSITY BOULEVARD, S.E., ALONG A CURVE TO THE RIGHT, HAVING AN ARC LENGTH OF 43.43 FEET, A RADIUS OF 30.00 FEET, A DELTA ANGLE OF 82°56'21', A CHORD BEARING OF S 40°35'16" W, AND A CHORD LENGTH OF 39.73 FEET TO THE POINT OF BEGINNING, CONTAINING 0.0941 ACRES (4,101 SQUARE FEET), MORE OR LESS.

I CERTIFY THAT I AM A REGISTERED PROFESSIONAL SURVEYOR AND THAT THIS DESCRIPTION IS AN INTERIM PRODUCT OF PROJECT DESIGN DEVELOPMENT AND WAS PREPARED BY ME OR UNDER MY DIRECTION AND IS BASED ON ACTUAL FIELD SURVEYS PERFORMED UNDER MY DIRECTION ON FEBRUARY THROUGH OCTOBER 2014 AND IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

LARRY (W. MEDRANO, NMPS 11993                    DATE
PRECISION SURVEYS, INC.
9200 SAN MATEO BOULEVARD N.E.
ALBUQUERQUE, NM, 87113

48027854

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands the day and year first above written.

LESSOR:

_____
Larry Gutierrez

LESSEE:
New Mexico Food Distributors, Inc.

By _____
Name: Stephanie Dieckmann
Title: COO/CFO

## ACKNOWLEDGEMENT

STATE OF NEW MEXICO          )

                             )ss.

COUNTY of BERNALILLO         )

The foregoing instrument was acknowledged before me this 12ᵗʰ of May , 2021, by Larry Gutierrez.

My Commission Expires: 9/25/2023

_____
Notary Public

STATE OF NEW MEXICO          )

                             )ss.

COUNTY of BERNALILLO         )

OFFICIAL SEAL
**Kira Petersen**
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 9/25/2023

The foregoing instrument was acknowledged before me this ____ of _____ 2021 by _____, _____ of New Mexico Food Distributors, Inc., a New Mexico Corporation.

_____
Notary Public

My Commission Expires: _____

*[Signature Page to the Lease Agreement]*

Exhibit B
31

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands the day and year first above written.

LESSOR:                                   LESSEE:
                                          New Mexico Food Distributors, Inc.

_____                   By _____
Larry Gutierrez                           Name: Stephanie Dieckmann
                                          Title: COO/CFO


ACKNOWLEDGEMENT

STATE OF NEW MEXICO          )
                             )ss.
COUNTY of BERNALILLO         )

     The foregoing instrument was acknowledged before me this ____ of _____, 2021, by Larry Gutierrez.

My Commission Expires: _____

                                                                 _____
                                                                 Notary Public


STATE OF NEW MEXICO          )
                             )ss.
COUNTY of BERNALILLO         )

     The foregoing instrument was acknowledged before me this ____ of _____ 2021 by _____, _____ of New Mexico Food Distributors, Inc., a New Mexico Corporation.

                                                                  _____
                                                                 Notary Public


My Commission Expires: _____

*[Signature Page to the Lease Agreement]*

**ACKNOWLEDGMENT**

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _Los Angeles_ )

On _5/01/2021_ before me, _Wayne A. Joseph Jr., Notary Public_
(insert name and title of the officer)

personally appeared _Stephanie Dieckmann_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

WAYNE A. JOSEPH JR.
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMMISSION # 2329546
MY COMM. EXPIRES JUNE 11, 2024

Signature _Wayne A. Joseph Jr._ **(Seal)**

# EXHIBIT "C"

6844301335

# SECOND AMENDED AND RESTATED LEASE AGREEMENT

**BERNALILLO COUNTY, NEW MEXICO**

and

**NEW MEXICO FOOD DISTRIBUTORS, INC.**

*Dated as of May 1, 2013*

**$2,900,000**
**BERNALILLO COUNTY, NEW MEXICO**
**TAXABLE VARIABLE RATE INDUSTRIAL REVENUE REFUNDING BONDS**
**(NEW MEXICO FOOD DISTRIBUTORS, INC. PROJECT)**
**SERIES 2013**

Exhibit C
35

# TABLE OF CONTENTS

Page #

## ARTICLE I

### RECITALS

SECTION 1.1 *Recitals* ...................................................................................................1

## ARTICLE II

### DEFINITIONS AND RULES OF CONSTRUCTION

SECTION 2.1 *Definitions* ..............................................................................................2

SECTION 2.2 *Rules of Construction* ............................................................................4

## ARTICLE III

### REPRESENTATIONS

SECTION 3.1 *Issuer Representations* ...........................................................................5

SECTION 3.2 *Company Representations* .......................................................................6

## ARTICLE IV

### THE PROJECT

SECTION 4.1 *Acquisition, Installation and Completion* ...............................................8

SECTION 4.2 *Plans and Specifications; Changes* ........................................................8

SECTION 4.3 *No Warranty* ...........................................................................................8

SECTION 4.4 *Completion Date* .....................................................................................9

SECTION 4.5 *Gross Receipts and Compensating Tax* ..................................................9

SECTION 4.6 *Assessment in the Company's Name* .....................................................10

SECTION 4.7 *Compliance With Law* ...........................................................................10

Exhibit C
36

SECTION 4.8  *Nuisance Not Permitted*..............................................................................11

SECTION 4.9  *Taxes and Utility Charges*...........................................................................11

SECTION 4.10  *Maintenance*.................................................................................................11

SECTION 4.11  *Replacement and Removal of Project Property*.......................................11

SECTION 4.12  *Easements*.....................................................................................................11

SECTION 4.13  *Eminent Domain; Damage; Destruction*..................................................12

SECTION 4.14  *Insurance*......................................................................................................12

SECTION 4.15  *Access and Inspection*................................................................................12

SECTION 4.16  *Liens*..............................................................................................................12

SECTION 4.17  *Reports on Employment at the Project*...................................................13

SECTION 4.18  *Annual Certificate*......................................................................................13

SECTION 4.19  *Restrictive Covenants*................................................................................13

SECTION 4.20  *Use of Project Property*.............................................................................13

## ARTICLE V

### LEASE; TERM; POSSESSION; RENT; INDEMNIFICATION; PILOT PAYMENTS

SECTION 5.1  *Lease of the Project Property; Term*...........................................................13

SECTION 5.2  *Quiet Enjoyment*............................................................................................13

SECTION 5.3  *Rent*..................................................................................................................14

SECTION 5.4  *Obligations Unconditional*..........................................................................14

SECTION 5.5  *Recording and Filing; Further Assurances*..............................................15

SECTION 5.6  *Claims*.............................................................................................................15

SECTION 5.7  *Indemnity, Expenses*....................................................................................15

SECTION 5.8  *Environmental Matters*................................................................................17

ii

Exhibit C
37

SECTION 5.9  *Indenture Provisions* ........................................................................17

SECTION 5.10  *Payment in Lieu of Certain Property Taxes*.................................................18

## ARTICLE VI

### ASSIGNMENT, LEASING, AND SELLING

SECTION 6.1  *Assignment of Rights by the Issuer*.......................................................18

SECTION 6.2  *No Other Transfer by Issuer*.............................................................18

SECTION 6.3  *Assignment, Lease, Encumbrance and Sale by the Company*.........................19

## ARTICLE VII

### EVENTS OF DEFAULT AND REMEDIES

SECTION 7.1  *Events of Default Defined*................................................................19

SECTION 7.2  *Remedies on Default*....................................................................20

SECTION 7.3  *Company To Give Notice of Default* .....................................................21

SECTION 7.4  *Remedies on Default*...................................................................21

SECTION 7.5  *Default by Issuer - Limited Liability*......................................................21

## ARTICLE VIII

### PREPAYMENTS

SECTION 8.1  *Prepayments*............................................................................22

## ARTICLE IX

### PURCHASE OF PROJECT PROPERTY

SECTION 9.1  *Purchase of Project Property*...........................................................22

## ARTICLE X

### MISCELLANEOUS

Exhibit C
38

SECTION 10.1  *Incorporation of Indenture Provisions* ................................................. 22

SECTION 10.2  *Amendments* ........................................................................................ 22

SECTION 10.3  *No Pecuniary Liability of Issuer* ......................................................... 22

SECTION 10.4  *No Violation of Public Policies Regarding Indemnity.* ......................... 23

SECTION 10.5  *Binding Effect* ..................................................................................... 23

SECTION 10.6  *Severability* ......................................................................................... 23

SECTION 10.7  *Recording* ............................................................................................ 23

SECTION 10.8  *No Waiver* ............................................................................................ 23

SECTION 10.9  *Non-Merger* ......................................................................................... 24

## EXHIBITS

Exhibit A - Project Site

Exhibit B - Permitted Liens

Exhibit C - Improvements

Exhibit D - Tax Abatement Schedule

Exhibit C
39

### Second Amended and Restated Lease Agreement

Bernalillo County, New Mexico, a New Mexico political subdivision (together with its successors and assigns, the "Issuer"), and New Mexico Food Distributors, Inc., a New Mexico corporation (together with its successors and assigns, the "Company"), and agree hereby to enter into this Second Amended and Restated Lease Agreement (the "Second Amended Agreement").

### ARTICLE I

### RECITALS

SECTION 1.01 *Recitals.*

A.    The Company has requested that the Issuer issue its Taxable Variable Rate Industrial Revenue Refunding Bonds (New Mexico Food Distributors, Inc. Project), Series 2013, in the maximum principal amount of $2,900,000 (the "Bonds" or "Series 2013 Bonds"). The proceeds of the Bonds will be used for the Project (defined below);

B.    The Issuer is authorized under Section 4-59-1 to 4-59-16 New Mexico Statutes Annotated, 1978 Compilation (the "Act"), to Refinance certain projects and issue its industrial revenue bonds in payment therefor and has determined that it is desirable to acquire the Project (defined below) by Ordinance No. 2004-9 (the "Bond Ordinance") and has in the Bond Ordinance authorized the issuance of the Series 2013 Bonds;

C.    The Series 2013 Bonds are to be issued under an Second Amended and Restated Indenture dated as of May 1, 2013 (together with any and all amendments and supplements, the "Indenture") between the Issuer and New Mexico Bank & Trust (together with its successors and assignees, and transferees of the Series 2013 Bonds, the "Purchaser").

D.    The proceeds of the Series 2013 Bonds will be used to refund the Series 2008 Bonds, as defined in the Indenture, on a current basis and provide the Company with additional funds necessary to purchase new equipment and pay the costs of issuance of the Series 2013 Bonds.

E.    The Company has caused the Project Site (as defined below) to be conveyed to the Issuer pursuant to a special warranty deed and subject to the Permitted Liens. The Project Property is to be leased to the Company under this Second Amended Agreement;

F.    The Bonds are to be purchased under a Bond Purchase Agreement dated as of May 1, 2013 (together with any and all amendments and supplements, the "Bond Purchase Agreement") among the Issuer, the Purchaser and the Company. The

Exhibit C
40

Indenture, the Bond Purchase Agreement and this Second Amended Agreement are referred to as the "Bond Documents";

G.    The Issuer deems it desirable, in the best interests of its residents and in accordance with the purposes of the Act, to issue the Series 2013 Bonds and make the proceeds thereof available to the Company pursuant to this Second Amended Agreement for the purposes described above and in the Indenture;

H.    The Series 2013 Bonds will be special limited obligations of the Issuer payable as therein provided and the Bonds will not constitute a debt or pledge of the credit of the Issuer, and the Purchaser or owners of the Bonds will have no right to have taxes levied by the Issuer or to require the Issuer to use any revenues for the payment of the Series 2013 Bonds, except for Revenues (as defined in the Indenture); and

I.    The Company and the Issuer each have full right and lawful authority to enter into this Second Amended Agreement and to perform and observe the provisions hereof on their respective parts to be performed and observed.

In consideration of the premises and the mutual representations and agreements hereinafter contained, the Issuer and the Company agree as follows (provided that any obligation of the Issuer created by or arising out of this Second Amended Agreement will never constitute a general debt of the Issuer or give rise to any pecuniary liability of the Issuer, but will be payable solely out of Revenues).

## ARTICLE II

## DEFINITIONS AND RULES OF CONSTRUCTION

SECTION 2.1    *Definitions.*  All words and terms defined in the Indenture have the same meanings when used in this Second Amended Agreement.  In addition:

*"Additional Payments"* has the meaning assigned in Section 5.3(b).

*"Applicable Environmental Law"* means any applicable law, statute, regulation, order or rule pertaining to health or the environment, including, without limitation, CERCLA and RCRA, as each is amended and in effect from time to time.

*"Basic Rent"* has the meaning assigned in Section 5.3 A.

*"CERCLA"* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

*"Commission"* means the Board of County Commissioners of Bernalillo County, New Mexico.

2

Exhibit C
41

*"Debt Service Coverage Compliance Certificate"* means the certificate submitted by the Company to the Issuer and the Purchaser certifying that the Company is in compliance with the Debt Service Coverage Requirement.

*"Debt Service Coverage Requirement"* means Debt Service Coverage as defined in the Second Amended Agreement dated as May 1, 2013 between the Company and the Purchaser

*"Completion Date"* has the meaning assigned in Section 4.4.

*"Eminent Domain"* means the taking of title to, or the temporary use of, all or any part of the Project Property pursuant to eminent domain or condemnation proceedings, or by any settlement or compromise of such proceedings, or any voluntary conveyance of all or any part of the Project Property during the pendency of, or as a result of a threat of, such proceedings.

*"Event of Default"* has the meaning assigned in Section 7.1.

*"Facility"* means a facility used in connection with the Company's commercial food distribution operations to be operated by the Company in Bernalillo County, New Mexico.

*"Guaranties"* collectively means the: (1) Continuing Unlimited Guaranty dated as of May 1, 2013 by Larry P. Gutierrez in favor of Purchaser; (2) Continuing Unlimited Guaranty dated as of May 1, 2013 by Little Anita's Mexican Food, Inc. in favor of Purchaser; and (3) Continuing Unlimited Guaranty dated as of May 1, 2013 by Green Chili, Inc. in favor of Purchaser.

*"Improvements"* means all equipment, furniture, furnishings, computers and other systems and all other personal property of any kind which is subject to depreciation for federal income tax purposes and is suitable for use and used in the Facility, including particularly, but without limitation, those described on Exhibit C.

*"Indemnitee"* means the Indemnified Persons and Indemnified Parties as defined in Section 5.7.

*"Issuance Costs"* means items of expense payable or reimbursable directly or indirectly by the Issuer or the Company and related to the authorization, sale and issuance of the Series 2013 Bonds and authorization and execution of this Second Amended Agreement, which items of expense shall include, but not be limited to, application fees and expenses, publication costs, printing costs, costs of reproducing documents, filing and recording fees, Bond Counsel and counsel fees, costs of credit ratings, charges for execution, transportation and safekeeping of the Series 2013 Bonds and related documents, and other costs, charges and fees in connection with the foregoing.

*"Mortgages"* collectively means the Mortgage dated as of May 1, 2013 executed by Larry P. Gutierrez, the Company and the Issuer in favor of the Purchaser, and the Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing dated as of May 1, 2013 executed by Issuer and Company in favor of the Purchaser.

3

Exhibit C
42

*"Permitted Liens"* means, as of the date of delivery of this Second Amended Agreement, the liens and encumbrances shown in Exhibit B and, as of any particular time, (i) liens for taxes and special assessments, if any, to the extent permitted in Section 4.9, (ii) this Second Amended Agreement and any assignment or lease permitted by this Second Amended Agreement, (iii) mechanics', materialmen's, carriers' and other similar liens to the extent permitted in Section 4.16, and (iv) such minor defects, irregularities, encumbrances, easements, rights-of-way and clouds on title to the Project Property as normally exist with respect to similar properties and as do not, individually or in the aggregate, materially impair the Project Property for the purpose for which it is used by the Company or materially detract from the value of the Project Property.

*"Person"* means any natural person, firm, partnership, association, corporation, or public body.

*"Proceeds,"* when used with respect to any insurance proceeds or any award resulting from, or other amount received in connection with, Eminent Domain, means the gross proceeds from the insurance or such award or other amount.

*"Project"* means the refinancing and purchase of equipment for commercial food distribution, including approximately 4.89 acres of land and approximately 49,683 square foot facility to be located in Bernalillo County, New Mexico.

*"Project Property"* means the Project Site, the Facility and the Improvements.

*"Project Site"* means the real property in Bernalillo County, New Mexico described on Exhibit A.

*"Purchaser"* means New Mexico Bank & Trust, its successors, assigns and transferees of the Bonds.

*"RCRA"* means the Resource Conservation and Recovery Act of 1976.

*"Rent"* means Basic Rent, any Additional Payments and any other amount payable by the Company under this Second Amended Agreement.

*"Term"* means the period from the date of the execution and delivery of this Second Amended Agreement by the Issuer and the Company to the earlier of the date of Payment of the Bonds or the date of termination of this Second Amended Agreement pursuant to Section 7.2(c).

*"TRD"* means the New Mexico Taxation and Revenue Department.

*"Unassigned Rights"* means the right of the Issuer to make all determinations and approvals and receive all notices accorded to it under this Second Amended Agreement and to enforce in its name and for its own benefit the provisions of Sections 4.4, 4.5, 4.15, 4.16, 4.17, 4.20, 5.7, 5.8, 5.10, 5.11, 5.12 and 6.3 of this Second Amended Agreement, with respect to Issuer fees and expenses; gross receipts and compensating tax; the right to access the Project; payments in lieu of taxes; reports to the Issuer; environmental matters; transfer, assignment and subleasing and indemnity payments as the interests of the Issuer and related persons shall appear.

4

Exhibit C
43

SECTION 2.2 *Rules of Construction.*

A.  The captions and headings in this Second Amended Agreement are for
    convenience only and in no way define, limit or describe the scope or intent of
    any provisions or sections of this Second Amended Agreement.

B.  All references in this Second Amended Agreement to particular articles, sections
    or exhibits are references to articles or sections of or exhibits to this Second
    Amended Agreement unless some other reference is established.

C.  Any inconsistency between the provisions of this Second Amended Agreement
    and the provisions of the Indenture will be resolved in favor of the provisions of
    the Indenture.

## ARTICLE III

### REPRESENTATIONS

SECTION 3.1 *Issuer Representations.* The Issuer represents that, as of the date of delivery of
this Second Amended Agreement:

A.  The Issuer is a political subdivision, body corporate and politic of the State, is
    authorized and empowered by the provisions of the Act and the ordinance
    authorizing the issuance of the Series 2013 Bonds to enter into the transactions
    contemplated by this Second Amended Agreement and to carry out its obligations
    hereunder, and by proper action of its governing body has been duly authorized to
    execute and deliver this Second Amended Agreement, the Indenture, the Bond
    Purchase Agreement and the Bonds, and this Second Amended Agreement, the
    Indenture, the Bond Purchase Agreement and the Series 2013 Bonds have been
    duly executed and delivered by the Issuer and assuming due authorization and
    execution by the other party, they are valid and binding obligations of the Issuer
    enforceable in accordance with their terms, except as enforceability may be
    limited by bankruptcy, insolvency, reorganization, moratorium and other laws
    affecting creditors' rights generally and general principles of equity.

B.  The Series 2013 Bonds are to be issued under and secured by the Indenture,
    pursuant to which certain of the Issuer's interests in this Second Amended
    Agreement, and the revenues and receipts to be derived by the Issuer pursuant to
    this Second Amended Agreement, will be pledged and assigned to the Purchaser
    as security for payment of the principal of, premium, if any, and interest on the
    Bonds. The Issuer covenants that it has not and will not pledge or assign its
    interest in this Second Amended Agreement, or the revenues and receipts derived
    pursuant to this Second Amended Agreement, excepting Unassigned Rights, other
    than to the Purchaser under the Indenture to secure the Bonds.

C.  The Issuer finds and determines that the refinancing of the Project will be of
    substantial economic and other benefit to the Issuer, and is in the public interest

5

Exhibit C
44

and in compliance with the purposes and provision of the Act. The Project is located within the boundaries of the Issuer.

D. To the knowledge of the Issuer, neither the execution and delivery of this Second Amended Agreement, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Second Amended Agreement conflicts with or results in a breach of the terms, conditions or provisions of any material restriction, agreement or instrument to which the Issuer is a party, or by which it or any of its property is bound, or constitutes a default under any of the foregoing.

E. To the knowledge of the Issuer, no litigation, proceedings or investigations are pending or, to the knowledge of the Issuer, threatened against the Issuer at law or in equity before any court, tribunal, governmental authority or arbitration board, seeking to restrain, enjoin or limit the approval or issuance and delivery of the Series 2013 Bonds, the Indenture, this Second Amended Agreement or any other documents to which the Issuer is a party, or in which an unfavorable determination could materially and adversely affect the validity or enforceability of the Series 2013 Bonds, the Indenture, this Second Amended Agreement or any other documents to which the Issuer is a party or its ability to perform its obligations thereunder.

F. Neither the nature of the Issuer nor any of its activities or properties, nor any relationship between the Issuer and any other person, nor any circumstance in connection with the issue, sale or delivery of any of the Series 2013 Bonds is such as to require the consent, approval or authorization of, or the filing, registration or qualification with, any governmental authority on the part of the Issuer in connection with the execution, delivery and performance of this Second Amended Agreement or the Bond Purchase Agreement dated of even date herewith other than those already obtained; provided, however, no representation is made as to compliance with any federal or state securities or "blue sky" law.

G. To the knowledge of the Issuer, no member, officer or other official of the Issuer has any pecuniary interest whatsoever in the Company or in the transactions contemplated by this Second Amended Agreement.

H. On August 10, 2004, the Commission adopted the Bond Ordinance approving financing for the Project. The Series 2013 Bonds are issued pursuant to the Bond Ordinance and the Indenture.

SECTION 3.2 *Company Representations.* The Company represents that, as of the date of delivery of this Second Amended Agreement:

A. The Company is a corporation duly organized and validly existing under the laws of the State of New Mexico, is in good standing, and has duly authorized the execution, delivery and performance of this Second Amended Agreement and the Bond Purchase Agreement.

6

Exhibit C
45

B. The execution, delivery and performance by the Company of this Second Amended Agreement and the Bond Purchase Agreement will not conflict with, contravene, violate or constitute a breach of or default under the charter or the bylaws of the Company or any law, rule, regulation, ordinance, order, consent, decree, or any material agreement or instrument to which the Company is a party or by which it or its properties or the Project Property is bound.

C. All necessary authorizations, approvals, consents and other orders of any governmental authority or agency for the execution and delivery by the Company of this Second Amended Agreement and the Bond Purchase Agreement have been obtained and are in full force and effect

D. There is no action, suit, proceeding, inquiry or investigation by or before any court, public board or body pending or, to the knowledge of the Company, threatened against the Company, which (i) seeks to or does restrain or enjoin the issuance or delivery of the Series 2013 Bonds or the execution and delivery of any of the Bond Documents, (ii) in any manner questions the validity or enforceability of the Series 2013 Bonds or any of the Bond Documents, or (iii) questions the authority of the Company to own or operate the Project Property as a whole.

