1   DAVID L. NEALE (SBN 141225)
2   TODD M. ARNOLD (SBN 221868)
    ROBERT M. CARRASCO (SBN 334642)
3   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
    2818 La Cienega Avenue
4   Los Angeles, California 90034
    Telephone: (310) 229-1234
5   Facsimile: (310) 229-1244
    Email: DLN@LNBYG.COM; TMA@LNBYG.COM; RMC@LNBYG.COM
6

7   Proposed Attorneys for Debtors and Debtors in Possession

8                    **UNITED STATES BANKRUPTCY COURT**
             **CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**
9

10  In re:                                    | Lead Case No.: 2:23-bk-14154-SK

11  ☐ ITTELLA INTERNATIONAL LLC,              | Jointly administered with Case Nos.
    a California limited liability company     | 2:23-bk-14159-SK; 2:23-bk-14161-SK;
12  ☐ ITTELLA'S CHEF, LLC,                     | 2:23-bk-14157-SK; 2:23-bk-14158-SK;
    a California limited liability company     | 2:23-bk-14155-SK; 2:23-bk-14156-SK; and
13  ☒ TATTOOED CHEF, INC.,                     | 2:23-bk-14160-SK
    a Delaware corporation
14  ☐ MYJOJO, INC.,                            | Chapter 11 Cases
    a Delaware corporation
15  ☐ NEW MEXICO FOOD DISTRIBUTORS, INC.,      | **DEBTOR'S MOTION FOR ENTRY OF**
    a New Mexico corporation                   | **AN ORDER (1) AUTHORIZING SALE**
16  ☐ TCI TORTILLA FACTORY, LLC,               | **OF SUBSTANTIALLY ALL OF TCI'S**
    a New Mexico limited liability company     | **ASSETS FREE AND CLEAR OF ALL**
17  ☐ BCI ACQUISITION, INC.,                   | **LIENS, CLAIMS, ENCUMBRANCES**
    a Delaware corporation                     | **AND INTERESTS; (2) WAIVING THE**
18  ☐ TTCF-NM HOLDINGS INC.,                   | **14-DAY STAY PERIODS SET FORTH**
    a Delaware corporation                     | **IN BANKRUPTCY RULE 6004(h);**
19  ☐ All Debtors                              | **AND (3) GRANTING RELATED**
                                               | **RELIEF; MEMORANDUM OF**
20          Debtors and Debtors-in-Possession. | **POINTS AND AUTHORITIES AND**
                                               | **DECLARATION IN SUPPORT**
21                                             | **THEREOF**

22
23                                             | Date:      September 6, 2023
24                                             | Time:      9:00 a.m.
                                               | Location:  Courtroom 1575
25                                             |            255 East Temple Street
26                                             |            Los Angeles, California 90012
                                               |            [Also VIA ZoomGov]
27

28

                                      1

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 5

I. STATEMENT OF FACTS ............................................................................................ 5

    A.    Background. ..................................................................................................... 5

    B.    Proposed Terms Of The Sale. ...................................................................... 11

II. DISCUSSION ............................................................................................................. 13

    A.    The Court Should Authorize TCI To Sell The Transferred Assets To
            Buyer Or The Successful Bidder. ................................................................. 13

           1.    Sound Business Purpose ................................................................ 14

           2.    Accurate and Reasonable Notice .................................................. 16

           3.    Fair and Reasonable Price.............................................................. 18

           4.    Good Faith ....................................................................................... 19

    B.    The Sale Of The Property Should Be Free And Clear Of All Liens,
            Claims, Encumbrances And Other Interests Pursuant To 11 U.S.C. §
            363(f).............................................................................................................. 22

           1.    The Proposed Sale Should Be Approved Under 11 U.S.C. § 363(f)(2). .. 22

    C.    TCI Requests That The Court Waive The Fourteen-Day Waiting Periods
            Set Forth In Bankruptcy Rule 6004(h)......................................................... 23

III. CONCLUSION........................................................................................................... 24

DECLARATION OF EDWARD BIDANSET............................................................... 27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Abbotts Dairies of Pennsylvania, Inc.,*
  788 F.2d 143 (3d Cir. 1986) ...................................................................................14, 19

*In re Alpha Industries, Inc.,*
  84 B.R. 703 (Bankr. Mont. 1988) ............................................................................18, 19

*In re Apex Oil Co.,*
  92 B.R. 847 (Bankr. E.D. Mo. 1988) .............................................................................19

*Big Shanty Land Corp. v. Comer Properties, Inc.,*
  61 B.R. 272 (Bankr. N.D. Ga. 1985) .............................................................................18

*In re Canyon Partnership,*
  55 B.R. 520 (Bankr. S.D. Cal. 1985) .............................................................................18

*Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.),*
  722 F.2d 1063 (2d Cir. 1983) .....................................................................................14, 15

*In re Continental Airlines, Inc.,*
  780 F.2d 1223 (5th Cir. 1986) ........................................................................................15

*In re Del Grosso,*
  106 B.R. 165 (Bankr. N.D. Ill. 1989) .............................................................................20

*In re Delaware and Hudson Ry. Co.,*
  124 B.R. 169 (D. Del. 1991) .......................................................................................14, 16

*In re Eliot,*
  94 B.R. 343 (E.D. Pa. 1988) .......................................................................................22, 23

*In re Ex-Cel Concrete Company, Inc.,*
  178 B.R. 198 (9th Cir. BAP 1995) .................................................................................23

*Fabricators Inc. v. Technical Fabricators, Inc.,*
  926 F.2d 1458 (5th Cir. 1991) ........................................................................................20

*In re Filtercorp, Inc.,*
  163 F.3d 570 (9th Cir. 1998) ..........................................................................................20

*In re Gabel,*
  61 B.R. 661 (Bankr. W.D. La. 1985) .............................................................................23

*In re Harford Sands Inc.,*
  372 F.3d 637 (4th Cir. 2004) ..........................................................................................20

*In re Huntington, Ltd.*,
    654 F.2d 578 (9th Cir. 1981) ..........................................................................14

*In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*,
    77 B.R. 15 (Bankr. E.D. Pa. 1987) ...............................................................19

*In re Karpe*,
    84 B.R. 926 (Bankr. M.D. Pa. 1988) .............................................................16

*In re M Capital Corporation*,
    290 B.R. 743 (9th Cir. BAP 2003)..................................................................20

*In re Martin (Myers v. Martin)*,
    91 F.3d 389 (3d Cir. 1996)..............................................................................13

*In re MCorp Financial, Inc.*,
    160 B.R. 941 (S.D. Tex. 1993) .......................................................................20

*In re Paddlewheels, Inc.*,
    2007 WL 1035151 (Bankr. E.D.La. April 2, 2007).......................................23

*In re Qintex Entertainment, Inc.*,
    950 F.2d 1492 (9th Cir. 1991) ........................................................................14

*In re Rock Indus. Mach. Corp.*,
    572 F.2d 1195 (7th Cir. 1978) ........................................................................19

*Titusville Country Club v. Pennbank (In re Titusville Country Club)*,
    128 B.R. 396 (Bankr. W.D. Pa. 1991) ...........................................................14

*Walter v. Sunwest Bank (In re Walter)*,
    83 B.R. 14 (9th Cir. BAP 1988)...............................................................14, 15

*In re Whittemore*,
    37 B.R. 93 (Bankr. D. Or. 1984).....................................................................22

*In re Wilde Horse Enterprises*,
    136 B.R. ....................................................................................................18, 19

**Federal Statutes**

11 U.S.C.
    § 102(1)(A) ......................................................................................................16
    § 363(b)(1) .................................................................................................16, 19
    § 363(b), (f) and (m) .........................................................................................2
    § 363(f)...............................................................................................2, 21, 22
    § 363(f)(1)-(5)..............................................................................................3, 25
    § 363(f)(2)...................................................................................................22, 23
    § 363(m)......................................................................................................3, 21, 24

§ 503(b)(3) .............................................................................................................12, 35
§ 705 .................................................................................................................................17
§ 1102 ...............................................................................................................................17
§ 363 ............................................................................................................................14, 16
§ 363(b) .............................................................................................................13, 14, 15, 18
§ 363(b)(2) .......................................................................................................................17
§ 363(k) ......................................................................................................................11, 34
§§ 1107 and 1108 ...............................................................................................................5

**Other Authorities**

Fed. R. Bankr. P. 2002(a)(2), (c)(1), (i) and (k) ..................................................17
Fed. R. Bankr. P. 2002 and 6004 .............................................................................2
Fed. R. Bankr. P. 2002(i) ...........................................................................................17
Fed. R. Bankr. P. 2002(a)(2) ....................................................................................17
Fed. R. Bankr. P. 2002(c)(1) .....................................................................................17
Fed. R. Bankr. P. 2002(k) ..........................................................................................17
Fed. R. Bankr. P. 6004(c) ....................................................................................17, 18
Fed. R. Bankr. P. 6004(a) ....................................................................................16, 17
Fed. R. Bankr. P. 6004(h) ..............................................................2, 4, 23, 24, 26
Fed. R. Bankr. P. 6004(a) and 2002(a)(2), (c)(1), (i) and (k) .......................17
Fed. R. Bankr. P. 9014 ...............................................................................................17

Local Bankruptcy Rule 6007-1(f) ....................................................................17, 18
Local Bankruptcy Rule 9013-1(d)(2) ....................................................................17
Local Bankruptcy Rules 6004-1(c) and 9013-1 ...................................................2
10 *Collier on Bankruptcy* ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds.
    16th ed. 2015) ...................................................................................................23, 24

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE FOR THE CENTRAL DISTRICT OF CALIFORNIA:**

Tattooed Chef, Inc., one of debtors and debtors in possession in the above-captioned, jointly administered Chapter 11 bankruptcy cases ("TCI"),[1] hereby files this motion (the "Motion") seeking an order of the Court:

(A) pursuant to 11 U.S.C. § 363(f), authorizing TCI to enter into an agreement (the "APA"), in substantially the form attached as **Exhibit "1"** to the annexed Declaration of Edward Bidanset (the "Bidanset Declaration"), to sell certain equipment and spare parts described in the APA (collectively, the "Transferred Assets"), free and clear of liens, claims, encumbrances and other interests, under the terms and conditions set forth in the APA, to Naturasol S.A. de C.V. ("Buyer") or to a successful overbidder as determined at an auction to be conducted before this Court, if appropriate, on September 6, 2023 at 9:00 a.m.;

(B) waiving the 14-day stay periods set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and

(C) granting related relief as described in the Motion.

The Motion is based upon this Motion, the Notice of this Motion filed concurrently herewith, the annexed Memorandum of Points and Authorities (the "Memorandum") and Bidanset Declaration, 11 U.S.C. § 363(b), (f) and (m), Bankruptcy Rules 2002 and 6004, and Local Bankruptcy Rules 6004-1(c) and 9013-1, the entire record in TCI's case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court.

**WHEREFORE**, TCI respectfully requests that the Court enter an order:

(1) finding that notice of the Motion and the hearing on the Motion was proper, timely, adequate, appropriate and sufficient;

---

[1] This Motion addresses assets owned solely and exclusively by TCI (Case No. 2:23-bk-14161-SK).  The other jointly administered estates have no interest in the assets proposed to be sold.

2

(2)      finding good, sufficient, and sound business purposes and justification and compelling circumstances for the sale of the Transferred Assets prior to, and outside of, a plan of reorganization;

(3)      finding that the APA was negotiated, proposed and entered into by the parties thereto without collusion, in good faith, and from arms' length bargaining positions, and that Buyer (or a successful overbidder) is a good faith buyer entitled to all of the protections afforded by 11 U.S.C. § 363(m);

(4)      finding the consideration provided by Buyer (or a successful overbidder) for the Transferred Assets to (i) be fair and reasonable, (ii) be the highest or otherwise best offer for the Transferred Assets that was received, (iii) provide a greater recovery for TCI's creditors than would be provided by any other practical available alternative, and (iv) constitute reasonably equivalent value and fair consideration under the circumstances of TCI's bankruptcy case;

(5)      finding that one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied for selling the Transferred Assets, free and clear of all liens, claims, encumbrances and other interests;

(6)      finding that approval of the APA and the consummation of the sale of the Transferred Assets to Buyer (or a successful overbidder) is in the best interests of TCI, its estate, its creditors, and other parties in interest;

(7)      authorizing TCI to (a) enter into the APA, in substantially the form attached as **Exhibit "1"** to the Bidanset Declaration, (b) sell and transfer the Transferred Assets to Buyer (or a successful overbidder), free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever other than as may be provided in the APA, such that the Sale Order shall be effective as a determination that any and all liens, claims, encumbrances and interests shall be, and are, released with respect to the Transferred Assets as of the Closing, except that such liens, claims and encumbrances and interests shall attach to TCI's interest in the sale proceeds in the order of their priority, with the same validity, force and effect as they had in the Transferred Assets, subject to any rights, claims and defenses of TCI, and, (c) upon Closing, authorizing TCI to distribute the proceeds of the sale to any creditors holding valid liens against

the Transferred Assets; as follows: (i) an amount equal to the JCF Claim[2] to JCF to satisfy the JCF Claim and extinguish JCF's lien and (ii) the remainder (approximately $4,840,000) distributed to UMB to be first applied to fully repay the DIP Roll-Up Loans (as defined in the Final DIP Order) and thereafter to be applied to reduce the Lender Allowed Claim (as defined in the Final DIP Order), provided that, if the proposed distribution of the sale proceeds is not approved by the Court, the proceeds will be held in a segregated blocked debtor-in-possession account at UMB and UMB's lien and JCF's lien shall attach to the proceeds of the sale in the same priority and to the same extent and validity as their respective pre-petition liens;

(8)    authorizing TCI to execute and deliver such additional agreements and documents, and take any and all further actions, as may be reasonably requested by Buyer (or a successful overbidder) to implement the terms of the APA;

(9)    determining that Buyer (or a successful overbidder) is not a successor under theories of successor liability, vicarious liability or otherwise, to TCI, and shall not be deemed or found to have merged with or into TCI;

(10)    waiving the 14-day stay periods set forth in Bankruptcy Rule 6004(h); and

(11)    granting such other and further relief as the Court deems just and proper.