E. The agreement by the Issuer to lease the Project to the Company and to refinance the Project has induced the Company to undertake acquisition, construction, installation and equipping of the Project and to locate its business in Bernalillo County, New Mexico.

F. The Company intends to operate or to cause the Facility to be operated so as to qualify as a "project" as defined in the Act to the later of the payment in full of the principal of, premium, if any, and interest on the Series 2013 Bonds and the expiration or sooner termination of the Term of this Second Amended Agreement as provided herein for use as a manufacturing facility.

G. As agent for the Issuer, the Company has acquired, constructed and equipped the Project.

H. None of the proceeds of the Series 2013 Bonds will be used to provide working capital.

I. The Project will be located inside the corporate limits of the Issuer.

J. This Second Amended Agreement will serve as a financing agreement for the purpose of providing payment for the account of the Issuer of such revenues as will be sufficient to pay the principal of, or premium, if any, and interest on the Bonds, and providing that the Company shall be obligated to pay for the maintenance of and insurance or meet self-insurance requirements on the Project as required by the Act. The Company represents to the Issuer that the Company has the economic ability to meet all of the financial obligations imposed upon the

Exhibit C
46

Company under this Second Amended Agreement and the Company will at all times meet or exceed the Debt Service Coverage Requirement.

K.   No officer or other official of the Issuer has any interest of any kind in the Company which would result, as a result of the issuance of the Series 2013 Bonds, in a substantial financial benefit to such persons other than as a member of the general public of the State.

L.   All property which is to be refinanced by the net proceeds of the Bonds is to be leased by the Company under this Second Amended Agreement.

M.   The Company has heretofore supplied the Issuer estimates of the Related Costs, the Completion Date and periods of usefulness of the Project. The Company hereby warrants that such estimates were made in good faith and are fair, reasonable and realistic.

N.   The Company shall complete the Project prior to the Completion Date and shall cause to be paid all costs of the Project in excess of the moneys available therefor in the Acquisition Account.

O.   No event has occurred and no condition exists with respect to the Company that would constitute an *"Event of Default"* under this Second Amended Agreement or that, with the lapse of time or the giving of notice or both, would become an "Event of Default" under this Second Amended Agreement.

## ARTICLE IV

## THE PROJECT

**SECTION 4.1** *Refinancing and Completion.* The Company will, on behalf of and as agent for the Issuer, refinance the Project Property with all reasonable dispatch. To the maximum extent reasonably possible, the Company will cause the Project to be refinanced with proceeds of the issuance of the Bonds and the Company will use its best reasonable efforts to cause the Purchaser to carry out its obligations to make advances under the Series 2013 Bonds. To the extent necessary, after proceeds of the Series 2013 Bonds have been exhausted, the Company will cause the Project to be refinanced with its own funds or other resources.

**SECTION 4.2** *[Reserved].*

**SECTION 4.3** *No Warranty.* THE COMPONENTS OF THE PROJECT PROPERTY HAVE BEEN DESIGNATED AND SELECTED BY THE COMPANY. THE ISSUER HAS NOT MADE AN INSPECTION OF ANY PORTION OF THE PROJECT PROPERTY. THE ISSUER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS, IMPLIED OR OTHERWISE, WITH RESPECT TO ANY PORTION OF THE PROJECT PROPERTY OR THE LOCATION, USE, DESCRIPTION, DESIGN, MERCHANTABILITY, FITNESS FOR USE FOR ANY PARTICULAR PURPOSE, CONDITION OR DURABILITY OF THE SAME, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN THE SAME. ALL RISKS INCIDENT TO THE PROJECT PROPERTY ARE TO BE BORNE BY THE

8

Exhibit C
47

COMPANY. THE ISSUER WILL HAVE NO LIABILITY WITH REGARD TO OR ARISING OUT OF ANY DEFECT OR DEFICIENCY OF ANY NATURE IN ANY PORTION OF THE PROJECT PROPERTY, WHETHER PATENT OR LATENT. THE PROVISIONS OF THIS SECTION 4.3 HAVE BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES OR REPRESENTATIONS BY THE ISSUER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY PORTION OF THE PROJECT PROPERTY, WHETHER ARISING UNDER THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT.

SECTION 4.4 *Completion Date.* On the date the refinancing of the Project is complete, in the sole opinion of the Company (the "Completion Date"), the Company will deliver to the Issuer a certificate signed by an Authorized Company Representative stating that, except for specified amounts remaining in the Acquisition Account for any specified Related Costs incurred by the Company but not then due and payable, the Project is complete. The Company will cause the Completion Date to occur not later than April 13, 2013. After the transfer of remaining moneys in the Acquisition Account to the Company pursuant to Section 6.05 of the Indenture, the Company will have sole responsibility for the payment of any Related Cost in excess of the amount specified to be retained in the Acquisition Account.

SECTION 4.5 *Gross Receipts and Compensating Tax.*

A.       The Company, either on its own behalf or as agent for the Issuer pursuant to Section 4.1 and this Section, will file returns for reporting and paying compensating tax which is due because of the Project and will pay, as a Related Cost, any gross receipts or compensating tax due from the Issuer under any such returns pursuant to Section 7-9-54 New Mexico Statutes Annotated, 1978 Compilation. The Issuer, at the request of the Company, will provide to the Company a supply of Nontaxable Transaction Certificates to be issued to vendors and contractors by the Company, as agent for the Issuer, in order to permit the vendors and contractors to claim deductions available under the New Mexico Gross Receipts and Compensating Tax Act for their receipts from selling certain tangible personal property for the Project, to the Company, as agent for the Issuer. The Company will promptly pay any gross receipts or compensating tax plus applicable penalty and interest which is found by the TRD to be due from the Company or the Issuer because of the purchase or use of any Project Property or any component of Project Property by the Company or the Issuer. The Company, at its sole expense, may request any rulings from the TRD which the Company determines might be necessary or desirable to clarify the New Mexico gross receipts and compensating tax results of transactions related to the Project and may dispute, at its sole expense, in any manner authorized by the New Mexico Tax Administration Act, any gross receipts or compensating tax liability imposed on the Company or the Issuer because of the Project, provided the Company shall not pursue a dispute without notice to the Issuer and shall not pursue any dispute that, in the opinion of the Issuer, may materially and adversely affect the interests or rights of the Issuer. The Issuer will, at the sole expense of the Company, join in any reasonable modifications to this Second Amended Agreement which are necessary or desirable to obtain Nontaxable Transaction Certificates or otherwise reduce the gross receipts and compensating tax imposed on the Company or

9

Exhibit C
48

the Issuer as a result of or in connection with the Project or the Company's operations at the Project.

B.     The receipts of vendors from the sale of tangible personal property to the Issuer, which tangible personal property is included in the Project Property (but excluding "construction material", as defined in Section 7-9-3.4(B) NMSA 1978), shall be deductible from gross receipts or governmental gross receipts, and exempt from compensating tax, to the fullest extent permitted by Sections 7-9-14 and 7-9-54 NMSA 1978 and 3.2.212.22 NMAC and sections of the NMSA 1978 and the New Mexico Administrative Code (NMAC) under which such provisions or similar provisions may be codified or renumbered in the future. The deduction from gross receipts or governmental gross receipts, and the exemption from compensating tax, shall not apply to purchases of Project Property except as provided in the preceding sentence, and, except as contemplated in the preceding sentence, the Company shall not be authorized by this Second Amended Agreement to provide Nontaxable Transaction Certificates to vendors.

SECTION 4.6  *Assessment in the Company's Name.*  Subject to the provisions of Section 8.1 and 9.1 hereof, if this Second Amended Agreement has not been terminated on or before September 8, 2028, the Company (which, for purposes of this Section 4.6, means the then current lessee of the Project Property under this Second Amended Agreement) will take all necessary action to have the Project Property assessed for property tax purposes in the name of the Company on or within 30 days before September 8, 2028, and the Company (or, if the Issuer does not hold title to the Project Property, the holder of such title) will pay all ad valorem taxes on the Project Property from and after September 8, 2028. If the Project Property must be deeded to the Company to accomplish such assessment, this Second Amended Agreement will thereafter be construed to be an installment sale agreement and all terms and provisions of this Second Amended Agreement will remain in full force and effect. The provisions of Article IX of this Second Amended Agreement govern the delivery and form of any such deed.

SECTION 4.7  *Compliance With Law.*  The Company will obtain or cause to be obtained all necessary permits and approvals for the operation and maintenance of the Project Property, will comply with all lawful requirements of any governmental body, agency or department regarding the use or condition of the Project Property and will cause the Project Property, upon completion, to comply with all applicable restrictive covenants and all other applicable laws, ordinances, statutes, rules and regulations relating to the Project Property and the Facility as a whole. The Company may in good faith contest the validity or the applicability of any such requirement. During the period of such contest and any related appeal, this Section 4.7 will be deemed satisfied with respect to the requirement so contested.

SECTION 4.8  *Nuisance Not Permitted.*  The Company will not permit or suffer its agents, employees, invitees (including building contractors and subcontractors), guests or other visitors to commit a nuisance on or about the Project Property or itself commit a nuisance in connection with its use or occupancy of the Project Property.

SECTION 4.9  *Taxes and Utility Charges.*  The Company will pay, as and when due, (i) all taxes, assessments and governmental charges of any kind whatsoever that may at any time be

Exhibit C
49

lawfully assessed or levied against or with respect to the Project Property; (ii) all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of the Project Property and (iii) all assessments and charges lawfully made by any governmental body for public improvements that may be secured by any lien on the Project Property. The Company may, in good faith, contest the amount or validity of any such levy, tax, assessment or other charge by appropriate legal proceedings. During the period of such contest and any related appeal, this Section 4.9 will be deemed satisfied with respect to any such levy, tax, assessment or other charge so contested.

SECTION 4.10 *Maintenance*. The Issuer will not be under any obligation to, and will not, operate, maintain or repair the Project Property. During the Term of this Second Amended Agreement, the Company will, at its own expense, keep the Project Property in safe repair and in such operating condition as is needed for its operations and make all necessary repairs and replacements to the Project Property (whether ordinary or extraordinary, structural or nonstructural, foreseen or unforeseen).

SECTION 4.11 *Replacement and Removal of Project Property* . The Company may replace or remove any machinery, equipment or fixtures constituting a part of the Project Property and thereby acquire title to such machinery, equipment or fixtures, provided that such replacement or removal will not change the nature of the Project as a qualified "project" as defined in and as contemplated by the Act. Upon request of the Company, the Issuer will deliver to the Company appropriate instruments evidencing the acquisition by the Company of title to any machinery, equipment or fixtures permitted by this Section 4.11 to be so replaced or removed. The provisions of Article IX governs the delivery and form of any such instruments.

SECTION 4.12 *Easements*. The Company may at any time or times grant easements, licenses, rights-of-way and other rights or privileges in the nature of easements with respect to any part of the Project Property, and the Company may release existing interests, easements, licenses, rights-of-way and other rights or privileges with or without consideration and without the consent of the Issuer. The Issuer will, at the Company's sole expense, reasonably cooperate in connection with the execution of the required instruments in connection with the grant and release of such easements, licenses rights of way, rights and privileges.

SECTION 4.13 *Eminent Domain; Damage; Destruction*. The Company will give prompt notice to the Issuer and the Purchaser of any material damage to or destruction of the Project Property. If either the Issuer or the Company receives notice of the proposed taking of all or any part of the Project Property by Eminent Domain, it will give prompt notice to the other and the Purchaser. Any such notice will describe generally the nature and extent of such damage, destruction, taking or proposed taking. The Proceeds resulting from the exercise of Eminent Domain with respect to or from any damage to or destruction of all or any portion of the Project Property will be paid to the Company.

SECTION 4.14 *Insurance*. The Company will keep the Project Property continuously insured against such risks and in such amounts, with such deductible provisions, as are customary in connection with the type and size of the Project Property. Each casualty insurance policy will show the Company as loss payee and each public liability risks insurance policy will show the Company as loss payee, insured under such policies. Such insurance may, to the extent

11

Exhibit C
50

permitted under applicable law, be provided by blanket policies maintained by the Company, by a captive insurance company controlled by the Company or through self-insurance. Such insurance will include general liability insurance against liability for (i) claims for injuries to or death of any person or damage to or loss of property arising out of or in any way relating to the condition of the Project Property, and (ii) liability with respect to the Project Property under the workers' compensation laws of the State (unless the Company has complied with the requirements of the laws of the State for self-insurance).

SECTION 4.15 *Access and Inspection.* Subject to the reasonable security and safety requirements of the Company and with reasonable advance notice to the Company, during the Term of this Second Amended Agreement, the Company will give the Issuer, the Purchaser and their duly authorized agents during regular business hours (i) such rights of access to the Project Property as may be reasonably necessary to inspect the progress of the Project and (ii) the right of entry onto the Project Property as a whole for any purpose contemplated by this Second Amended Agreement. The Company will execute, acknowledge and deliver all such further documents, including any deed or easement, and do all such other acts and things as may be necessary in order to grant to the Issuer and the Purchaser such rights of access and entry. During the Term of this Second Amended Agreement, such rights of access and entry will not be terminated, curtailed or otherwise limited by any sale, assignment, lease or other transfer of the Project Property by the Company to any other Person.

SECTION 4.16 *Liens.* Except for Permitted Liens, the Company will not suffer any liens to exist on the Project Property as a result of any claims brought against the Company pursuant to a right or interest not existing in connection with, or permitted by, this Second Amended Agreement. The Company will notify the Issuer and the Purchaser of the existence of any lien, other than a Permitted Lien, on the Project Property within 60 days after such lien attaches. The Company may, in good faith, contest the validity of any lien on the Project Property. During the period of such contest and any related appeal, this Section 4.16 will be deemed satisfied with respect the lien so contested.

SECTION 4.17 *Reports on Employment at the Project.* On or before January 31 of each calendar year while the Bonds are outstanding, the Company shall deliver to the Issuer (i) a written report (which may be prepared in reliance upon information furnished by one or more of the construction manager, general contractor, or subcontractors) setting forth in reasonable detail in numbers and types of workers employed in the construction of the Project and (ii) a written report (which may be prepared in reliance upon information furnished by any manager at the time engaged by the Company with respect to the Project) setting forth the number of workers, on a full-time equivalent basis, employed at the Project during the preceding calendar year.

SECTION 4.18 *Annual Certificate.* The Company will furnish to the Issuer and the Purchaser on or before January 31 of each year while the Bonds are outstanding, a certificate of the Company signed by the Authorized Company Representative stating that the Company has made a review of its activities during the preceding calendar year for the purpose of determining whether or not the Company has complied with all of the terms, provisions and conditions of this Second Amended Agreement and the Company has kept, observed, performed and fulfilled each and every covenant, provision and condition of this Second Amended Agreement on its part to be performed and is not in default in the performance or observance of any of the terms,

Exhibit C
51

covenants, provisions or conditions hereof, or if the Company shall be in default such certificate shall specify all such defaults and the nature thereof.

SECTION 4.19 *Restrictive Covenants.* The Company shall comply with all restrictive covenants which run with and bind the Project Site.

SECTION 4.20 *Use of Project Property.* The Company will use the Project Property continuously during the Term so as to constitute a "project" within the meaning of the Act as in effect on the date of issuance of the Bonds. As used in the first sentence of this Section, "continuously" means regularly and on a schedule consistent with that of similar facilities in the United States. Temporary cessation of operations during holiday periods, for maintenance or retooling, during reasonable periods for the repair or replacement of the facilities damaged or destroyed, resulting from labor disputes or because of excess inventories, or under similar circumstances will not constitute a failure by the Company to comply with this section.

SECTION 4.21 *Quarterly and Annual Financial Reports.*

A. The Company shall provide to the Issuer and the Purchaser, no later than 120 days after the end of each fiscal year, the Company's balance sheet, income statement and Debt Service Coverage Compliance Certificate all of which have been reviewed by a qualified firm of Certified Public Accountants acceptable to the Issuer and the Purchaser. In addition, the Company shall provide to the Issuer and the Purchaser, no later than 60 days after the end of each fiscal quarter, Company's balance sheet, income statement and Debt Service Coverage Compliance Certificate acceptable to the Issuer and the Purchaser.

## ARTICLE V
### LEASE; TERM; POSSESSION;
### RENT; INDEMNIFICATION; PILOT PAYMENTS

SECTION 5.1 *Lease of the Project Property; Term.* In consideration of the payment of Rent and for other good and valuable consideration, the Issuer leases the Project Property to the Company for the Term.

SECTION 5.2 *Quiet Enjoyment.* The Issuer will not take any action, other than pursuant to Section 4.15 or Article VII, to prevent the Company from having quiet and peaceable possession and enjoyment of the Project Property during the Term (except as necessary with respect to Eminent Domain for public projects and purposes) and will, at the request of the Company and at the Company's expense, to the extent that it is lawfully necessary and the Issuer may lawfully do so, join in any legal action in which the Company asserts its right to such possession and enjoyment.

SECTION 5.3 *Rent.*

A. The Company will pay to the Purchaser for the account of the Issuer, such amounts at such times as are necessary to make all payments of principal of, interest on and redemption price of the Bonds in accordance with the terms of the Bonds and the Indenture as and when due, (collectively, the "Basic Rent");

13

Exhibit C
52

**B.** The Company will also make the following payments (the "Additional Payments" and, together with the Basic Rent, the "Rent"):

(1) to or on behalf of the Issuer, all reasonable out-of-pocket costs and expenses (including, but not limited to, reasonable counsel fees and expenses) incurred by the Issuer in connection with the issuance of the Bonds and the performance of its duties under this Second Amended Agreement and the Indenture, promptly on demand of the Issuer; and

(2) the payments required by Section 5.10 hereof.

SECTION 5.4 *Obligations Unconditional.* The obligation of the Company to pay Rent and to perform its other obligations under this Second Amended Agreement is absolute and unconditional and will not be subject to diminution by setoff, counterclaim, abatement or otherwise, whether as a result of damage to or destruction of or removal of all or any portion of the Project Property or any other event or condition. In the event the Issuer fails to perform any of its obligations under this Second Amended Agreement, the Company may institute such action against the Issuer as the Company may deem necessary to compel such performance. The Company may also, at its own cost and expense and in its own name or, if legally necessary, in the name of the Issuer, prosecute or defend any action or proceeding or take any other action involving third parties which the Company deems reasonably necessary in order to secure or protect its title to or its right of possession and use of the Project Property. In such event, if no Event of Default has occurred and is continuing, the Issuer will cooperate with the Company, so long as it is not the adverse party, upon receipt of indemnity satisfactory to the Issuer against any out-of-pocket cost, expense (including reasonable counsel fees and expenses) or liability the Issuer may incur or suffer as a result of or in connection with such cooperation.

Notwithstanding the above paragraph, it is the intention of this Second Amended Agreement that the Company shall make payments to the Purchaser for the account of the Issuer, in such amounts and at such times as are necessary to make all payments of principal of, interest on and redemption price of the Bonds in accordance with the terms of the Bond Documents as and when due, and all such payments shall be netted against any monies and investment made by the Purchaser to the Acquisition Account (as defined in the Indenture) (including interest income). The Purchaser will look only to the Company for payment of the Bonds and upon the security granted in the Indenture for the Company's obligations under this Second Amended Agreement. As described in Section 6.1, the Issuer will assign and pledge to the Purchaser all right, title and interest of the Issuer in and to this Second Amended Agreement including the right to receive payments hereunder.

SECTION 5.5 *Recording and Filing; Further Assurances.* The Issuer and the Company will, at the direction of the Purchaser and at the expense of the Company, take all actions that at the time are and from time to time may be reasonably necessary to perfect, preserve, protect and secure the interests of the Issuer and the Purchaser in and to the Rent and in the Project Property, including, without limitation, the recordation of this Second Amended Agreement and the Indenture, the filing of financing statements and continuation statements and the execution, acknowledgement, delivery, filing and recordation of any other necessary agreements and instruments.

Exhibit C
53

SECTION 5.6  *Claims.*  The Company will pay and discharge and will indemnify and hold harmless the Issuer from (a) any lien or charge upon payments by the Company to, or for the account of, the Issuer under this Second Amended Agreement and (b) any taxes, assessments, impositions and other charges in respect of the Project Property. If any such claim is asserted, or any such lien or charge upon payments, or any such taxes, assessments, impositions or other charges, are sought to be imposed, the Issuer will give prompt notice to the Company, and the Company will have the sole right and duty to assume the defense of the same and will have the power to litigate, compromise or settle the same.

SECTION 5.7  *Indemnity, Expenses.*

A.      The Issuer and members of its governing body, officers, agents, employees, successors and assigns or other elected or appointed officials of the Issuer, past, present or future (hereinafter the "Indemnified Persons") shall not be liable to the Company for any reason. The Company shall indemnify and hold the Issuer and the Indemnified Persons harmless from and against any and all claims, damages, demands, expenses, liabilities and losses of every kind, character and nature asserted by or on behalf of any person in connection with (i) the issuance, offering, sale, delivery, or remarketing of the Bonds, the Indenture and this Second Amended Agreement; or the acquisition, equipping, operation, use, occupancy, maintenance, or ownership of the Project; (ii) any written statements or representations made or given by the Company or any of its officers or employees to the Indemnified Persons, with respect to the Company, the Project, or the Bonds, including, but not limited to, statements or representations of facts, financial information, or corporate affairs or any breach or default on the part of the Company in the performance of any representation, covenant or agreement of the Company under this Second Amended Agreement, or any related document, or arising from any acts or failure to act by the Company, or any of its agents, contractors, servants, employees or licensees; (iii) damage to property or any injury to or death of any Person that may be occasioned by any cause whatsoever pertaining to the Project; and (iv) any loss or damage incurred by the Issuer as a result of violation by the Company of the provisions of Section 3.2 hereof, or arising out of, resulting from, or in any way connected with, the condition, use, possession, conduct, management, planning, design, acquisition, construction, equipping and renovation or sale of the Project or any part thereof, to the extent not caused or occasioned solely by the gross negligence or willful misconduct of such Indemnified Person. The Company also covenants and agrees, at its expense, to pay, and to indemnify the Indemnified Persons from and against, all costs, reasonable attorney fees, expenses and liabilities incurred in any action or proceeding brought by reason of any such claim. If any such suit, action or proceeding is brought against the Issuer or any Indemnified Person, that suit, action or proceeding shall be defended by counsel to the Issuer or the Company, as the Issuer shall determine. If the defense is by counsel to the Issuer, the Company shall indemnify the Issuer and Indemnified Persons for the reasonable cost of that defense including reasonable counsel fees. If the Issuer determines that the Company shall defend the Issuer or any Indemnified Person, the Company shall immediately assume the defense at its own cost.

B.      The Company shall not be liable for any settlement of any proceeding made without consent (which consent shall not be unreasonably withheld) but if settled with the consent

15

Exhibit C
54

of the Company or if there be a final, unappealable judgment for the plaintiff in any such action, the Company shall indemnify and hold harmless the Indemnified Persons. The Company shall not be obligated to indemnify the Issuer or any Indemnified Person under subsection A, if a court with competent jurisdiction finds that the liability in question was caused by the willful misconduct or gross negligence of the Issuer or the involved Indemnified Person(s), unless the Court determines that, despite the adjudication of liability but in view of all circumstances of the case, the Issuer or the Indemnified Person(s) is (are) fairly and reasonably entitled to indemnity for the expenses which the Court considers proper.