Dated: August 16, 2023                    TATTOOED CHEF, INC.


By:    /s/ David L. Neale
                        DAVID L. NEALE
                        TODD M. ARNOLD
                        ROBERT M. CARRASCO
                        LEVENE, NEALE, BENDER,
                            YOO & GOLUBCHIK L.L.P.
                        Proposed Attorneys for Debtors and
                        Debtors in Possession

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Memorandum.

## MEMORANDUM OF POINTS AND AUTHORITIES
### I.
### STATEMENT OF FACTS

**A.    Background.**

1.    Ittella International LLC ("Ittella"), Ittella's Chef, LLC ("ICLLC"), Tattooed Chef, Inc., ("TCI") Myjojo, Inc., ("Myjojo") New Mexico Food Distributors, Inc., ("NMFD") Karsten Tortilla Factory, LLC, ("Karsten"), BCI Acquisition, Inc., ("BCI") and TTCF-NM Holdings Inc., ("TTCF") the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases (collectively, the "Debtors") each filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 2, 2023 (the "Petition Date").    The Debtors continue to operate their businesses, manage their financial affairs, and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.    Official Committees of Unsecured Creditors were appointed in the Ittella and NMFD bankruptcy cases, but not in TCI's or the other Debtors' bankruptcy cases.

2.    TCI is a publicly held company (NASDAQ: TTCF) offering a broad portfolio of innovative plant-based frozen foods through the other Debtors, all of which are direct or indirect subsidiaries of TCI. Beginning in 2017, the Debtors have supplied plant-based products to leading retailers in the United States, with signature products such as ready-to-cook bowls, zucchini spirals, riced cauliflower, acai and smoothie bowls, cauliflower crust pizza, wood fire crusted pizza, handheld burritos, bars and quesadillas. The Debtors' products are available in all 50 states both in private label and through their "Tattooed Chef™" brand mainly in the frozen food section of retail food stores.

3.    The Debtors believe their innovative food offerings converge with consumer trends and demands for great-tasting, wholesome, plant-based foods made from sustainably sourced ingredients, including preferences for flexitarian, vegetarian, vegan, organic, and gluten-free lifestyles.    As of December 31, 2022, the Debtors' products were sold in approximately 21,000 retail outlets in the United States.    The Debtors' brand strategy has been to introduce the attributes of a plant-based lifestyle to build a connection with a broad array of consumers that are seeking delicious, sustainably sourced, plant-based foods.    The diverse offering of plant-based

meals produced by the Debtors includes certified organic, non-GMO, certified Kosher, gluten-free, as well as plant protein elements that the Debtors believe provide health-conscious consumers an affordable, great tasting, clean label food option.  As of December 31, 2022, the Debtors had 132 SKUs and over 175 plant-based food concepts and recipes under development and testing

4. The Debtors are led by their President and CEO, Salvatore "Sam" Galletti, who has over 35 years of experience in the food industry as both a manager and an investor, and Sarah Galletti, the Chief Creative Officer and the creator of the Tattooed Chef brand.  The brand's tagline, "Serving Plant-Based Foods to People Who Give a Crop," aims to convey the brand's mission to deliver plant-based foods to consumers who care about sustainable and ethically sourced foods.

5. The Debtors, through their affiliate Ittella Italy SRL ("Ittella Italy"),[3] operate a 100,000 square foot processing facility in Prossedi, Italy located in close proximity to many of the growers that are the Debtors' primary suppliers of produce. This facility opened in 2017 and manufactures various products, including riced cauliflower (plain and value-added), diced squash/zucchini, and vegetable spirals.  Due to the location of the facility, the Debtors are able to transport raw materials to the facility, process them, and manufacture products within a relatively short time. Prior to each growing season, the Debtors obtain written commitments as to quantity and price from various growers, who commit to supply the projected needs, which commitments are then followed by written purchase orders closer to the start of the harvest season.  When necessary (whether as a result of greater than anticipated demand from customers, or poor crop yields due to inclement weather, infestation and the like), the Debtors have been able to obtain alternative raw material supply from other sources or on the spot market on satisfactory terms. The Prossedi plant was originally leased from a third party.  In April 2021, the Debtors spent approximately $4.9 million to acquire this facility and its machinery to secure and upgrade the frozen food manufacture capabilities.  During the past two years, the Debtors improved their

---

[3] Concurrently with the commencement of these bankruptcy cases, the Debtors' Italian affiliate commenced a restructuring process under Italian law.

internal cold storage capabilities to better manage inventory and to capitalize on seasonal purchases of raw materials during peak harvest season.

6.     In May 2021, TCI acquired NMFD and Karsten for a total purchase price of approximately $34.1 million, and, on December 21, 2021, through BCI, acquired substantially all of the assets and assumed certain liabilities from Belmont Confections, Inc. (located in Ohio) for a total purchase price of $16.7 million.  In August 2022, TCI, through TTCF, entered into an equipment purchase agreement with Desert Premium Group, LLC pursuant to which the Debtors acquired certain manufacturing, production, and storage assets, organized workforce, as well as assumed a lease for an 80,000 square foot manufacturing facility located in Albuquerque, New Mexico, for a purchase price of approximately $10.4 million.[4]

7.     The Debtors currently lease processing facilities in Paramount, California, Albuquerque, New Mexico, and Youngstown, Ohio, a storage facility in Vernon, California, approximately 270,000 square feet of cold storage facility in Ceccano, Italy and have a small office suite lease in San Pedro, California.  The Paramount facility also serves as the Debtors' headquarters.

8.     As of December 31, 2022, the Debtors had approximately 800 full-time employees in the United States and 140 full-time employees in Italy. None of the Debtors' employees are represented by a labor union; they are either employed directly through the Debtors or through a staffing agency.

9.     The Debtors own domestic copyrights and domestic and foreign trademarks, trademark applications, registrations, and other proprietary rights that are important to their business. The Debtors' primary trademarks include the Tattooed Chef® and People Who Give a Crop™.   In addition, the Debtors own the domain names: *www.ittellafoods.com* and *www.tattooedchef.com*.

---

[4] TCI acquired all of the equity of Myjojo pursuant to an Agreement and Plan of Merger, dated June 11, 2020, as amended on August 10, 2020.  Myjojo has no operations, and its only asset is the membership interest in Ittella.  In turn, Ittella owns the membership interest in ITLLC, a California limited liability company, which owns equity interests in Ittella Italy.

10.     When the Debtors went public in 2020, the brand had household awareness of under 6%, were available in only 4 major retailers nationwide, and were in less than 4,000 stores. Since then, brand awareness has grown to over 26% of households, and the Debtors' products are carried by over 40 retailers in over 23,000 retail stores.  The Debtors invested over $100 million on marketing and in-store promotions to achieve this growth within such a short time period.

11.     After the corporate acquisitions described above and the substantial outlay of funds to develop the market for the Debtors' products, the Debtors found themselves short on cash.  In August 2022, the Debtors engaged a financial advisor to pursue new financing through a "PIPE"[5] transaction whereby an institutional or accredited investor would acquire shares in TCI at a below market price, or through other financing methods that might be available to the Debtors.  In October, the Debtors' auditors advised the Debtors that certain adjustments and restatements to their financial statements were required, which affected the Debtors' financial statements for the preceding six financial quarters.

12.     Over the next 8 months, the Debtors diligently explored alternative financing and funding solutions.  However, due to the Debtors' restated financial statements, changes in the capital markets, and the general economic conditions affecting the Debtors' market segment, the Debtors were unable to obtain any new financing.  Although the Debtors experienced revenue growth from $147 million in 2020 to $230 million in 2022, TCI's share price declined dramatically, particularly over the first quarter of 2023.  During this time period, the Debtors' liquidity became constrained and the Debtors fell behind on payments to suppliers and other parties necessary to the continued operation and profitability of their business.

13.     Although the Debtors have done everything possible to reduce operating expenses over the last nine months, such reduction in expenses has not resulted in sufficient savings to preserve the Debtors' ability to timely pay its obligations and satisfy customer demand.  In addition, the costs of compliance with public company reporting and other requirements have

---

[5] Private investment in public equity.

been substantial.  As a result of the Debtors' inability to obtain new financing and materially reduce operating and other expenses, the Debtors ultimately decided to commence these bankruptcy cases in order to expeditiously pursue a sale of some or all of their assets.

14.    Prior to the Petition Date, TCI entered into an agreement with JC Ford ("JCF"), pursuant to which TCI acquired certain machinery and equipment manufactured by JCF, to be used by Karsten to manufacture Tattooed Chef branded salty snacks, Mexican entrees, traditional entree bowls and private label products.[6]  As a condition of the purchase from JCF, JCF obtained a security interest in the equipment sold to TCI until such time as the full purchase price for the equipment was paid.  As of the Petition Date, the balance of the purchase price still owed to JCF was $910,318.15 (the "JCF Claim").  JCF properly perfected its security interest by recording a UCC-1 against TCI with the Delaware Secretary of State, which is the state where TCI was incorporated.  A true and correct copy of JCF's UCC-1 obtained from the Delaware Secretary of State is attached hereto as **Exhibit "2."**

15.    After the Petition Date, the Debtors filed their *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion") [Itella Doc. No. 8].  The Court entered an interim order (the "Interim DIP Order") [Itella Doc. No. 77] granting the DIP Motion on an interim basis and a final order (the "Final DIP Order") [Itella Doc. No. 275] granting the DIP Motion on a final basis.  Pursuant to the Interim DIP Order, UMB Bank, n.a. ("UMB"), the Debtors pre-Petition Date and debtor in possession lender, perfected its security interest in TCI's assets to secure the $3,000,000 New Money DIP Loans and $3,000,000 DIP Roll-Up Loans made by UMB to the Debtors by recording a UCC-1 against

---

[6] Based upon the Debtors' internal accounting system and the fact that the equipment was used by Karsten in its facility, the Karsten Schedules of Assets and Liabilities (Karsten Doc. No. 22) identify the Transferred Assets as property of the Karsten estate.  Title to the Transferred Assets was transferred to TCI in the sale transaction with JCF, and there has never been a formal transfer of title from TCI to Karsten.

TCI with the Delaware Secretary of State, which is the state where TCI was incorporated. A true and correct copy of the current UCC-1 Report obtained from the Delaware Secretary of State, which shows UMB's lien, is attached hereto as **Exhibit "3."**

16.     As part of their restructuring efforts prior to the commencement of their bankruptcy case, representatives of the Debtors, which include TCI, contacted JCF to explore the possibility of a sale of the equipment and to find out whether JCF could identify any potential buyers for the equipment. TCI entered into negotiations with Naturasol, a Sociedad Anónima de Capital Variable ("<u>Buyer</u>") to acquire the equipment, and reached an agreement regarding the terms and conditions for the sale of the equipment for a purchase price of $5,750,000.[7]

17.     The offer made by Buyer was roughly equal to TCI's cost of acquiring the equipment from JCF, less the costs associated with installing the equipment when it was purchased. As such, the Debtors determined that it was in the best interests of TCI, its estate and its creditors to proceed with a sale of the designated assets. As of the date of this Motion, TCI has received no other offers to acquire the assets to be sold to Buyer.[8]

18.     The Debtors engaged SC&H Group, Inc. ("<u>SCH</u>") as their investment banker to market and manage a sales process for their assets, in whole or in part.[9] Because the Debtors believe that the purchase price to be paid for TCI's assets represents fair market value, and because the proposed transaction is an all-cash deal with no contingencies other than Bankruptcy

---

[7] After the Petition Date, Buyer revised its offer to reduce the purchase price to $5,000,000. As a result of arm's length, good faith negotiations, TCI was able to get Buyer to proceed on the original terms negotiated, *i.e.*, a purchase price of $5,750,000.

[8] The assets which are to be sold to Buyer have been listed by the Debtors' investment banker among the assets generally being offered for sale, and information regarding the assets which are the subject of this Motion has been available to any and all interested parties through the data room that has been established. No party other than Buyer has expressed an interest in acquiring just the assets which are to be sold to Buyer. Nonetheless, the Debtors will provide notice of the hearing on this Motion and the opportunity to bid for the assets to be sold to any party who has executed a non-disclosure agreement and accessed the data room, provided that SCH (as defined below) has an email address or mailing address for such party.