C.    The Company shall also indemnify the Issuer or any Indemnified Person for all reasonable costs and expenses, including reasonable counsel fees, incurred in: (i) enforcing any obligation of the Company under this Second Amended Agreement or any related agreement, (ii) taking any action requested by the Company, (iii) taking any action required by this Second Amended Agreement or any related agreement or (iv) taking any action considered necessary by the Issuer and which is authorized by this Second Amended Agreement or any related agreement.

D.    The indemnification provisions herein contained shall not be exclusive or in limitation of, but shall be in addition to, the rights to indemnification of the Indemnified Persons or the Indemnified Parties under any other agreement or law by which the Company is bound or to which the Company is subject.

E.    The obligations of the Company under this Section 5.7 shall survive any assignment or termination of this Second Amended Agreement, or the discharge of the Indenture.

SECTION 5.8 *Environmental Matters*.  To the extent that the Project Property shall house petroleum or any petroleum products, asbestos, urea formaldehyde foam insulation or any other chemical, material or substance, exposure to which may or could pose a health hazard, the possession and use of such materials shall be in accordance with law, including any applicable regulations.

To the extent that the use which the Company makes or intends to make of the Project Property shall result in the manufacture, treatment, refining, transportation, generation, storage, disposal or other release or presence of any hazardous substance or solid waste on or to the Project Property, such use will be in accordance with law, including any applicable regulations. For purposes of this Second Amended Agreement, the terms "hazardous substance" and "release" will have the meanings specified in CERCLA, and the term "disposal" (or "disposed") will have the meaning specified in RCRA; provided, in the event either CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning will apply subsequent to the effective date of such amendment, and provided further, to the extent that the laws of the State establish a meaning for "hazardous substance," "release," or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader meaning will apply; provided further, that the term "hazardous substance" will also include those listed in the U.S. Department of Transportation Table (49 C.F.R. 172.101) and amendments thereto from time to time.

Exhibit C
55

The Company shall promptly notify the Issuer of any violation or alleged violation of any Applicable Environmental Law related to the Project Property of which the Company becomes aware.

As an inducement for the Issuer to execute the Indenture, the Company shall indemnify and hold harmless the Issuer from and against any and all liabilities, damages, fines, penalties, claims, losses, judgments, causes of action, costs and expenses (including the reasonable fees and expenses of counsel) which may be incurred the Issuer relating to or arising out of the generation, storage, manufacture, refining, release, transportation, treatment, disposal or other presence of any hazardous substances on or about the Project Property.

SECTION 5.9 *Indenture Provisions.* The Indenture provisions concerning the Series 2013 Bonds and the other matters therein are an integral part of the terms and conditions of this Second Amended Agreement, and the execution of this Second Amended Agreement shall constitute conclusive evidence of approval of the Indenture by the Company to the extent it relates to the Company. Additionally, the Company agrees that, whenever the Indenture by its terms imposes a duty or obligation upon the Company, such duty or obligation shall be binding upon the Company to the same extent as if the Company were an express party to the Indenture, and the Company hereby agrees to carry out and perform all of its obligations under the Indenture as fully as if the Company were a party to the Indenture.

SECTION 5.10 *Payment in Lieu of Certain Property Taxes .*

A. *Payments to School District.* Beginning on the first business day in July 2013, and continuing to and including July 1, 2028, Company shall make annual payments to the Albuquerque Public School District ("APS") in the amount shown on Exhibit D. Each annual payment shall be paid on the first business day in July. The payment provisions of this Section 5.10 A may be amended by the mutual agreement of the Company, APS and Issuer.

B. *Payments to Hospital.* Beginning on the first business day in June 2013, and continuing to and including July 1, 2028, Company shall make annual payments to the University of New Mexico Hospital ("UNMH") in the amount shown on Exhibit D. Each annual payment shall be paid on the first business day in July. The payment provisions of this Section 5.10 B may be amended by the mutual agreement of the Issuer, UNMH and the Company.

C. *Payments to the Issuer.* If the Company terminates this Second Amended Agreement within five (5) years of the date hereof due to (i) ceasing operations, (ii) moving the manufacturing facility out of Bernalillo County, or (iii) any other voluntary act of the Company that results in the Project Property's use being discontinued, the Company shall pay to the Issuer an amount equal to the abated taxes less all amounts paid to APS and UNMH pursuant to paragraphs 5.10 A and 5.10 B hereof. The payment shall be made within thirty (30) days of such discontinuance.

17

Exhibit C
56

### D. ARTICLE VI
### ASSIGNMENT, LEASING AND SELLING

**SECTION 6.1** *Assignment of Rights by the Issuer.* As security for the payment of the Series 2013 Bonds, the Issuer will assign and pledge to the Purchaser all right, title and interest of the Issuer in and to this Second Amended Agreement including the right to receive payments hereunder and thereunder (except the Unassigned Rights), and hereby directs the Company to make such Rent payments directly to the Purchaser and other payments to the Purchaser. The Company consents to such assignment and pledge and agrees that it will make payments directly to the Purchaser without defense or setoff by reason of any dispute between the Company and the Issuer or the Purchaser, and hereby further agrees that its obligations to make payments hereunder and to perform its other agreements contained herein are absolute and unconditional.

**SECTION 6.2** *No Other Transfer by Issuer.* Except for the assignment described in Section 6.1, the Issuer will not sell, assign, transfer or convey its rights, title or interests in this Second Amended Agreement, or the Project Property, or its obligations under this Second Amended Agreement. The parties agree that the Company will be entitled to injunctive relief and specific performance (in addition to any other remedies available to it at law or in equity) to enforce the provisions of this Section 6.2.

**SECTION 6.3** *Assignment, Lease, Encumbrance and Sale by the Company.* The rights of the Company under this Second Amended Agreement may be assigned, and the rights of the Company in the Project Property may be assigned, leased, encumbered or sold as a whole or in part by the Company. No such assignment, lease, encumbrance or sale will relieve the Company from primary liability for making payments of Rent and for the performance of its other obligations, including without limitation, the Company's indemnification agreements in Sections 5.7 and 5.8 of this Second Amended Agreement, under this Second Amended Agreement to the same extent as though no assignment, lease, encumbrance or sale had been made. Any assignee, lessee or purchaser of the Company's interest in this Second Amended Agreement or of the Project Property will assume in writing the obligations of the Company under this Second Amended Agreement to the extent of the interest assigned, leased or sold. The Company will, not more than 60 nor less than 30 days before the effective date of any such assignment, lease, encumbrance or sale, furnish or cause to be furnished to the Issuer and the Purchaser a true and complete copy of such proposed assignment, lease, encumbrance or purchase contract and, if applicable, such assumption. On the effective date of any such assignment, lease, encumbrance or sale, the Company will, at the request of the Issuer or the Purchaser and at the expense of the Company, deliver to the requesting Party, an opinion of counsel to the Company (which may be an employee of the Company or other counsel reasonably acceptable to the requesting Party) to the effect that such assignment, lease, encumbrance or sale has been duly authorized by the Company and does not conflict with applicable federal or State law.

18

Exhibit C
57

## ARTICLE VII
### EVENTS OF DEFAULT AND REMEDIES

**SECTION 7.1** *Events of Default Defined.* Each of the following events is an *"Event of Default"*:

**A.**   Failure by the Company to make any Rent payment or Additional Payments when due.

**B.**   The representations of the Company in this Second Amended Agreement or by Larry P. Gutierrez in the Mortgages or the Guaranties prove to have been incorrect in any material respect when made.

**C.**   A decree or order for relief by a court of competent jurisdiction is entered in an involuntary case under any federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Company or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days, or the commencement by the Company of a voluntary case under such law, or the consent by the Company either to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Company or for any substantial part of its property, or the making by it of any assignment for the benefit of creditors, or the taking of action by the Company to authorize or effect any of the foregoing.

**D.**   Failure by the Company to perform any of its obligations under this Second Amended Agreement or the Indenture other than the payment of Rent, for a period of 30 days after written notice, specifying such failure and requesting that it be remedied, is given to the Company by the Issuer or the Purchaser, unless such failure cannot be remedied within 30 days and the Company has instituted corrective action within 30 days after such notice and diligently pursues such action until such failure is remedied.

**E.**   The occurrence of an Event of Default (as defined in the Mortgages).

**SECTION 7.2** *Remedies on Default.* If an Event of Default occurs and is continuing, the Purchaser and only the Purchaser, as the assignee of the Issuer under the Indenture and on behalf of the Issuer, may, but is not required to, take any one or more of the following remedial steps:

> **A.**   By written notice to the Company declare all such amounts of Rent payable for the remainder of the Term as are required to provide for the Payment of the Bonds to be immediately due and payable, whereupon the same will be immediately due and payable;
>
> **B.**   Take possession of the Project Property without terminating this Second Amended Agreement and lease or sublease the Project Property for the account of the Company, crediting against the Rent required to be paid by the Company the amounts received by the Purchaser for the account of the Issuer from any sublessee;
>
> **C.**   Terminate this Second Amended Agreement, hold the Company liable for all Rent due at the effective date of termination and due until the effective

19

Exhibit C
58

date of leasing the Project Property to another, exclude the Company from possession of the Project Property and lease the Project Property to another; provided, however, that such termination and exclusion will not impair any remedy granted to the Issuer or the Purchaser under this Second Amended Agreement;

D.   Take whatever action at law or in equity may appear necessary or desirable to collect the Rent then due and thereafter to become due or to enforce the performance and observance of any obligation of the Company under this Second Amended Agreement or the Indenture; or

E.   Exercise any remedies provided for in the Indenture. In the enforcement of the remedies provided in this Section 7.2, the Purchaser, as the assignee of the Issuer and on behalf of the Issuer will treat all expenses of enforcement, including, without limitation, legal, accounting and advertising fees, as Additional Payments then due and owing. As the assignee of the Issuer, the Purchaser has sole responsibility for the exercise of any remedies if an Event of Default occurs and is continuing, provided that the Issuer shall be under no obligation to exercise any remedies in the event the Purchaser fails to do so.

SECTION 7.3 *Company To Give Notice of Default.* The Company will promptly give notice to the Purchaser of the occurrence of any Event of Default of which it has actual knowledge.

SECTION 7.4 *Remedies on Default.* Notwithstanding any other provision of this Second Amended Agreement or the Indenture, the Issuer shall be entitled to cause the Company to perform the Company's obligations under Sections 4.4, 4.5, 4.15, 4.16, 4.17, 4.20, 4.21, 5.7, 5.8, 5.10, 5.11, 5.12 and 6.3 hereof for the benefit of the Issuer. If the Company fails to comply with its obligations set forth in Sections 4.5, 4.15, 4.16, 4.17, 4.18, 4.19, 4.20, 4.21, 5.7, 5.8, 5.10, 5.11, 5.12 and 6.3 and such failure continues for thirty (30) days after the Issuer gives the Company notice of such failure or any representation of the Company in any Bond document or any document or agreement delivered to any of the other Parties in connection with the transaction contemplated by the Bond Documents proves to have been incorrect in any material respect when made, then, the Issuer may immediately take all steps necessary to have the Project Property immediately assessed for property tax purposes in the name of the Company, and this Second Amended Agreement will thereafter be deemed to be an installment sale agreement. If the Company disputes that such a failure has occurred or continued for such period, or that such a representation was material or incorrect, the County Commission of the Issuer will make a final binding determination.

SECTION 7.5 *Default by Issuer - Limited Liability.* Notwithstanding any provision or obligation to the contrary hereinbefore set forth, no provision of this Second Amended Agreement shall be construed so as to give rise to a pecuniary liability of the Issuer or to give rise to a charge upon the general credit of the Issuer, the liability of the Issuer hereunder shall be limited to its interest in this Second Amended Agreement, and all other related documents and collateral and the lien of any judgment shall be restricted thereto. In the performance of the agreements of the Issuer herein contained, any obligation it may incur for the payment of money

20

Exhibit C
59

shall not be a debt of the Issuer, nor shall the Issuer be liable on any obligation so incurred. The Issuer does not assume general liability for the repayment of the Series 2013 Bonds or for the costs, fees, penalties, taxes, interest, omissions, charges, insurance or any other payments recited herein, and shall be obligated to pay the same only out of the amounts payable by the Company hereunder. The Issuer shall not be required to do any act whatsoever or exercise any diligence whatsoever to mitigate the damages to the Company if a default shall occur hereunder.

## ARTICLE VIII

### PREPAYMENTS

SECTION 8.1 *Prepayments*. The Company may at any time (including after the occurrence and during the continuance of an Event of Default) and for any reason cause all or any portion of the Series 2013 Bonds to be redeemed in accordance with the provisions of the Indenture by giving notice of such redemption to the Issuer, and the Purchaser not less than five days before the redemption date. Such notice will specify the redemption date and the principal amount of the Series 2013 Bonds to be redeemed. If the Company uses its own funds to prepay the principal amounts, on the redemption date the Company will prepay the Rent in an amount equal to such principal amount plus accrued interest on such principal amount to the redemption date by payment of such amounts to the Purchaser. If any prepayment of principal funds if financed by another financial entity, Company will pay a prepayment penalty as follows: during year one of the Second Amended Agreement the Company will pay a prepayment penalty of three percent (3.0%) of outstanding principal; during year two of the Second Amended Agreement the Company will pay a prepayment penalty of two percent (2.0%) of outstanding principal; during years three through six of the Second Amended Agreement the Company will pay a prepayment penalty of three percent (1.0%) of outstanding principal.

## ARTICLE IX

### PURCHASE OF PROJECT PROPERTY

SECTION 9.1 *Purchase of Project Property*. The Company, its successors or assignees will purchase, and the Issuer will sell, the Project Property for $1.00 at the expiration or sooner termination of this Second Amended Agreement and following Payment of the Series 2013 Bonds. The Company will give notice to the Issuer specifying the date of closing such purchase, which will be not less than 15 nor more than 90 days from the date of such notice. At the closing of such purchase, the Issuer will, upon receipt of the purchase price, deliver to the Company a bill of sale and other appropriate documents conveying to the Company title to the Project Property, as they exist at the time of such purchase, subject only to: (i) those liens and encumbrances created by the Company or to the creation or suffering of which the Company consented; (ii) those liens and encumbrances resulting from the failure of the Company to perform any of its obligations under this Second Amended Agreement; and (iii) Permitted Liens other than the Indenture and this Second Amended Agreement. The Company may purchase the Project Property whether or not a Default or an Event of Default has occurred and is continuing.

Exhibit C
60

## ARTICLE X

### MISCELLANEOUS

**SECTION 10.1** *Incorporation of Indenture Provisions.* Each of the provisions of Article X of the Indenture is incorporated in this Second Amended Agreement.

**SECTION 10.2** *Amendments.* This Second Amended Agreement may be amended or modified only as provided in the Indenture.

**SECTION 10.3** *No Pecuniary Liability of Issuer.* No agreements or provisions contained herein nor any agreement, covenant or undertaking by the Issuer contained in any document executed by the Issuer in connection with any property of the Company financed, directly or indirectly, out of the Bond proceeds or the issuance, sale and delivery of the Bonds will give rise to any pecuniary liability of the Issuer or constitute a charge against the Issuer's general credit, or will obligate the Issuer financially in any way, except with respect to the funds available hereunder or under the Indenture and pledged to the payment of the Bonds and its application as provided under the Indenture. No failure of the Issuer to comply with any terms, covenants or agreements herein or in any document executed by the Issuer in connection with the Bonds will subject the Issuer to any pecuniary charge or liability except to the extent that the same can be paid or recovered from the funds available hereunder or under the Indenture and pledged to the payment of the Bonds. None of the provisions of the Second Amended Agreement will require the Issuer to expend or risk its own funds or to otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder unless it will first have been adequately indemnified to its satisfaction against the cost, expense or liability which might be incurred thereby. Nothing herein will preclude a proper party in interest from seeking and obtaining, to the extent permitted by law, specific performance against the Issuer for any failure to comply with any term, conditions, covenant or agreement herein or in the Indenture; provided, that no costs, expenses or other monetary relief will be recoverable from the Issuer except as may be payable from the funds available hereunder or under the Indenture and pledged to the payment of the Bonds.

**SECTION 10.4** *No Violation of Public Policies Regarding Indemnity.* If a court of competent jurisdiction determines that the provisions of Section 56-7-1 NMSA 1978, as amended, are applicable to this Second Amended Agreement or any claim arising under this Second Amended Agreement, then any agreement to indemnify in connection with this Second Amended Agreement will not extend to liability, claims, damages, losses or expenses, including attorney fees, arising out of bodily injury to persons or damage to property caused by or resulting from, in whole or in part, the negligence, act or omission of the indemnitee, its officers, employees or agents.

**SECTION 10.5** *Binding Effect.* This Second Amended Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Company, and their respective successors and assigns.

**SECTION 10.6** *Severability.* In the event any provisions of this Second Amended Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

Exhibit C
61

SECTION 10.7 *Recording*. This Second Amended Agreement, the Indenture and every assignment and modification hereof, or an appropriate and sufficient memorandum thereof, shall be recorded in the office of the County Clerk of Bernalillo County, New Mexico. This Second Amended Agreement as originally executed or an appropriate and sufficient memorandum thereof shall be so recorded before the recordation of the Indenture.

SECTION 10.8 *No Waiver*. No waiver of any breach of any covenant or agreement herein contained shall operate as a waiver of any subsequent breach of the same covenant or agreement, and in case of a breach by either party of any covenant, agreement or undertaking, the non-defaulting party may nevertheless accept from the other any payment or payments or performance hereunder without in any way waiving its right to exercise any of its rights and remedies provided for herein or otherwise with respect to any such default or defaults which were in existence at the time such payment or payments or performance were accepted by it.

SECTION 10.9 *Non-Merger*. The provisions of this Second Amended Agreement shall survive the conveyance of the Project Property to the Issuer, the reconveyance of the Project Property to the Company, and all other performances hereunder, and shall not be deemed merged in any deed or other instrument or document delivered hereunder.

*[Remainder of page intentionally left blank]*

Exhibit C
62

Dated as of  March **19**, 2013.

**BERNALILLO COUNTY, NEW MEXICO**

By 

Chair, County Commission

STATE OF NEW MEXICO )
                             ) ss.
COUNTY OF BERNALILLO )

This instrument was acknowledged before me on March **19**, 2013, by Maggie Hart Stebbins,
Chair of County Commission of Bernalillo County, New Mexico.

Notary Public  Sandra E. Tafoya

My commission expires:  **9/29/15**

> OFFICIAL SEAL
> **Sandra E. Tafoya**
> NOTARY PUBLIC
> STATE OF NEW MEXICO
> My Commission Expires: **9/29/15**

*[Issuer's Signature Page to Second Amended and Restated Lease Agreement]*

S-1

Exhibit C
63

Dated as of May 1, 2013.

NEW MEXICO FOOD DISTRIBUTORS, INC.

_____
Larry P. Gutierrez

STATE OF NEW MEXICO        )
                           ) ss.
COUNTY OF BERNALILLO       )

This instrument was acknowledged before me on [ 5/1/13 ], by _Larry P Guttourez_
of New Mexico Food Distributors, Inc., a New Mexico corporation.

Notary Public

My commission expires: 6/7/13

OFFICIAL SEAL
CRYSTAL LeMASTER
NOTARY PUBLIC - STATE OF NEW MEXICO
My Commission Expires 6/7/13

*[Company's Signature Page to Second Amended and Restated Lease Agreement]*

25

Exhibit C
64

**EXHIBIT A**
**PROJECT SITE**

LEGAL DESCRIPTION

Lot numbered Three-A (3-A) in Block numbered Two (2) of SUNPORT PARK, Albuquerque, New Mexico, as the same is shown and designated on the replat of Lots 1,2 & 3, Block 2 of said Subdivision, filed in the Office of the County Clerk of Bernalillo County, New Mexico, on August 21, 1990, in Plat Book 90C, Folio 195.

A-1

Exhibit C
65

# EXHIBIT B
## PERMITTED LIENS

*[To come from New Mexico Bank & Trust]*

Exhibit C
66

## EXHIBIT C

### IMPROVEMENTS

[ To be updated from NM Foods]

The Improvements to be placed in the Project Site include, but are not limited to, equipments to be used for the commercial food distribution operations of New Mexico Food Distributors, Inc.