[9] *See* application to employ SCH [Ittella Doc. No. 110] and the order thereon [Ittella Doc. No. 171].

Court approval, after consultation with SCH, the Debtors have determined that it is in all parties' best interests to sell TCI's assets separately from all of the other assets to be sold.

19. TCI's Schedules of Assets and Liabilities (TCI Doc. No. 22) reflect only two creditors with liquidated claims: UMB, holding a claim of approximately $19,000,000[10] secured by a lien on all of TCI's assets, and an intercompany claim by Ittella in the amount of approximately $34.5 million. JCF was mistakenly listed as an unsecured creditor with no liquidated claim.

**B.    Proposed Terms Of The Sale.[11]**

19. The APA, a true and correct copy of which is attached as **Exhibit "1"** to the annexed Bidanset Declaration, contemplates the sale and transfer of certain assets of TCI, as more particularly described in Exhibit "A" to the APA (collectively, the "Transferred Assets"), free and clear of all liens, claims, encumbrances, and interests,[12] to Buyer for cash in the amount of $5,750,000 (the "Purchase Price").

20. Under the terms of the APA, the Purchase Price to be paid by Buyer for the Transferred Assets is comprised of the following: (a) a non-refundable cash deposit in the amount of $2,000,000 upon execution of the APA, (b) the remaining balance payable prior to the removal of the Transferred Assets from the Karsten facility, but in no event later than 3 weeks after Bankruptcy Court approval of the sale. There are no conditions to Buyer's offer other than Bankruptcy Court approval, and there are no contingencies that must be addressed before Buyer will close. The Transferred Assets are to be sold to Buyer "as is" and "where is" with no

---

[10] Although UMB might have the right to credit bid for the Transferred Assets pursuant to Section 363(k) of the Bankruptcy Code, UMB has advised TCI that it does not intend to exercise such right.

[11] The following is a summary of the principal terms of the sale of TCI's assets pursuant to the APA, and is not intended to be a comprehensive recitation of the terms and conditions set forth in the APA. In the event of any inconsistency between the summary set forth herein and the APA itself, the APA shall control.

[12] Any and all valid liens, claims, encumbrances or interests that were perfected as of the Petition Date shall attach to the proceeds of the sale once received by TCI. As part of this Motion, TCI is requesting authority to distribute the sale proceeds to UMB and JCF in the amounts set forth herein.

representations or warranties by TCI other than it is the lawful owner of the Transferred Assets and, upon approval of the sale, shall transfer the Transferred Assets free and clear of all liens and encumbrances. *See* APA, ¶ 4.

21.     SCH has discussed the sale process with Buyer, and have obtained Buyer's consent to allow TCI to solicit higher and better bids to acquire the Transferred Assets. TCI contemplates the consideration of competing bids at the hearing on this Motion. In order to participate in the auction for the Transferred Assets, by not later than 2 business days prior to the hearing on the Motion, a prospective bidder must (a) deliver a cashier's check in the amount of $575,000 to counsel for the Debtors; (b) provide proof of the bidder's ability to pay the remainder of the purchase price in cash upon closing which shall occur no later than 3 weeks following entry of an order approving the proposed sale; and (c) agree to proceed with the acquisition of the Transferred Assets on all of the same terms and conditions set forth in the APA (other than the identity of Buyer and the purchase price), including, without limitation, the absence of any conditions to closing other than entry of an order approving the sale and identifying the bidder as the winning bidder. Any competing bid made at the hearing on the Motion must be not less than $50,000 more than the prior highest bid, and the bidding shall continue until no further bids are made by any participant in the auction. Neither Buyer nor any competing bidder shall be entitled to a break-up fee, any expense reimbursement, or any administrative claim for a "substantial contribution" claim under 11 U.S.C. § 503(b)(3) or (4), or any similar claim, in connection, with the sale.[13]

22.     At the conclusion of the auction, if any, TCI shall identify the "winning" bidder and may designate another party as a "backup" bidder in the event the winning bidder does not proceed with the transaction. If a party is designated as a "winning" bidder and, through no fault of TCI, fails to close within the established deadline, such bidder shall forfeit its deposit, and

---

[13] SCH is not seeking payment of a fee upon the closing of the sale of the Transferred Assets. However, upon the close of the sale of other assets, SCH will seek the payment of a fee consistent with its approved employment application in connection with the sale of the Transferred Assets.

1   TCI can proceed to close a transaction with the designated "backup" bidder.

2       23.    If no party satisfies the conditions to participating in an auction for the

3   Transferred Assets prior to the hearing on the Motion, TCI will advise the Court that no auction

4   will be necessary, and will seek approval of the APA and the sale to Buyer on the terms and

5   conditions set forth therein.

6       24.    Given that the only creditors of TCI are UMB, JCF and Ittella, TCI has reached

7   an agreement with UMB that the proceeds from the sale shall be allocated as follows: (a) an

8   amount equal to the JCF Claim to JCF to satisfy the JCF Claim and extinguish JCF's lien and (B)

9   the remainder (approximately $4,840,000) distributed to UMB to be first applied to fully repay

10  the DIP Roll-Up Loans (as defined in the Final DIP Order) and thereafter to be applied to reduce

11  the Lender Allowed Claim (as defined in the Final DIP Order). Additionally, the Debtors will

12  submit an Updated Budget that reduces the Permitted Overformula Amount by the amount of

13  such paydown.  If the proposed distribution of the sale proceeds is not approved by the Court, the

14  proceeds will be held in a segregated blocked debtor-in-possession account at UMB and UMB's

15  lien and JCF's lien shall attach to the proceeds of the sale in the same priority and to the same

16  extent and validity as their respective pre-petition liens.

17      25.    Under the circumstances, and, in particular, given the straightforward nature of

18  the proposed sale to Buyer, TCI has determined that the proposed sale is in its best interests, and

19  in the best interests of its estate and creditors.

20                                    **II.**

21                              **DISCUSSION**

22  **A.    The Court Should Authorize TCI To Sell The Transferred Assets To Buyer Or The**

23          **Successful Bidder.**

24          Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing,

25  may use, sell or lease, other than in the ordinary course of business, property of the estate."  To

26  approve a use, sale or lease of property other than in the ordinary course of business, the court

27  must find "some articulated business justification."  *See, e.g., In re Martin (Myers v. Martin)*, 91

28  F.3d 389, 395 (3d Cir. 1996) citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513,

515 (7th Cir. 1991); *Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision).

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale. *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (9th Cir. BAP 1988). The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991).

In determining whether a sale satisfies the business judgment standard, courts have held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also, In re Walter*, 83 B.R. at 19-20.

TCI submits that the proposed sale of the Transferred Assets to Buyer (or a successful competing bidder after conclusion of the auction, if any) comports with each of these four criteria and demonstrates that TCI's business judgment to proceed with the sale and Auction of the Transferred Assets is sound.

### 1. <u>Sound Business Purpose</u>

There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy court may order such disposition under Section 363(b). *In re Lionel Corp.*, 722 F.2d at 1070. The Ninth Circuit Bankruptcy Appellate Panel in *In re Walter*, *supra*, 83 B.R. at 19, has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b). In *Walter*, the

Bankruptcy Appellate Panel, adopting the reasoning of the Fifth Circuit in *In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) and the Second Circuit in *In re Lionel Corp.*, *supra*, articulated the standard to be applied under Section 363(b) as follows:

> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in *Lionel*, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the Debtor, creditors and equity holders, alike. He might, for example, look to such relevant facts as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In re Walter*, 83 B.R. at 19-20, *citing In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

The facts pertaining to TCI's proposed sale of the Transferred Assets to Buyer clearly substantiate TCI's conclusion, based on TCI's business judgment, that such contemplated sale serves the best interests of TCI's estates and creditors, and merits the approval of the Court. As noted above, TCI, with the assistance of SCH and chief restructuring officer, solicited offers for the Transferred Assets, and evaluated the Purchase Price relative to the original cost of the Transferred Assets. The terms and conditions negotiated with Buyer, particularly once exposed to potential overbidding, are reflective of the fair market value of the Transferred Assets.

At this point, given that the Debtors are already pursuing a sale of all or any part of their assets and are continuing to wind down their business operations, TCI has concluded that the best outcome for its bankruptcy estate and limited creditors would be to proceed with an expeditious sale of the Transferred Assets to Buyer (or a successful competing bidder). There is no guarantee that any prospective purchaser for the other Debtors' assets would offer a price

which would allocate a greater value to the Transferred Assets than that reflected in the Purchase Price negotiated with Buyer.  This is the classic case of "a bird in the hand beats two in the bush" – rather than hold out for a bid that *might* include other assets of the estates, TCI, in the exercise of its sound business judgment, believes that availing itself of the transaction with Buyer makes sense and eliminates the risk that any future proposal would be at a price less (or subject to more conditions) than the terms reflected in the APA.  To assist the Debtors' cashflow, SCH is not seeking payment of a fee upon the closing of the sale of the Transferred Assets.  However, upon the close of the sale of other assets, SCH will seek the payment of a fee consistent with its approved employment application in connection with the sale of the Transferred Assets.

Based on the foregoing, TCI believes that the proposed sale of the Transferred Assets is in the overwhelming best interests of TCI's estate and creditors.

## 2. <u>Accurate and Reasonable Notice</u>

In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors.  The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate."  *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 180 (D. Del. 1991).  A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections.  *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988).  The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections.  *Id.*

Section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 102(1) defines "after notice and a hearing" as after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances.  11 U.S.C. § 102(1)(A).

Rule 6004(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") provides in pertinent part that notice of a proposed sale not in the ordinary course of business

must be given pursuant to Bankruptcy Rule 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in accordance with Section 363(b)(2) of the Bankruptcy Code. Fed. R. Bankr. P. 6004(a). Bankruptcy Rule 2002(a)(2) requires at least 21 days' notice by mail of a proposed sale of property of the estate other than in the ordinary course of business, unless the Court for cause shown shortens the time or directs another method of giving notice. Fed. R. Bankr. P. 2002(a)(2). Bankruptcy Rule 2002(c)(1) requires that the notice of a proposed sale include the date, time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. It also provides that the notice of sale or property is sufficient if it generally describes the property. Fed. R. Bankr. P. 2002(c)(1). Bankruptcy Rule 2002(i) requires that the notice be mailed to committees elected pursuant to 11 U.S.C. § 705 or appointed pursuant to 11 U.S.C. § 1102. Fed. R. Bankr. P. 2002(i). Bankruptcy Rule 2002(k) requires that the notice be given to the United States Trustee. Fed. R. Bankr. P. 2002(k).

Bankruptcy Rule 6004(c) provides that a motion for authority to sell property free and clear of liens or other interests must be made in accordance with Bankruptcy Rule 9014 and must be served on the parties who have liens or other interests in the property to be sold. Fed. R. Bankr. P. 6004(c).

Local Bankruptcy Rule 9013-1(d)(2) requires that a notice of motion and motion be served at least 21 days before the hearing on the date specified in the notice. L.B.R. 9013-1(d)(2).

In addition, Local Bankruptcy Rule 6007-1(f) requires that an additional copy of the Notice be submitted to the Clerk of the Bankruptcy Court together with a document Form 6004-2 at the time of filing for purposes of publication. L.B.R. 6007-1(f).

TCI has complied with all of the above provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, as modified by the Court's ruling and soon to be entered order on the Debtors' motion to limit notice. TCI has complied with Bankruptcy Rules 6004(a) and 2002(a)(2), (c)(1), (i) and (k), as modified by the Court's ruling and soon to be entered order on the Debtors' motion to limit notice, because a notice of this Motion (the "Notice") has been filed contemporaneously herewith, which includes the date, time and place of

the hearing on this Motion (including the opportunity to participate in an auction at the time of the hearing) (the "Sale Hearing") as well as the deadline for objecting to the Motion, and such Notice has been served on the United States Trustee, the Buyer, JCF, the 20 largest creditors in each of the Debtors' cases, all parties receiving ECF notice, including proposed counsel to the Official Committees of Unsecured Creditors appointed in the Ittella and NMFD cases, and all parties requesting special notice in each of the Debtors' cases.  Because of the limited number of TCI creditors, this Motion has also been served upon the United States Trustee, the Buyer, JCF, all parties receiving ECF notice, including proposed counsel to the Official Committees of Unsecured Creditors appointed in the Ittella and NMFD cases, and all parties requesting special notice in each of the Debtors' cases.  In addition, within one day of the filing hereof, the Notice will be served by email or U.S. Mail on all parties that have executed non-disclosure agreements and accessed the data room established by SCH, provided that SCH has an email address or mailing address for such party.  TCI has complied with Bankruptcy Rule 6004(c) because the Notice and this Motion have also been served upon the parties who have alleged liens or interests in the Transferred Assets.  TCI has complied with the requirements of Local Bankruptcy Rule 6007-1(f) because TCI has filed the Notice and Form 6004-2 with the Clerk of the Bankruptcy Court.

Based on the foregoing, TCI respectfully submits that adequate, accurate and reasonable notice of the proposed sale of the Transferred Assets has been provided to creditors and other parties in interest in TCI's case.