**IMPROVEMENTS**

| DESCRIPTION EQUIPMENT | DATE IN SERVICE | BOOK COST |
|---|---|---|
| OPERATING EQUIP | 01/01/88 | $134,709.00 |
| CODE DATE PRINTER - MULTI | 06/30/93 | 5,040.07 |
| PALLET JACK | 07/31/94 | 559.75 |
| 87 CROWN ELECTRIC FORKLIFT | 10/24/94 | 16,310.64 |
| 40 GAL TILT SKILLET | 10/31/94 | 3,591.76 |
| SHELVING FOR WAREHOUSE | 12/31/94 | 3,853.25 |
| 9' BACK TO BACK TABLE W/ | 01/01/95 | 500.00 |
| THERMAL DYNAMIC PLASMA | 03/31/95 | 1,243.30 |
| 2 SYNTRON VIBRATORY FEE | 03/31/95 | 7,604.64 |
| COLBORNE PISTON FILLER | 04/30/95 | 4,878.04 |
| VACUUM PUMP MODULE | 05/31/95 | 2,266.10 |
| AIR DRAWLICS DRYER | 06/30/95 | 1,999.28 |
| CORN TORTILLA MACHINE | 01/19/96 | 135,903.83 |
| AMER STAINLESS TAMALE ST | 07/31/95 | 11,251.24 |
| FOOD CHOPPER | 08/31/95 | 3,015.37 |
| CLARKLIFT | 01/31/96 | 516.20 |
| CONVEYORS | 06/17/96 | 1,412.45 |
| HOBART SLICER | 11/21/96 | 950.06 |
| FLOUR TORTILLA MACHINE | 05/29/97 | 97,547.50 |
| CUTTERS FOR TORTILLA MACH | 06/30/97 | 1,200.00 |
| EXHAUST FAN | 08/31/97 | 1,067.65 |
| SURVEILLANCE SYSTEM | 08/31/97 | 1,560.73 |
| ROLLERS FLOUR TORTILLA | 08/31/97 | 481.80 |
| FLOUR MIXER | 09/30/97 | 14,475.00 |

Exhibit C
67

IMPROVEMENTS

| DESCRIPTION | DATE IN | BOOK |
| --- | --- | --- |
| TORTILLA MACHINE ELECTIRC | 11/30/97 | 1,523.70 |
| USED COOLING CONVEYOR | 01/13/98 | 2,000.00 |
| SIMPLEX MODEL AIR V-100 FILTER | 07/31/98 | 11,399.42 |
| USED CONVECTION OVEN | 11/25/98 | 500.00 |
| USED ADAMADOC PROOFER | 11/25/98 | 1,000.00 |
| USED TAYLOR ICE CREAM MACHINE | 11/25/98 | 2,000.00 |
| USED COOLING CONVEYOR | 11/25/98 | 2,000.00 |
| USED CHIP FRYER | 11/25/98 | 500.00 |
| HOBART PEELER MODEL 6115 | 11/20/98 | 1,640.10 |
| USED FREEZER UNIT | 01/31/99 | 1,000.00 |
| STAINLESS STEEL STEAMER | 05/31/99 | 2,500.00 |
| SHRINK WRAPPING MACHINE | 08/31/99 | 2,200.00 |
| FREEZER UNIT | 12/31/99 | 844.50 |
| COOLING CONVEYOR | 12/31/99 | 28,433.10 |
| UNKNOWN | 01/31/00 | 4,525.34 |
| STAINLESS STEEL VAT - CLEM | 03/17/00 | 1,200.00 |
| UNKNOWN | 05/19/00 | 1,660.20 |
| RIFRIGERATION | 06/16/00 | 6,500.00 |
| TILT SKILLET | 09/27/00 | 1,000.00 |
| CHILLER TORTILLA PLANT | 12/15/00 | 2,097.01 |
| USED - SC (HOBART) | 01/31/01 | 1,882.52 |
| USED FORKLIFT | 04/30/01 | 3,200.83 |
| THERMO-KING VAN | 05/15/01 | 6,573.60 |
| FORKLIFT (S&J) | 06/12/01 | 4,000.00 |
| DOUGH ROLLER | 10/25/01 | 2,390.87 |
| TILTING SKILLET | 11/15/01 | 1,200.00 |
| GAS FURNACE | 11/15/01 | 563.20 |
| FLAT SLAT BELT ASSEM | 12/04/01 | 2,100.00 |
| DOUGH/TORTILLA MACHINE | 02/01/02 | 145,332.28 |
| ALARM SYSTEM | 04/17/02 | 2,089.80 |
| HOOD TEST KITCHEN | 04/30/03 | 500.00 |
| MULTIVAC PARTS | 06/19/03 | 1,269.75 |

Exhibit C
68

## IMPROVEMENTS

| DESCRIPTION | DATE IN | BOOK |
|---|---|---|
| 1000 BASKETS | 07/12/03 | 10,078.82 |
| SCALE PART | 07/31/03 | 1,300.00 |
| SCALE PART | 07/31/03 | 500.00 |
| NEW TORTILLA MACHINE | 09/01/03 | 1,018,825.45 |
| FREEZER | 10/01/03 | 338,486.82 |
| KETTLES | 10/01/03 | 74,266.44 |
| BOILER | 10/01/03 | 118,701.10 |
| FRYER | 10/01/03 | 86,077.75 |
| MURZAN PUMP | 10/01/03 | 9,875.20 |
| BLENDER | 10/01/03 | 28,930.81 |
| VAC TUMBLER | 10/01/03 | 6,057.76 |
| STEIN FILTER | 10/01/03 | 17,712.74 |
| COSTCO EQUIPMENT | 10/01/03 | 201,910.78 |
| REFRIGERANT | 10/01/03 | 11,629.86 |
| WATER SOFTNER | 10/01/03 | 6,944.94 |
| CHASE DOORS | 10/01/03 | 21,992.38 |
| CYBERNETICS COMM EQUIP | 10/02/03 | 3,020.95 |
| LOVESHAW CASE SEALER | 10/29/03 | 6,877.85 |
| CORN GRINDER | 12/15/03 | 7,500.00 |
| ANSUL SYSTEM | 12/30/03 | 1,122.63 |
| SCALE SP1500 | 12/31/03 | 525.95 |
| 10 TON CHILLER BARREL | 02/18/04 | 2,610.54 |
| CONVEYOR BELT 24"X51' | 02/23/04 | 1,143.24 |
| CON EYOR | 02/26/04 | 529.05 |
| AIR HANDLER | 03/25/04 | 1,159.13 |
| UNDER COUNTER FREEZER | 03/26/04 | 1,163.94 |
| SEMI-AUTO CASE SEALER | 04/09/04 | 586.24 |
| AUTO PLASTIC BAGGER | 04/09/04 | 598.00 |
| KOPPENS TRANSFER CONVEYOR | 04/20/04 | 547.00 |
| WIRE CONVEYOR | 04/20/04 | 1,094.00 |
| INCLINE CONVEYOR | 04/20/04 | 821.00 |
| (3) STAINLESS STEEL VATS | 04/20/04 | 812.00 |

Exhibit C
69

IMPROVEMENTS

| DESCRIPTION | DATE IN | BOOK |
|---|---|---|
| GARLAND/US RANGE | 04/22/04 | 2,751.13 |
| DEAN NATL GAS FRYER | 04/22/04 | 687.78 |
| MIXER/GRINDER | 05/05/04 | 1,743.70 |
| VENT HOOD | 05/05/04 | 5,872.60 |
| CHILI DEPOSITOR | 05/16/04 | 11,249.14 |
| FIRE SUPPRESSION SYSTEM | 05/17/04 | 1,620.95 |
| (3) STAINLESS STEEL CARTS | 05/31/04 | 2,620.61 |
| AMULSIFIER | 06/02/04 | 1,430.75 |
| TEMP CONTROLS-3 DWR STM CAB | 06/17/04 | 1,760.50 |
| STEAM KETTLE | 06/28/04 | 10,500.00 |
| FILLING STATION | 06/28/04 | 9,600.00 |
| VACUUM CASING CLIPPER | 06/28/04 | 3,100.00 |
| DOUGH LIFTER | 06/30/04 | 3,097.20 |
| STEIN TEMPURA BATTER APPLICATOR | 07/22/04 | 7,666.35 |
| DATA LOGGING EQUIP | 08/24/04 | 9,274.08 |
| FIRE SUPPRESSION SYSTEM | 08/23/04 | 1,991.12 |
| SANDWICH/SALAD PRED UNIT 60" | 08/24/04 | 1,760.65 |
| OFFICE EQUIP | 01/20/90 | 1,067.00 |
| SUBIA PRTBL TRADE SHOW | 04/30/94 | 5,287.45 |
| OFFICE CABINET | 02/02/01 | 1,047.70 |
| INSIGHT | 2002 | 960.59 |
| AM0210 | 2002 | 771.10 |
| COMPUTERS | 2002 | 3,129.00 |
| UPGRADE PHONE SYSTEM | 03/18/03 | 20,528.68 |
| PHONE SYSTEM UPGRADE | 04/01/03 | 2,505.69 |
| PHONE SYSTEM | 11/03/03 | 1,170.60 |
| BECK OFFICE SYSTEMS | 03/12/03 | 19,680.07 |
| 37 FILE CABINETS | 04/04/03 | 8,233.21 |
| PICTURES FOR OFFICE | 04/14/03 | 5,443.34 |
| SIGN AT ROAD | 07/22/03 | 920.66 |
| SIGN ON BUILDING | 07/31/03 | 568.74 |
| LOBBY COUNTER | 10/01/03 | 2,779.69 |

Exhibit C
70

IMPROVEMENTS

| DESCRIPTION | DATE IN | BOOK |
|---|---|---|
| PELIKAN INDUST CAMERAS | 01/21/04 | 1,011.43 |
| TELEPHONE MODEL 12 | 07/27/04 | 630.28 |
| VP2020 COLOR PRINTER | 08/29/04 | 5,495.00 |
| ALUMINUM PANEL | 08/29/04 | 1,166.69 |
| OKIDATA ML 590 PRINTER | 01/31/97 | 550.99 |
| 2 MMX COMPUSA COMPUTER | 10/31/99 | 1,876.00 |
| DELL PENTIUM III | 07/01/01 | 1,570.68 |
| GATEWAY P-4-1300 | 07/01/01 | 1,435.40 |
| CAMN | 03/17/03 | 5,176.35 |
| AM0210 | 10/02/03 | 1,259.37 |
| PELIKAN DVR 400 GB HDD | 11/10/03 | 3,855.56 |
| INSIGHT COMPAQ & 17" | 11/21/03 | 816.97 |
| COMPUTER HARDWARE | 01/15/04 | 1,507.15 |
| IOT MONITOR | 08/18/04 | 697.36 |
| | | 2,858,835.56 |

All equipment purchased in the future while the bonds remain outstanding.

Exhibit C
71

# EXHIBIT D
## TAX ABATEMENT (10-YR TAX LIFE, 20-YR BOND AMORTIZATION)

*(Attached)*

Exhibit C
72

# LEASE AGREEMENT

BERNALILLO COUNTY, NEW MEXICO

and

NEW MEXICO FOOD DISTRIBUTORS, INC.

*Dated as of September 1, 2008*

**$3,000,000**
**BERNALILLO COUNTY, NEW MEXICO**
**TAXABLE VARIABLE RATE INDUSTRIAL REVENUE REFUNDING BONDS**
**(NEW MEXICO FOOD DISTRIBUTORS, INC. PROJECT)**
**SERIES 2008**

Exhibit C
73

## TABLE OF CONTENTS

Page #

### ARTICLE I

### RECITALS

SECTION 1.1 *Recitals*................................................................................................1

### ARTICLE II

### DEFINITIONS AND RULES OF CONSTRUCTION

SECTION 2.1 *Definitions* ..........................................................................................2

SECTION 2.2 *Rules of Construction*..........................................................................4

### ARTICLE III

### REPRESENTATIONS

SECTION 3.1 *Issuer Representations* ........................................................................5

SECTION 3.2 *Company Representations*....................................................................6

### ARTICLE IV

### THE PROJECT

SECTION 4.1 *Acquisition, Installation and Completion*............................................8

SECTION 4.2 *Plans and Specifications; Changes* .....................................................8

SECTION 4.3 *No Warranty* ........................................................................................8

SECTION 4.4 *Completion Date*..................................................................................9

SECTION 4.5 *Gross Receipts and Compensating Tax*...............................................9

SECTION 4.6 *Assessment in the Company's Name* .................................................10

SECTION 4.7 *Compliance With Law* ........................................................................10

Exhibit C
74

SECTION 4.8 *Nuisance Not Permitted* .................................................................. 11

SECTION 4.9 *Taxes and Utility Charges* ............................................................... 11

SECTION 4.10 *Maintenance* ................................................................................. 11

SECTION 4.11 *Replacement and Removal of Project Property* ............................ 11

SECTION 4.12 *Easements* .................................................................................... 11

SECTION 4.13 *Eminent Domain; Damage; Destruction* ...................................... 12

SECTION 4.14 *Insurance* ..................................................................................... 12

SECTION 4.15 *Access and Inspection* ................................................................. 12

SECTION 4.16 *Liens* ............................................................................................ 12

SECTION 4.17 *Reports on Employment at the Project* ......................................... 13

SECTION 4.18 *Annual Certificate* ........................................................................ 13

SECTION 4.19 *Restrictive Covenants* .................................................................. 13

SECTION 4.20 *Use of Project Property* ................................................................ 13

## ARTICLE V

### LEASE; TERM; POSSESSION; RENT; INDEMNIFICATION; PILOT PAYMENTS

SECTION 5.1 *Lease of the Project Property; Term* .............................................. 13

SECTION 5.2 *Quiet Enjoyment* ............................................................................ 13

SECTION 5.3 *Rent* ............................................................................................... 14

SECTION 5.4 *Obligations Unconditional* ............................................................. 14

SECTION 5.5 *Recording and Filing; Further Assurances* .................................... 15

SECTION 5.6 *Claims* ........................................................................................... 15

SECTION 5.7 *Indemnity, Expenses* ..................................................................... 15

SECTION 5.8 *Environmental Matters* .................................................................. 17

ii

Exhibit C
75

SECTION 5.9 *Indenture Provisions* .......................................................................17

SECTION 5.10 *Payment in Lieu of Certain Property Taxes.* ...........................................18

## ARTICLE VI

### ASSIGNMENT, LEASING, AND SELLING

SECTION 6.1 *Assignment of Rights by the Issuer* .......................................................18

SECTION 6.2 *No Other Transfer by Issuer* .............................................................18

SECTION 6.3 *Assignment, Lease, Encumbrance and Sale by the Company* .........................19

## ARTICLE VII

### EVENTS OF DEFAULT AND REMEDIES

SECTION 7.1 *Events of Default Defined* ................................................................19

SECTION 7.2 *Remedies on Default* .....................................................................20

SECTION 7.3 *Company To Give Notice of Default* ....................................................21

SECTION 7.4 *Remedies on Default* .....................................................................21

SECTION 7.5 *Default by Issuer - Limited Liability* ...................................................21

## ARTICLE VIII

### PREPAYMENTS

SECTION 8.1 *Prepayments* ..............................................................................22

## ARTICLE IX

### PURCHASE OF PROJECT PROPERTY

SECTION 9.1 *Purchase of Project Property* ............................................................22

iii

Exhibit C
76

## ARTICLE X

### MISCELLANEOUS

SECTION 10.1 *Incorporation of Indenture Provisions* .................................................................22

SECTION 10.2 *Amendments* ..................................................................................................22

SECTION 10.3 *No Pecuniary Liability of Issuer* ..........................................................................22

SECTION 10.4 *No Violation of Public Policies Regarding Indemnity.* ............................................23

SECTION 10.5 *Binding Effect* ...............................................................................................23

SECTION 10.6 *Severability* ..................................................................................................23

SECTION 10.7 *Recording* ...................................................................................................23

SECTION 10.8 *No Waiver* ....................................................................................................23

SECTION 10.9 *Non-Merger* ................................................................................................24

## EXHIBITS

Exhibit A - Project Site

Exhibit B - Permitted Liens

Exhibit C - Improvements

Exhibit D - Tax Abatement Schedule

Exhibit C
77

### First Amended and Restated Lease Agreement

Bernalillo County, New Mexico, a New Mexico political subdivision (together with its successors and assigns, the "Issuer"), and New Mexico Food Distributors, Inc., a New Mexico corporation (together with its successors and assigns, the "Company"), and agree hereby enter into this First Amended and Restated Lease Agreement (the "Agreement").

### ARTICLE I

### RECITALS

**SECTION 1.01** *Recitals.*

    **A.**    The Company has requested that the Issuer issue its Taxable Variable Rate Industrial Revenue Refunding Bonds (New Mexico Food Distributors, Inc. Project), Series 2008, in the maximum principal amount of $3,000,000 (the "Bonds"). The proceeds of the Bonds will be used to refinance the Project (defined below);

    **B.**    The Issuer is authorized under Section 4-59-1 to 4-59-16 New Mexico Statutes Annotated, 1978 Compilation (the "Act"), to Refinance certain projects and issue its industrial revenue bonds in payment therefor and has determined that it is desirable to acquire the Project (defined below) by Ordinance No. 2004-9 (the "Bond Ordinance") and has in the Bond Ordinance authorized the issuance of the Series 2008 Bonds;

    **C.**    The Series 2008 Bonds are to be issued under an Indenture dated as of September 1, 2008 (together with any and all amendments and supplements, the "Indenture") between the Issuer and Compass Bank (together with its successors and assignees, and transferees of the Series 2008 Bonds, the "Purchaser").

    **D.**    The proceeds of the Series 2008 Bonds will be used to refinance the Project Property (defined below); by refunding on a current basis $1,850,098.46 Bernalillo County, New Mexico Taxable Variable Rate Industrial Revenue Bonds (New Mexico Food Distributors Project) Series 2004, to refinance other obligations of the Company and to pay the cost of Issuance of the Series 2008 Bonds.

    **E.**    The Company has caused the Project Site (as defined below) to be conveyed to the Issuer pursuant to a special warranty deed and subject to the Permitted Liens. The Project Property is to be leased to the Company under this Lease Agreement (together with all amendments and supplements, this "Agreement");

    **F.**    The Bonds are to be purchased under a Bond Purchase Agreement dated as of September 8, 2008 (together with any and all amendments and supplements, the "Bond Purchase Agreement") among the Issuer, the Purchaser and the Company.

Exhibit C
78

The Indenture, the Bond Purchase Agreement and this Agreement are referred to as the "Bond Documents";

G.    The Issuer deems it desirable, in the best interests of its residents and in accordance with the purposes of the Act, to issue the Series 2008 Bonds and make the proceeds thereof available to the Company pursuant to this Agreement for the purposes described above and in the Indenture;

H.    The Series 2008 Bonds will be special limited obligations of the Issuer payable as therein provided and the Bonds will not constitute a debt or pledge of the credit of the Issuer, and the Purchaser or owners of the Bonds will have no right to have taxes levied by the Issuer or to require the Issuer to use any revenues for the payment of the Series 2008 Bonds, except for Revenues (as defined in the Indenture); and

I.    The Company and the Issuer each have full right and lawful authority to enter into this Agreement and to perform and observe the provisions hereof on their respective parts to be performed and observed.

In consideration of the premises and the mutual representations and agreements hereinafter contained, the Issuer and the Company agree as follows (provided that any obligation of the Issuer created by or arising out of this Agreement will never constitute a general debt of the Issuer or give rise to any pecuniary liability of the Issuer, but will be payable solely out of Revenues).

## ARTICLE II

### DEFINITIONS AND RULES OF CONSTRUCTION

SECTION 2.1    *Definitions*.  All words and terms defined in the Indenture have the same meanings when used in this Agreement.  In addition:

*"Additional Payments"* has the meaning assigned in Section 5.3(b).

*"Applicable Environmental Law"* means any applicable law, statute, regulation, order or rule pertaining to health or the environment, including, without limitation, CERCLA and RCRA, as each is amended and in effect from time to time.

*"Basic Rent"* has the meaning assigned in Section 5.3 A.

*"CERCLA"* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

*"Commission"* means the Board of County Commissioners of Bernalillo County, New Mexico.

2

Exhibit C
79

*"Debt Service Coverage Compliance Certificate"* means the certificate submitted by the Lessee to the Issuer and the Purchaser certifying that the Lessee is in compliance with the Debt Service Coverage Requirement.

*"Debt Service Coverage Requirement"* means Debt Service Coverage as defined in the Agreement dated as September 10, 2008 between the Company and the Purchaser

*"Completion Date"* has the meaning assigned in Section 4.4.

*"Eminent Domain"* means the taking of title to, or the temporary use of, all or any part of the Project Property pursuant to eminent domain or condemnation proceedings, or by any settlement or compromise of such proceedings, or any voluntary conveyance of all or any part of the Project Property during the pendency of, or as a result of a threat of, such proceedings.

*"Event of Default"* has the meaning assigned in Section 7.1.

*"Facility"* means a facility used in connection with the Company's commercial food distribution operations to be operated by the Company in Bernalillo County, New Mexico.

*"Guaranty"* means the Continuing Guaranty (Unlimited) dated as of September 10, 2008 from the Company to the Purchaser.

*"Improvements"* means all equipment, furniture, furnishings, computers and other systems and all other personal property of any kind which is subject to depreciation for federal income tax purposes and is suitable for use and used in the Facility, including particularly, but without limitation, those described on Exhibit C.

*"Indemnitee"* means the Indemnified Persons and Indemnified Parties as defined in Section 5.7.

*"Issuance Costs"* means items of expense payable or reimbursable directly or indirectly by the Issuer or the Company and related to the authorization, sale and issuance of the Series 2008 Bonds and authorization and execution of this Agreement, which items of expense shall include, but not be limited to, application fees and expenses, publication costs, printing costs, costs of reproducing documents, filing and recording fees, Bond Counsel and counsel fees, costs of credit ratings, charges for execution, transportation and safekeeping of the Series 2008 Bonds and related documents, and other costs, charges and fees in connection with the foregoing.

*"Mortgage"* means that certain Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing dated as of September 1, 2008 from the Company and the Issuer to the Purchaser.

*"Permitted Liens"* means, as of the date of delivery of this Agreement, the liens and encumbrances shown in Exhibit B and, as of any particular time, (i) liens for taxes and special assessments, if any, to the extent permitted in Section 4.9, (ii) this Agreement and any assignment or lease permitted by this Agreement, (iii) mechanics', materialmen's, carriers' and other similar liens to the extent permitted in Section 4.16, and (iv) such minor defects, irregularities, encumbrances, easements, rights-of-way and clouds on title to the Project Property

3

Exhibit C
80

as normally exist with respect to similar properties and as do not, individually or in the aggregate, materially impair the Project Property for the purpose for which it is used by the Company or materially detract from the value of the Project Property.

*"Person"* means any natural person, firm, partnership, association, corporation, or public body.

*"Proceeds,"* when used with respect to any insurance proceeds or any award resulting from, or other amount received in connection with, Eminent Domain, means the gross proceeds from the insurance or such award or other amount.

*"Project"* means the Refinancing of a facility for commercial food distribution, including approximately 4.89 acres of land and approximately 49,683 square foot facility to be located in Bernalillo County, New Mexico.

*"Project Property"* means the Project Site, the Facility and the Improvements.

*"Project Site"* means the real property in Bernalillo County, New Mexico to be acquired as part of the Project described on Exhibit A.

*"Purchaser"* means Compass Bank, its successors, assigns and transferees of the Bonds.

*"RCRA"* means the Resource Conservation and Recovery Act of 1976.

*"Rent"* means Basic Rent, any Additional Payments and any other amount payable by the Company under this Agreement.

*"Term"* means the period from the date of the execution and delivery of this Agreement by the Issuer and the Company to the earlier of the date of Payment of the Bonds or the date of termination of this Agreement pursuant to Section 7.2(c).

*"TRD"* means the New Mexico Taxation and Revenue Department.

*"Unassigned Rights"* means the right of the Issuer to make all determinations and approvals and receive all notices accorded to it under this Agreement and to enforce in its name and for its own benefit the provisions of Sections 4.4, 4.5, 4.15, 4.16, 4.17, 4.20, 5.7, 5.8, 5.10, 5.11, 5.12 and 6.3 of this Agreement, with respect to Issuer fees and expenses; gross receipts and compensating tax; the right to access the Project; payments in lieu of taxes; reports to the Issuer; environmental matters; transfer, assignment and subleasing and indemnity payments as the interests of the Issuer and related persons shall appear.

SECTION 2.2 *Rules of Construction.*

A.    The captions and headings in this Agreement are for convenience only and in no way define, limit or describe the scope or intent of any provisions or sections of this Agreement.

4

Exhibit C
81

**B.**    All references in this Agreement to particular articles, sections or exhibits are references to articles or sections of or exhibits to this Agreement unless some other reference is established.

**C.**    Any inconsistency between the provisions of this Agreement and the provisions of the Indenture will be resolved in favor of the provisions of the Indenture.

## ARTICLE III

### REPRESENTATIONS

SECTION 3.1 *Issuer Representations.* The Issuer represents that, as of the date of delivery of this Agreement:

**A.**    The Issuer is a political subdivision, body corporate and politic of the State, is authorized and empowered by the provisions of the Act and the ordinance authorizing the issuance of the Series 2008 Bonds to enter into the transactions contemplated by this Agreement and to carry out its obligations hereunder, and by proper action of its governing body has been duly authorized to execute and deliver this Agreement, the Indenture, the Bond Purchase Agreement and the Bonds, and this Agreement, the Indenture, the Bond Purchase Agreement and the Series 2008 Bonds have been duly executed and delivered by the Issuer and assuming due authorization and execution by the other party, they are valid and binding obligations of the Issuer enforceable in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity.