### 3. Fair and Reasonable Price

In order for a sale to be approved under Section 363(b), the purchase price must be fair and reasonable.  *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985). The trustee (or debtor in possession) is given substantial discretion in this regard.  Id.  In addition, Courts have broad discretion with respect to matters under section 363(b).  *See Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985).  In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold. *Wilde Horse Enterprises, Inc.*, 136 B.R. at 841 (*citing In re Chung King, Inc.*, 753 F.2d 547 (7th

Cir. 1985)), *In re Alpha Industries, Inc.*, 84 B.R. 703, 705 (Bankr. Mont. 1988).

TCI, with the assistance of knowledgeable and experienced professionals, has sought out the most likely purchasers for the Transferred Assets and negotiated the Purchase Price at arm's length. Given the straightforward nature of the transaction, TCI believes that the proposed sale of the Transferred Assets to Buyer is the best possible outcome for TCI's estate and creditors, and that the Purchase Price offered by Buyer represents the fair market value of the Transferred Assets under the current circumstances. Notwithstanding the foregoing, in an effort to obtain the highest possible price for the Transferred Assets, TCI has obtained the agreement of Buyer to subject the Transferred Assets to overbid; TCI believes that subjecting the Transferred Assets to overbid and auction will foster competitive bidding among any serious potential buyers and ensure that the highest possible purchase price is obtained for the Transferred Assets. Based on the foregoing, TCI submits that the ultimate purchase price paid by Buyer or a successful competing bidder for the Transferred Assets is fair and reasonable and reasonably equates to the fair market value of the Transferred Assets, and should therefore be approved by the Court.

### 4.    **Good Faith**

When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of Buyer. *In re Abbotts Dairies*, 788 F.2d at 149. Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith. *Id.* at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction. *In re Wilde Horse Enterprises*, 136 B.R. at 842. With respect to the debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction." *See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987). With respect to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion between Buyer and other bidders or the [debtor], or an attempt to take grossly unfair

advantage of other bidders." *In re Abbotts Dairies*, 788 F.2d at 147, *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. at 842; *In re Alpha Industries, Inc.*, 84 B.R. 703, 706 (Bankr. D. Mont. 1988). In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings." *In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), *citing In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983).

In *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith Buyer:

> A good faith buyer "is one who buys 'in good faith' and 'for value.'" [citations omitted.] [L]ack of good faith is [typically] shown by 'fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" [citations omitted.]

*Filtercorp*, 163 F.3d at 577. The Ninth Circuit has stated that "[t]he essence of the [good faith] test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." *In re Marquam Investment Corp.*, *supra* at 1465; *see also In re Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 2004); *Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991).

The negotiations with Buyer have been led by SCH and the Debtors' chief restructuring officer. As such, TCI is not aware of, and there is certainly no evidence of, any fraud or collusion between Buyer and other bidders or TCI, nor is there any evidence of an attempt by Buyer to take grossly unfair advantage of other bidders. As set forth in the annexed Bidanset Declaration, approval of the proposed sale of the Transferred Assets to Buyer (or to a successful competing bidder) is being sought in good faith in a manner designed to maximize the value of the Transferred Assets.

Moreover, although the proponent of a sale has the initial burden of proving good faith, once the proponent has presented evidence to the court to support a *prima facie* finding of good faith, a party questioning the good faith of a sale must provide more than argument – such party must provide evidence inconsistent with good faith that is sufficient to overcome evidence of

good faith.  *See, In re M Capital Corporation*, 290 B.R. 743, 747-48 (9th Cir. BAP 2003); *see also, In re Del Grosso*, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989) (in the context of a settlement, "[o]nce there is a showing that the settlement should be approved, the burden then shifts to the objecting party who cannot oppose the settlement by merely demanding more proof.  'To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process...' (citation omitted)"); *In re MCorp Financial, Inc.*, 160 B.R. 941, 954-55 (S.D. Tex. 1993) (mere fact that debtors had previously opposed settlement did not demonstrate that the settlement was proposed in bad faith; parties arguing bad faith should offer evidence of such bad faith).

Here, TCI has provided evidence, pursuant to the annexed Bidanset Declaration, to show that the sale of the Transferred Assets to Buyer has been negotiated at arms' length and has been proposed in good faith.  Accordingly, absent any evidence that the sale of the Transferred Assets was negotiated in bad faith or not at arms' length, the Court should conclude that TCI and Buyer have acted, and are continuing to act, in good faith with respect to the sale of the Transferred Assets.  Based on the foregoing, TCI seeks a finding from the Court that Buyer (if it is the successful bidder for the Transferred Assets) is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.

To the extent that there is at least one other party interested in bidding on the Transferred Assets, the highest and best price possible for the Transferred Assets will be determined following an open and transparent bidding process at the Sale Hearing.  There is no fraud or collusion expected in connection with the proposed auction of the Transferred Assets since each bidder will have the opportunity to make an offer on the Transferred Assets (or any portion thereof), which offer will be subject to competitive bidding by other parties entitled to participate in the auction.  Furthermore, TCI is not aware of any prospective bidder who has received any special treatment, nor is TCI aware of any fraud, collusion or attempt to take unfair advantage of other bidders or going concern sale buyers.  Based on the foregoing, TCI respectfully submits that the Court should find that the successful bidder at the Auction is a good faith Buyer entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

**B.** **The Sale Of The Property Should Be Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To 11 U.S.C. § 363(f).**

11 U.S.C. § 363(f) provides that a debtor may sell property of the estate "free and clear of any interest in such property" if:

> (1)    applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because Section 363(f) is in the disjunctive, TCI need only meet one of the five subsections of Section 363(f) in order to sell the Transferred Assets free and clear of all liens, claims, interests and encumbrances. *In re Whittemore*, 37 B.R. 93, 94 (Bankr. D. Or. 1984).

**1.** **The Proposed Sale Should Be Approved Under 11 U.S.C. § 363(f)(2).**

TCI submits that the proposed sale of the Transferred Assets should be authorized under 11 U.S.C. § 363(f)(2). Section 363(f)(2) of the Bankruptcy Code authorizes a sale to be free and clear of an interest if the interest holder consents to the sale. The debt owed by TCI to UMB and JCF is the only secured debt that TCI is aware of. UMB has advised TCI that it consents to the proposed sale of the Transferred Assets, and TCI has proposed that the full amount of the JCF Claim be paid from the proceeds of the sale, so its consent can be presumed.

The "consent" of an entity asserting an interest in the property sought to be sold, as referenced in 11 U.S.C. § 363(f)(2), can be implied if such entity fails to make a timely objection to the sale after receiving notice of the sale. *In re Eliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). In the *Eliot* case, the bankruptcy court approved the sale by a trustee of certain real property that was subject to a mortgage in favor of Citicorp. Citicorp had received notice of the sale, but did not

file any timely objection to the sale.  After the sale occurred, Citicorp filed a motion to set aside

the sale, which was handled by the bankruptcy court as an adversary proceeding.    The

bankruptcy court dismissed the complaint to set aside the sale, and Citicorp appealed the ruling.

The district court affirmed the dismissal, and, in so doing, stated:

> … if any of the five conditions of § 363(f) are met, the Trustee has
> the authority to conduct the sale free and clear of all liens.
>
> In this case, the authority for the sale can be found in 11 U.S.C. §
> 363(f)(2).  That section allows the Trustee to sell the property free
> and clear of all liens because Citicorp consented to the sale.
> **Citicorp consented to the sale by failing to make any timely
> objection after receiving notice of the sale.**  Citicorp contends
> that implied consent is insufficient to satisfy the consent
> requirement of § 363(f)(2).  I disagree.

*Eliot,* 94 B.R. at 345 (emphasis added).  In its ruling, the *Eliot* court relied on *In re Gabel*, 61

B.R. 661 (Bankr. W.D. La. 1985), which held that implied consent is sufficient to authorize a

sale under § 363(f)(2).  *See also, In re Ex-Cel Concrete Company, Inc.*, 178 B.R. 198, 203 (9th

Cir. BAP 1995) ["The issue here is whether there was consent or non-opposition by Citicorp."];

*In re Paddlewheels, Inc.*, 2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ["The Sale Motion

complies with section 363(f) of the Bankruptcy Code, in that the Trustee either obtained the

consent of Whitney to the sale of the Vessel to Buyer or Whitney had no objection to the Sale."].

Based upon the foregoing, TCI requests that the Court approve the sale of the Transferred

Assets to Buyer (or a successful competing bidder), free and clear of all liens, claims, interests

and encumbrances of any parties who assert such liens, claims, interests and encumbrances and

who do not file a timely objection to the sale and/or this Motion, by deeming all such parties to

have consented to the proposed sale of the Transferred Assets pursuant to 11 U.S.C. § 363(f)(2).

**C.    TCI Requests That The Court Waive The Fourteen-Day Waiting Periods Set Forth
In Bankruptcy Rule 6004(h).**

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use,

sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court

order, unless the Court orders otherwise. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See 10 *Collier on Bankruptcy* ¶ 6004.11 at 6004-26 (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2015). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *Id.* at 6004-22.

For the reasons discussed above, TCI believes that it is critically important that TCI and Buyer be permitted to consummate the sale of the Transferred Assets and proceed to the closing as soon as possible after entry of an order granting this Motion. TCI is winding down its operations, and continuing to maintain and preserve the Transferred Assets is not without cost to its estate. Moreover, Buyer has expressed its desire to close as soon as possible so as to begin the process of removing the Transferred Assets. Based on the foregoing, TCI respectfully requests that the Court waive the fourteen day stay periods set forth in Bankruptcy Rule 6004(h) to permit TCI to proceed immediately to close the sale of the Transferred Assets following the entry of the sale order.

### III.

### CONCLUSION

**WHEREFORE**, TCI respectfully requests that the Court enter an order:

(1)    finding that notice of the Motion and the hearing on the Motion was proper, timely, adequate, appropriate and sufficient;

(2)    finding good, sufficient, and sound business purposes and justification and compelling circumstances for the sale of the Transferred Assets prior to, and outside of, a plan of reorganization;

(3)    finding that the APA was negotiated, proposed and entered into by the parties thereto without collusion, in good faith, and from arms' length bargaining positions, and that Buyer (or a successful overbidder) is a good faith buyer entitled to all of the protections afforded

by 11 U.S.C. § 363(m);

(4)     finding the consideration provided by Buyer (or a successful overbidder) for the Transferred Assets to (i) be fair and reasonable, (ii) be the highest or otherwise best offer for the Transferred Assets that was received, (iii) provide a greater recovery for TCI's creditors than would be provided by any other practical available alternative, and (iv) constitute reasonably equivalent value and fair consideration under the circumstances of TCI's bankruptcy case;

(5)     finding that one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied for selling the Transferred Assets, free and clear of all liens, claims, encumbrances and other interests;

(6)     finding that approval of the APA and the consummation of the sale of the Transferred Assets to Buyer (or a successful overbidder) is in the best interests of TCI, its estate, its creditors, and other parties in interest;

(7)     authorizing TCI to (a) enter into the APA, in substantially the form attached as **Exhibit "1"** to the Bidanset Declaration, (b) sell and transfer the Transferred Assets to Buyer (or a successful overbidder), free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever other than as may be provided in the APA, such that the Sale Order shall be effective as a determination that any and all liens, claims, encumbrances and interests shall be, and are, released with respect to the Transferred Assets as of the Closing, except that such liens, claims, and interests shall attach to TCI's interest in the sale proceeds in the order of their priority, with the same validity, force and effect as they had in the Transferred Assets, subject to any rights, claims and defenses of TCI, and, (c) upon Closing, authorizing TCI to distribute the proceeds of the sale to any creditors holding valid liens against the Transferred Assets; as follows: (i) an amount equal to the JCF Claim to JCF to satisfy the JCF Claim and extinguish JCF's lien and (ii) the remainder (approximately $4,840,000) distributed to UMB to be first applied to fully repay the DIP Roll-Up Loans (as defined in the Final DIP Order) and thereafter to be applied to reduce the Lender Allowed Claim (as defined in the Final DIP Order), provided that, if the proposed distribution of the sale proceeds is not approved by the Court, the proceeds will be held in a segregated blocked debtor-in-possession

account at UMB and UMB's lien and JCF's lien shall attach to the proceeds of the sale in the same priority and to the same extent and validity as their respective pre-petition liens;

(8)     authorizing TCI to execute and deliver such additional agreements and documents, and take any and all further actions, as may be reasonably requested by Buyer (or a successful overbidder) to implement the terms of the APA;

(9)     determining that Buyer (or a successful overbidder) is not a successor under theories of successor liability, vicarious liability or otherwise, to TCI, and shall not be deemed or found to have merged with or into TCI;

(10)    waiving the 14-day stay periods set forth in Bankruptcy Rule 6004(h); and

(11)    granting such other and further relief as the Court deems just and proper.

Dated:  August 16, 2023                  TATTOOED CHEF, INC.


                                         By:    /s/ David L. Neale
                                                DAVID L. NEALE
                                                TODD M. ARNOLD
                                                ROBERT M. CARRASCO
                                                LEVENE, NEALE, BENDER,
                                                    YOO & GOLUBCHIK L.L.P.
                                                Proposed Attorneys for Debtors and
                                                Debtors in Possession

### DECLARATION OF EDWARD BIDANSET

I, Edward Bidanset, hereby declare as follows:

1.    Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I make this declaration in support of the Motion to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the foroegoing Motion.