**B.**    The Series 2008 Bonds are to be issued under and secured by the Indenture, pursuant to which certain of the Issuer's interests in this Agreement, and the revenues and receipts to be derived by the Issuer pursuant to this Agreement, will be pledged and assigned to the Purchaser as security for payment of the principal of, premium, if any, and interest on the Bonds. The Issuer covenants that it has not and will not pledge or assign its interest in this Agreement, or the revenues and receipts derived pursuant to this Agreement, excepting Unassigned Rights, other than to the Purchaser under the Indenture to secure the Bonds.

**C.**    The Issuer finds and determines that the refinancing of the Project will be of substantial economic and other benefit to the Issuer, and is in the public interest and in compliance with the purposes and provision of the Act. The Project is located within the boundaries of the Issuer.

**D.**    To the knowledge of the Issuer, neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflicts with or results in a breach of the terms, conditions or provisions of any material restriction, agreement or instrument to which the Issuer is a party, or by

Exhibit C
82

which it or any of its property is bound, or constitutes a default under any of the foregoing.

E.    To the knowledge of the Issuer, no litigation, proceedings or investigations are pending or, to the knowledge of the Issuer, threatened against the Issuer at law or in equity before any court, tribunal, governmental authority or arbitration board, seeking to restrain, enjoin or limit the approval or issuance and delivery of the Series 2008 Bonds, the Indenture, this Agreement or any other documents to which the Issuer is a party, or in which an unfavorable determination could materially and adversely affect the validity or enforceability of the Series 2008 Bonds, the Indenture, this Agreement or any other documents to which the Issuer is a party or its ability to perform its obligations thereunder.

F.    Neither the nature of the Issuer nor any of its activities or properties, nor any relationship between the Issuer and any other person, nor any circumstance in connection with the issue, sale or delivery of any of the Bonds is such as to require the consent, approval or authorization of, or the filing, registration or qualification with, any governmental authority on the part of the Issuer in connection with the execution, delivery and performance of this Agreement or the Bond Purchase Agreement dated of even date herewith other than those already obtained; provided, however, no representation is made as to compliance with any federal or state securities or "blue sky" law.

G.    To the knowledge of the Issuer, no member, officer or other official of the Issuer has any pecuniary interest whatsoever in the Company or in the transactions contemplated by this Agreement.

H.    On August 10, 2004, the Commission adopted the Bond Ordinance approving financing for the Project. The Series 2008 Bonds are issued pursuant to the Bond Ordinance and the Indenture.

**SECTION 3.2** *Company Representations.* The Company represents that, as of the date of delivery of this Agreement:

A.    The Company is a corporation duly organized and validly existing under the laws of the State of New Mexico, is in good standing, and has duly authorized the execution, delivery and performance of this Agreement and the Bond Purchase Agreement.

B.    The execution, delivery and performance by the Company of this Agreement and the Bond Purchase Agreement will not conflict with, contravene, violate or constitute a breach of or default under the charter or the bylaws of the Company or any law, rule, regulation, ordinance, order, consent, decree, or any material agreement or instrument to which the Company is a party or by which it or its properties or the Project Property is bound.

C.    All necessary authorizations, approvals, consents and other orders of any governmental authority or agency for the execution and delivery by the Company

Exhibit C
83

of this Agreement and the Bond Purchase Agreement have been obtained and are in full force and effect

D.    There is no action, suit, proceeding, inquiry or investigation by or before any court, public board or body pending or, to the knowledge of the Company, threatened against the Company, which (i) seeks to or does restrain or enjoin the issuance or delivery of the Bonds or the execution and delivery of any of the Bond Documents, (ii) in any manner questions the validity or enforceability of the Bonds or any of the Bond Documents, or (iii) questions the authority of the Company to own or operate the Project Property as a whole.

E.    The agreement by the Issuer to lease the Project to the Company and to refinance the Project has induced the Company to undertake acquisition, construction, installation and equipping of the Project and to locate its business in Bernalillo County, New Mexico.

F.    The Company intends to operate or to cause the Facility to be operated so as to qualify as a "project" as defined in the Act to the later of the payment in full of the principal of, premium, if any, and interest on the Bonds and the expiration or sooner termination of the Term of this Agreement as provided herein for use as a manufacturing facility.

G.    As agent for the Issuer, the Company has acquired, constructed and equipped the Project.

H.    None of the proceeds of the Series 2008 Bonds will be used to provide working capital.

I.    The Project will be located inside the corporate limits of the Issuer.

J.    This Agreement will serve as a financing agreement for the purpose of providing payment for the account of the Issuer of such revenues as will be sufficient to pay the principal of, premium, if any, and interest on the Bonds, and providing that the Company shall be obligated to pay for the maintenance of and insurance or meet self-insurance requirements on the Project as required by the Act. The Company represents to the Issuer that the Company has the economic ability to meet all of the financial obligations imposed upon the Company under this Agreement and the Company will at all times meet or exceed the Debt Service Coverage Requirement.

K.    No officer or other official of the Issuer has any interest of any kind in the Company which would result, as a result of the issuance of the Series 2008 Bonds, in a substantial financial benefit to such persons other than as a member of the general public of the State.

L.    All property which is to be refinanced by the net proceeds of the Bonds is to be leased by the Company under this Agreement.

7

Exhibit C
84

**M.** The Company has heretofore supplied the Issuer estimates of the Related Costs, the Completion Date and periods of usefulness of the Project. The Company hereby warrants that such estimates were made in good faith and are fair, reasonable and realistic.

**N.** The Company shall complete the Project prior to the Completion Date and shall cause to be paid all costs of the Project in excess of the moneys available therefor in the Acquisition Account.

**O.** No event has occurred and no condition exists with respect to the Company that would constitute an *"Event of Default"* under this Agreement or that, with the lapse of time or the giving of notice or both, would become an "Event of Default" under this Agreement.

**ARTICLE IV**

**THE PROJECT**

**SECTION 4.1** *Refinancing and Completion.* The Company will, on behalf of and as agent for the Issuer, refinance the Project Property with all reasonable dispatch. To the maximum extent reasonably possible, the Company will cause the Project to be refinanced with proceeds of the issuance of the Bonds and the Company will use its best reasonable efforts to cause the Purchaser to carry out its obligations to make advances under the Series 2008 Bonds. To the extent necessary, after proceeds of the Series 2008 Bonds have been exhausted, the Company will cause the Project to be refinanced with its own funds or other resources.

**SECTION 4.2** *[Reserved].*

**SECTION 4.3** *No Warranty.* THE COMPONENTS OF THE PROJECT PROPERTY HAVE BEEN DESIGNATED AND SELECTED BY THE COMPANY. THE ISSUER HAS NOT MADE AN INSPECTION OF ANY PORTION OF THE PROJECT PROPERTY. THE ISSUER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS, IMPLIED OR OTHERWISE, WITH RESPECT TO ANY PORTION OF THE PROJECT PROPERTY OR THE LOCATION, USE, DESCRIPTION, DESIGN, MERCHANTABILITY, FITNESS FOR USE FOR ANY PARTICULAR PURPOSE, CONDITION OR DURABILITY OF THE SAME, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN THE SAME. ALL RISKS INCIDENT TO THE PROJECT PROPERTY ARE TO BE BORNE BY THE COMPANY. THE ISSUER WILL HAVE NO LIABILITY WITH REGARD TO OR ARISING OUT OF ANY DEFECT OR DEFICIENCY OF ANY NATURE IN ANY PORTION OF THE PROJECT PROPERTY, WHETHER PATENT OR LATENT. THE PROVISIONS OF THIS SECTION 4.3 HAVE BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES OR REPRESENTATIONS BY THE ISSUER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY PORTION OF THE PROJECT PROPERTY, WHETHER ARISING UNDER THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT.

**SECTION 4.4** *Completion Date.* On the date the refinancing of the Project is complete, in the sole opinion of the Company (the "Completion Date"), the Company will deliver to the Issuer a

8

Exhibit C
85

certificate signed by an Authorized Company Representative stating that, except for specified amounts remaining in the Acquisition Account for any specified Related Costs incurred by the Company but not then due and payable, the Project is complete. The Company will cause the Completion Date to occur not later than September 8, 2008. After the transfer of remaining moneys in the Acquisition Account to the Company pursuant to Section 6.05 of the Indenture, the Company will have sole responsibility for the payment of any Related Cost in excess of the amount specified to be retained in the Acquisition Account.

SECTION 4.5 *Gross Receipts and Compensating Tax.*

A.      The Company, either on its own behalf or as agent for the Issuer pursuant to Section 4.1 and this Section, will file returns for reporting and paying compensating tax which is due because of the Project and will pay, as a Related Cost, any gross receipts or compensating tax due from the Issuer under any such returns pursuant to Section 7-9-54 New Mexico Statutes Annotated, 1978 Compilation. The Issuer, at the request of the Company, will provide to the Company a supply of Nontaxable Transaction Certificates to be issued to vendors and contractors by the Company, as agent for the Issuer, in order to permit the vendors and contractors to claim deductions available under the New Mexico Gross Receipts and Compensating Tax Act for their receipts from selling certain tangible personal property for the Project, to the Company, as agent for the Issuer. The Company will promptly pay any gross receipts or compensating tax plus applicable penalty and interest which is found by the TRD to be due from the Company or the Issuer because of the purchase or use of any Project Property or any component of Project Property by the Company or the Issuer. The Company, at its sole expense, may request any rulings from the TRD which the Company determines might be necessary or desirable to clarify the New Mexico gross receipts and compensating tax results of transactions related to the Project and may dispute, at its sole expense, in any manner authorized by the New Mexico Tax Administration Act, any gross receipts or compensating tax liability imposed on the Company or the Issuer because of the Project, provided the Company shall not pursue a dispute without notice to the Issuer and shall not pursue any dispute that, in the opinion of the Issuer, may materially and adversely affect the interests or rights of the Issuer. The Issuer will, at the sole expense of the Company, join in any reasonable modifications to this Agreement which are necessary or desirable to obtain Nontaxable Transaction Certificates or otherwise reduce the gross receipts and compensating tax imposed on the Company or the Issuer as a result of or in connection with the Project or the Company's operations at the Project.

B.      The receipts of vendors from the sale of tangible personal property to the Issuer, which tangible personal property is included in the Project Property (but excluding "construction material", as defined in Section 7-9-3.4(B) NMSA 1978), shall be deductible from gross receipts or governmental gross receipts, and exempt from compensating tax, to the fullest extent permitted by Sections 7-9-14 and 7-9-54 NMSA 1978 and 3.2.212.22 NMAC and sections of the NMSA 1978 and the New Mexico Administrative Code (NMAC) under which such provisions or similar provisions may be codified or renumbered in the future. The deduction from gross receipts or governmental gross receipts, and the exemption from compensating tax, shall not apply to purchases of Project Property except as provided in the preceding sentence, and, except as

9

Exhibit C
86

contemplated in the preceding sentence, the Company shall not be authorized by this Lease to provide Nontaxable Transaction Certificates to vendors.

**SECTION 4.6** *Assessment in the Company's Name.* Subject to the provisions of Section 8.1 and 9.1 hereof, if this Agreement has not been terminated on or before September 8, 2028, the Company (which, for purposes of this Section 4.6, means the then current lessee of the Project Property under this Agreement) will take all necessary action to have the Project Property assessed for property tax purposes in the name of the Company on or within 30 days before September 8, 2028, and the Company (or, if the Issuer does not hold title to the Project Property, the holder of such title) will pay all ad valorem taxes on the Project Property from and after September 8, 2028. If the Project Property must be deeded to the Company to accomplish such assessment, this Agreement will thereafter be construed to be an installment sale agreement and all terms and provisions of this Agreement will remain in full force and effect. The provisions of Article IX of this Agreement govern the delivery and form of any such deed.

**SECTION 4.7** *Compliance With Law.* The Company will obtain or cause to be obtained all necessary permits and approvals for the operation and maintenance of the Project Property, will comply with all lawful requirements of any governmental body, agency or department regarding the use or condition of the Project Property and will cause the Project Property, upon completion, to comply with all applicable restrictive covenants and all other applicable laws, ordinances, statutes, rules and regulations relating to the Project Property and the Facility as a whole. The Company may in good faith contest the validity or the applicability of any such requirement. During the period of such contest and any related appeal, this Section 4.7 will be deemed satisfied with respect to the requirement so contested.

**SECTION 4.8** *Nuisance Not Permitted.* The Company will not permit or suffer its agents, employees, invitees (including building contractors and subcontractors), guests or other visitors to commit a nuisance on or about the Project Property or itself commit a nuisance in connection with its use or occupancy of the Project Property.

**SECTION 4.9** *Taxes and Utility Charges.* The Company will pay, as and when due, (i) all taxes, assessments and governmental charges of any kind whatsoever that may at any time be lawfully assessed or levied against or with respect to the Project Property; (ii) all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of the Project Property and (iii) all assessments and charges lawfully made by any governmental body for public improvements that may be secured by any lien on the Project Property. The Company may, in good faith, contest the amount or validity of any such levy, tax, assessment or other charge by appropriate legal proceedings. During the period of such contest and any related appeal, this Section 4.9 will be deemed satisfied with respect to any such levy, tax, assessment or other charge so contested.

**SECTION 4.10** *Maintenance.* The Issuer will not be under any obligation to, and will not, operate, maintain or repair the Project Property. During the Term of this Agreement, the Company will, at its own expense, keep the Project Property in safe repair and in such operating condition as is needed for its operations and make all necessary repairs and replacements to the

Exhibit C
87

Project Property (whether ordinary or extraordinary, structural or nonstructural, foreseen or unforeseen).

SECTION 4.11 *Replacement and Removal of Project Property* . The Company may replace or remove any machinery, equipment or fixtures constituting a part of the Project Property and thereby acquire title to such machinery, equipment or fixtures, provided that such replacement or removal will not change the nature of the Project as a qualified "project" as defined in and as contemplated by the Act. Upon request of the Company, the Issuer will deliver to the Company appropriate instruments evidencing the acquisition by the Company of title to any machinery, equipment or fixtures permitted by this Section 4.11 to be so replaced or removed. The provisions of Article IX governs the delivery and form of any such instruments.

SECTION 4.12 *Easements*. The Company may at any time or times grant easements, licenses, rights-of-way and other rights or privileges in the nature of easements with respect to any part of the Project Property, and the Company may release existing interests, easements, licenses, rights-of-way and other rights or privileges with or without consideration and without the consent of the Issuer. The Issuer will, at the Company's sole expense, reasonably cooperate in connection with the execution of the required instruments in connection with the grant and release of such easements, licenses rights of way, rights and privileges.

SECTION 4.13 *Eminent Domain; Damage; Destruction*. The Company will give prompt notice to the Issuer and the Purchaser of any material damage to or destruction of the Project Property. If either the Issuer or the Company receives notice of the proposed taking of all or any part of the Project Property by Eminent Domain, it will give prompt notice to the other and the Purchaser. Any such notice will describe generally the nature and extent of such damage, destruction, taking or proposed taking. The Proceeds resulting from the exercise of Eminent Domain with respect to or from any damage to or destruction of all or any portion of the Project Property will be paid to the Company.

SECTION 4.14 *Insurance*. The Company will keep the Project Property continuously insured against such risks and in such amounts, with such deductible provisions, as are customary in connection with the type and size of the Project Property. Each casualty insurance policy will show the Company as loss payee and each public liability risks insurance policy will show the Company as loss payee, insured under such policies. Such insurance may, to the extent permitted under applicable law, be provided by blanket policies maintained by the Company, by a captive insurance company controlled by the Company or through self-insurance. Such insurance will include general liability insurance against liability for (i) claims for injuries to or death of any person or damage to or loss of property arising out of or in any way relating to the condition of the Project Property, and (ii) liability with respect to the Project Property under the workers' compensation laws of the State (unless the Company has complied with the requirements of the laws of the State for self-insurance).

SECTION 4.15 *Access and Inspection*. Subject to the reasonable security and safety requirements of the Company and with reasonable advance notice to the Company, during the Term of this Agreement, the Company will give the Issuer, the Purchaser and their duly authorized agents during regular business hours (i) such rights of access to the Project Property as may be reasonably necessary to inspect the progress of the Project and (ii) the right of entry

11

Exhibit C
88

onto the Project Property as a whole for any purpose contemplated by this Agreement. The Company will execute, acknowledge and deliver all such further documents, including any deed or easement, and do all such other acts and things as may be necessary in order to grant to the Issuer and the Purchaser such rights of access and entry. During the Term of this Agreement, such rights of access and entry will not be terminated, curtailed or otherwise limited by any sale, assignment, lease or other transfer of the Project Property by the Company to any other Person.

SECTION 4.16 *Liens*. Except for Permitted Liens, the Company will not suffer any liens to exist on the Project Property as a result of any claims brought against the Company pursuant to a right or interest not existing in connection with, or permitted by, this Agreement. The Company will notify the Issuer and the Purchaser of the existence of any lien, other than a Permitted Lien, on the Project Property within 60 days after such lien attaches. The Company may, in good faith, contest the validity of any lien on the Project Property. During the period of such contest and any related appeal, this Section 4.15 will be deemed satisfied with respect the lien so contested.

SECTION 4.17 *Reports on Employment at the Project*. On or before January 31 of each calendar year while the Bonds are outstanding, the Company shall deliver to the Issuer (i) a written report (which may be prepared in reliance upon information furnished by one or more of the construction manager, general contractor, or subcontractors) setting forth in reasonable detail in numbers and types of workers employed in the construction of the Project and (ii) a written report (which may be prepared in reliance upon information furnished by any manager at the time engaged by the Company with respect to the Project) setting forth the number of workers, on a full-time equivalent basis, employed at the Project during the preceding calendar year.

SECTION 4.18 *Annual Certificate*. The Company will furnish to the Issuer and the Purchaser on or before January 31 of each year while the Bonds are outstanding, a certificate of the Company signed by the Authorized Company Representative stating that the Company has made a review of its activities during the preceding calendar year for the purpose of determining whether or not the Company has complied with all of the terms, provisions and conditions of this Agreement and the Company has kept, observed, performed and fulfilled each and every covenant, provision and condition of this Agreement on its part to be performed and is not in default in the performance or observance of any of the terms, covenants, provisions or conditions hereof, or if the Company shall be in default such certificate shall specify all such defaults and the nature thereof.

SECTION 4.19 *Restrictive Covenants*. The Company shall comply with all restrictive covenants which run with and bind the Project Site.

SECTION 4.20 *Use of Project Property*. The Company will use the Project Property continuously during the Term so as to constitute a "project" within the meaning of the Act as in effect on the date of issuance of the Bonds. As used in the first sentence of this Section, "continuously" means regularly and on a schedule consistent with that of similar facilities in the United States. Temporary cessation of operations during holiday periods, for maintenance or retooling, during reasonable periods for the repair or replacement of the facilities damaged or

12

Exhibit C
89

destroyed, resulting from labor disputes or because of excess inventories, or under similar circumstances will not constitute a failure by the Company to comply with this section.

SECTION 4.21 *Quarterly and Annual Financial Reports.*

A. The Lessee shall provide to he Issuer and the Purchaser, no later than 120 days after the end of each fiscal year, the Lessee's balance sheet, income statement and Debt Service Coverage Compliance Certificate all of which have been reviewed by a qualified firm of Certified Public Accountants acceptable to the Issuer and the Purchaser. In addition, the Lessee shall provide to the Issuer and the Purchaser, no later than 60 days after the end of each fiscal quarter, the Lessee's balance sheet, income statement and Debt Service Coverage Compliance Certificate acceptable to the Issuer and the Purchaser.

ARTICLE V
LEASE; TERM; POSSESSION;
RENT; INDEMNIFICATION; PILOT PAYMENTS

SECTION 5.1 *Lease of the Project Property; Term.* In consideration of the payment of Rent and for other good and valuable consideration, the Issuer leases the Project Property to the Company for the Term.

SECTION 5.2 *Quiet Enjoyment.* The Issuer will not take any action, other than pursuant to Section 4.15 or Article VII, to prevent the Company from having quiet and peaceable possession and enjoyment of the Project Property during the Term (except as necessary with respect to Eminent Domain for public projects and purposes) and will, at the request of the Company and at the Company's expense, to the extent that it is lawfully necessary and the Issuer may lawfully do so, join in any legal action in which the Company asserts its right to such possession and enjoyment.

SECTION 5.3 *Rent.*

A.  The Company will pay to the Purchaser for the account of the Issuer, such amounts at such times as are necessary to make all payments of principal of, interest on and redemption price of the Bonds in accordance with the terms of the Bonds and the Indenture as and when due, (collectively, the "Basic Rent");

B.  The Company will also make the following payments (the "Additional Payments" and, together with the Basic Rent, the "Rent"):

(1) to or on behalf of the Issuer, all reasonable out-of-pocket costs and expenses (including, but not limited to, reasonable counsel fees and expenses) incurred by the Issuer in connection with the issuance of the Bonds and the performance of its duties under this Agreement and the Indenture, promptly on demand of the Issuer; and

(2) the payments required by Section 5.10 hereof.

SECTION 5.4 *Obligations Unconditional.* The obligation of the Company to pay Rent and to perform its other obligations under this Agreement is absolute and unconditional and will not be

13

Exhibit C
90

subject to diminution by setoff, counterclaim, abatement or otherwise, whether as a result of damage to or destruction of or removal of all or any portion of the Project Property or any other event or condition. In the event the Issuer fails to perform any of its obligations under this Agreement, the Company may institute such action against the Issuer as the Company may deem necessary to compel such performance. The Company may also, at its own cost and expense and in its own name or, if legally necessary, in the name of the Issuer, prosecute or defend any action or proceeding or take any other action involving third parties which the Company deems reasonably necessary in order to secure or protect its title to or its right of possession and use of the Project Property. In such event, if no Event of Default has occurred and is continuing, the Issuer will cooperate with the Company, so long as it is not the adverse party, upon receipt of indemnity satisfactory to the Issuer against any out-of-pocket cost, expense (including reasonable counsel fees and expenses) or liability the Issuer may incur or suffer as a result of or in connection with such cooperation.

Notwithstanding the above paragraph, it is the intention of this Agreement that the Company shall make payments to the Purchaser for the account of the Issuer, in such amounts and at such times as are necessary to make all payments of principal of, interest on and redemption price of the Bonds in accordance with the terms of the Bond Documents as and when due, and all such payments shall be netted against any monies and investment made by the Purchaser to the Acquisition Account (as defined in the Indenture) (including interest income). The Purchaser will look only to the Company for payment of the Bonds and upon the security granted in the Indenture for the Company's obligations under this Agreement. As described in Section 6.1, the Issuer will assign and pledge to the Purchaser all right, title and interest of the Issuer in and to this Agreement including the right to receive payments hereunder.