3.    I serve as the Chief Restructuring Officer of the Debtors in the above-captioned, jointly administered, Chapter 11 bankruptcy cases pursuant to the Court's order [Itella Doc. No. 121] granting the Debtors' *Emergency Motion For Entry Of An Order (1) Authorizing The Retention Of Cutsheet Express, LLC ["CE"]; (2) Authorizing The Designation Of Edward Bidanset As Chief Restructuring Officer Effective As Of The Petition Date; And (3) Granting Related Relief* [Itella Doc. No. 11].

4.    I am the sole member, manager, and employee of CE, which is an internationally recognized restructuring and turnaround firm with substantial experience in providing interim management and financial advisory services and has an excellent reputation for its work in complex situations including in Chapter 11 cases on behalf of debtors and creditors throughout the United States.

5.    I am a turnaround executive with more than 35 years of financial consulting and management experience.  I have an extensive background in turnarounds, crisis management, investment banking, and sales of assets in and out of bankruptcy cases.  I have worked with both Fortune 500 firms and privately held companies, acting as an advisory consultant or taking on the role of CRO, CFO or COO.  I have particular expertise working with companies in the consumer products, food processing, retail, printing, plastics and metals industries.

6.    I have been a member of the Turnaround Management Association (TMA) and the Financial Executives Institute.  I hold a Bachelor's degree in Economics from the State University of New York (SUNY) at Cortland and an MBA from Duke University's Fuqua School of Business.

7.     I have reviewed and am familiar with and am knowledgeable about the books and records of the Debtors, which books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded.

8.     Ittella International LLC ("Ittella"), Ittella's Chef, LLC ("ICLLC"), Tattooed Chef, Inc., ("TCI") Myjojo, Inc., ("Myjojo") New Mexico Food Distributors, Inc., ("NMFD") Karsten Tortilla Factory, LLC, ("Karsten"), BCI Acquisition, Inc., ("BCI") and TTCF-NM Holdings Inc., ("TTCF") the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases (collectively, the "Debtors") each filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 2, 2023 (the "Petition Date").

9.     TCI is a publicly held company (NASDAQ: TTCF) offering a broad portfolio of innovative plant-based frozen foods through the other Debtors, all of which are direct or indirect subsidiaries of TCI. Beginning in 2017, the Debtors have supplied plant-based products to leading retailers in the United States, with signature products such as ready-to-cook bowls, zucchini spirals, riced cauliflower, acai and smoothie bowls, cauliflower crust pizza, wood fire crusted pizza, handheld burritos, bars and quesadillas. The Debtors' products are available in all 50 states both in private label and through their "Tattooed Chef™" brand mainly in the frozen food section of retail food stores.

10.     The Debtors believe their innovative food offerings converge with consumer trends and demands for great-tasting, wholesome, plant-based foods made from sustainably sourced ingredients, including preferences for flexitarian, vegetarian, vegan, organic, and gluten-free lifestyles.  As of December 31, 2022, the Debtors' products were sold in approximately 21,000 retail outlets in the United States. The Debtors' brand strategy has been to introduce the attributes of a plant-based lifestyle to build a connection with a broad array of consumers that are seeking delicious, sustainably sourced, plant-based foods. The diverse offering of plant-based meals produced by the Debtors includes certified organic, non-GMO, certified Kosher, gluten-free, as well as plant protein elements that the Debtors believe provide health-conscious consumers an affordable, great tasting, clean label food option.  As of December 31, 2022, the

Debtors had 132 SKUs and over 175 plant-based food concepts and recipes under development and testing

11.     The Debtors are led by their President and CEO, Salvatore "Sam" Galletti, who has over 35 years of experience in the food industry as both a manager and an investor, and Sarah Galletti, the Chief Creative Officer and the creator of the Tattooed Chef brand.  The brand's tagline, "Serving Plant-Based Foods to People Who Give a Crop," aims to convey the brand's mission to deliver plant-based foods to consumers who care about sustainable and ethically sourced foods.

12.     The Debtors, through their affiliate Ittella Italy SRL ("Ittella Italy"),[14] operate a 100,000 square foot processing facility in Prossedi, Italy located in close proximity to many of the growers that are the Debtors' primary suppliers of produce. This facility opened in 2017 and manufactures various products, including riced cauliflower (plain and value-added), diced squash/zucchini, and vegetable spirals. Due to the location of the facility, the Debtors are able to transport raw materials to the facility, process them, and manufacture products within a relatively short time. Prior to each growing season, the Debtors obtain written commitments as to quantity and price from various growers, who commit to supply the projected needs, which commitments are then followed by written purchase orders closer to the start of the harvest season. When necessary (whether as a result of greater than anticipated demand from customers, or poor crop yields due to inclement weather, infestation and the like), the Debtors have been able to obtain alternative raw material supply from other sources or on the spot market on satisfactory terms. The Prossedi plant was originally leased from a third party. In April 2021, the Debtors spent approximately $4.9 million to acquire this facility and its machinery to secure and upgrade the frozen food manufacture capabilities. During the past two years, the Debtors improved their internal cold storage capabilities to better manage inventory and to capitalize on seasonal purchases of raw materials during peak harvest season.

---

[14] Concurrently with the commencement of these bankruptcy cases, the Debtors' Italian affiliate has commenced a restructuring process under Italian law.

13. In May 2021, TCI acquired NMFD and Karsten for a total purchase price of approximately $34.1 million, and, on December 21, 2021, through BCI, acquired substantially all of the assets and assumed certain liabilities from Belmont Confections, Inc. (located in Ohio) for a total purchase price of $16.7 million. In August 2022, TCI, through TTCF, entered into an equipment purchase agreement with Desert Premium Group, LLC pursuant to which the Debtors acquired certain manufacturing, production, and storage assets, organized workforce, as well as assumed a lease for an 80,000 square foot manufacturing facility located in Albuquerque, New Mexico, for a purchase price of approximately $10.4 million.[15]

14. The Debtors currently lease processing facilities in Paramount, California, Albuquerque, New Mexico, and Youngstown, Ohio, a storage facility in Vernon, California, approximately 270,000 square feet of cold storage facility in Ceccano, Italy and have a small office suite lease in San Pedro, California. The Paramount facility also serves as the Debtors' headquarters.

15. As of December 31, 2022, the Debtors had approximately 800 full-time employees in the United States and 140 full-time employees in Italy. None of the Debtors' employees are represented by a labor union; they are either employed directly through the Debtors or through a staffing agency.

16. The Debtors own domestic copyrights and domestic and foreign trademarks, trademark applications, registrations, and other proprietary rights that are important to their business. The Debtors' primary trademarks include the Tattooed Chef® and People Who Give a Crop™. In addition, the Debtors own the domain names: _www.ittellafoods.com_ and _www.tattooedchef.com_.

17. When the Debtors went public in 2020, the brand had household awareness of under 6%, were available in only 4 major retailers nationwide, and were in less than 4,000 stores.

---

[15] TCI acquired all of the equity of Myjojo pursuant to an Agreement and Plan of Merger, dated June 11, 2020, as amended on August 10, 2020. Myjojo has no operations, and its only asset is the membership interest in Ittella. In turn, Ittella owns the membership interest in ITLLC, a California limited liability company, which owns equity interests in Ittella Italy.

Since then, brand awareness has grown to over 26% of households, and the Debtors' products are carried by over 40 retailers in over 23,000 retail stores. The Debtors invested over $100 million on marketing and in-store promotions to achieve this growth within such a short time period.

18.    After the corporate acquisitions described above and the substantial outlay of funds to develop the market for the Debtors' products, the Debtors found themselves short on cash. In August 2022, the Debtors engaged a financial advisor to pursue new financing through a "PIPE"[16] transaction whereby an institutional or accredited investor would acquire shares in TCI at a below market price, or through other financing methods that might be available to the Debtors. In October, the Debtors' auditors advised the Debtors that certain adjustments and restatements to their financial statements were required, which affected the Debtors' financial statements for the preceding six financial quarters.

19.    Over the next 8 months, the Debtors diligently explored alternative financing and funding solutions. However, due to the Debtors' restated financial statements, changes in the capital markets, and the general economic conditions affecting the Debtors' market segment, the Debtors were unable to obtain any new financing. Although the Debtors experienced revenue growth from $147 million in 2020 to $230 million in 2022, TCI's share price declined dramatically, particularly over the first quarter of 2023. During this time period, the Debtors' liquidity became constrained and the Debtors fell behind on payments to suppliers and other parties necessary to the continued operation and profitability of their business.

20.    Although the Debtors have done everything possible to reduce operating expenses over the last nine months, such reduction in expenses has not resulted in sufficient savings to preserve the Debtors' ability to timely pay its obligations and satisfy customer demand. In addition, the costs of compliance with public company reporting and other requirements have been substantial. As a result of the Debtors' inability to obtain new financing and materially

---

[16] Private investment in public equity.

reduce operating and other expenses, the Debtors ultimately decided to commence these bankruptcy cases in order to expeditiously pursue a sale of some or all of their assets.

21.    Prior to the Petition Date, TCI entered into an agreement with JC Ford ("JCF"), pursuant to which TCI acquired certain machinery and equipment manufactured by JCF, to be used by Karsten to manufacture Tattooed Chef branded salty snacks, Mexican entrees, traditional entree bowls and private label products.[17]    As a condition of the purchase from JCF, JCF obtained a security interest in the equipment sold to TCI until such time as the full purchase price for the equipment was paid.  As of the Petition Date, the balance of the purchase price still owed to JCF was $910,318.15 (the "JCF Claim").  JCF properly perfected its security interest by recording a UCC-1 against TCI with the Delaware Secretary of State, which is the state where TCI was incorporated.  A true and correct copy of JCF's UCC-1 obtained from the Delaware Secretary of State is attached hereto as **Exhibit "2."**

22.    After the Petition Date, the Debtors filed their *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion") [Itella Doc. No. 8].  The Court entered an interim order (the "Interim DIP Order") [Itella Doc. No. 77] granting the DIP Motion on an interim basis and a final order (the "Final DIP Order") [Itella Doc. No. 275] granting the DIP Motion on a final basis.  Pursuant to the Interim DIP Order, UMB Bank, n.a. ("UMB"), the Debtors pre-Petition Date and debtor in possession lender, perfected its security interest in TCI's assets to secure the $3,000,000 New Money DIP Loans and $3,000,000 DIP Roll-Up Loans made by UMB to the Debtors by recording a UCC-1 against TCI with the Delaware Secretary of State, which is the state where TCI was incorporated.  A true

---

[17] Based upon the Debtors' internal accounting system and the fact that the equipment was used by Karsten in its facility, the Karsten Schedules of Assets and Liabilities (Karsten Doc. No. 22) identify the Transferred Assets as property of the Karsten estate.  Title to the Transferred Assets was transferred to TCI in the sale transaction with JCF, and there has never been a formal transfer of title from TCI to Karsten.

and correct copy of the current UCC-1 Report obtained from the Delaware Secretary of State, which shows UMB's lien, is attached hereto as **Exhibit "3."**

23.     As part of their restructuring efforts prior to the commencement of their bankruptcy case, representatives of the Debtors, which include TCI, contacted JCF to explore the possibility of a sale of the equipment and to find out whether JCF could identify any potential buyers for the equipment.  TCI entered into negotiations with Naturasol, a Sociedad Anónima de Capital Variable ("Buyer") to acquire the equipment, and reached an agreement regarding the terms and conditions for the sale of the equipment for a purchase price of $5,750,000.[18]

24.     The offer made by Buyer was roughly equal to TCI's cost of acquiring the equipment from JCF, less the costs associated with installing the equipment when it was purchased.  As such, the Debtors determined that it was in the best interests of TCI, its estate and its creditors to proceed with a sale of the designated assets.  As of the date of this Motion, TCI has received no other offers to acquire the assets to be sold to Buyer.[19]

25.     The Debtors engaged SC&H Group, Inc. ("SCH") as their investment banker to market and manage a sales process for their assets, in whole or in part.[20]  Because the Debtors believe that the purchase price to be paid for TCI's assets represents fair market value, and because the proposed transaction is an all-cash deal with no contingencies other than Bankruptcy Court approval, after consultation with SCH, the Debtors have determined that it is in all parties' best interests to sell TCI's assets separately from all of the other assets to be sold.

---

[18] After the Petition Date, Buyer revised its offer to reduce the purchase price to $5,000,000.  As a result of arm's length, good faith negotiations, TCI was able to get Buyer to proceed on the original terms negotiated, *i.e.*, a purchase price of $5,750,000.

[19] The assets which are to be sold to Buyer have been listed by the Debtors' investment banker among the assets generally being offered for sale, and information regarding the assets which are the subject of this Motion has been available to any and all interested parties through the data room that has been established.  No party other than Buyer has expressed an interest in acquiring just the assets which are to be sold to Buyer.  Nonetheless, the Debtors will provide notice of the hearing on this Motion and the opportunity to bid for the assets to be sold to all parties who have executed non-disclosure agreements and accessed the data room.