SECTION 5.5 *Recording and Filing; Further Assurances*. The Issuer and the Company will, at the direction of the Purchaser and at the expense of the Company, take all actions that at the time are and from time to time may be reasonably necessary to perfect, preserve, protect and secure the interests of the Issuer and the Purchaser in and to the Rent and in the Project Property, including, without limitation, the recordation of this Agreement and the Indenture, the filing of financing statements and continuation statements and the execution, acknowledgement, delivery, filing and recordation of any other necessary agreements and instruments.

SECTION 5.6 *Claims*. The Company will pay and discharge and will indemnify and hold harmless the Issuer from (a) any lien or charge upon payments by the Company to, or for the account of, the Issuer under this Agreement and (b) any taxes, assessments, impositions and other charges in respect of the Project Property. If any such claim is asserted, or any such lien or charge upon payments, or any such taxes, assessments, impositions or other charges, are sought to be imposed, the Issuer will give prompt notice to the Company, and the Company will have the sole right and duty to assume the defense of the same and will have the power to litigate, compromise or settle the same.

SECTION 5.7 *Indemnity, Expenses*.

A.    The Issuer and members of its governing body, officers, agents, employees, successors and assigns or other elected or appointed officials of the Issuer, past, present or future (hereinafter the "Indemnified Persons") shall not be liable to the Company for any

14

Exhibit C
91

reason. The Company shall indemnify and hold the Issuer and the Indemnified Persons harmless from and against any and all claims, damages, demands, expenses, liabilities and losses of every kind, character and nature asserted by or on behalf of any person in connection with (i) the issuance, offering, sale, delivery, or remarketing of the Bonds, the Indenture and this Agreement; or the acquisition, equipping, operation, use, occupancy, maintenance, or ownership of the Project; (ii) any written statements or representations made or given by the Company or any of its officers or employees to the Indemnified Persons, with respect to the Company, the Project, or the Bonds, including, but not limited to, statements or representations of facts, financial information, or corporate affairs or any breach or default on the part of the Company in the performance of any representation, covenant or agreement of the Company under this Agreement, or any related document, or arising from any acts or failure to act by the Company, or any of its agents, contractors, servants, employees or licensees; (iii) damage to property or any injury to or death of any Person that may be occasioned by any cause whatsoever pertaining to the Project; and (iv) any loss or damage incurred by the Issuer as a result of violation by the Company of the provisions of Section 3.2 hereof, or arising out of, resulting from, or in any way connected with, the condition, use, possession, conduct, management, planning, design, acquisition, construction, equipping and renovation or sale of the Project or any part thereof, to the extent not caused or occasioned solely by the gross negligence or willful misconduct of such Indemnified Person. The Company also covenants and agrees, at its expense, to pay, and to indemnify the Indemnified Persons from and against, all costs, reasonable attorney fees, expenses and liabilities incurred in any action or proceeding brought by reason of any such claim. If any such suit, action or proceeding is brought against the Issuer or any Indemnified Person, that suit, action or proceeding shall be defended by counsel to the Issuer or the Company, as the Issuer shall determine. If the defense is by counsel to the Issuer, the Company shall indemnify the Issuer and Indemnified Persons for the reasonable cost of that defense including reasonable counsel fees. If the Issuer determines that the Company shall defend the Issuer or any Indemnified Person, the Company shall immediately assume the defense at its own cost.

B.  The Company shall not be liable for any settlement of any proceeding made without consent (which consent shall not be unreasonably withheld) but if settled with the consent of the Company or if there be a final, unappealable judgment for the plaintiff in any such action, the Company shall indemnify and hold harmless the Indemnified Persons. The Company shall not be obligated to indemnify the Issuer or any Indemnified Person under subsection A, if a court with competent jurisdiction finds that the liability in question was caused by the willful misconduct or gross negligence of the Issuer or the involved Indemnified Person(s), unless the Court determines that, despite the adjudication of liability but in view of all circumstances of the case, the Issuer or the Indemnified Person(s) is (are) fairly and reasonably entitled to indemnity for the expenses which the Court considers proper.

C.  The Company shall also indemnify the Issuer or any Indemnified Person for all reasonable costs and expenses, including reasonable counsel fees, incurred in: (i) enforcing any obligation of the Company under this Agreement or any related agreement, (ii) taking any action requested by the Company, (iii) taking any action

15

Exhibit C
92

required by this Agreement or any related agreement or (iv) taking any action considered necessary by the Issuer and which is authorized by this Agreement or any related agreement.

**D.**    The indemnification provisions herein contained shall not be exclusive or in limitation of, but shall be in addition to, the rights to indemnification of the Indemnified Persons or the Indemnified Parties under any other agreement or law by which the Company is bound or to which the Company is subject.

**E.**    The obligations of the Company under this Section 5.7 shall survive any assignment or termination of this Agreement, or the discharge of the Indenture.

SECTION **5.8** *Environmental Matters.*  To the extent that the Project Property shall house petroleum or any petroleum products, asbestos, urea formaldehyde foam insulation or any other chemical, material or substance, exposure to which may or could pose a health hazard, the possession and use of such materials shall be in accordance with law, including any applicable regulations.

To the extent that the use which the Company makes or intends to make of the Project Property shall result in the manufacture, treatment, refining, transportation, generation, storage, disposal or other release or presence of any hazardous substance or solid waste on or to the Project Property, such use will be in accordance with law, including any applicable regulations. For purposes of this Agreement, the terms "hazardous substance" and "release" will have the meanings specified in CERCLA, and the term "disposal" (or "disposed") will have the meaning specified in RCRA; provided, in the event either CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning will apply subsequent to the effective date of such amendment, and provided further, to the extent that the laws of the State establish a meaning for "hazardous substance," "release," or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader meaning will apply; provided further, that the term "hazardous substance" will also include those listed in the U.S. Department of Transportation Table (49 C.F.R. 172.101) and amendments thereto from time to time.

The Company shall promptly notify the Issuer of any violation or alleged violation of any Applicable Environmental Law related to the Project Property of which the Company becomes aware.

As an inducement for the Issuer to execute the Indenture, the Company shall indemnify and hold harmless the Issuer from and against any and all liabilities, damages, fines, penalties, claims, losses, judgments, causes of action, costs and expenses (including the reasonable fees and expenses of counsel) which may be incurred the Issuer relating to or arising out of the generation, storage, manufacture, refining, release, transportation, treatment, disposal or other presence of any hazardous substances on or about the Project Property.

SECTION **5.9** *Indenture Provisions.*  The Indenture provisions concerning the Series 2008 Bonds and the other matters therein are an integral part of the terms and conditions of this Agreement, and the execution of this Agreement shall constitute conclusive evidence of approval of the Indenture by the Company to the extent it relates to the Company.  Additionally, the

Exhibit C
93

Company agrees that, whenever the Indenture by its terms imposes a duty or obligation upon the Company, such duty or obligation shall be binding upon the Company to the same extent as if the Company were an express party to the Indenture, and the Company hereby agrees to carry out and perform all of its obligations under the Indenture as fully as if the Company were a party to the Indenture.

SECTION 5.10 *Payment in Lieu of Certain Property Taxes.*

A.    *Payments to School District.* Beginning on the first business day in July 2009, and continuing to and including July 1, 2028, Company shall make annual payments to the Albuquerque Public School District ("APS") in the amount shown on Exhibit D. Each annual payment shall be paid on the first business day in July. The payment provisions of this Section 5.10 A may be amended by the mutual agreement of the Company, APS and Issuer.

B.    *Payments to Hospital.* Beginning on the first business day in June 2009, and continuing to and including July 1, 2028, Company shall make annual payments to the University of New Mexico Hospital ("UNMH") in the amount shown on Exhibit D. Each annual payment shall be paid on the first business day in July. The payment provisions of this Section 5.10 B may be amended by the mutual agreement of the Issuer, UNMH and the Company.

C.    *Payments to the Issuer.* If the Company terminates this Agreement within five (5) years of the date hereof due to (i) ceasing operations, (ii) moving the manufacturing facility out of Bernalillo County, or (iii) any other voluntary act of the Company that results in the Project Property's use being discontinued, the Company shall pay to the Issuer an amount equal to the abated taxes less all amounts paid to APS and UNMH pursuant to paragraphs 5.10 A and 5.10 B hereof.

The payment shall be made within thirty (30) days of such discontinuance.

## ARTICLE VI
### ASSIGNMENT, LEASING AND SELLING

SECTION 6.1 *Assignment of Rights by the Issuer.* As security for the payment of the Series 2008 Bonds, the Issuer will assign and pledge to the Purchaser all right, title and interest of the Issuer in and to this Agreement including the right to receive payments hereunder and thereunder (except the Unassigned Rights), and hereby directs the Company to make such Rent payments directly to the Purchaser and other payments to the Purchaser. The Company consents to such assignment and pledge and agrees that it will make payments directly to the Purchaser without defense or setoff by reason of any dispute between the Company and the Issuer or the Purchaser, and hereby further agrees that its obligations to make payments hereunder and to perform its other agreements contained herein are absolute and unconditional.

SECTION 6.2 *No Other Transfer by Issuer.* Except for the assignment described in Section 6.1, the Issuer will not sell, assign, transfer or convey its rights, title or interests in this Agreement, or the Project Property, or its obligations under this Agreement. The parties agree that the

17

Exhibit C
94

Company will be entitled to injunctive relief and specific performance (in addition to any other remedies available to it at law or in equity) to enforce the provisions of this Section 6.2.

SECTION 6.3 *Assignment, Lease, Encumbrance and Sale by the Company*.  The rights of the Company under this Agreement may be assigned, and the rights of the Company in the Project Property may be assigned, leased, encumbranced or sold as a whole or in part by the Company. No such assignment, lease, encumbrance or sale will relieve the Company from primary liability for making payments of Rent and for the performance of its other obligations, including without limitation, the Company's indemnification agreements in Sections 5.7 and 5.8 of this Agreement, under this Agreement to the same extent as though no assignment, lease, encumbrance or sale had been made.  Any assignee, lessee or purchaser of the Company's interest in this Agreement or of the Project Property will assume in writing the obligations of the Company under this Agreement to the extent of the interest assigned, leased or sold.  The Company will, not more than 60 nor less than 30 days before the effective date of any such assignment, lease, encumbrance or sale, furnish or cause to be furnished to the Issuer and the Purchaser a true and complete copy of such proposed assignment, lease, encumbrance or purchase contract and, if applicable, such assumption.  On the effective date of any such assignment, lease, encumbrance or sale, the Company will, at the request of the Issuer or the Purchaser and at the expense of the Company, deliver to the requesting Party, an opinion of counsel to the Company (which may be an employee of the Company or other counsel reasonably acceptable to the requesting Party) to the effect that such assignment, lease, encumbrance or sale has been duly authorized by the Company and does not conflict with applicable federal or State law.

## ARTICLE VII
## EVENTS OF DEFAULT AND REMEDIES

SECTION 7.1 *Events of Default Defined*.  Each of the following events is an *"Event of Default"*:

A.    Failure by the Company to make any Rent payment or Additional Payments when due.

B.    The representations of the Company in this Agreement or the Guaranty or by Larry P. and Jane H. Gutierrez in the Mortgage prove to have been incorrect in any material respect when made.

C.    A decree or order for relief by a court of competent jurisdiction is entered in an involuntary case under any federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Company or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days, or the commencement by the Company of a voluntary case under such law, or the consent by the Company either to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Company or for any substantial part of its property, or the making by it of any assignment for the benefit of creditors, or the taking of action by the Company to authorize or effect any of the foregoing.

D.    Failure by the Company to perform any of its obligations under this Agreement or the Indenture other than the payment of Rent, for a period of 30 days after written notice, specifying

18

Exhibit C
95

such failure and requesting that it be remedied, is given to the Company by the Issuer or the Purchaser, unless such failure cannot be remedied within 30 days and the Company has instituted corrective action within 30 days after such notice and diligently pursues such action until such failure is remedied.

E.    The occurrence of an Event of Default (as defined in the Mortgage).

SECTION 7.2 *Remedies on Default.* If an Event of Default occurs and is continuing, the Purchaser and only the Purchaser, as the assignee of the Issuer under the Indenture and on behalf of the Issuer, may, but is not required to, take any one or more of the following remedial steps:

A.    By written notice to the Company declare all such amounts of Rent payable for the remainder of the Term as are required to provide for the Payment of the Bonds to be immediately due and payable, whereupon the same will be immediately due and payable;

B.    Take possession of the Project Property without terminating this Agreement and lease or sublease the Project Property for the account of the Company, crediting against the Rent required to be paid by the Company the amounts received by the Purchaser for the account of the Issuer from any sublessee;

C.    Terminate this Agreement, hold the Company liable for all Rent due at the effective date of termination and due until the effective date of leasing the Project Property to another, exclude the Company from possession of the Project Property and lease the Project Property to another; provided, however, that such termination and exclusion will not impair any remedy granted to the Issuer or the Purchaser under this Agreement;

D.    Take whatever action at law or in equity may appear necessary or desirable to collect the Rent then due and thereafter to become due or to enforce the performance and observance of any obligation of the Company under this Agreement or the Indenture; or

E.    Exercise any remedies provided for in the Indenture. In the enforcement of the remedies provided in this Section 7.2, the Purchaser, as the assignee of the Issuer and on behalf of the Issuer will treat all expenses of enforcement, including, without limitation, legal, accounting and advertising fees, as Additional Payments then due and owing. As the assignee of the Issuer, the Purchaser has sole responsibility for the exercise of any remedies if an Event of Default occurs and is continuing, provided that the Issuer shall be under no obligation to exercise any remedies in the event the Purchaser fails to do so.

19

Exhibit C
96

SECTION 7.3 *Company To Give Notice of Default.* The Company will promptly give notice to the Purchaser of the occurrence of any Event of Default of which it has actual knowledge.

SECTION 7.4 *Remedies on Default.* Notwithstanding any other provision of this Agreement or the Indenture, the Issuer shall be entitled to cause the Company to perform the Company's obligations under Sections 4.4, 4.5, 4.15, 4.16, 4.17, 4.20, 4.21, 5.7, 5.8, 5.10, 5.11, 5.12 and 6.3 hereof for the benefit of the Issuer. If the Company fails to comply with its obligations set forth in Sections 4.5, 4.15, 4.16, 4.17, 4.18, 4.19, 4.20, 4.21, 5.7, 5.8, 5.10, 5.11, 5.12 and 6.3 and such failure continues for thirty (30) days after the Issuer gives the Company notice of such failure or any representation of the Company in any Bond document or any document or agreement delivered to any of the other Parties in connection with the transaction contemplated by the Bond Documents proves to have been incorrect in any material respect when made, then, the Issuer may immediately take all steps necessary to have the Project Property immediately assessed for property tax purposes in the name of the Company, and this Agreement will thereafter be deemed to be an installment sale agreement. If the Company disputes that such a failure has occurred or continued for such period, or that such a representation was material or incorrect, the County Commission of the Issuer will make a final binding determination.

SECTION 7.5 *Default by Issuer - Limited Liability.* Notwithstanding any provision or obligation to the contrary hereinbefore set forth, no provision of this Agreement shall be construed so as to give rise to a pecuniary liability of the Issuer or to give rise to a charge upon the general credit of the Issuer, the liability of the Issuer hereunder shall be limited to its interest in this Agreement, and all other related documents and collateral and the lien of any judgment shall be restricted thereto. In the performance of the agreements of the Issuer herein contained, any obligation it may incur for the payment of money shall not be a debt of the Issuer, nor shall the Issuer be liable on any obligation so incurred. The Issuer does not assume general liability for the repayment of the Series 2008 Bonds or for the costs, fees, penalties, taxes, interest, omissions, charges, insurance or any other payments recited herein, and shall be obligated to pay the same only out of the amounts payable by the Company hereunder. The Issuer shall not be required to do any act whatsoever or exercise any diligence whatsoever to mitigate the damages to the Company if a default shall occur hereunder.

## ARTICLE VIII

### PREPAYMENTS

SECTION 8.1 *Prepayments.* The Company may at any time (including after the occurrence and during the continuance of an Event of Default) and for any reason cause all or any portion of the Series 2008 Bonds to be redeemed in accordance with the provisions of the Indenture by giving notice of such redemption to the Issuer, and the Purchaser not less than five days before the redemption date. Such notice will specify the redemption date and the principal amount of the Series 2008 Bonds to be redeemed. On the redemption date the Company will prepay the Rent

Exhibit C
97

in an amount equal to such principal amount plus accrued interest on such principal amount to
the redemption date by payment of such amounts to the Purchaser.

## ARTICLE IX

### PURCHASE OF PROJECT PROPERTY

**SECTION 9.1** *Purchase of Project Property*.  The Company, its successors or assignees will
purchase, and the Issuer will sell, the Project Property for $1.00 at the expiration or sooner
termination of this Agreement and following Payment of the Series 2008 Bonds.  The Company
will give notice to the Issuer specifying the date of closing such purchase, which will be not less
than 15 nor more than 90 days from the date of such notice.  At the closing of such purchase, the
Issuer will, upon receipt of the purchase price, deliver to the Company a bill of sale and other
appropriate documents conveying to the Company title to the Project Property, as they exist at
the time of such purchase, subject only to:  (i) those liens and encumbrances created by the
Company or to the creation or suffering of which the Company consented; (ii) those liens and
encumbrances resulting from the failure of the Company to perform any of its obligations under
this Agreement; and (iii) Permitted Liens other than the Indenture and this Agreement.  The
Company may purchase the Project Property whether or not a Default or an Event of Default has
occurred and is continuing.

## ARTICLE X

### MISCELLANEOUS

**SECTION 10.1** *Incorporation of Indenture Provisions*.  Each of the provisions of Article X of
the Indenture is incorporated in this Agreement.

**SECTION 10.2** *Amendments*.  This Agreement may be amended or modified only as provided
in the Indenture.

**SECTION 10.3** *No Pecuniary Liability of Issuer*.  No agreements or provisions contained herein
nor any agreement, covenant or undertaking by the Issuer contained in any document executed
by the Issuer in connection with any property of the Company financed, directly or indirectly,
out of the Bond proceeds or the issuance, sale and delivery of the Bonds will give rise to any
pecuniary liability of the Issuer or constitute a charge against the Issuer's general credit, or will
obligate the Issuer financially in any way, except with respect to the funds available hereunder or
under the Indenture and pledged to the payment of the Bonds and its application as provided
under the Indenture.  No failure of the Issuer to comply with any terms, covenants or agreements
herein or in any document executed by the Issuer in connection with the Bonds will subject the
Issuer to any pecuniary charge or liability except to the extent that the same can be paid or
recovered from the funds available hereunder or under the Indenture and pledged to the payment
of the Bonds.  None of the provisions of the Agreement will require the Issuer to expend or risk
its own funds or to otherwise incur financial liability in the performance of any of its duties or in
the exercise of any of its rights or powers hereunder unless it will first have been adequately
indemnified to its satisfaction against the cost, expense or liability which might be incurred
thereby.  Nothing herein will preclude a proper party in interest from seeking and obtaining, to
the extent permitted by law, specific performance against the Issuer for any failure to comply

21

Exhibit C
98

with any term, conditions, covenant or agreement herein or in the Indenture; provided, that no costs, expenses or other monetary relief will be recoverable from the Issuer except as may be payable from the funds available hereunder or under the Indenture and pledged to the payment of the Bonds.

**SECTION 10.4** *No Violation of Public Policies Regarding Indemnity.* If a court of competent jurisdiction determines that the provisions of Section 56-7-1 NMSA 1978, as amended, are applicable to this Agreement or any claim arising under this Agreement, then any agreement to indemnify in connection with this Agreement will not extend to liability, claims, damages, losses or expenses, including attorney fees, arising out of bodily injury to persons or damage to property caused by or resulting from, in whole or in part, the negligence, act or omission of the indemnitee, its officers, employees or agents.

**SECTION 10.5** *Binding Effect.* This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Company, and their respective successors and assigns.

**SECTION 10.6** *Severability.* In the event any provisions of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

**SECTION 10.7** *Recording.* This Agreement, the Indenture and every assignment and modification hereof, or an appropriate and sufficient memorandum thereof, shall be recorded in the office of the County Clerk of Bernalillo County, New Mexico. This Agreement as originally executed or an appropriate and sufficient memorandum thereof shall be so recorded before the recordation of the Indenture.

**SECTION 10.8** *No Waiver.* No waiver of any breach of any covenant or agreement herein contained shall operate as a waiver of any subsequent breach of the same covenant or agreement, and in case of a breach by either party of any covenant, agreement or undertaking, the non-defaulting party may nevertheless accept from the other any payment or payments or performance hereunder without in any way waiving its right to exercise any of its rights and remedies provided for herein or otherwise with respect to any such default or defaults which were in existence at the time such payment or payments or performance were accepted by it.

**SECTION 10.9** *Non-Merger.* The provisions of this Agreement shall survive the conveyance of the Project Property to the Issuer, the reconveyance of the Project Property to the Company, and all other performances hereunder, and shall not be deemed merged in any deed or other instrument or document delivered hereunder.

*[Remainder of page intentionally left blank]*

22

Exhibit C
99

Dated as of September ___, 2008.

BERNALILLO COUNTY, NEW MEXICO

By _Alan B. Armijo_____
Chair, County Commission

STATE OF NEW MEXICO        )
                           ) ss.
COUNTY OF BERNALILLO       )

This instrument was acknowledged before me on September _8th_, 2008, by Alan Armijo, Chair of County Commission of Bernalillo County, New Mexico.

Notary Public _Mary A. Benardy_

My commission expires: _03/16/2011_

*[Issuer's Signature Page to First Amended and Restated Lease Agreement]*

24

Exhibit C
100

Dated as of September ___, 2008.

BERNALILLO COUNTY, NEW MEXICO

By _____
Chair, County Commission

STATE OF NEW MEXICO      )
                         ) ss.
COUNTY OF BERNALILLO     )

This instrument was acknowledged before me on September 8ᵗʰ, 2008, by Alan Armijo, Chair of County Commission of Bernalillo County, New Mexico.

Notary Public _May a. Benards_

My commission expires: _03/16/2011_

*[Issuer's Signature Page to First Amended and Restated Lease Agreement]*

24

Exhibit C
101

Dated as of September ___, 2008.

BERNALILLO COUNTY, NEW MEXICO

By _Alan B. Amijo_____
Chair, County Commission

STATE OF NEW MEXICO      )
                         ) ss.
COUNTY OF BERNALILLO     )

This instrument was acknowledged before me on September 8ᵗʰ, 2008, by Alan Armijo, Chair of County Commission of Bernalillo County, New Mexico.

Notary Public  Mary a. Benavides

My commission expires: 03/16/2011

*[Issuer's Signature Page to First Amended and Restated Lease Agreement]*

24

Exhibit C
102

**New Mexico Food Distributors, Inc.**

By _____

Its _____PRESIDENTS_____

STATE OF NEW MEXICO           )
                              ) ss.
COUNTY OF BERNALILLO          )

This instrument was acknowledged before me on September _10_, 2008,
by _LARRY Gutierrez_
of New Mexico Food Distributors, Inc., a New Mexico corporation.