[20] *See* application to employ SCH [Ittella Doc. No. 110] and the order thereon [Ittella Doc. No. 171].

26.     TCI's Schedules of Assets and Liabilities (TCI Doc. No. 22) reflect only two creditors with liquidated claims:  UMB, holding a claim of approximately $19,000,000[21] secured by a lien on all of TCI's assets, and an intercompany claim by Ittella in the amount of approximately $34.5 million.   JCF was mistakenly listed as an unsecured creditor with no liquidated claim.

26.     The APA, a true and correct copy of which is attached hereto as **Exhibit "1,"** contemplates the sale and transfer of certain assets of TCI, as more particularly described in Exhibit "A" to the APA (collectively, the "Transferred Assets"), free and clear of all liens, claims, encumbrances, and interests,[22] to Buyer for cash in the amount of $5,750,000 (the "Purchase Price").

27.     Under the terms of the APA, [23] the Purchase Price to be paid by Buyer for the Transferred Assets is comprised of the following:  (a) a non-refundable cash deposit in the amount of $2,000,000 upon execution of the APA, (b) the remaining balance payable prior to the removal of the Transferred Assets from the Karsten facility, but in no event later than 3 weeks after Bankruptcy Court approval of the sale.  There are no conditions to Buyer's offer other than Bankruptcy Court approval, and there are no contingencies that must be addressed before Buyer will close. The Transferred Assets are to be sold to Buyer "as is" and "where is" with no representations or warranties by TCI other than it is the lawful owner of the Transferred Assets and, upon approval of the sale, shall transfer the Transferred Assets free and clear of all liens and encumbrances. *See* APA, ¶ 4.

---

[21] Although UMB might have the right to credit bid for the Transferred Assets pursuant to Section 363(k) of the Bankruptcy Code, UMB has advised TCI that it does not intend to exercise such right.

[22] Any and all valid liens, claims, encumbrances or interests that were perfected as of the Petition Date shall attach to the proceeds of the sale once received by TCI.  As part of this Motion, TCI is requesting authority to distribute the sale proceeds to UMB and JCF in the amounts set forth herein.

[23] The following is a summary of the principal terms of the sale of TCI's assets pursuant to the APA, and is not intended to be a comprehensive recitation of the terms and conditions set forth in the APA.  In the event of any inconsistency between the summary set forth herein and the APA itself, the APA shall control.

28. SCH has discussed the sale process with Buyer, and have obtained Buyer's consent to allow TCI to solicit higher and better bids to acquire the Transferred Assets. TCI contemplates the consideration of competing bids at the hearing on this Motion. In order to participate in the auction for the Transferred Assets, by not later than 2 business days prior to the hearing on the Motion, a prospective bidder must (a) deliver a cashier's check in the amount of $575,000 to counsel for the Debtors; (b) provide proof of the bidder's ability to pay the remainder of the purchase price in cash upon closing which shall occur no later than 3 weeks following entry of an order approving the proposed sale; and (c) agree to proceed with the acquisition of the Transferred Assets on all of the same terms and conditions set forth in the APA (other than the identity of Buyer and the purchase price), including, without limitation, the absence of any conditions to closing other than entry of an order approving the sale and identifying the bidder as the winning bidder. Any competing bid made at the hearing on the Motion must be not less than $50,000 more than the prior highest bid, and the bidding shall continue until no further bids are made by any participant in the auction. Neither Buyer nor any competing bidder shall be entitled to a break-up fee, any expense reimbursement, or any administrative claim for a "substantial contribution" claim under 11 U.S.C. § 503(b)(3) or (4), or any similar claim, in connection, with the sale.[24]

29. At the conclusion of the auction, if any, TCI shall identify the "winning" bidder and may designate another party as a "backup" bidder in the event the winning bidder does not proceed with the transaction. If a party is designated as a "winning" bidder and, through no fault of TCI, fails to close within the established deadline, such bidder shall forfeit its deposit, and TCI can proceed to close a transaction with the designated "backup" bidder.

30. If no party satisfies the conditions to participating in an auction for the Transferred Assets prior to the hearing on the Motion, TCI will advise the Court that no auction

---

[24] SCH is not seeking payment of a fee upon the closing of the sale of the Transferred Assets. However, upon the close of the sale of other assets, SCH will seek the payment of a fee consistent with its approved employment application in connection with the sale of the Transferred Assets.

will be necessary, and will seek approval of the APA and the sale to Buyer on the terms and conditions set forth therein.

31.    Given that the only creditors of TCI are UMB, JCF and Ittella, TCI has reached an agreement with UMB that the proceeds from the sale shall be allocated as follows: (a) an amount equal to the JCF Claim to JCF to satisfy the JCF Claim and extinguish JCF's lien and (B) the remainder (approximately $4,840,000) distributed to UMB to be first applied to fully repay the DIP Roll-Up Loans (as defined in the Final DIP Order) and thereafter to be applied to reduce the Lender Allowed Claim (as defined in the Final DIP Order). Additionally, the Debtors will submit an Updated Budget that reduces the Permitted Overformula Amount by the amount of such paydown.  If the proposed distribution of the sale proceeds is not approved by the Court, the proceeds will be held in a segregated blocked debtor-in-possession account at UMB and UMB's lien and JCF's lien shall attach to the proceeds of the sale in the same priority and to the same extent and validity as their respective pre-petition liens.

32.    Under the circumstances, and, in particular, given the straightforward nature of the proposed sale to Buyer, I determined that the proposed sale is in the best interests of TCI, and in the best interests of its estate and creditors.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 16th day of August 2023, at ___Paramount, CA___.


_____
EDWARD BIDANSET

# EXHIBIT "1"

## AGREEMENT FOR SALE OF USED EQUIPMENT

This Agreement entered into and made effective this 9th day of August, 2023, by and between Naturasol ("Buyer"), a Sociedad Anónima de Capital Variable with its principal office at Circunvalaciónponiente 9a, Naucalpande Juarez, Estate of Mexico, and Karsten Tortilla Factory, LLC, a New Mexico limited liability company ("Seller"), with its principal office at 2810 Karsten Court SE, Albuquerque, NM 87102.

### W I T N E S S E T H:

In consideration of the and of the mutual covenants and obligations hereinafter set forth, the parties hereto agree as follows:

1. **Purchase and Sale**. Subject to Bankruptcy Court Approval, Seller shall sell to Buyer and Buyer shall purchase from Seller the used equipment and spare parts located at 2810 Karsten Court SE, Albuquerque, NM 87102 ("Premises") and described in Exhibit A, attached hereto (hereinafter referred to as the "Used Equipment"), in accordance with the terms and conditions hereof. Risk of loss or damage to the Used Equipment shall pass to Buyer upon execution of this Agreement.

2. **Purchase Price**. The price of the Used Equipment sold hereunder is Five Million Seven Hundred and Fifty Thousand US Dollars and 00/100 Cents ($5,750,000.00) (the "Purchase Price"). The Purchase Price shall be paid as follows: (i) Two Million US Dollars and 00/100 Cents ($2,000,000.00) in the form of a non-refundable deposit due immediately upon execution of this Agreement and (ii) the remaining balance due and payable prior to the removal of the Used Equipment from the Premises, but in no event later than three (3) weeks after Bankruptcy Court approval of this Agreement. Such payment shall be in the form of a wire transfer of immediately available funds in accordance with the wire instructions, attached hereto to Exhibit B. The price for the Used Equipment does not include brokers' fees or federal, state or local sales, use, excise or similar taxes or assessments applicable to the sale of such Used Equipment. Any such fees and taxes shall be paid by Buyer. Upon closing of the sale contemplated hereby, Seller shall deliver to Buyer a bill of sale in substantially the form set forth in Exhibit C hereof, incorporated herein by reference.

3. **Removal of Used Equipment**. Buyer shall remove the Used Equipment from Seller's Premises at a mutually agreeable time no later than three (3) weeks after Bankruptcy Court approval of this Agreement ("Removal Date"). Seller shall grant Buyer reasonable access to the Used Equipment to allow Buyer to prepare the Used Equipment for transport. Seller reserves the right for any Used Equipment not picked up by Buyer by the Removal Date, to be sold or scrapped without further notice. If Buyer dismantles the Used Equipment at Seller's facility, prior to removal, Buyer will provide Seller with:

(1) a written indemnification agreement issued by the third party removal contractor; (2) evidence of insurance sufficient to support the indemnity; and (3) lien waivers from the company removing the Used Equipment, all in a form satisfactory to Seller. Receipt of satisfactory indemnification and insurance documentation shall be a condition precedent to permission to enter Seller's property to perform the dismantling of the Used Equipment. The contractors indemnification and insurance shall provide the coverage of Seller required of

Buyer in Sections 5 and 6 below. If such documentation is not received by the time designated for removal of the Used Equipment, Buyer shall be in breach of its obligations hereunder. In such case, notwithstanding any payment that may have been made by Buyer for the Used Equipment and/or delivery of a bill of sale by Seller, Seller shall have the right (in addition to all other rights and remedies) and not as an election of remedies) to refuse to permit removal of the Used Equipment until Buyer's default is cured.

### 4. Warranty.

(a)    Seller warrants that it (i) is the lawful owner of the Used Equipment and (ii) on the Removal Date, will transfer title free and clear of all liens and encumbrances.

(b)    Buyer acknowledges that Seller is not the manufacturer or supplier of the Used Equipment and Buyer represents that it has selected the Used Equipment based upon its sole judgment and expertise. In addition, Buyer acknowledges that nothing contained in any discussions between the parties or between Buyer and any broker claiming to represent Seller shall be deemed to constitute a representation or warranty upon which Buyer can rely. Except as set forth in Section 4(a) above, BUYER ACKNOWLEDGES THAT IT HAS BEEN PROVIDED THE OPPORTUNITY TO INSPECT THE USED EQUIPMENT, BUYER TAKES THE USED EQUIPMENT "AS IS", WHERE IS, WITH ALL FAULTS AND DEFECTS BOTH LATENT AND PATENT AND BUYER AGREES THAT SELLER HAS MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED. SELLER EXPRESSLY DISCLAIMS ALL WARRANTIES WITH RESPECT TO SUITABILITY, DURABILITY, FITNESS FOR USE AND MERCHANTABILITY OF ANY OF THE USED EQUIPMENT, FOR THE PURPOSES AND USES OF BUYER OR OTHERWISE. IN NO EVENT, SHALL SELLER BE LIABLE FOR ANY INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES. Buyer specifically waives all rights to make any claim against Seller for breach of any warranty of any kind whatsoever, other than the warranty in Section 4(a). Seller shall not be liable to Buyer for any loss, damage or expense of any kind or nature caused directly or indirectly by the Used Equipment or the disassembly, removal, use, transportation or maintenance thereof, or for the failure of operations thereof, or for repairs, service, or adjustment thereto, or for any interruption of service or loss of use thereof or for any loss of business or any other damages whatsoever and howsoever caused.

(c)    Each party hereby represents and warrants that it has the right, power and authority to enter into this Agreement, to become a party hereto and to perform its obligations hereunder. This Agreement is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law). Notwithstanding, if Seller is unable to obtain Bankruptcy Court approval to sell the Used Equipment, Seller shall not be bound by this Agreement.

### 5. Indemnity and Release.

(a)    Buyer assumes liability for, and hereby agrees to indemnify, defend and hold harmless Seller, its successors, assigns, parent, subsidiary and affiliated companies, and the agents, employees, officers, directors of each of the foregoing (the "Released Parties"), from

2

and against any and all liabilities, obligations, losses, damages, claims, demands, actions, costs and expenses (including attorney's fees and costs, whether or not suit is brought and at trial and all levels of appeal, and in any insolvency, bankruptcy or similar proceeding), of whatsoever kind and nature arising out of the disassembly, removal, use, condition (including, but not limited to, latent and other defects and whether or not discoverable by Buyer or Seller), operation, transportation, ownership, selection, delivery, installation, or use and subsequent disposition of the Used Equipment after the sale to Buyer hereunder.

(b)    It is agreed that this indemnity shall apply notwithstanding the joint, concurring or contributory fault or negligence of Seller and further notwithstanding any theory of law including, but not limited to, a characterization of Seller's joint, concurring or contributory fault or negligence as either passive or active in nature. With respect to the Released Parties' rights pursuant to this Indemnity, Buyer expressly waives all statutory defenses, including, but not limited to those under workers' compensation, contribution, comparative fault or similar statutes that are inconsistent with or would defeat the purpose of this Indemnity.

(c)    Buyer hereby fully and forever releases and discharges and covenants not to sue the Released Parties from any and all claims, demands, damages, rights of action, or causes of action, present or future, whether the same be known or unknown, anticipated or unanticipated, resulting from or arising out of the Used Equipment after the date of receipt by Buyer. This Release is intended to be as broad and inclusive as permitted by law, and if any portion thereof is held invalid, the balance shall continue in full legal force and effect. This Release shall be binding on Buyer's heirs, executors, administrators, successors and assigns. Buyer also agrees and acknowledges that the release contained in this Section 5 applies to all unknown and unanticipated injuries and/or damages (as well as those now disclosed). Section 1542 of the California Civil Code provides: A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his/her favor at the time of executing the release, and that, if known by him/her, would have materially affected his/her settlement with the debtor or released party. By signing this Agreement, Buyer waives the provisions of Section 1542 and any similar state provisions.