_____
Notary Public

My commission expires: _5/30/12_

OFFICIAL SEAL
SHERRY L. SIEBACH
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires 5/30/12

*[Lessee's Signature Page to First Amended and Restated Lease Agreement]*

25

Exhibit C
103

## EXHIBIT A
## PROJECT SITE

### LEGAL DESCRIPTION

Lot numbered Three-A (3-A) in Block numbered Two (2) of
SUNPORT PARK, Albuquerque, New Mexico, as the same is
shown and designated on the replat of Lots 1,2 & 3, Block 2 of
said Subdivision, filed in the Office of the County Clerk of
Bernalillo County, New Mexico, on August 21, 1990, in Plat Book
90C, Folio 195.

A-1

Exhibit C
104

# EXHIBIT B
## PERMITTED LIENS

*[To come from Compass Bank]*

Exhibit C
105

**EXHIBIT C**

**IMPROVEMENTS**

[To be updated from NM Foods]

The Improvements to be placed in the Project Site include, but are not limited to, equipments to be used for the commercial food distribution operations of New Mexico Food Distributors, Inc.

**IMPROVEMENTS**

| DESCRIPTION EQUIPMENT | DATE IN SERVICE | BOOK COST |
|---|---|---|
| OPERATING EQUIP | 01/01/88 | $134,709.00 |
| CODE DATE PRINTER - MULTI | 06/30/93 | 5,040.07 |
| PALLET JACK | 07/31/94 | 559.75 |
| 87 CROWN ELECTRIC FORKLIFT | 10/24/94 | 16,310.64 |
| 40 GAL TILT SKILLET | 10/31/94 | 3,591.76 |
| SHELVING FOR WAREHOUSE | 12/31/94 | 3,853.25 |
| 9' BACK TO BACK TABLE W/ | 01/01/95 | 500.00 |
| THERMAL DYNAMIC PLASMA | 03/31/95 | 1,243.30 |
| 2 SYNTRON VIBRATORY FEE | 03/31/95 | 7,604.64 |
| COLBORNE PISTON FILLER | 04/30/95 | 4,878.04 |
| VACUUM PUMP MODULE | 05/31/95 | 2,266.10 |
| AIR DRAWLICS DRYER | 06/30/95 | 1,999.28 |
| CORN TORTILLA MACHINE | 01/19/96 | 135,903.83 |
| AMER STAINLESS TAMALE ST | 07/31/95 | 11,251.24 |
| FOOD CHOPPER | 08/31/95 | 3,015.37 |
| CLARKLIFT | 01/31/96 | 516.20 |
| CONVEYORS | 06/17/96 | 1,412.45 |
| HOBART SLICER | 11/21/96 | 950.06 |
| FLOUR TORTILLA MACHINE | 05/29/97 | 97,547.50 |
| CUTTERS FOR TORTILLA MACH | 06/30/97 | 1,200.00 |
| EXHAUST FAN | 08/31/97 | 1,067.65 |
| SURVEILLANCE SYSTEM | 08/31/97 | 1,560.73 |
| ROLLERS FLOUR TORTILLA | 08/31/97 | 481.80 |
| FLOUR MIXER | 09/30/97 | 14,475.00 |

Exhibit C
106

## IMPROVEMENTS

| DESCRIPTION | DATE IN | BOOK |
|---|---|---|
| TORTILLA MACHINE ELECTIRC | 11/30/97 | 1,523.70 |
| USED COOLING CONVEYOR | 01/13/98 | 2,000.00 |
| SIMPLEX MODEL AIR V-100 FILTER | 07/31/98 | 11,399.42 |
| USED CONVECTION OVEN | 11/25/98 | 500.00 |
| USED ADAMADOC PROOFER | 11/25/98 | 1,000.00 |
| USED TAYLOR ICE CREAM MACHINE | 11/25/98 | 2,000.00 |
| USED COOLING CONVEYOR | 11/25/98 | 2,000.00 |
| USED CHIP FRYER | 11/25/98 | 500.00 |
| HOBART PEELER MODEL 6115 | 11/20/98 | 1,640.10 |
| USED FREEZER UNIT | 01/31/99 | 1,000.00 |
| STAINLESS STEEL STEAMER | 05/31/99 | 2,500.00 |
| SHRINK WRAPPING MACHINE | 08/31/99 | 2,200.00 |
| FREEZER UNIT | 12/31/99 | 844.50 |
| COOLING CONVEYOR | 12/31/99 | 28,433.10 |
| UNKNOWN | 01/31/00 | 4,525.34 |
| STAINLESS STEEL VAT - CLEM | 03/17/00 | 1,200.00 |
| UNKNOWN | 05/19/00 | 1,660.20 |
| RIFRIGERATION | 06/16/00 | 6,500.00 |
| TILT SKILLET | 09/27/00 | 1,000.00 |
| CHILLER TORTILLA PLANT | 12/15/00 | 2,097.01 |
| USED - SC (HOBART) | 01/31/01 | 1,882.52 |
| USED FORKLIFT | 04/30/01 | 3,200.83 |
| THERMO-KING VAN | 05/15/01 | 6,573.60 |
| FORKLIFT (S&J) | 06/12/01 | 4,000.00 |
| DOUGH ROLLER | 10/25/01 | 2,390.87 |
| TILTING SKILLET | 11/15/01 | 1,200.00 |
| GAS FURNACE | 11/15/01 | 563.20 |
| FLAT SLAT BELT ASSEM | 12/04/01 | 2,100.00 |
| DOUGH/TORTILLA MACHINE | 02/01/02 | 145,332.28 |
| ALARM SYSTEM | 04/17/02 | 2,089.80 |
| HOOD TEST KITCHEN | 04/30/03 | 500.00 |
| MULTIVAC PARTS | 06/19/03 | 1,269.75 |

Exhibit C
107

IMPROVEMENTS

| DESCRIPTION | DATE IN | BOOK |
|---|---|---|
| 1000 BASKETS | 07/12/03 | 10,078.82 |
| SCALE PART | 07/31/03 | 1,300.00 |
| SCALE PART | 07/31/03 | 500.00 |
| NEW TORTILLA MACHINE | 09/01/03 | 1,018,825.45 |
| FREEZER | 10/01/03 | 338,486.82 |
| KETTLES | 10/01/03 | 74,266.44 |
| BOILER | 10/01/03 | 118,701.10 |
| FRYER | 10/01/03 | 86,077.75 |
| MURZAN PUMP | 10/01/03 | 9,875.20 |
| BLENDER | 10/01/03 | 28,930.81 |
| VAC TUMBLER | 10/01/03 | 6,057.76 |
| STEIN FILTER | 10/01/03 | 17,712.74 |
| COSTCO EQUIPMENT | 10/01/03 | 201,910.78 |
| REFRIGERANT | 10/01/03 | 11,629.86 |
| WATER SOFTNER | 10/01/03 | 6,944.94 |
| CHASE DOORS | 10/01/03 | 21,992.38 |
| CYBERNETICS COMM EQUIP | 10/02/03 | 3,020.95 |
| LOVESHAW CASE SEALER | 10/29/03 | 6,877.85 |
| CORN GRINDER | 12/15/03 | 7,500.00 |
| ANSUL SYSTEM | 12/30/03 | 1,122.63 |
| SCALE SP1500 | 12/31/03 | 525.95 |
| 10 TON CHILLER BARREL | 02/18/04 | 2,610.54 |
| CONVEYOR BELT 24"X51' | 02/23/04 | 1,143.24 |
| CON EYOR | 02/26/04 | 529.05 |
| AIR HANDLER | 03/25/04 | 1,159.13 |
| UNDER COUNTER FREEZER | 03/26/04 | 1,163.94 |
| SEMI-AUTO CASE SEALER | 04/09/04 | 586.24 |
| AUTO PLASTIC BAGGER | 04/09/04 | 598.00 |
| KOPPENS TRANSFER CONVEYOR | 04/20/04 | 547.00 |
| WIRE CONVEYOR | 04/20/04 | 1,094.00 |
| INCLINE CONVEYOR | 04/20/04 | 821.00 |
| (3) STAINLESS STEEL VATS | 04/20/04 | 812.00 |

Exhibit C
108

IMPROVEMENTS

| DESCRIPTION | DATE IN | BOOK |
|---|---|---|
| GARLAND/US RANGE | 04/22/04 | 2,751.13 |
| DEAN NATL GAS FRYER | 04/22/04 | 687.78 |
| MIXER/GRINDER | 05/05/04 | 1,743.70 |
| VENT HOOD | 05/05/04 | 5,872.60 |
| CHILI DEPOSITOR | 05/16/04 | 11,249.14 |
| FIRE SUPPRESSION SYSTEM | 05/17/04 | 1,620.95 |
| (3) STAINLESS STEEL CARTS | 05/31/04 | 2,620.61 |
| AMULSIFIER | 06/02/04 | 1,430.75 |
| TEMP CONTROLS-3 DWR STM CAB | 06/17/04 | 1,760.50 |
| STEAM KETTLE | 06/28/04 | 10,500.00 |
| FILLING STATION | 06/28/04 | 9,600.00 |
| VACUUM CASING CLIPPER | 06/28/04 | 3,100.00 |
| DOUGH LIFTER | 06/30/04 | 3,097.20 |
| STEIN TEMPURA BATTER APPLICATOR | 07/22/04 | 7,666.35 |
| DATA LOGGING EQUIP | 08/24/04 | 9,274.08 |
| FIRE SUPPRESSION SYSTEM | 08/23/04 | 1,991.12 |
| SANDWICH/SALAD PRED UNIT 60" | 08/24/04 | 1,760.65 |
| OFFICE EQUIP | 01/20/90 | 1,067.00 |
| SUBIA PRTBL TRADE SHOW | 04/30/94 | 5,287.45 |
| OFFICE CABINET | 02/02/01 | 1,047.70 |
| INSIGHT | 2002 | 960.59 |
| AM0210 | 2002 | 771.10 |
| COMPUTERS | 2002 | 3,129.00 |
| UPGRADE PHONE SYSTEM | 03/18/03 | 20,528.68 |
| PHONE SYSTEM UPGRADE | 04/01/03 | 2,505.69 |
| PHONE SYSTEM | 11/03/03 | 1,170.60 |
| BECK OFFICE SYSTEMS | 03/12/03 | 19,680.07 |
| 37 FILE CABINETS | 04/04/03 | 8,233.21 |
| PICTURES FOR OFFICE | 04/14/03 | 5,443.34 |
| SIGN AT ROAD | 07/22/03 | 920.66 |
| SIGN ON BUILDING | 07/31/03 | 568.74 |
| LOBBY COUNTER | 10/01/03 | 2,779.69 |

Exhibit C
109

IMPROVEMENTS

| DESCRIPTION | DATE IN | BOOK |
|---|---|---|
| PELIKAN INDUST CAMERAS | 01/21/04 | 1,011.43 |
| TELEPHONE MODEL 12 | 07/27/04 | 630.28 |
| VP2020 COLOR PRINTER | 08/29/04 | 5,495.00 |
| ALUMINUM PANEL | 08/29/04 | 1,166.69 |
| OKIDATA ML 590 PRINTER | 01/31/97 | 550.99 |
| 2 MMX COMPUSA COMPUTER | 10/31/99 | 1,876.00 |
| DELL PENTIUM III | 07/01/01 | 1,570.68 |
| GATEWAY P-4-1300 | 07/01/01 | 1,435.40 |
| CAMN | 03/17/03 | 5,176.35 |
| AM0210 | 10/02/03 | 1,259.37 |
| PELIKAN DVR 400 GB HDD | 11/10/03 | 3,855.56 |
| INSIGHT COMPAQ & 17" | 11/21/03 | 816.97 |
| COMPUTER HARDWARE | 01/15/04 | 1,507.15 |
| IOT MONITOR | 08/18/04 | 697.36 |

|  |  | 2,858,835.56 |

All equipment purchased in the future while the bonds remain outstanding.

Exhibit C
110

# Exhibit D
## Tax Abatement (10-yr Tax Life, 20-yr Bond Amortization)

*(Attached)*

Exhibit C
111

| Tax Year | Acquisition Cost | % Good | Depreciated Cost | | Calc. Taxable Value | Mill Rate Attributable to UNM APS | Mill Rate Attributable to UNM Hosp. | Calc. | Tax Due to Aps. | Tax Due to UNM Hosp. | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3,000,000.00 | 0.96 | 2,880,000.00 | 0.3333 | 959,904.00 | 11.152 | 6.500 | 1,000.00 | 10,704.85 | 6,239.38 | 16,944.23 |
| 2 | 3,000,000.00 | 0.87 | 2,610,000.00 | 0.3333 | 869,913.00 | 11.152 | 6.500 | 1,000.00 | 9,701.27 | 5,654.43 | 15,355.70 |
| 3 | 3,000,000.00 | 0.78 | 2,340,000.00 | 0.3333 | 779,922.00 | 11.152 | 6.500 | 1,000.00 | 8,697.69 | 5,069.49 | 13,767.18 |
| 4 | 3,000,000.00 | 0.69 | 2,070,000.00 | 0.3333 | 689,931.00 | 11.152 | 6.500 | 1,000.00 | 7,694.11 | 4,484.55 | 12,178.66 |
| 5 | 3,000,000.00 | 0.61 | 1,830,000.00 | 0.3333 | 609,939.00 | 11.152 | 6.500 | 1,000.00 | 6,802.04 | 3,964.60 | 10,766.64 |
| 6 | 3,000,000.00 | 0.52 | 1,560,000.00 | 0.3333 | 519,948.00 | 11.152 | 6.500 | 1,000.00 | 5,798.46 | 3,379.66 | 9,178.12 |
| 7 | 3,000,000.00 | 0.43 | 1,290,000.00 | 0.3333 | 429,957.00 | 11.152 | 6.500 | 1,000.00 | 4,794.88 | 2,794.72 | 7,589.60 |
| 8 | 3,000,000.00 | 0.34 | 1,020,000.00 | 0.3333 | 339,966.00 | 11.152 | 6.500 | 1,000.00 | 3,791.30 | 2,209.78 | 6,001.08 |
| 9 | 3,000,000.00 | 0.26 | 780,000.00 | 0.3333 | 259,974.00 | 11.152 | 6.500 | 1,000.00 | 2,899.23 | 1,689.83 | 4,589.06 |
| 10 | 3,000,000.00 | 0.17 | 510,000.00 | 0.3333 | 169,983.00 | 11.152 | 6.500 | 1,000.00 | 1,895.65 | 1,104.89 | 3,000.54 |
| 11 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 12 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 13 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 14 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 15 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 16 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 17 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 18 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 19 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| 20 | 3,000,000.00 | 0.13 | 390,000.00 | 0.3333 | 129,987.00 | 11.152 | 6.500 | 1,000.00 | 1,449.62 | 844.92 | 2,294.53 |
| | | | | | | | | | 77,275.63 | 45,040.50 | |

Exhibit C
112

# EXHIBIT "D"

| | |
|---|---|
| **From:** | Robb Haltom |
| **To:** | Thomas Walker; rayapadilla1@gmail.com; rayapadilla@aol.com |
| **Subject:** | Fwd: Rent for 3041 University Blvd SE |
| **Date:** | Thursday, May 4, 2023 10:59:57 AM |
| **Attachments:** | image001.png |

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Fri, Mar 24, 2023 1:39 pm
Subject: Re: Rent for 3041 University Blvd SE

We don't send invoices for rents or late fees due.  Rents and late fees are due according to the lease and
the lease does not call for invoices.

The last time the rent was paid late, the late fees were added to the rent and no invoice was sent from me
to you.


Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Robb Haltom - AOL <rhaltom112@aol.com>; Stephanie Dieckmann <Stephanie@tattooedchef.com>;
Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>;
rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>;
lgutier130@aol.com <lgutier130@aol.com>
Sent: Thu, Mar 23, 2023 4:39 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb

Did you send over a late fee invoice?


        Thank you,

        Jennifer Mendoza
        **Accounts Payable Manager| Tattooed Chef**
        **Office:** 562-602-0822  jennifer@tattooedchef.com

Exhibit D
114



**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Thursday, March 23, 2023 2:17 PM
**To:** Jennifer Mendoza <Jennifer@tattooedchef.com>; Stephanie Dieckmann
<Stephanie@tattooedchef.com>; Mary Chesley <Mary@tattooedchef.com>;
rayapadilla1@gmail.com; rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>;
lgutier130@aol.com
**Subject:** Re: Rent for 3041 University Blvd SE

Any word yet on the late fees for the rent for March?  Non-payment constitutes a default under the lease.

Thanks!


Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Thu, Mar 16, 2023 4:52 pm
Subject: Re: Rent for 3041 University Blvd SE

Please get back to me about the late fee.

thanks!

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Tue, Mar 14, 2023 9:45 am
Subject: Re: Rent for 3041 University Blvd SE

Hello Jennifer:

We received the rent check a few minutes ago but it did not include the late fee.  Please let me know when you will be sending that check.

Thanks!

Robb Haltom
rhaltom112@aol.com

-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Robb Haltom - AOL <rhaltom112@aol.com>; Stephanie Dieckmann <Stephanie@tattooedchef.com>;
Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>;
rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>
Sent: Fri, Mar 10, 2023 4:17 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb

Please see below fedex tracking number for the March 2023 rent, apologies for the delay.

Have a great weekend.

# 771538758644

Thank you,

## Jennifer Mendoza
## Accounts Payable Manager| Tattooed Chef
## Office: 562-602-0822  jennifer@tattooedchef.com



From: Robb Haltom <rhaltom112@aol.com>
Sent: Wednesday, February 8, 2023 2:13 PM
To: Jennifer Mendoza <Jennifer@tattooedchef.com>; Stephanie Dieckmann
<Stephanie@tattooedchef.com>; Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com;
rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>
Subject: Re: Rent for 3041 University Blvd SE

Thanks for your help!

Robb Haltom

rhaltom112@aol.com

-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Stephanie Dieckmann <Stephanie@tattooedchef.com>; Robb Haltom - AOL <rhaltom112@aol.com>;
Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>;
rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>
Sent: Wed, Feb 8, 2023 3:04 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Rob,

Apologies for the delay, here is the fedex tracking number **771251915462**, it is being sent out overnight,
you should receive in the morning.


Thank you,

**Jennifer Mendoza**
**Accounts Payable Manager| Tattooed Chef**
**Office:** 562-602-0822  jennifer@tattooedchef.com



**From:** Stephanie Dieckmann <Stephanie@tattooedchef.com>
**Sent:** Wednesday, February 8, 2023 1:59 PM
**To:** Robb Haltom - AOL <rhaltom112@aol.com>; Mary Chesley <Mary@tattooedchef.com>;
rayapadilla1@gmail.com; rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>
**Cc:** Jennifer Mendoza <Jennifer@tattooedchef.com>
**Subject:** RE: Rent for 3041 University Blvd SE

I signed it yesterday.

Jennifer, has it been sent?  We probably need to overnight if it hasn't.

Thank you,
Stephanie

**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Wednesday, February 8, 2023 1:58 PM
**To:** Stephanie Dieckmann <Stephanie@tattooedchef.com>; Mary Chesley <Mary@tattooedchef.com>;
rayapadilla1@gmail.com; rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>
**Subject:** Re: Rent for 3041 University Blvd SE

Hello Stephanie:

Just wanted to see if you have sent the rent payment for February yet.  I just got the mail for today and we have not yet received the check.

Thank you!

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Stephanie Dieckmann <Stephanie@tattooedchef.com>
To: 'Robb Haltom' <rhaltom112@aol.com>; Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>
Sent: Wed, Feb 1, 2023 1:11 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb,

Not sure why you would be blocked, you shouldn't be.  What is your regular e-mail address so that we can white list you?  I only received this e-mail.  We will send on Friday.

Thank you,
Stephanie

**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Wednesday, February 1, 2023 11:48 AM
**To:** Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com; rayapadilla@aol.com; Stephanie Dieckmann <Stephanie@tattooedchef.com>; Thom Rindt <Thom@tattooedchef.com>
**Subject:** Rent for 3041 University Blvd SE

Hi Mary:

This is to notify you that we have not yet received the rent for 3041 University Blvd. SE Abq NM 87106 that is due to Larry Gutierrez for the month of February 2023.  This e-mail starts the running of the 10 days for notification of non-payment and the late fee provisions of the lease.

I believe my e-mails may be blocked on your end so I am sending this duplicate message from a personal email account.

Thanks!

Robb

Robb Haltom
rhaltom112@aol.com

| From: | Robb Haltom |
|---|---|
| To: | Thomas Walker |
| Subject: | Fwd: Rent for 3041 University Blvd SE |
| Date: | Thursday, May 4, 2023 11:00:34 AM |
| Attachments: | image001.png |

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Wed, Apr 5, 2023 11:22 am
Subject: Re: Rent for 3041 University Blvd SE

We received the rent for 3041 University today.  Thank you for that.

The late fee for March is still outstanding and non-payment of that fee constitutes a default/breach under
the lease.

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Fri, Mar 24, 2023 1:39 pm
Subject: Re: Rent for 3041 University Blvd SE

We don't send invoices for rents or late fees due.  Rents and late fees are due according to the lease and
the lease does not call for invoices.

The last time the rent was paid late, the late fees were added to the rent and no invoice was sent from me
to you.


Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Robb Haltom - AOL <rhaltom112@aol.com>; Stephanie Dieckmann <Stephanie@tattooedchef.com>;
Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>;
rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>;
lgutier130@aol.com <lgutier130@aol.com>

Sent: Thu, Mar 23, 2023 4:39 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb

Did you send over a late fee invoice?


Thank you,

Jennifer Mendoza

**Accounts Payable Manager | Tattooed Chef**

**Office:** 562-602-0822   jennifer@tattooedchef.com



---

**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Thursday, March 23, 2023 2:17 PM
**To:** Jennifer Mendoza <Jennifer@tattooedchef.com>; Stephanie Dieckmann
<Stephanie@tattooedchef.com>; Mary Chesley <Mary@tattooedchef.com>;
rayapadilla1@gmail.com; rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>;
lgutier130@aol.com
**Subject:** Re: Rent for 3041 University Blvd SE

Any word yet on the late fees for the rent for March?  Non-payment constitutes a default under the lease.

Thanks!


Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Thu, Mar 16, 2023 4:52 pm
Subject: Re: Rent for 3041 University Blvd SE

Please get back to me about the late fee.

thanks!

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Tue, Mar 14, 2023 9:45 am
Subject: Re: Rent for 3041 University Blvd SE

Hello Jennifer:

We received the rent check a few minutes ago but it did not include the late fee.  Please let me know
when you will be sending that check.

Thanks!

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Robb Haltom - AOL <rhaltom112@aol.com>; Stephanie Dieckmann <Stephanie@tattooedchef.com>;
Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>;
rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>
Sent: Fri, Mar 10, 2023 4:17 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb

Please see below fedex tracking number for the March 2023 rent, apologies for the delay.

Have a great weekend.

# 771538758644


Thank you,

## Jennifer Mendoza
**Accounts Payable Manager| Tattooed Chef**
**Office:** 562-602-0822  jennifer@tattooedchef.com



**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Wednesday, February 8, 2023 2:13 PM
**To:** Jennifer Mendoza <Jennifer@tattooedchef.com>; Stephanie Dieckmann
<Stephanie@tattooedchef.com>; Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com;
rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>
**Subject:** Re: Rent for 3041 University Blvd SE

Thanks for your help!