(d)    The Released Parties shall give Buyer prompt notice of any Claim brought against any of them coming within the purview of these indemnities. Within five (5) business days after receipt of such notice, the Buyer shall undertake the defense of each such Claim with counsel satisfactory to and approved by the Released Party. If the Buyer fails to undertake and sustain the defense of any Claim in the manner required by this Section 5, the Released Party may engage separate counsel, pay, settle or otherwise finally resolve such Claim for the account and at the risk and expense of the Buyer. Any payment, settlement or final resolution otherwise by the Released Party shall release the Buyer from liability for such Claim. If the Buyer undertakes the defense of a Claim in the manner required by this Section 5, the Released Party may, at its own expense, engage separate counsel and participate in the defense of any Claim brought against it.

**6. Insurance**.

Buyer hereby agrees to furnish and maintain at Buyer's own cost and expense, insurance policies underwritten by good and solvent insurance companies, acceptable to Seller providing coverage for the following:

(1) The legal liability of Buyer (and any subcontractor engaged by Buyer to perform under this Agreement) to pay claims because of damage to property and for injuries to or death of any person or persons for occurrences arising out of the use, handling, delivery, removal,

transportation, disassembly, installation, operation or condition of the Used Equipment (including automobile exposure). Said insurance to be written with a limit of not less than Two Million Dollars ($2,000,000) for any one occurrence. Coverage shall be included for broad form property damage liability.

(2) The legal liability of Buyer (and any subcontractor engaged by Buyer to perform under this Agreement) under the Workers' Compensation Act of any state, and under any other Employee Benefit Statute or similar law to pay claims for bodily injuries, including death and disease sustained by its employees. Employers' Liability coverage shall be included with a limit of liability of not less than One Million Dollars ($1,000,000).

(3) The contractual liability assumed by Buyer in Section 5 hereof; said insurance to be written with limits of not less than those specified in sub-paragraphs (1) and (2) above. All policies shall be written so that Seller will be notified of cancellation or of any restrictive amendment to the policies at least thirty (30) days prior to the effective date of such cancellation or amendment. Notice shall be by certified mail, return receipt requested, addressed to Seller at the address set forth above.

7. **Removal of Seller Logos**. Promptly upon removal of the Used Equipment from Seller's facilities, Buyer shall remove from the Used Equipment any and all symbols, designs, figures, trademarks, trade names, service marks, logos or any other matter owned, developed or created by Seller, its subsidiary or affiliated companies.

8. **Complete Agreement; Benefits**. This Agreement constitutes the final, complete and exclusive understanding between the parties with respect to its subject matter and supersedes all prior or contemporaneous agreements in regard thereto. The parties have not relied upon any promises, warranties or undertakings other than those expressly set forth in this Agreement. Nothing in this Agreement shall give any person other than the parties to this Agreement or their respective successors or assigns any legal or equitable right, remedy or claim under this Agreement except that the Released Parties specified in Section 5 may enforce their rights thereunder.

9. **Amendment**. This Agreement cannot be amended or waived except by an agreement in writing signed by authorized representatives of both parties and specifically referring to this Agreement.

10. **Waiver**. The failure of either party to object to or to take affirmative action with respect to any conduct of the other party which is in violation of the terms hereof shall not be construed as a waiver thereof, nor of any subsequent breach or wrongful conduct. The rights and remedies set forth herein are intended to be cumulative, and the exercise of any right or remedy by either party shall not preclude or waive its exercise of any other rights or remedies hereunder or pursuant to law or equity.

11. **Section Headings**. The section headings set forth herein are for convenience only and do not constitute a substantive part of this Agreement.

12. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

13. **Severability**. If any provision of this Agreement is deemed to be invalid or unenforceable

by any court of competent jurisdiction, then the balance of this Agreement shall remain enforceable, and such invalid or unenforceable provision shall be enforced by such court to the maximum possible extent. If Seller is unable to obtain Bankruptcy Court approval to sell the Used Equipment, Seller shall not be bound by this Agreement and it shall be deemed terminated.

**14.  Successors and Assigns**. Neither party shall assign its rights and/or obligations or delegate its duties under this Agreement without the prior written approval of the other party and any attempted assignment or delegation without such approval shall be null and void and constitute a material breach. This Agreement and all of the terms and provisions hereof will be binding upon, and will inure to the benefit of, the parties hereto, and their respective successors and approved assigns.

**15.  Survival**. The provisions of Sections 4 and 5 shall survive the closing of the sale contemplated hereby and shall be deemed incorporated in the bill of sale.

**16.  Governing Law**. This Agreement is made in the State of California and shall be governed by the substantive provisions of California law. The parties agree that any legal action or proceeding with respect to this Agreement shall be brought in any court of general jurisdiction in Orange County, California. Buyer consents to the personal jurisdiction of such courts, agrees to accept service of process by certified or registered mail and hereby waives any jurisdictional or venue defenses otherwise available to it.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized representatives on the date first set forth above.

Karsten Tortilla Factory, LLC,
a New Mexico limited liability company

By_____
Name: _____
Title: _____

Naturasol S.A.de C.V.

By _08/09/23_
Name: _Ulises Vigil_
Title: _COO._

## EXHIBIT A

DESCRIPTION OF USED EQUIPMENT:

Exhibit A - Description of Used Equipment

## TORTILLA CHIP LINE, 2500 LB/HR

| ITEM | DESCRIPTION |
|------|-------------|
| 100 | CORN FLOUR DELIVERY SYSTEM |
| 300 | MASA MIXING TRANSFER |
| 400 | TORTILLA CHIP SHEETING & BAKING |
| 450 | SYSTEM CONTROLS |
| 500 | TORTILLA CHIP FRYER SYSTEM |
| 600 | SEASONING & PACKAGING SYSTEM |

## TORTILLA CHIP LINE, 2500 LB/HR

| ITEM | QTY | DESCRIPTION |
|------|-----|-------------|
| 100 | | **CORN FLOUR DELIVERY SYSTEM** |
| 100 | 2 | SINGLE TOTE SUPERSACK UNLOADER |
| 101 | 1 | BAG BREAK STATION |
| 102 | 1 | BP-50150 BLOWER UNIT - TUBING & COMPONENTS |
| 103 | 1 | CORN FLOUR SCALE SYSTEM PACKAGE |
| 103A | 1 | SCALE SUPPORT STRUCTURE |
| 104 | 1 | CORN FLOUR DELIVERY CONTROL CENTER- HMI |
| | | |
| 300 | | **MASA MIXING TRANSFER** |
| 300 | 1 | JCF SIGMA BLADE MASA MIXER - 1000 LB +WM |
| 301 | 1 | MIXER AUTO CONTROL OPTION REMOTE I/O |
| 302 | 1 | PRE SHEETER HOPPER GAURD - AUTO OPTION |
| 303 | 1 | PRE-SHEETER, 10" DIA X 47" WIDE ROLLERS |
| 304 | 1 | PRE SHEETER/MIXER SUPPORT STAND -WRAP AROUND |
| 305 | 1 | PRE SHEETER ACCESS ATTACHMENT |
| | | |
| 400 | | **TORTILLA CHIP SHEETING & BAKING** |
| 404 | 1 | SHEETER, 12" DIA. X 48" WIDE ROLLERS |
| 404B | 1 | SHEETER DISCHARGE CONVEYOR |
| 404C | 1 | CUTTER - Customer to size |
| 405 | 1 | BAKING OVEN, 20' LONG X 50" WIDE CHIP OVEN - INFRA-RED BURNERS |
| 406 | 2 | OVEN EXHAUST SYSTEM, DUAL STACK - Exhaust stack from oven to roof - By Customer - Fan Controls Integration Included |
| 407 | 1 | Z TRANSFER CONVEYOR |
| 408 | 1 | EQUILIBRATING CONVEYOR |
| 409 | 1 | FRYER INFEED/REVERSING CONVEYOR |

**TORTILLA CHIP LINE, 2500 LB/HR**

| 450 | SYSTEM CONTROLS | |
|-----|----|----|
| 450 | 1 | MCC 3 - CONTROL CENTER |
| 451 | 1 | REMOTE PEDESTAL MOUNTED CONTROL PANEL |
| 452 | 1 | AC - E-BOX AIR CONDITIONING UNIT |
| 453 | 1 | MCC-4 - FRYER CONTROL CENTER -HMI |
| 454 | 1 | AC - E-BOX AIR CONDITIONING UNIT |

| 500 | TORTILLA CHIP FRYER SYSTEM | |
|-----|----|----|
| 507 | 1 | TORTILLA CHIP FRYER, 2500 LBS/HR |
| 507A | 1 | QUICKDRAFT FRYER EXHAUSTER & GREASE DEMIST |
| 508 | 1 | HEAT EXCHANGER - 3.0 MBTU |
| 509 | 1 | FRYER COMPONENT SKID, HX-3000 |
| 510 | 1 | PIPING & VALVES |
| 511 | 1 | FORCED AIR COOLER |

| 600 | SEASONING & PACKAGING SYSTEM | |
|-----|----|----|
| 600 | 1 | TRANSFER CONVEY & SEASONING SYSTEM - Dry Seasoning Applicator Single drum |
| 601 | 1 | TRANSFER & DISTRIBUTION CONVEYOR SYSTEM |
| 602 | 1 | 2 -14 HEAD SCALES, 2 BAGGERS, 2METAL DETECTORS, 2 CODE PRINTER |
| 603 | 1 | SYSTEM CONTROLS |
| 604 | 1 | INTEGRATION PACKAGE |
| 605 | 1 | DUAL SCALE PLATFORM W ACCESS STAIRS |

Supplemental Equipment

Additional (4) Bagger Systems and associated components

Six (6) position deck with stainless support legs

- 6 bag BPA collector
- 1 Scale Douglas washer
- 1 fire suppression water system
- 1 compacting machine
- Kit of various spare parts
- 6 IPG tape machines
- 21 tubes for Ishidas

**EXHIBIT B**
WIRE INSTRUCTIONS


[To Be Provided by Seller prior to execution of this Agreement]

**EXHIBIT C**
BILL OF SALE

IN CONSIDERATION OF the receipt of the sum of Five Million Seven Hundred and Fifty Thousand US Dollars and 00/100 Cents ($5,750,000.00) in hand paid, and for other good and valuable consideration, Tattooed Chef, Inc., a Delaware corporation ("Seller"), does hereby sell, assign, transfer and convey absolutely to Naturasol S.A. de C.V. ("Buyer"), free and clear of all liens and encumbrances, all right, title and interest in and to the used equipment ("Used Equipment") as set forth on Exhibit A, attached hereto, and other appurtenant rights relating thereto. The Used Equipment is sold "As Is", "Where Is" with all faults and defects, both latent and patent. Seller EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INLCUDING WITHOUT LIMITATION WITH RESPECT TO SUITABILITY, DURABILITY, FITNESS FOR USE AND MERCHANTABILITY OF ANY OF THE USED EQUIPMENT, FOR THE PURPOSES AND USES OF BUYER OR OTHERWISE. Seller is the lawful owner of the Used Equipment and title to the Used Equipment is transferred to Buyer.

Dated this 9th day August, 2023

Karsten Tortilla Factory, LLC,
a New Mexico limited liability company

By_____
Name: _____
Title: _____

Naturasol S.A. de C.V.,

By _____8/09/23_____
Name: _Ulises Vigil___
Title: ___COO_____

Please send original signed contract, Resale Certificate, and Insurance documents to the following address:

Tattooed Chef, Inc., 6305 Alondra Blvd., Paramount, CA 90723

CONTRACT COMPLETION CHECKLIST

____✓____Yes _____No : Contract is Signed by an authorized representative

____✓____Yes _____No : Each page of the Contract has been initialed

____✓____Yes _____N/A : Resale Certificate NOTE: If your company does not have a Tax Exempt Certificate, then the appropriate tax value will be added to the agreement.

____✓____Yes _____N/A : Insurance Certificate attached (In certain cases, Seller can waive the insurance requirement.)

[Exhibit C to sales agreement for used equipment]

# EXHIBIT "2"



**Telos Legal Corp.**

*A company that cares*

Name :                          **Tattooed Chef Inc.**

Service :                       **UCC/FTL - Certified**

Jurisdiction :                  **US - DE - Secretary of State**

Thru Date:                      **06/07/2023**

Results :

              **1 Financing Statement(s)**

              **0 Federal Tax Lien(s)**

Reasonable care is exercised in the completion of all requests, however, as the responsibility for the accuracy
of the public records rests with the filing officer, we accept no liability for the report contained herein.

# Delaware

*Page 1*

### The First State

CERTIFICATE

SEARCHED JUNE 20, 2023 AT 4:48 P.M.
FOR DEBTOR, TATTOOED CHEF, INC.

1 OF 1           FINANCING STATEMENT                 20230992627

           EXPIRATION DATE: 02/07/2028
DEBTOR:       TATTOOED CHEF, INC.