Robb Haltom
rhaltom112@aol.com

-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Stephanie Dieckmann <Stephanie@tattooedchef.com>; Robb Haltom - AOL <rhaltom112@aol.com>;
Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>;
rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>
Sent: Wed, Feb 8, 2023 3:04 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Rob,

Apologies for the delay, here is the fedex tracking number **77125191 5462**, it is being sent out overnight,
you should receive in the morning.

Thank you,

**Jennifer Mendoza**
**Accounts Payable Manager| Tattooed Chef**
**Office:** 562-602-0822   jennifer@tattooedchef.com



**From:** Stephanie Dieckmann <Stephanie@tattooedchef.com>
**Sent:** Wednesday, February 8, 2023 1:59 PM
**To:** Robb Haltom - AOL <rhaltom112@aol.com>; Mary Chesley <Mary@tattooedchef.com>;

[rayapadilla1@gmail.com](mailto:rayapadilla1@gmail.com); [rayapadilla@aol.com](mailto:rayapadilla@aol.com); Thom Rindt <[Thom@tattooedchef.com](mailto:Thom@tattooedchef.com)>
**Cc:** Jennifer Mendoza <[Jennifer@tattooedchef.com](mailto:Jennifer@tattooedchef.com)>
**Subject:** RE: Rent for 3041 University Blvd SE

I signed it yesterday.

Jennifer, has it been sent?  We probably need to overnight if it hasn't.

Thank you,
Stephanie

---

**From:** Robb Haltom <[rhaltom112@aol.com](mailto:rhaltom112@aol.com)>
**Sent:** Wednesday, February 8, 2023 1:58 PM
**To:** Stephanie Dieckmann <[Stephanie@tattooedchef.com](mailto:Stephanie@tattooedchef.com)>; Mary Chesley <[Mary@tattooedchef.com](mailto:Mary@tattooedchef.com)>; [rayapadilla1@gmail.com](mailto:rayapadilla1@gmail.com); [rayapadilla@aol.com](mailto:rayapadilla@aol.com); Thom Rindt <[Thom@tattooedchef.com](mailto:Thom@tattooedchef.com)>
**Subject:** Re: Rent for 3041 University Blvd SE

Hello Stephanie:

Just wanted to see if you have sent the rent payment for February yet.  I just got the mail for today and we have not yet received the check.

Thank you!

Robb Haltom
[rhaltom112@aol.com](mailto:rhaltom112@aol.com)


-----Original Message-----
From: Stephanie Dieckmann <[Stephanie@tattooedchef.com](mailto:Stephanie@tattooedchef.com)>
To: 'Robb Haltom' <[rhaltom112@aol.com](mailto:rhaltom112@aol.com)>; Mary Chesley <[Mary@tattooedchef.com](mailto:Mary@tattooedchef.com)>; [rayapadilla1@gmail.com](mailto:rayapadilla1@gmail.com) <[rayapadilla1@gmail.com](mailto:rayapadilla1@gmail.com)>; [rayapadilla@aol.com](mailto:rayapadilla@aol.com) <[rayapadilla@aol.com](mailto:rayapadilla@aol.com)>; Thom Rindt <[Thom@tattooedchef.com](mailto:Thom@tattooedchef.com)>
Sent: Wed, Feb 1, 2023 1:11 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb,

Not sure why you would be blocked, you shouldn't be.  What is your regular e-mail address so that we can white list you?  I only received this e-mail.  We will send on Friday.

Thank you,
Stephanie

---

**From:** Robb Haltom <[rhaltom112@aol.com](mailto:rhaltom112@aol.com)>
**Sent:** Wednesday, February 1, 2023 11:48 AM
**To:** Mary Chesley <[Mary@tattooedchef.com](mailto:Mary@tattooedchef.com)>; [rayapadilla1@gmail.com](mailto:rayapadilla1@gmail.com); [rayapadilla@aol.com](mailto:rayapadilla@aol.com); Stephanie Dieckmann <[Stephanie@tattooedchef.com](mailto:Stephanie@tattooedchef.com)>; Thom Rindt <[Thom@tattooedchef.com](mailto:Thom@tattooedchef.com)>
**Subject:** Rent for 3041 University Blvd SE

Hi Mary:

This is to notify you that we have not yet received the rent for 3041 University Blvd. SE Abq NM 87106 that is due to Larry Gutierrez for the month of February 2023.  This e-mail starts the running of the 10 days for notification of non-payment and the late fee provisions of the lease.

I believe my e-mails may be blocked on your end so I am sending this duplicate message from a personal email account.

Thanks!

Robb

Robb Haltom
rhaltom112@aol.com

| | |
|---|---|
| **From:** | Robb Haltom |
| **To:** | Thomas Walker |
| **Subject:** | Fwd: Rent for 3041 University Blvd SE |
| **Date:** | Thursday, May 4, 2023 11:00:34 AM |
| **Attachments:** | image001.png |

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Wed, Apr 5, 2023 11:22 am
Subject: Re: Rent for 3041 University Blvd SE

We received the rent for 3041 University today.  Thank you for that.

The late fee for March is still outstanding and non-payment of that fee constitutes a default/breach under
the lease.

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Fri, Mar 24, 2023 1:39 pm
Subject: Re: Rent for 3041 University Blvd SE

We don't send invoices for rents or late fees due.  Rents and late fees are due according to the lease and
the lease does not call for invoices.

The last time the rent was paid late, the late fees were added to the rent and no invoice was sent from me
to you.


Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Robb Haltom - AOL <rhaltom112@aol.com>; Stephanie Dieckmann <Stephanie@tattooedchef.com>;
Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>;
rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>;
lgutier130@aol.com <lgutier130@aol.com>

Sent: Thu, Mar 23, 2023 4:39 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb

Did you send over a late fee invoice?


Thank you,


Jennifer Mendoza

**Accounts Payable Manager | Tattooed Chef**

**Office:** 562-602-0822   jennifer@tattooedchef.com



---

**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Thursday, March 23, 2023 2:17 PM
**To:** Jennifer Mendoza <Jennifer@tattooedchef.com>; Stephanie Dieckmann
<Stephanie@tattooedchef.com>; Mary Chesley <Mary@tattooedchef.com>;
rayapadilla1@gmail.com; rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>;
lgutier130@aol.com
**Subject:** Re: Rent for 3041 University Blvd SE

Any word yet on the late fees for the rent for March?  Non-payment constitutes a default under the lease.

Thanks!


Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Thu, Mar 16, 2023 4:52 pm
Subject: Re: Rent for 3041 University Blvd SE

Please get back to me about the late fee.

thanks!

Robb Haltom
rhaltom112@aol.com

-----Original Message-----
From: Robb Haltom <rhaltom112@aol.com>
To: Jennifer@tattooedchef.com <Jennifer@tattooedchef.com>; Stephanie@tattooedchef.com
<Stephanie@tattooedchef.com>; Mary@tattooedchef.com <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom@tattooedchef.com <Thom@tattooedchef.com>; lgutier130@aol.com <lgutier130@aol.com>
Sent: Tue, Mar 14, 2023 9:45 am
Subject: Re: Rent for 3041 University Blvd SE

Hello Jennifer:

We received the rent check a few minutes ago but it did not include the late fee.  Please let me know
when you will be sending that check.

Thanks!

Robb Haltom
rhaltom112@aol.com

-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Robb Haltom - AOL <rhaltom112@aol.com>; Stephanie Dieckmann <Stephanie@tattooedchef.com>;
Mary Chesley <Mary@tattooedchef.com> rayapadilla1@gmail.com <rayapadilla1@gmail.com>;
rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>
Sent: Fri, Mar 10, 2023 4:17 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb

Please see below fedex tracking number for the March 2023 rent, apologies for the delay.

Have a great weekend.

# 771538758644

Thank you,

## Jennifer Mendoza
**Accounts Payable Manager| Tattooed Chef**
**Office:** 562-602-0822   jennifer@tattooedchef.com



**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Wednesday, February 8, 2023 2:13 PM
**To:** Jennifer Mendoza <Jennifer@tattooedchef.com>; Stephanie Dieckmann <Stephanie@tattooedchef.com>; Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com; rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>
**Subject:** Re: Rent for 3041 University Blvd SE

Thanks for your help!

Robb Haltom
rhaltom112@aol.com

-----Original Message-----
From: Jennifer Mendoza <Jennifer@tattooedchef.com>
To: Stephanie Dieckmann <Stephanie@tattooedchef.com>; Robb Haltom - AOL <rhaltom112@aol.com>; Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>; Thom Rindt <Thom@tattooedchef.com>
Sent: Wed, Feb 8, 2023 3:04 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Rob,

Apologies for the delay, here is the fedex tracking number **771251915462**, it is being sent out overnight, you should receive in the morning.

Thank you,

Jennifer Mendoza
**Accounts Payable Manager| Tattooed Chef**
**Office:** 562-602-0822  jennifer@tattooedchef.com



**From:** Stephanie Dieckmann <Stephanie@tattooedchef.com>
**Sent:** Wednesday, February 8, 2023 1:59 PM
**To:** Robb Haltom - AOL <rhaltom112@aol.com>; Mary Chesley <Mary@tattooedchef.com>;

rayapadilla1@gmail.com; rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>
**Cc:** Jennifer Mendoza <Jennifer@tattooedchef.com>
**Subject:** RE: Rent for 3041 University Blvd SE

I signed it yesterday.

Jennifer, has it been sent?  We probably need to overnight if it hasn't.

Thank you,
Stephanie

---

**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Wednesday, February 8, 2023 1:58 PM
**To:** Stephanie Dieckmann <Stephanie@tattooedchef.com>; Mary Chesley <Mary@tattooedchef.com>;
rayapadilla1@gmail.com; rayapadilla@aol.com; Thom Rindt <Thom@tattooedchef.com>
**Subject:** Re: Rent for 3041 University Blvd SE

Hello Stephanie:

Just wanted to see if you have sent the rent payment for February yet.  I just got the mail for today and
we have not yet received the check.

Thank you!

Robb Haltom
rhaltom112@aol.com


-----Original Message-----
From: Stephanie Dieckmann <Stephanie@tattooedchef.com>
To: 'Robb Haltom' <rhaltom112@aol.com>; Mary Chesley <Mary@tattooedchef.com>;
rayapadilla1@gmail.com <rayapadilla1@gmail.com>; rayapadilla@aol.com <rayapadilla@aol.com>;
Thom Rindt <Thom@tattooedchef.com>
Sent: Wed, Feb 1, 2023 1:11 pm
Subject: RE: Rent for 3041 University Blvd SE

Hi Robb,

Not sure why you would be blocked, you shouldn't be.  What is your regular e-mail address so that we
can white list you?  I only received this e-mail.  We will send on Friday.

Thank you,
Stephanie

---

**From:** Robb Haltom <rhaltom112@aol.com>
**Sent:** Wednesday, February 1, 2023 11:48 AM
**To:** Mary Chesley <Mary@tattooedchef.com>; rayapadilla1@gmail.com; rayapadilla@aol.com;
Stephanie Dieckmann <Stephanie@tattooedchef.com>; Thom Rindt <Thom@tattooedchef.com>
**Subject:** Rent for 3041 University Blvd SE

Hi Mary:

This is to notify you that we have not yet received the rent for 3041 University Blvd. SE Abq NM 87106 that is due to Larry Gutierrez for the month of February 2023.  This e-mail starts the running of the 10 days for notification of non-payment and the late fee provisions of the lease.

I believe my e-mails may be blocked on your end so I am sending this duplicate message from a personal email account.

Thanks!

Robb

Robb Haltom
rhaltom112@aol.com

**From:** Robb Haltom
**Sent:** Tuesday, March 22, 2022 9:15 AM
**To:** Sulema Lenz <slenz@bernco.gov>
**Cc:** lora@tattooedchef.com
**Subject:** FW: NM Food Distributors-Annual Billing 1/22/2022
**Importance:** High

Hello Sulema:

The new A/P person at NM Foods is Lora and I have copied her on this e-mail.

Robb

---

**From:** Sulema Lenz <slenz@bernco.gov>
**Sent:** Monday, March 21, 2022 3:08 PM
**To:** Robb Haltom <rhaltom@picosofoods.com>

**Subject:** FW: NM Food Distributors-Annual Billing 1/22/2022
**Importance:** High

Hi Robb, I glad Marcos had your new email address. There is an outstanding PILT Payment that needs to be paid. Can you make sure it gets to the right person.

Thank you

**Sulema Lenz**
Economic Development
Senior Analyst
415 Silver Ave SW

8th Floor, Albuquerque, NM 87102
Email: slenz@bernco.gov
O: (505) 468-7185
C: (505) 220-1537
www.bernco.gov

**From:** Sulema Lenz
**Sent:** Tuesday, March 15, 2022 12:49 PM
**To:** 'Alex Campos' <acampos@foodsofnewmexico.com>
**Subject:** RE: NM Food Distributors-Annual Billing 1/22/2022

Hi Alex, can you please let me know if the PILT payment was made?


Thank you




**Sulema Lenz**
Economic Development
Senior Analyst
415 Silver Ave SW

8th Floor, Albuquerque, NM 87102
Email: slenz@bernco.gov
O: (505) 468-7185
C: (505) 220-1537
www.bernco.gov

**From:** Sulema Lenz
**Sent:** Monday, February 28, 2022 1:42 PM
**To:** Alex Campos <acampos@foodsofnewmexico.com>
**Subject:** FW: NM Food Distributors-Annual Billing 1/22/2022
**Importance:** High

Hi Alex, I sent Robb an email on the outstanding PILT payment that as yet to be paid. I have attached the invoice for your reference. Please read the email below and let me know the status of the payment

Thank you
Sulema Lenz

1/22/2022

Hi Robb,

Do you know if this payment has been made? If so, please send me a copy of the cleared check. As of today, it is still outstanding. If the payment has not been made can you, please do so.

Thank you

**Sulema Lenz**
Economic Development
Senior Analyst
415 Silver Ave SW
8th Floor, Albuquerque, NM 87102
Email: slenz@bernco.gov
O: (505) 468-7185
C: (505) 220-1537
www.bernco.gov

**From:** Carla Nieto <cnieto@bernco.gov>
**Sent:** Thursday, December 9, 2021 12:28 PM
**To:** RHaltom@foodsofnewmexico.com
**Cc:** Sulema Lenz <slenz@bernco.gov>; Marcos A. Gonzales <maagonzales@bernco.gov>
**Subject:** NM Food Distributors-Annual Billing 1/22/2022

Good afternoon,

Attached is the Annual Billing. Please attach the bottom portion of the invoice to the payment to ensure accurate posting.

Please note that our new mailing address is the following.

Remit to:
Bernalillo County
ATTN: Accounting Department
415 Silver SW
Albuquerque NM 87102

Sincerely,



**Carla Nieto**
*Senior Financial Accountant*
Accounting/Budget Department
415 Silver NW, 6th Floor, Albuquerque, NM 87102
Email: cnieto@bernco.gov
Phone: (505) 588-1972
www.bernco.gov

# EXHIBIT "E"

**LOCATION and LEGAL DESCRIPTION:**

3041 UNIVERSITY BLVD SE

# 2022 Property Tax Summary
## NANCY M. BEARCE TREASURER
## BERNALILLO COUNTY
**415 SILVER SW 87102**
**ALBUQUERQUE, NM**

**(505) 468-7031**
http://www.bernco.gov/treasurer
e-mail: treasurers@bernco.gov

Today's date:  8/3/2023 11:25 AM

NEW MEXICO FOOD DISTRIBUTORS INC
NEW MEXICO FOOD DISTRIBUTORS INC
3041 UNIVERSITY BLVD SE
ALBUQUERQUE NM 87106-5040

## Tax and Payment History

| Tax Year | Valuation Class | Tax District | Tax Rate | Assessor's Net Taxable Value | Tax Due | Int | Pen | Fees | Paid | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | NR | A1A | 47.976 | 248,910.00 | 11,941.72 | 656.81 | 477.68 | 0.00 | 0.00 | 13,076.21 |
| 2021 | NR | A1A | 47.978 | 248,910.00 | 11,942.22 | 0.00 | 0.00 | 0.00 | -11,942.22 | 0.00 |
| 2020 | NR | A1A | 47.978 | 249,218.00 | 11,956.98 | 0.00 | 0.00 | 0.00 | -11,956.98 | 0.00 |
| 2019 | NR | A1A | 47.983 | 181,990.00 | 8,732.44 | 0.00 | 0.00 | 0.00 | -8,732.44 | 0.00 |
| 2018 | NR | A1A | 47.985 | 80,245.00 | 3,850.56 | 0.00 | 0.00 | 0.00 | -3,850.56 | 0.00 |
| 2017 | NR | A1A | 47.985 | 96,743.00 | 4,642.22 | 0.00 | 0.00 | 0.00 | -4,642.22 | 0.00 |
| 2016 | NR | A1A | 47.940 | 131,670.00 | 6,312.26 | 0.00 | 0.00 | 0.00 | -6,312.26 | 0.00 |
| 2015 | NR | A1A | 47.488 | 752,280.00 | 35,724.28 | 0.00 | 0.00 | 0.00 | -35,724.28 | 0.00 |
| 2014 | NR | A1A | 47.284 | 887,486.00 | 41,963.88 | 453.88 | 453.88 | 0.00 | -42,871.64 | 0.00 |
| 2013 | NR | A1A | 47.148 | 264,407.00 | 12,466.24 | 0.00 | 0.00 | 0.00 | -12,466.24 | 0.00 |

| | | | | |
|---|---|---|---|---|
| 1st half due | 5,970.86 | 477.68 | 298.55 | 0.00 | 0.00 | 6,747.09 |
| 2nd half due | 5,970.86 | 179.13 | 179.13 | 0.00 | 0.00 | 6,329.12 |
| Total Due | 11,941.72 | 656.81 | 477.68 | 0.00 | 0.00 | 13,076.21 |

Assessor's current valuation exemption(s)

| | |
|---|---|
| Head of Household | 0.00 |
| Veteran | 0.00 |
| Other | 0.00 |

| | |
|---|---|
| **Monthly Payment Program Balance:** | 0.00 |
| **Pre-payment Balance:** | 0.00 |
| **Total Due:** | 13,076.21 |

Tax bills are mailed November 1 of every year as required by state law. Taxes are due in two equal installments. The first half payment is due November 10 and must be paid by December 10 to avoid delinquency charges. Second half payments are due by April 10 of the following calendar year and must be made by May 10 to avoid delinquency charges.

| PRINT THIS PARCEL NO. ON YOUR CHECK | 644441 |
|---|---|

# PAYMENT COUPON

PLEASE MAKE YOUR CHECK PAYABLE TO
THE BERNALILLO COUNTY TREASURER AND
MAIL TO :

**BERNALILLO COUNTY TREASURER**

PO BOX 27800

ALBUQUERQUE, NM 87103-0627

| NEW MEXICO FOOD DISTRIBUTORS INC | |
|---|---|
| 1st half due | 6,747.09 |
| 2nd half due | 6,329.12 |
| Total Due | **13,076.21** |



AMOUNT ENCLOSED    $_____

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy c se or adversary proceeding.  My business address is:
2049 Century Park East, Ste. 2600 Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): DECLARATION OF ROBB HALTOM IN SUPPORT OF
LESSOR LARRY GUTIERREZ'S LIMITED OBJECTION TO DEBTORS' NOTICE OF MOTION AND  MOTION TO: (1) APPROVE AUCTION(S)
AND BID PROCEDURES FOR THE SALE OF EQUITY AND/OR ASSETS AND (2)
SET SCHEDULING FOR A MOTION TO APPROVE THE SALE OF EQUITY AND/OR ASSETS

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
_____8/7/2023_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____8/7/2023_____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____8/7/2023_____, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.
**VIA MESSENGER**
**The Honorable Sandra R. Klein**
**United States Bankruptcy Court**
**Central District of California**
**Edward R. Roybal Federal Building and Courthouse**
**255 E. Temple Street, Ste. 1582**
**Los Angeles, CA 90012**                                        ☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| _8/7/2023_ | Julie King | /s/ Julie King |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- Mark A Amendola     mamendola@martynlawfirm.com
- Todd M Arnold     tma@lnbyg.com
- Marshall J August     maugust@frandzel.com, rsantamaria@frandzel.com
- Tanya Behnam     tbehnam@polsinelli.com,
  tanyabehnam@gmail.com;ccripe@polsinelli.com;ladocketing@polsinelli.com
- Michael Jay Berger     michael.berger@bankruptcypower.com,
  yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- Daren Brinkman     firm@brinkmanlaw.com, 7764052420@filings.docketbird.com
- Robert Carrasco     rmc@lnbyg.com
- Abram Feuerstein     abram.s.feuerstein@usdoj.gov
- John-Patrick M Fritz     jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com
- Michael I. Gottfried     mgottfried@elkinskalt.com,
  cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- Everett L Green     everett.l.green@usdoj.gov
- David S Hagen     davidhagenlaw@gmail.com
- Mark S Horoupian     mark.horoupian@gmlaw.com,
  mhoroupian@ecf.courtdrive.com;cheryl.caldwell@gmlaw.com;karen.files@gmlaw.com
- K Kenneth Kotler     kotler@kenkotler.com, linda@kenkotler.com
- Jeffrey A. Krieger JKrieger@ggfirm.com, KWoodson@GreenbergGlusker.com,
  Calendar@GreenbergGusker.com, JKing@GreenbergGlusker.com
- Aaron J Malo     amalo@sheppardmullin.com,
  clopez@sheppardmullin.com;abilly@sheppardmullin.com
- Ron Maroko     ron.maroko@usdoj.gov
- Kyle J Mathews     kmathews@sheppardmullin.com
- David W. Meadows     david@davidwmeadowslaw.com
- Angela Z Miller     amiller@phillipslytle.com, styrone@phillipslytle.com
- John A Moe     john.moe@dentons.com, glenda.spratt@dentons.com;derry.kalve@dentons.com
- Tania M Moyron     tania.moyron@dentons.com,
  rebecca.wicks@dentons.com;kathryn.howard@dentons.com;derry.kalve@dentons.com;glenda.s
  pratt@dentons.com;DOCKET.GENERAL.LIT.LOS@dentons.com
- Alan I Nahmias     anahmias@mbn.law, jdale@mbn.law
- David L. Neale     dln@lnbyg.com
- Matthew D. Resnik     Matt@rhmfirm.com,
  roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca
  @rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com
- Edward Rubacha     er@jhkmlaw.com, docket@jhc.law;am@jhc.law
- Amit Kumar Sharma     amit.sharma@aisinfo.com
- David Samuel Shevitz     david@shevitzlawfirm.com,
  shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com
- Ronald P Slates     rslates2@rslateslaw.com,
  scannavan@rslateslaw.com;slatesecf@rslateslaw.com
- Lindsey L Smith     lls@lnbyg.com, lls@ecf.inforuptcy.com
- Alan G Tippie     Alan.Tippie@gmlaw.com,
  atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walke
  r@gmlaw.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Glenn S Walter     gwalter@honigman.com
- Roye Zur     rzur@elkinskalt.com,
  cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com