              251 LITTLE FALLS DRIVE              ADDED    02-07-23

              WILMINGTON, DE US 19808

SECURED:      J. C. FORD COMPANY

              901 LESLIE STREET                  ADDED    02-07-23

              LA HABRA, CA US 90631


                    F I L I N G   H I S T O R Y

   20230992627    FILED 02-07-23    AT 2:52 P.M.    FINANCING STATEMENT


          E N D   O F   F I L I N G   H I S T O R Y

   THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE
LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS,
LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY
INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, TATTOOED
CHEF, INC. AS OF JUNE 7, 2023 AT 11:59 P.M.



Jeffrey W. Bullock, Secretary of State

20249496447-UCC11                                Authentication: 203584701
SR# 20232805841                                  Date: 06-20-23
You may verify this certificate online at corp.delaware.gov/authver.shtml

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|

| B. E-MAIL CONTACT AT FILER (optional) |
|---|

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Ferguson Braswell Fraser Kubasta PC
2500 Dallas Parkway, Suite 600
Plano, TX 75093
Attn: Benjamin Halpern, Esq.**

**Delaware Department of State
U.C.C. Filing Section
Filed: 02:52 PM 02/07/2023
U.C.C. Initial Filing No: 2023 0992627**

**Service Request No:   20230410706**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Tattooed Chef, Inc.** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **251 Little Falls Drive** | **Wilmington** | **DE** | **19808** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **J. C. Ford Company** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **901 Leslie Street** | **La Habra** | **CA** | **90631** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**Equipment listed in Proposal 21-056D as set forth on Exhibit "A" attached hereto.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**SOS - Delaware**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

EXHIBIT "A"

# JC FORD

## EQUIPMENT PROPOSAL SUMMARY
## TORTILLA CHIP LINE, 2500 LB/HR

SINCE 945

| ITEM | QTY | DESCRIPTION |
|------|-----|-------------|
| **100** | | **CORN FLOUR DELIVERY SYSTEM** |
| 100 | 2 | SINGLE TOTE SUPERSACK UNLOADER |
| 101 | 1 | BAG BREAK STATION |
| 102 | 1 | BP-50150 BLOWER UNIT - TUBING & COMPONENTS |
| 103 | 1 | CORN FLOUR SCALE SYSTEM PACKAGE |
| 103A | 1 | SCALE SUPPORT STRUCTURE |
| 104 | 1 | CORN FLOUR DELIVERY CONTROL CENTER- HMI |
| | | **100 TOTAL** |
| **300** | | **MASA MIXING TRANSFER** |
| 300 | 1 | JCF SIGMA BLADE MASA MIXER - 1000 LB +WM |
| 301 | 1 | MIXER AUTO CONTROL OPTION REMOTE I/O |
| 302 | 1 | PRE SHEETER HOPPER GAURD - AUTO OPTION |
| 303 | 1 | PRE-SHEETER, 10" DIA X 47" WIDE ROLLERS |
| 304 | 1 | PRE SHEETER/MIXER SUPPORT STAND -WRAP AROUND |
| 305 | 1 | PRE SHEETER ACCESS ATTACHMENT |
| | | **300 TOTAL** |
| **400** | | **TORTILLA CHIP SHEETING & BAKING** |
| 404 | 1 | SHEETER, 12" DIA. X 48" WIDE ROLLERS |
| 404B | 1 | SHEETER DISCHARGE CONVEYOR |
| 404C | 1 | CUTTER - Customer to size |
| 405 | 1 | BAKING OVEN, 20' LONG X 50" WIDE CHIP OVEN - INFRA-RED BURNERS |
| 406 | 2 | OVEN EXHAUST SYSTEM, DUAL STACK - Exhaust stack from oven to roof - By Customer - Fan Controls Integration Included |
| 407 | 1 | Z TRANSFER CONVEYOR |
| 408 | 1 | EQUILIBRATING CONVEYOR |
| 409 | 1 | FRYER INFEED/REVERSING CONVEYOR |
| | | **400 TOTAL** |

## EQUIPMENT PROPOSAL SUMMARY
## TORTILLA CHIP LINE, 2500 LB/HR

| 450 | SYSTEM CONTROLS | |
|---|---|---|
| 450 | 1 | MCC 3 - CONTROL CENTER |
| 451 | 1 | REMOTE PEDESTAL MOUNTED CONTROL PANEL |
| 452 | 1 | AC - E-BOX AIR CONDITIONING UNIT |
| 453 | 1 | MCC-4 - FRYER CONTROL CENTER -HMI |
| 454 | 1 | AC - E-BOX AIR CONDITIONING UNIT |
| | | 450 TOTAL |

| 500 | TORTILLA CHIP FRYER SYSTEM | |
|---|---|---|
| 507 | 1 | TORTILLA CHIP FRYER, 2500 LBS/HR |
| 507A | 1 | QUICKDRAFT FRYER EXHAUSTER & GREASE DEMIST |
| 508 | 1 | HEAT EXCHANGER - 3.0 MBTU |
| 509 | 1 | FRYER COMPONENT SKID, HX-3000 |
| 510 | 1 | PIPING & VALVES |
| 511 | 1 | FORCED AIR COOLER |
| | | 500 TOTAL |

| 600 | SEASONING & PACKAGING SYSTEM | |
|---|---|---|
| 600 | 1 | TRANSFER CONVEY & SEASONING SYSTEM - Dry Seasoning Applicator Single drum |
| 601 | 1 | TRANSFER & DISTRIBUTION CONVEYOR SYSTEM |
| 602 | 1 | 2 -14 HEAD SCALES, 2 BAGGERS, 2METAL DETECTORS, 2 CODE PRINTER |
| 603 | 1 | SYSTEM CONTROLS |
| 604 | 1 | INTEGRATION PACKAGE |
| 605 | 1 | DUAL SCALE PLATFORM W ACCESS STAIRS |
| | | 600 TOTAL |

| Item # | Action | Description (including contract item identification) |
|--------|--------|-----------------------------------------------------|
| 1 | ADD | DASHBOARD MONITORING SYSTEM<br> - EWON FLEXI - ETHERNET CONNECTION<br> - OVEN GAS FLOW METER<br> - FRYER GAS FLOW METER<br> - FRYER OIL FLOW METER  - 3 MOISTURE METER NDC |

# EXHIBIT "3"

# Delaware

*Page 1*

## The First State

CERTIFICATE

SEARCHED JULY 25, 2023 AT 12:24 P.M.
FOR DEBTOR, TATTOOED CHEF, INC.

1 OF 2            FINANCING STATEMENT              20230992627

        EXPIRATION DATE: 02/07/2028
DEBTOR:       TATTOOED CHEF, INC.

        251 LITTLE FALLS DRIVE              ADDED    02-07-23

        WILMINGTON, DE US 19808

SECURED:      J. C. FORD COMPANY

        901 LESLIE STREET                  ADDED    02-07-23

        LA HABRA, CA US 90631


        F I L I N G   H I S T O R Y

    20230992627    FILED 02-07-23    AT 2:52 P.M.    FINANCING STATEMENT


    2 OF 2            FINANCING STATEMENT              20234935523

        EXPIRATION DATE: 07/17/2028
DEBTOR:       TTCF-NM HOLDINGS, INC.

        6305 ALONDRA BLVD.                 ADDED    07-17-23

        PARAMOUNT, CA US 90723



Jeffrey W. Bullock, Secretary of State

20250395798-UCC11                                   Authentication: 203818512
SR# 20233075376                                     Date: 07-25-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

# Delaware

*Page 2*

## The First State

DEBTOR:        TATTOOED CHEF, INC.

     6305 ALONDRA BLVD.      ADDED    07-17-23

     PARAMOUNT, CA US 90723

SECURED:       UMB BANK, N.A.

     333 S. GRAND AVE., SUITE 2200  ADDED    07-17-23

     LOS ANGELES, CA US 90071


**F I L I N G   H I S T O R Y**

20234935523    FILED 07-17-23   AT 4:16 P.M.   FINANCING STATEMENT


**E N D   O F   F I L I N G   H I S T O R Y**

THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS, LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, TATTOOED CHEF, INC. AS OF JULY 17, 2023 AT 11:59 P.M.



Jeffrey W. Bullock, Secretary of State

20250395798-UCC11            Authentication: 203818512
SR# 20233075376              Date: 07-25-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **DEBTOR'S MOTION FOR ENTRY OF AN ORDER (1) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF TCI'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (2) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULE 6004(h); AND (3) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 16, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Mark A Amendola    mamendola@martynlawfirm.com**
- **Todd M Arnold    tma@lnbyg.com**
- **Marshall J August    maugust@frandzel.com, rsantamaria@frandzel.com**
- **Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com;ccripe@polsinelli.com;ladocketing@polsinelli.com**
- **Michael Jay Berger    michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com**
- **Daren Brinkman    firm@brinkmanlaw.com, 7764052420@filings.docketbird.com**
- **Robert Carrasco    rmc@lnbyg.com**
- **Abram Feuerstein    abram.s.feuerstein@usdoj.gov**
- **John-Patrick M Fritz    jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com**
- **Michael I. Gottfried    mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com**
- **Everett L Green    everett.l.green@usdoj.gov**
- **David S Hagen    davidhagenlaw@gmail.com**
- **Mark S Horoupian    mark.horoupian@gmlaw.com, mhoroupian@ecf.courtdrive.com;cheryl.caldwell@gmlaw.com;karen.files@gmlaw.com**
- **K Kenneth Kotler    kotler@kenkotler.com, linda@kenkotler.com**
- **Jeffrey A Krieger    jkrieger@ggfirm.com, kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com**
- **Aaron J Malo    amalo@sheppardmullin.com, clopez@sheppardmullin.com;abilly@sheppardmullin.com**
- **Ron Maroko    ron.maroko@usdoj.gov**
- **Kyle J Mathews    kmathews@sheppardmullin.com**
- **David W. Meadows    david@davidwmeadowslaw.com**
- **Angela Z Miller    amiller@phillipslytle.com, styrone@phillipslytle.com**
- **John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com;derry.kalve@dentons.com**
- **Tania M Moyron    tania.moyron@dentons.com, rebecca.wicks@dentons.com;kathryn.howard@dentons.com;derry.kalve@dentons.com;glenda.spratt@dentons.com;DOCKET.GENERAL.LIT.LOS@dentons.com**
- **Alan I Nahmias    anahmias@mbn.law, jdale@mbn.law**
- **David L. Neale    dln@lnbyg.com**
- **Matthew D. Resnik    Matt@rhmfirm.com, roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com**
- **Edward Rubacha    er@jhkmlaw.com, docket@jhc.law;am@jhc.law**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                         **F 9013-3.1.PROOF.SERVICE**

- **Paul R Shankman    PShankman@fortislaw.com, info@fortislaw.com**
- **Amit Kumar Sharma    amit.sharma@aisinfo.com**
- **David Samuel Shevitz    david@shevitzlawfirm.com,
  shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com**
- **Ronald P Slates    rslates2@rslateslaw.com,
  scannavan@rslateslaw.com;slatesecf@rslateslaw.com**
- **Lindsey L Smith    lls@lnbyg.com, lls@ecf.inforuptcy.com**
- **Randy S Snyder    rsnyder@rsslegal.com**
- **Alan G Tippie    Alan.Tippie@gmlaw.com,
  atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Glenn S Walter    gwalter@honigman.com**
- **Roye Zur    rzur@elkinskalt.com,
  cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com**

**2. SERVED BY UNITED STATES MAIL**: On **August 16, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

In re itella International LLC
Case No. 10097
RSN
Served by U.S. Mail or **NEF** if marked
with an *

| | |
|---|---|
| Attn: BMW Financial Services NA, LLC Department /AIS Portfolio Services, LLC / Amit Sharma **(NEF)*** 4515 N Santa Fe Ave. Dept. APS Oklahoma City, OK 73118 | SUITABLE STAFFING SOLUTIONS, INC. c/o Frandzel Robins Bloom & Csato, L.C. Attn: Marshall J. August **(NEF)*** 1000 Wilshire Boulevard, 19th Floor Los Angeles, California, 90017-2427 |
| Edward Rubacha **(NEF)*** Jennings Haug Keleher McLeod, L.L.P. 2800 N. Central Avenue, Suite 1800 Phoenix, AZ 85004-1049 | SKILLSET GROUP LLC c/o Law Offices of K. Kenneth Kotler Attention: K. Kenneth Kotler **(NEF)*** 1901 Avenue of the Stars, Suite 1100 Los Angeles, CA 90067 |
| Secured Creditor JC Ford 901 LESLIE STREET LA HABRA, CA 90631 | Buyer Naturasol, a Sociedad Anónima de Capital Variable Circunvalaciónponiente 9a Naucalpande Juarez Mexico |

☐ *Additional service per Proof of Service to be filed by Stretto*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 16, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

**SERVED BY PERSONAL DELIVERY**

1  Honorable Sandra R. Klein
   United States Bankruptcy Court
2  255 E. Temple Street, Suite 1582
   Courtroom 1575
3  Los Angeles, CA 90012

4  I declare under penalty of perjury under the laws of the United States of America that the foregoing is
   true and correct.
5

   August 16, 2023          Lourdes Cruz                    /s/ Lourdes Cruz
6  Date                      Type Name                       Signature

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                          **F 9013-3.1.PROOF.SERVICE**